## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

JOHN TURNER, et al.         :

     v.               :       CIVIL ACTION NO. 04-936-JJF

                          :

B.V. SHIPPING COMPANY      :

LUZON STRAIT (GRONINGEN)   :

## BRIEF IN SUPPORT OF DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Date: July 29, 2005

PALMER BIEZUP & HENDERSON LLP
Michael B. McCauley (ID 2416)
1223 Foulk Road
Wilmington, DE 19803
(302) 594-0895
(302) 478-7625 (fax)
Attorneys for Defendant,
B.V. Shipping Company Luzon Strait
(Groningen)

**D.I. 41**
**Filed July 29, 2005**

PBH: 177310.1

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................... i - ii

NATURE AND STAGE OF PROCEEDING ....................................... 2

SUMMARY OF ARGUMENT ................................................ 2

FACTS .............................................................. 3

ARGUMENT .......................................................... 11

    I.      STANDARD FOR SUMMARY JUDGMENT ........................ 11

    II.    THE LIMITED DUTIES OWED BY A VESSEL TO A
           LONGSHOREMAN UNDER *SCINDIA* AND *HOWLETT* ............. 13

    III.   AS A MATTER OF LAW, DEFENDANT BREACHED NONE
           OF THE LEGAL DUTIES OWED TO PLAINTIFF ................... 17

          A.     As a Matter of Law, a Vessel Cannot be Held Liable Under
                § 905(b) of the LHWCA for Alleged Defects in the Vessel's
                Structural Design .......................................... 18

          B.     Plaintiff Cannot Recover Under the Turnover Duty Because
                There is No Evidence of Vessel Negligence ..................... 24

          C.     The Active Operations Duty Cannot Apply .................... 34

          D.     The Duty to Intervene Cannot Apply ......................... 38

CONCLUSION ......................................................... 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406 (E.D.N.Y. 2004) ............ 19, 20, 23, 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............... 12

*Biggs v. Logicon, Inc.*, 663 F.2d 52 (8th Cir. 1981) ................. 18

*Bilderbeck v. World Wide Shipping Agency*, 776 F.2d 817 (9th Cir. 1985) ......... 18, 20

*Bjaranson v. Botelho Shipping Corp. Manila*, 873 F.2d 1204 (9th Cir. 1989) ......... 31, 32, 37, 40

*Breaux v. United States*, 1996 WL 16318 (E.D. La. Oct. 23, 1996) ........................... 36

*Celestine v. Lykes Bros. S.S. Co.*, 729 F. Supp. 691 (N.D. Cal. 1989) ...................... 27

*Celotex Corp v. Catrett*, 477 U.S. 317 (1986) ................... 11, 12

*Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532 (3d Cir. 1994) ................ 37

*Davis v. United States*, 827 F. Supp. 1576 (S.D. Ga. 1993) ........................... 19, 21-23

*DeLange v. Dutra Construction, Co.*, 183 F.3d 916 (9th Cir. 1998) ......................... 29

*Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490 (3d Cir. 1987) .......................... 14, 15, 31

*Harrington & Co. v. United States Lines, Inc.*, 587 F. Supp. 239 (M.D. Fla. 1984) ............ 33, 39

*Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92 (1994) .............................. 10-11, 14-16, 31, 33, 35, 38-39

*Htut v. Toko Kaiun Kaisha, Ltd.*, 1992 A.M.C. 766 (N.D. Cal. 1991) ........................ 19

*Jackson v. Egyptian Navigation Company*, 364 F.3d 113 (3d Cir. 2004) .................. 13

*Kirsch v. Plovidba*, 971 F.2d 1026 (3d Cir. 1992) ....................... 31

*Landsem v. Isuzu Motors, Ltd*, 534 F. Supp. 448 (D. Or. 1982), *aff'd without opinion*, 711 F. 2d 1064 (9th Cir. 1983) ........................ 27

*Manning v. Mars, Ltd.*, No. 85-1271, 1987 U.S. Dist. LEXIS 1777 (E.D. Pa. 1986) ................ 29

*Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31 (5th Cir. 1997) ...................... 36

PBH: 177310.toa

i

*Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740 (2 Cir. 1984) .......................................... 21

*Matthews v. Lykes Bros. S.S. Co., Inc.*, 1987 WL 16506 (C.D. Cal. Feb. 26, 1987)
    *aff'd* 854 F. 2d 1166 (9th Cir. 1988)......................................................................... 20

*McCourt v. Mitsui O.S.K. Lines Am.*, 921 F. Supp. 1315 (D.N.J. 1996) ..................................... 32

*McMullen v. Guise Shipping Co.*, 1992 U.S. Dist. LEXIS 6471 (E.D. Pa. 1992) ...................... 29

*McSwiggin v. Oulu Shipping Ltd.*, 1992 U.S. Dist. LEXIS 4959,
    1992 WL 70416 (E.D. Pa. Mar. 31, 1992)
    *aff'd*, 980 F.2d 723 (3d Cir. 1992) ................................................. 19-20, 22-23, 33

*Mitchell v. Sea-Land Services, Inc.*, 1987 AMC 1698,
    1987 U.S. Dist. LEXIS 15067 (D. Md. 1987) ....................................................... 19

*Quevedo v. Trans-Pacific Shipping Inc.*, 1997 U.S. Dist. LEXIS 4745 (N.D. Cal. 1997) ......... 36

*Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp*, 330 U.S. 124 (1956) ...................................... 27

*Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443 (N.D. Cal. 1989) .................. 19, 20, 21, 23

*Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981) .................. 4, 10-11, 13-16
    24, 27-28,
    33-34, 38-39

*Serbin v. Bora Corp.*, 96 F.3d 66 (3d Cir. 1996) ........................................................................ 37

*Sinagra v. Atlantic Ocean Shipping, Ltd.*, 182 F. Supp. 2d 294 (E.D.N.Y. 2001) ...................... 36

*Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161 (5th Cir. 1990) .......................... 36

*Vadas v. J. Lauritzen Holdings*, 2000 U.S. Dist. LEXIS 200054,
    2001 AMC 498 (D. Conn. 2000) ........................................................................... 36

*Vadas v. J. Lauritzen Holdings*, 2000 U.S. Dist. LEXIS 20054,
    2001 AMC 498 (D. Conn. 2000) ........................................................................... 29

*Venturelli v. Cincinnati, Inc.*, 850 F.2d 825 (1st Cir. 1988) ....................................................... 21

*Wells v. Flota Bananera Equatoriana, S.A.*, 1985 U.S. Dist. LEXIS 18452 (S.D.N.Y. 1985) .. 29

*Whitfield v. Craigwin Co.*, 727 F. Supp. 183 (E.D. Pa. 1989) .................................................... 39

PBH: 177310.toa

*Wilhelm v. Associated Container Transportation*, 648 F.2d 1197 (9th Cir. 1981) ..................... 18

*Woodward v. Logistec Ltd.*, 164 F. Supp. 2d 941 (N.D. Ohio 2001) ............................ 32, 34, 39

*Wright v. Daviesyndicate, Inc.*, 1993 U.S. Dist. LEXIS 8739 (E.D. Pa. 1993) ......................... 29

*Wright v. Gulf Coast Dockside*, 1998 U.S. Dist. LEXIS 9519,
   1998 AMC 2460 (E.D. La. 1998) ....................................................................... 37

*Wright v. Gulf Coast Dockside, Inc.*, 1998 U.S. Dist. LEXIS 9519,
   1998 AMC 2460 (E.D. La. 1998) ....................................................................... 36

*Yates v. Navigation Maritime Bulgare Ltd.*,
   2000 U.S. Dist. LEXIS 11229 (E.D. Pa. 2000) ............................................... 28, 35

## FEDERAL STATUTES

33 U.S.C. § 905(b) ................................................................................... 2, 4, 10, 18, 13

33 U.S.C. § 941 ................................................................................................. 15, 31

## FEDERAL REGULATIONS

29 C.F.R. § 1918.1 ..................................................................................... 11, 15, 27, 31

29 C.F.R § 1918.24 ..................................................................................... 11, 26, 30, 31

## FEDERAL RULES

Fed. R. Civ. P. 56 ............................................................................................... 11-12

For the reasons that follow, Defendant B.V. Shipping Company Luzon Strait (Groningen) (hereafter "BV Shipping" or "shipowner"), respectfully submits that this Honorable Court should enter summary judgment in defendant's favor and dismiss Plaintiffs' Second Amended Complaint (D.I. 29) pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## NATURE AND STAGE OF PROCEEDING

Plaintiff longshoreman John Turner claims he was injured on November 8, 2002, at approximately 2:45 PM, when he pulled an access cover on top of himself as he was climbing up a fixed vertical ladder to get from compartment 2D to 2C aboard the M/V LUZON STRAIT. (Ex. 1, DRS Accident Report; Ex. 2, Plaintiff Deposition pp. 82-85). He seeks recovery against BV Shipping, the owners of the LUZON STRAIT, for negligence under the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 905(b).

## SUMMARY OF ARGUMENT

1.      Plaintiffs' claim under 33 U.S.C. § 905(b), to the extent it is based on alleged design defects in the access cover and securing device, constitutes an unseaworthiness claim and is barred by the 1972 Amendments to the LHWCA.

2.      There is a complete failure of proof of shipowner negligence with respect to Plaintiff's other breach of turnover duty theory, which is based on the mere allegation that the accident was caused by a latent defect in the securing device without proof of when and how long the alleged condition existed or that the shipowner had any knowledge of the condition prior to the alleged accident.

3.      In the event plaintiff argues alternatively that the alleged defect was somehow obvious to the shipowner, then such condition would have been equally obvious to the

stevedore and the type of condition that the shipowner could have reasonably expected the expert stevedore to observe and alleviate in accordance with the mandatory OSHA regulations.

4.    The active operations duty cannot apply to the instant case as there was no "active" involvement by the ship's crew in the work entrusted to the expert stevedore and no "active" control by the ship's crew over the area of the alleged accident.

5.    The intervention duty cannot apply to this matter as the shipowner had no actual knowledge of any alleged defect or problem with the access cover, securing device, or ladder that developed within the confines of the cargo operation entrusted to the expert stevedore.

## FACTS

Plaintiff Turner was employed by expert stevedore Delaware River Stevedores, Inc. ("DRS"), who were engaged to discharge a cargo of palletized frozen meat from the LUZON STRAIT. (Ex. 3, Plaintiff's Second Amended Complaint; Ex. 2, Pl. Dep. p. 49). Just minutes before the alleged accident, the DRS Stevedore Supervisor, the Plaintiff, and Plaintiff's fellow longshoremen had all used the same access, ladder, and access cover to climb in and out of compartment 2D without incident. (Ex. 2, Pl. Dep. pp. 51-55; Ex. 4, Lasch Dep. pp. 45-46). Turner and his fellow longshoremen had just completed discharging a cargo compartment 2D and were in the process of disembarking the vessel. Plaintiff claims that his accident was somehow caused by a defectively designed securing device for the access cover and a defectively designed access.

Assuming an accident occurred and injuries resulted as alleged, defendant is not liable as a matter of law. The M/V LUZON STRAIT was a brand new ship and was on her maiden voyage, having been launched and delivered to the shipowner just 69 days before the alleged

accident. Plaintiff's claim is not actionable under the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. § 905(b) (1927 as amended 1984) ("LHWCA") because negligent ship design is just another way of alleging that a ship was unseaworthy, a cause of action that was barred by the 1972 Amendments to the LHWCA.[1]  Moreover, Plaintiff cannot prove the negligence of the shipowner, an essential element in a prima facie case under § 905(b).

Briefly, the M/V LUZON STRAIT is a refrigerated cargo vessel owned by defendant BV Shipping.  The LUZON STRAIT was built in the China Shipbuilding Company ("CSBC") shipyard in Keelung, Taiwan for a different owner who, eventually, refused to take delivery of the ship. (Ex.5, Jansen Dep. pp. 103-104).  BV Shipping purchased the vessel from the CSBC shipyard after it was already designed and constructed.  (Ex. 5, Jansen Dep. pp. 103-104).  On August 31, 2002, BV Shipping took delivery of the LUZON STRAIT from the shipyard.  (Ex. 6, Mobach Dep. pp. 26-27).  The voyage during which plaintiff's alleged accident occurred was the ship's very first voyage. (*Id.*)  BV Shipping did not design or construct the M/V LUZON STRAIT.  (Ex. 5, Jansen Dep. pp. 103-104).  The vessel was equipped with a state of the art side loading / discharge cargo handling equipment.  (Ex. 4, Lasch Dep. p. 21; Ex. 20, Photo of sideloading door).  The vessel's four refrigerated cargo holds are located forward of the ship's house / superstructure.  (Ex. 7, Small GA Plan). Plaintiff claims that his alleged accident happened in compartment 2C[2] at the forward access opening which leads to compartment 2D.  (Ex. 1, DRS Rpt.).  During the two weeks leading up to the launching of the M/V LUZON STRAIT, inspectors from the flag state, The Netherlands, inspected the entire vessel, included all accessways and access covers, and

---

[1] *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165 (1981).

[2] Compartments 2C and 2D are bottom two levels within the number 2 cargo hold.

certified the vessel as properly constructed and equipped for sailing. (Ex. 6, Mobach Dep. pp.

148-150). Surveyors from the ship's Classification Society also fully inspected the LUZON

STRAIT in the shipyard and certified that the vessel was in full compliance with all safety

and construction requirements of the Classification Society, Bureau Veritas. (Ex. 8, Borst

Dep. pp. 62-64; Ex. 18, Dutch Flag Inspection Report). The vessel was also audited by

Lloyd's Register and certified as compliant with the International Safety Management (ISM)

Code, which resulted in the issuance of an ISM Safety Management Certificate. (Ex. 19, ISM

Audit and Safety Management Certificate).

The access cover and securing device involved in the alleged accident were part of the

ship's original structure designed and constructed by the shipyard. (Ex. 6, Mobach Dep. pp.

50-51; Ex. 9, Fwd. Access Photo). This access was located at the forward end of

compartment 2C and when opened, provided access to a ladder leading to the compartment

below, 2D. (Ex. 11, Plan showing location of forward access). It consisted of a steel cover

which opened to an approximate angle of slightly more than 90° and rested on a stopper. (Ex.

9, Access Photos). The cover was locked in the open position with a hook and eye securing

device. (Ex. 9, Fwd. Access Photos; Ex. 6, Mobach Dep. pp. 50-51). The hook was attached

to the steel coaming around the opening in the deck and the eye was attached to the top of the

cover. (Ex. 9, Fwd. Access Photos). Located at the aft end of compartment 2C, in the cooler

trunk, was a second access and ladder leading to compartment 2D. (Ex. 10, Aft. Access

Photo; Ex. 21, pp. 1-2, 4-7, Photos of Aft. Door to Cooler Space and Access). The hatch

opening in compartment 2C was located at the forward end of the compartment. (Ex. 11,

Plan).

The maiden voyage which brought the LUZON STRAIT to the port of Wilmington,

Delaware was for the purpose of delivering a cargo of palletized frozen meat loaded in the

port of Townsville, and other Australian ports. (Ex. 6, Mobach Dep. p. 117). The palletized cargo of frozen meat that was carried in compartments 2C and 2D was loaded in Townsville, Australia by an independent Australian stevedoring company. All of the cargo stowed in 2C and 2D was bound for Wilmington, Delaware. (Ex. 4, Lasch Dep. pp. 54-55).

The M/V LUZON STRAIT came alongside the Wilmington Marine Terminal with her starboard side next to the pier at 5:34 AM on November 6, 2002. (Ex. 12, Statement of Facts). Delaware River Stevedores, Inc. ("DRS"), an expert and experienced independent stevedoring company, is the stevedoring company that was engaged to discharge the vessel's cargo of frozen meat. (Ex. 4, Lasch Dep., p. 23). Stevedore DRS commenced discharging the LUZON STRAIT at 0800 on November 6, 2002, and knocked off for the day at 6:00 PM. (Ex. 13, DRS Wk. Rpts.). Discharge operations were continued by stevedore DRS from 7:00 AM to 6:00 PM on November 7. (Ex. 13, DRS Wk. Rpts.). On Friday, November 8, plaintiff's assigned gang, the Joe Jackson gang, was the only DRS gang that worked. (Ex. 2, Pl. Dep. p 47). They started work at 7:00 AM and completed discharge at 3:00 PM. (Ex. 13, DRS Wk. Rpts.). The Jackson gang worked in compartment 3D from 7:00 AM until 10:43 AM, at which time the gang switched to compartment 2D.

Plaintiff John Turner discharged cargo from the M/V LUZON STRAIT the day before the accident, November 7, as a member of the Albert Rice gang. (Ex. 2, Pl. Dep. p. 46). On November 8, Turner worked as a holdman in the Jackson gang, driving a forklift in cargo compartments. (Ex. 2 , Pl. Dep. pp 48-49). Turner, a longshoremen with 20 years of experience, had extensive prior experience as a holdman in climbing up and down ladders and through accesses with covers on them. (Ex. 2, Pl. Dep. pp. 17-18, 41-42).

Plaintiff admitted that he passed through the access in question at the forward end of compartment 2C on three occasions just before the accident without a problem. (Ex. 2, Pl.

Dep. pp. 51-55). Plaintiff recalled that the forward access cover in 2C was always in the open

position. (Ex. 2 , Pl. Dep. pp. 69, 75-78). All three times Plaintiff passed through the access,

11:00 AM, 12:00 Noon, and 2:00 PM, he grabbed onto the open cover to support his weight

as he climbed up and down. (Ex. 2, Pl. Dep. pp. 69, 75-78). Plaintiff's fellow longshoremen

also used the access in question numerous times to get in and out of compartment 2D before

the accident without a problem. (Ex. 2, Lasch Dep. pp. 32-33).

Cliff Lasch was the Stevedoring Ship Supervisor in charge of the discharge of the

M/V LUZON STRAIT for stevedore DRS. (Ex. 4, Lasch Dep. p. 14). On November 8, 2002,

Supervisor Lasch was either aboard the LUZON STRAIT or on the dock next to the vessel as

he "very rarely" left the vessel. (Ex. 4, Lasch Dep. p. 25). It was admitted by Stevedore Ship

Supervisor Lasch that it was his responsibility and the responsibility of other DRS

supervisory personnel to make sure that everything was done safely which included ensuring

that the access lids were open and properly secured in the open position. (Ex.4 , Lasch Dep.

pp. 35-37). Just 40 minutes before Turner's alleged accident, Supervisor Lasch entered and

exited the 2D compartment through the access in question without a problem. Lasch used the

access as a handhold to support his weight and tested the integrity of the securing device by

pulling on it with his weight on the cover. (Ex. 4, Lasch Dep. pp. 45-46). Stevedore Ship

Supervisor Lasch was fully satisfied that the access and cover, as secured in the open

position, was safe for use by his longshoremen. (Ex. 4, Lasch Dep. p. 46). At no time did

Lasch notice that there was any defect or problem with the access, cover, or securing device.

(Ex. 4, Lasch Dep. pp. 45-46). Lasch eventually prepared the "DRS Supervisor's Accident

Investigation" report wherein he provided the following comments on why the alleged

accident occurred: "Seems as though securing pin worked out of the slot. Should be

inspected before entering deck." (Ex. 1, DRS Accident Rpt.). It was admitted by Lasch that

the report does not state that the securing device was broken because no one ever mentioned that it was broken. No one ever advised Lasch that anything was broken; had someone told Lasch that the securing device was broken he would have included that in his Supervisor's Accident Investigation report. (Ex. 4, Lasch Dep. pp. 41-42). Lasch was sure that had the device been broken Turner would have brought that to his attention before he signed the report. (Ex. 4, Lasch Dep. p. 42). It was admitted by plaintiff Turner that the description of his alleged accident set forth in the DRS Supervisor's Accident Investigation report is accurate. (Ex. 2, Pl. Dep. pp.100-101).

On November 8, cargo discharge from compartment 2D was completed by the DRS longshoremen at 2:45 PM. (Ex. 13, DRS Wk. Rpts.). Turner and fellow gang members William Grinnel and Gregory Ringgold were the last gang members in compartment 2D, as they had to load the forklifts and the steel plates onto the pallet tray for removal from the hatch. (Ex. 2, Pl. Dep. pp.79-80). Ringgold went up the same fixed vertical ladder and through the same access they had all used 45 minutes earlier to enter the compartment. According to Ringgold, he did not experience any problems as he climbed up through the access to the 2C level. (Ex. 14, Excerpts, Ringgold Dep. p. 23). Plaintiff confirmed that Ringgold never advised him that there was any problem with the access, cover, or securing device. (Ex. 2, Pl. Dep. p.79). Plaintiff climbed up the ladder and through the forward access leading from 2D to 2C within minutes of Ringgold. (Ex. 2, Pl. Dep. p. 81). Plaintiff claims that when he got to the point on the vertical ladder where his buttocks were through the opening, he was holding onto the open cover to support himself as he had done several times earlier that day. (Ex. 2, Pl. Dep. pp.75-78, 82-85). According to plaintiff, the cover seemed to be holding his weight and it then started to move towards him. He stated that he attempted to push it back because he thought there was a counterweight but it closed on him, causing

him to fall backwards so that his buttocks were sitting on the deck for 2C and his legs were hanging down just below the access opening. (Ex. 2, Pl. Dep. pp. 81-85, 88-89, 119). Following plaintiff's alleged accident, longshoreman Grinnel climbed up the ladder and through the access without the cover falling. (Ex. 15, Excerpts, Grinnel Dep.. p.18). Plaintiff testified that he never inspected or looked at the access cover securing device either before or after the accident and, therefore, had no idea whether the securing device was actually secured at the time of his accident. (Ex. 2, Pl. Dep. pp. 74, 77, 118). Similarly, Stevedore Supervisor Cliff Lasch admitted that he never actually saw the securing device in question. (Ex. 4, Lasch Dep. p. 46). Plaintiff's fellow longshoremen, William Grinnel and Sean Brady, claim that after the alleged accident they observed the hook portion of the securing device to be bent. (Ex. 15, Grinnel Dep. p. 20; Ex. 16, Excerpts Brady Dep. pp. 30-31). Plaintiff was helped up and then climbed out of the various accesses from 2C to the main deck (Ex. 2, Pl. Dep. p. 93).

There were no members of the ship's crew in the No. 2 cargo hold at or near the time of the alleged accident. (Ex. 2, Pl. Dep. p. 117; Ex. 16, Brady Dep. pp. 33-34; Ex. 14 , Ringgold Dep. p. 25; Ex. 15, Grinnel Dep. p. 27). After Turner reported the alleged accident, DRS Stevedore Ship Supervisor Cliff Lasch did not inspect the alleged accident scene nor did he even report the alleged accident to the Officers or crew aboard the LUZON STRAIT. (Ex. 4, Lasch Dep. pp. 44, 71-72). Lasch claimed that neither he nor anyone from DRS went aboard the vessel to investigate the accident nor report it to the vessel because the LUZON STRAIT was sailing right away. (Ex. 4, Lasch Dep. pp. 44, 71-72). In fact, the LUZON STRAIT did not sail from Wilmington Marine Terminal until 2159 on November 8, some six (6) hours after Lasch first became aware of the alleged accident. (Ex. 12, Statement of Facts). It was admitted by the plaintiff and all of his fellow longshoremen that no one reported the

plaintiff's alleged accident to the ship's Officers or crew. (Ex. 2, Pl. Dep. p. 117; Ex. 16, Brady Dep. pp. 34-35; Ex. 14, Ringgold Dep. pp. 25-27; Ex. 15, Grinnel Dep. p 27). The shipowner's first notice of Turner's alleged accident was in 2003 when plaintiff made a claim. The defendant's investigation revealed that the securing device was not bent or broken and did not require repairs. (Ex. 5, Jansen Dep. pp. 105-106).

DRS Stevedore Supervisor Cliff Lasch, testified the LUZON STRAIT was a brand new vessel that was well maintained. (Ex. 4, Lasch Dep. pp. 44-45).

This is an action filed by longshoreman John Turner against the owners of the M/V LUZON STRAIT pursuant to § 905(b) of the LHWCA, 33 U.S.C § 905(b). (Ex. 3, Pl. Second Amended Complaint). In a longshoreman's action under section 905(b) of the LHWCA, the plaintiff must prove that the vessel was negligent, and breached one of the limited duties that the vessel owes to longshoremen. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994); *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 168-72 (1981).

Plaintiff has alleged in this litigation that his alleged accident was caused by defects in the design and construction of the access and access cover securing device at the forward end of compartment 2C aboard the LUZON STRAIT. He has also alleged that there was a latent defect in the access securing device and that the access cover was unsecured. (Ex. 17, Plaintiff's answer to Interrog. No. 8 and 16). Plaintiff's action is barred as an impermissible claim based on unseaworthiness. 33 U.S.C. § 905(b); *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92 (1994); *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981). In the alternative, assuming plaintiff is deemed to have stated a cause of action for the vessel's negligence in respect of the newly constructed access and access cover securing device, the vessel is entitled to summary judgment because (1) there can be no proof of vessel

negligence; (2) no reasonable factfinder could infer that the arrangement and structural

condition of the  access and access cover securing device was anything but open, obvious and

apparent, (3) no reasonable factfinder could infer that a competent stevedore would not be

able to conduct its work safely, and (4) the stevedore-employer in this case has specifically

admitted through its stevedoring superintendent, that it was responsible for ensuring that the

access was safe; under the OSHA Safety and Health Regulations for Longshoring, 29 C.F.R.

§ 1918.1 *et seq*. and, in particular 29 C.F.R § 1918.24 (a)-(b), it is the stevedore who had the

responsibility to provide one safe access with an effective means of gaining a handhold and to

prohibit the use of any visibly unsafe ladder.

There can be no evidence in this case that defendant breached the turnover duty, the

duty to intervene, or the active operations duty as defined in *Howlett v. Birkdale Shipping

Co., S.A.*, 512 U.S. 92 (1994) and *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S.

156 (1981).  In these circumstances, defendant BV Shipping is entitled to summary judgment

as a matter of law since plaintiffs cannot meet their burden of proof on breach of a duty of

care, an essential element of plaintiffs' *prima facie* case under the LHWCA and there is no

genuine issue of material fact.

## ARGUMENT

### I.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is mandated where the record shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record]

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp*

*v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the burden shifts to

the non-movant "to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

*Id.* at 322. "Mere allegations or denials" will not defeat a well-supported motion for

summary judgment. Fed. R. Civ. P. 56(e). Rather, the non-movant must come forward with

"specific facts" that establish an issue for trial. *Id.*

    The Supreme Court articulated the standard of review applicable to motions for

summary judgment in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986):

> In our view, the plain language of Rule 56(c) **mandates** the
> entry of summary judgment, after adequate time for discovery
> and upon motion, against the party who fails to make a showing
> sufficient to establish the existence of an element essential to
> that party's case, and on which that party will bear the burden
> of proof at trial. In such a situation, there can be no genuine
> issue as to any material fact, since a complete failure of proof
> concerning an essential element of the nonmoving party's case
> necessarily renders all other facts immaterial.

> *Celotex Corp. v. Catrett*, 477 U.S. at 324 (emphasis added).

    This language was refined by the Supreme Court in *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242 (1986), when the Court explained that "[the summary judgment] standard

mirrors the standard for a directed verdict, . . . which is that the trial judge **must** direct a

verdict if under the governing law, there can be but one reasonable conclusion as to the

verdict." *Id.* at 250 (emphasis added). Thus, all that the moving party need do is demonstrate

an absence of evidence to support the other side's case. If the nonmoving party cannot

establish its case by competent and admissible evidence, summary judgment must be granted,

and to satisfy its burden, the nonmoving party must proffer more than a mere scintilla of

evidence in its favor, and cannot simply reassert factually unsupported allegations contained

in its pleadings. *See id.* at 250-51.

In the present case, the plaintiff has filed suit against the owners of the M/V LUZON STRAIT pursuant to section 905(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) ("LHWCA"). As is true of any case where a claimant fails to prove an element necessary to his cause of action, summary judgment should be entered because plaintiff has failed to demonstrate a breach by the vessel of its duty of care under section 905(b). *See Jackson v. Egyptian Navigation Company*, 364 F.3d 113 (3d Cir. 2004).

## II.    THE LIMITED DUTIES OWED BY A VESSEL TO A LONGSHOREMAN UNDER *SCINDIA* AND *HOWLETT*

Congress amended the LHWCA in 1972 in order to foreclose the longshoreman's remedy for unseaworthiness – a right of no-fault recovery against the vessel – and to eliminate the vessel's non-delegable duty to provide a safe place to work. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 168-72 (1981). Under the 1972 Amendments, longshoremen received a substantial increase in the compensation payments due them from their stevedore employers, while the longshoreman's right to recover against a vessel for unseaworthiness was eliminated, and the vessel's cause of action for indemnity against the stevedore employer was abolished. *Id.* at 165. The longshoreman's limited right to recovery is set forth in section 905(b), which provides an exclusive, statutory negligence cause of action against the vessel. *Id.*

Section 905(b) of the LHWCA states in pertinent part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

The guiding principle behind section 905(b) was the belief of "Congress . . . that it was fairer, and fully consistent with the goal of promoting safety, for the vessel's liability to be predicated on negligence, rather than the no-fault concept of unseaworthiness." *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 492 (3d Cir. 1987), *cert. denied*, 486 U.S. 1007 (1988) (quoting H.R. Rep. No. 1441, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4703)). As a result, "[t]he design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994).

After several years of litigation and considerable disagreement among the Courts of Appeals concerning the scope of the vessel's obligation in section 905(b) cases, the Supreme Court set out to define the governing standard of negligence in *Scindia*. There, a longshoreman was injured when sacks of wheat fell from a pallet suspended by a winch operated by the stevedore, and it was claimed the vessel was at fault for permitting the stevedore to continue using the winch when the vessel knew it had been malfunctioning for two days. In remanding the case for a determination as to whether or not the shipowner should have intervened, the Supreme Court set forth the principles that define the duty of a vessel to a longshoreman.

The cornerstone of the Supreme Court's analysis was the principle that "the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards," as the shipowner "is not the common employer of the longshoremen and owes no such statutory duty to them." *Scindia*, 451 U.S. at 170 (footnote omitted). The Court recognized that it is "the stevedore who is in the best position to avoid accidents during the cargo operation and has a statutory duty to provide for the safety of the longshoremen under

33 U.S.C. § 941 (1982) and warrants to the vessel that he will perform competently." *Derr*, 835 F.2d at 493 (citing *Scindia*, 451 U.S. at 170-71). Indeed, "[t]he statutory duty of the stevedore under 33 U.S.C. § 941 to provide a safe place to work has been implemented by the Safety & Health Regulations for Longshoring, 29 C.F.R. § 1918.1 *et. seq.*" *Scindia*, 451 U.S. at 176.

Given that the stevedore retains the primary obligation for the safety of its employees, the Supreme Court held that a vessel owes three limited duties to the longshoremen, referred to as (1) the turnover duty, (2) the active operations duty , and (3) the duty to intervene. *See Scindia*, 451 U.S. at 167-78.

The turnover duty defines the vessel's obligations of the vessel prior to the commencement of cargo operations:

> A vessel must exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property.

> A corollary to the turnover duty requires the vessel to warn the stevedore of any hazards on the ship or with respect to its equipment, so long as the hazards are known to the vessel or should be known to it in the exercise of reasonable care, and would likely be encountered by the stevedore, *and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.*

> *Howlett*, 512 U.S. at 98 (emphasis added) (quotations and citations omitted); *see also Scindia*, 451 U.S. at 167.

Again, because the shipowner is entitled to rely on the competence of the stevedore to respond to the dangers necessarily encountered while working on board a vessel, the shipowner is not required to turn over a hazard-free ship. *Scindia*, 451 U.S. at 167.

Similarly, the shipowner's duty to warn the stevedore extends only to latent defects, which are "defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work." *Howlett*, 512 U.S. at 105 (quoting *Scindia*, 541 U.S. at 167).

The second duty defined by the Supreme Court is the "active operations" duty, which applies during the course of cargo operations and is limited to situations where the vessel "actively involves itself in the cargo operations and negligently injures a longshoreman or fails to use due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167.

The third and final duty of the vessel is a duty to intervene in the stevedore's cargo operations. The duty to intervene is narrowly defined by the Supreme Court to arise only when, in the course of the cargo operations entrusted to the expert stevedore, the vessel obtains (1) *actual knowledge* of the existence of a dangerous condition that presents an unreasonable risk of harm to the longshoremen working, and (2) *actual knowledge* that the expert stevedore cannot be relied on to avoid or eliminate the condition. *Scindia*, 451 U.S. at 175-76. "Absent contract provision, positive law, or custom to the contrary," however, the shipowner "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of cargo operations that are assigned to the stevedore." *Id.* at 172. Accordingly, since the shipowner has no obligation to supervise the stevedore's work, the Supreme Court has limited the duty to intervene to those rare occasions in which the vessel nevertheless acquires actual notice that a dangerous condition has arisen, as well as actual notice that the stevedore is unwilling or unable to respond appropriately to that dangerous condition.

## III.   AS A MATTER OF LAW, DEFENDANT BREACHED NONE OF THE LEGAL DUTIES OWED TO PLAINTIFF

By the terms of section 905(b) and the Supreme Court's definition of the vessel's limited duties in *Scindia* and *Howlett,* a vessel can be liable to a longshoreman only if the evidence allows the factfinder to conclude that the vessel breached the turnover duty, or the active operations duty, or the duty to intervene.

Plaintiff has alleged that his alleged accident was caused by a defectively designed access, access cover and securing device. Plaintiff claims that the access in question was designed and constructed without adequate handholds and without a suitable securing device for the cover. It is apparently plaintiff's theory that the shipowner should have somehow realized that the design and construction of the access and access securing device were inadequate and taken some sort of action before the ship was turned over to expert stevedore DRS. In responses to discovery, plaintiff has also alleged that there was a latent defect in the securing device and the access cover was not properly secured. (Ex. 17, Pl. Ans. Interrog. 8). Necessarily, plaintiff's allegations demonstrate that neither the active operations duty nor the duty to intervene has any applicability to plaintiff's claim. Specifically, plaintiff has not alleged that any member of the ship's crew became "actively involved" in plaintiff's passing through the access, nor has plaintiff alleged that the shipowner had actual knowledge of obviously improvident actions by the plaintiff or DRS that would warrant the intervention of ship's personnel. Accordingly, the viability of the plaintiff's claim is dependent on whether plaintiff can produce evidence that the vessel breached the turnover duty, and that this breach was a substantial factor in causing the alleged accident.

### A.    As a Matter of Law, a Vessel Cannot be Held Liable Under § 905(b) of the LHWCA for Alleged Defects in the Vessel's Structural Design

On the date of plaintiff's alleged accident the M/V LUZON STRAIT was a brand new ship on its very first voyage. (Ex. 6, Mobach Dep. pp. 26-27). Defendant BV Shipping took delivery of the new vessel at the CSBC shipyard in Keelung, Taiwan on August 31, 2002, just 69 days before the alleged accident. (Ex. 6, Mobach Dep. pp. 26-27). Defendant BV Shipping was not involved in the design or construction of the LUZON STRAIT. (Ex. 5, Jansen Dep. pp. 103-04; Ex. 6, Mobach Dep. pp. 158-159). One of plaintiff's theories of recovery is that the access and access cover securing device were inadequately designed and constructed by the shipyard which somehow should have been noticed and corrected by the shipowner. Plaintiffs' criticism of the design is that (1) the hook and eye securing device was of inadequate strength and (2) the access should have been designed with handholds.[3]

Plaintiffs' negligent design theory of recovery is barred as a matter of law as it is premised on allegations of a defect in the structural design of the vessel. Such allegations of defects in a ship's design are nothing more than allegations of unseaworthiness, for which LHWCA § 905(b) provides no recovery. *See Bilderbeck v. World Wide Shipping Agency*, 776 F.2d 817, 818 (9th Cir. 1985) (claim for negligent design is another way of alleging that the ship was not seaworthy at the time of the accident); *Biggs v. Logicon, Inc.*, 663 F.2d 52 (8th Cir. 1981) (design defect, even if proven, does not result in liability under the LHWCA); *Wilhelm v. Associated Container Transportation*, 648 F.2d 1197, 1198 (9th Cir. 1981) (LHWCA does not permit product liability claims against shipowners).

---

[3]Plaintiffs' design theory was set forth in an expert report produced to defendants in discovery.

Given the absolute bar against claims for unseaworthiness, a longshoreman cannot

state a claim under the LHWCA by complaining generally about "negligence" in the design or

construction of the vessel's access ways. *See Anastasiou v. M/T WORLD TRUST*, 338 F.

Supp. 2d 406, 418 (E.D.N.Y. 2004) (LHWCA does not permit recovery based on assertion

that fall occurred because ramp did not have non-skid material, was excessively slippery

when wet, and did not have handholds); *McSwiggan v. Oulu Shipping Ltd.*, 1992 AMC 1825,

1829 (E.D. Pa. 1992) (complaint that recessed ladder design was defective not cognizable

under LHWCA); *Htut v. Toko Kaiun Kaisha, Ltd.*, 1992 A.M.C. 766 (N.D. Cal. 1991) (no

viable claim under LHWCA for trip and fall based on allegedly defective design of padeyes);

*Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443, 1444 (N.D. Cal. 1989) (no recovery

under LHWCA for trip and fall due to alleged design defects in padeyes); *see also Davis v.

United States*, 827 F. Supp. 1576, 1581-82 (S.D. Ga. 1993) (allegation that raised door sill on

access ramp was negligently installed, and posed danger to forklift drivers, goes to

seaworthiness and is not actionable under LHWCA); *Mitchell v. Sea-Land Services, Inc.*,

1987 AMC 1698, 1987 U.S. Dist. LEXIS 15067 (D. Md. 1987) (summary judgment granted

in favor of shipowner notwithstanding allegations of negligence based on a poorly designed

piece of lashing gear with the court finding that the design allegations were, in effect, a claim

of unseaworthiness).

In *Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004), the

plaintiff longshoreman asserted a § 905(b) negligence claim against the shipowner based on

*inter alia* design defects in a ramp from which he slipped and fell which resulted in the

plaintiff sustaining a broken leg and other injuries. Similar to the case at bar, the *Anastasiou*

case involved a vessel that was less than a year old and built in accordance with international

regulations. The plaintiff in *Anastasiou* claimed that the defects in the design of the ramp

consisted of (1) the absence of handrails; (2) the absence of drain holes in the diamond plate

surface; (3) the fact that the ramp became slippery when wet; and (4) the absence of ramp a

non-skid or non-slip surface.  The court, in granting summary judgment in favor of the

shipowner, stated the following concerning the unavailability of a negligent design theory in a

§ 905(b) case:

> A claim for negligent design is merely another way of
> alleging that the Vessel was unseaworthy, a cause of
> action that Plaintiff cannot assert because, as discussed
> above, he is covered by the LHWCA. Therefore, to the
> extent that plaintiff is predicating his negligence action
> on design defects of the ramp, his claim is flawed. For
> example, in *Biderbeck v World Wide Shipping Agency*,
> 776 F.2d 817, 819 (9th Cir. 1985), the court held that in
> order to defend against a summary judgment motion, an
> injured contractor must specifically identify negligent
> conduct; otherwise it is "simply another attempt to get
> unseaworthiness into the case in the face of a clear
> Congressional intent to remove it." Thus, courts have
> granted summary judgment as a matter of law where, for
> example, a party alleges that ramps on a vessel were not
> designed properly. *See, e.g., Matthews v. Lykes Bros.
> S.S. Co., Inc.*, 1987 WL 16506, at *17 (C.D. Cal. Feb.
> 26, 1987) ("absent evidence" that vessel owner
> "negligently created or modified the ramps, it has no
> liability therefor") aff'd 854 F. 2d 1166 (9th Cir. 1988);
> *see also Salvato v. Hakko Maritime Corp.*, 718 F. Supp.
> 1443, 1445-46 (N.D. Cal. 1989) (allegations that
> defendant negligently placed lashing padeyes on car
> carrier amounted to a design defect not recognized by
> the LHWCA); *McSwiggin v. Oulu Shipping Ltd.*, 1992
> U.S. Dist. LEXIS 4959, 1992 WL 70416, at *3 (E.D.
> Pa. Mar. 31, 1992) (plaintiff's claim that the existence
> of a recessed ladder is a design defect rendering the ship
> unseaworthy is not available under the LHWCA) *aff'd*,
> 980 F.2d 723 (3d Cir. 1992).

*Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d at 418-419.

In *Salvato*, a longshoreman alleged that while discharging vehicles from a car carrier,

he tripped on one of the deck padeyes used to lash down the vehicles during the voyage.  Mr.

Salvato asserted that the vessel owner/operator, Hakko Maritime, was negligent for failing to

rectify the design of a vessel which had hundreds of protruding padeyes on the deck that were

painted the same color as the deck.  The Court granted summary judgment to the vessel, and

ruled:

> It is undisputed that the padeyes were installed by [the
> shipbuilder], Hakko had no involvement in the design of the
> ship or the padeyes, and Hakko did not alter or modify the
> design of the padeyes after delivery of the ship.  Hakko cannot
> be liable for this alleged design defect.  Similarly, Salvato's
> allegation that the color of the padeyes lacked the safety feature
> of a contrasting color is a design defect that Hakko cannot be
> held liable for.  See *Venturelli v. Cincinnati, Inc.*, 850 F.2d 825,
> 827 (1 Cir. 1988) (different color is a safety device); *Martell v.
> Boardwalk Enterprises, Inc.*, 748 F.2d 740, 747 (2 Cir. 1984)
> (lack of visibility due to color and size of product is a design
> defect).

> *Salvato v. Hakko Maritime Corp.*, 718 F. Supp. at 1444-1445.

The court in *Davis v. United States*, 827 F. Supp. 1576, 1581-82 (S.D. Ga. 1993),

granted summary judgment in favor of a shipowner that had modified the design and structure

of the vessel M/V BELLATRIX to include a raised sill on an interior ramp that the plaintiff

longshoreman claimed caused his accident.  The longshoreman in *Davis* claimed that he

sustained a disabling herniated disc when the forklift he was operating hit the raised sill,

which caused him to strike the forklift's overhead rack with his head.  It was argued by the

plaintiff that the shipowner, the United States Government, was negligent in permitting a

negligently designed raised sill to be incorporated into the modification of the vessel from a

container ship into a Ro-Ro ship.[4]  The court held that plaintiff's negligence claim based on

defective design was not actionable under § 905 (b) of the LHWCA stating: "the claim that

the United States' design of the BELLATRIX resulted in plaintiff's harm is merely an

---

[4]"Ro-Ro" means roll on - roll off, so cargo can be driven aboard a vessel via a ramp to the
pier.

unseaworthiness claim, which was eliminated from the LHWCA in the 1972 amendment."
*Davis*, 827 F. Supp. at 1582. It should be noted that unlike the shipowner in the case at bar,
the shipowner in Davis was directly involved in the design of the modification / conversion of
the M/V BELLATRIX and, nevertheless, no liability could attach for negligent design.

In the case of *McSwiggan v. Oulu Shipping Ltd.*, 1992 AMC 1825, 1829 (E.D. Pa.),
*aff'd* 980 F.2d 723 (3d Cir. 1992), the plaintiff longshoreman was injured when his stepped
into a hole created by a recessed ladder that was part of the ship's original design. The ladder
was built into the tween deck hatch cover / floor so that when the cover was opened to gain
access to the deck below, it could be used as a ladder. When the tween deck cover was
closed, the recessed ladder created holes in the deck / flooring, one of which the plaintiff
stepped into, causing him to fall and sustain injuries. The plaintiff in *McSwiggan* argued that
the shipowner was negligent because the design of the recessed ladder created "cavities"
which made the work area unsafe. In granting summary judgment in favor of the shipowner,
the court stated:

> [P]laintiff's claim that the existence of the recessed ladder is a
> design defect rendering the ship unseaworthy is not available
> under the LHWCA. . . . Congress specifically eliminated a
> claim for unseaworthiness when it amended the LHWCA in
> 1972. Consequently, plaintiff may not recover against
> defendant for unseaworthiness as a matter of law.

*McSwiggan*, 1992 AMC at 1829 (citations omitted).[5]

Plaintiff's claim of negligence based on the alleged defective design of the access
(alleged absence of a handhold) and the access cover securing device (alleged inadequate
strength) is merely a claim of unseaworthiness which is barred under the 1972 Amendments

---

[5] It should be noted that although the court in *McSwiggan* refers to an unseaworthiness
claim by the plaintiff, the plaintiff's claim was actually a negligence claim made pursuant to
§905(b) of the LHWCA. 1992 AMC at 1825. It was plaintiff's design defect argument that
made the claim, in effect, an unseaworthiness claim.

to the LHWCA. The allegation that the ship's officers should have somehow been aware of the alleged design defects in the newly constructed and designed vessel similarly constitutes a claim of unseaworthiness. Pursuant to the authority cited and discussed above, a shipowner who purchases a newly constructed vessel is entitled to rely on the shipyard and naval architects to design and construct a vessel in accordance with applicable international regulations and the requirements of the Classification Society, in this instance Bureau Veritas. The fact that the LUZON STRAIT was Class Certified by Bureau Veritas and certified by the vessel's Flag State, The Netherlands, establishes that the vessel was built in accordance with international regulations. In such circumstances, the defendant cannot be found to have actual or constructive notice that the access or securing device were in any way dangerous. *See Anastasiou*, 383 F. Supp. 2d at 419. The fact that a design feature may be obvious to or known to the shipowner or its personnel aboard the vessel does not change the unavailability of the unseaworthiness claim in a §905 (b) case. See *Anastasiou, supra, Salvato, supra, Davis, supra,* and *McSwiggan, supra,* wherein the alleged design features complained of by the plaintiff longshoremen were obvious to the vessel owners involved and, nevertheless, the design defect claims were dismissed as thinly veiled unseawothiness claims not permitted under the LHWCA.

Plaintiffs' design defect claim is based on the premise that a longshoreman must be guaranteed a safe place to work by the shipowner. Such a premise does not exist under § 905(b) of the LHWCA which states in pertinent part: "The liability of a vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred." Unlike the shipowner, it was the expert stevedore, DRS in this instance, who had the statutory duty under § 941 of the LHWCA to provide its longshoremen

with a safe place to work and warranted to the shipowner that they would perform competently. *Scindia*, 451 U.S. at 170-71.

In these circumstances, defendant BV Shipping is entitled to summary judgment as a matter of law on plaintiffs' negligence claim based on the alleged defective design and construction of the access and the access securing device.

**B.    Plaintiff Cannot Recover Under the Turnover Duty Because There Is No Evidence of Vessel Negligence**

Based on plaintiffs' answers to defendant's interrogatories it appears that plaintiffs are possibly also contending that John Turner's alleged accident of November 8, 2002 was caused by a latent defect in the securing device for the access cover in question and also by the access cover not being properly secured in the open position.  Plaintiff John Turner provided the following answer to defendant's interrogatory number 8:

> **8.** Describe in detail any unsafe condition, defect and/or hazard which you contend was a proximate cause of the accident which is the subject matter of your Complaint and indicate whether the condition was latent or obvious. (Ex. 17, Def.'s Interrogatory No. 8)

> **Answer:** The hook and eye device utilized to hold the hatch lid in an open position was defective and the hatch lid was not firmly secured in an open position. The condition was latent in that the hatch lid appeared to be secured in an open position." (Ex. 17, Pl.'s Answer to Int. No. 8).

With regard to plaintiff's allegation that the hook and eye device was "defective," it will be assumed for the purposes of this section of the Defendant's Brief that by "defective" plaintiff means that the device was somehow broken or bent.[6]  There is no evidence of record that the securing device was broken or that the access cover was not secured in the open

---

[6] To the extent plaintiff claims that his defective allegation meant that the securing device was defectively designed, we refer to Section III-A, *supra*, concerning the unavailability of a defective design claim in a § 905(b) case.

position when the vessel was turned over to the expert stevedore, DRS.[7]  To the contrary, just

40 minutes or so before the alleged accident DRS Supervisor Lasch entered and exited

compartment 2D through the access in question without a problem.

> **Q.**    Before the accident?
>
> **A.**    Before the accident I was down there with them.
>
> **Q.**    When you went down through the access cover
>          and ladder that went from 2C down to 2D did
>          you experience any trouble?
>
> **A.**    No, I did not.
>
> **Q.**    When you went down was that cover for that
>          access, for that ladder access open and secured
>          in the open position?
>
> **A.**    Yes, all A, B, and C were all open.
>
> **Q.**    And secured?
>
> **A.**    And secured.  Six or seven of us went down and
>          I guess seven of us got out completely and the
>          eighth person didn't.  I don't know what
>          happened.
>
> **Q**     When you went back up you had the same thing,
>          it was secured in the open position?
>
> **A.**    I exited the same way I entered, I went up in D
>          to C; C to B; B to A;  A to the main deck.
>
> **Q.**    And that access cover leading, they had to go
>          through to get from D to C, it was open when you
>          went up and secured in the open position?
>
> **A.**    Yes.  They were all open, A, B, C, were all up,
>          yes.

---

[7] In fact, Turner has admitted in his answer to interrogatory number 16, which asked the plaintiff to state "the period of time the condition existed prior to the alleged incident...", that "the precise period of time [the condition existed] is not presently known." (Ex. 17, Pl. Ans. to Interrogs. and Defs. Interrogs.)

> **Q.**     And they were all secured?
>
> **A.**     To my knowledge, yes . . . .
>
> (Ex. 4, Lasch Dep. pp. 33-34).

When Supervisor Lasch did this, he used the access cover as a handhold to support his weight and tested the integrity of the securing device by pulling on it with his weight on the cover. (Ex. 4, Lasch Dep. pp. 33-34, 45-46). Lasch as the DRS Stevedore Supervisor was fully satisfied that the access and cover were safe for use by the DRS longshoremen. (Ex. 4, Lasch Dep. pp. 46). It was admitted by DRS Supervisor Lasch that it was his responsibility and that of the stevedore, DRS, to ensure that lids were open and secured properly before use by the DRS longshoremen.

> **Q.**     And when you as a Stevedoring Supervisor doing this
> many times before on other ships and everything, it is
> important to be sure that the lids are open and secured
> before the men use them?
>
> **A.**     Yes,  It's –it's the responsibility of the Ship Boss and
> the Hatch boss and the Ship Superintendent to make
> sure that everything is done safely.
>
> (Ex. 4, Lasch Dep. p. 37).

It is not surprising that DRS Supervisor Lasch checked to make sure that the access covers were open and properly secured, as the OSHA Safety and Health Regulations for the Longshoring Industry, 29 C.F.R. § 1918.24(a)-(c), require the stevedore employer, DRS in this instance, (a) to ensure that there was at least one safe and accessible fixed ladder with an effective means of gaining a handhold at the top of the ladder for each gang working in 2D, and (b) to identify and prohibit the use of any fixed ladders that were visibly unsafe. 29 C.F.R § 1918.24 (a) and (b). Pursuant to LHWCA § 941, responsibility for compliance with the above OSHA regulation rests solely with the stevedore employer, DRS in this instance.

The statutory duty of the stevedore under § 941 to provide a safe place to work for longshoremen was implemented by the OSHA Safety and Health Regulations for Longshoring 29 C.F.R. § 1918.1 *et seq. See Scindia*, 451 U.S. at 176, *Landsem v. Isuzu Motors, Ltd,* 534 F. Supp. 448, 451 (D. Or. 1982), *aff'd without opinion*, 711 F. 2d 1064 (9th Cir. 1983); *Celestine v. Lykes Bros. S.S. Co.*, 729 F. Supp. 691, 694 (N.D. Cal. 1989).

The shipowner in the case at bar was entitled to rely on stevedore DRS to obey the mandatory OSHA Safety and Health Regulations for Longshoring by ensuring there was an adequate handhold at the top of the vertical ladder in question and prohibiting the use of any ladder that the stevedore's inspection revealed was unsafe. As the Supreme Court indicated in *Scindia*, although the 1972 amendments did away with a *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp*, 330 U.S. 124 (1956), indemnity action against the stevedore, the Amendments did not disturb the warranty of workmanlike service owed by the stevedore to "perform his task properly without supervision from the ship." *Scindia*, 451 U.S. at 170.

In addition to DRS Supervisor Lasch, plaintiff John Turner testified that he passed through the access in question at the forward end of 2C on three occasions (11:00 AM, 12:00 noon, and 2:00 PM) just before the alleged accident, grabbed onto the open access cover to support his weight, and did not experience any problems. (Ex. 2 , Pl. Dep. pp. 69, 75-78). It was admitted by plaintiff that he never actually looked at the securing device but the access cover supported his weight. (Ex. 2, Pl. Dep. pp. 69, 75-78). Turner's fellow longshoremen Gregory Ringgold and William Grinnel both used the access in question before the accident and did not have a problem. (Ex. 15, Grinnel Dep. pp. 17, 24; Ex. 14, Ringgold Dep. p.14). Grinnel testified that when he used the cover as a handhold it seemed solid to him as he climbed into 2C at 2:00 PM. (Ex. 15, Grinnel Dep. pp. 24-25). Ringgold and Grinnel both

admitted that they never observed the securing device before the alleged accident. (Ex. 15, Grinnel Dep. p. 17; Ex. 14, Ringgold Dep. pp. 19-21, 24).

The evidence of record establishes that the access cover in question was open, secured, and solid at least through 2:00 PM on November 8, 2002 as confirmed by the testimony of DRS Supervisor Cliff Lasch, plaintiff John Turner, and William Grinnel. The expert stevedore, through its own supervisors, was completely satisfied that the open cover was safe for use as a handhold at the top of the fixed ladder by its employees. (Ex. 4, Lasch Dep. p. 46). There is no evidence of record which proves that the hook was broken, defective or not properly secured at any time before Turner's alleged accident. The expert stevedore had been working in compartment 2D since 11:00 AM by itself with no members of the ships crew in or near the work area. There is no evidence of record to prove that vessel personnel were in the area of the access in question between 2:00 PM and the time of the alleged accident, 2:45 PM, so as to have had the opportunity to even observe the securing device for the access cover in question during the time period that the alleged condition came into existence. It should be noted that the shipowner here had no duty to be present in the compartments in which the expert stevedore was performing its work because under the Supreme Court's holding in *Scindia*, "absent contract provision, positive law , or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of cargo operations that are assigned to the stevedore." *Scindia*, 451 U.S. at 172. Given the lack of evidence in this regard, plaintiff cannot prove negligence by the shipowner, an essential element of a *prima facie* case under § 905(b).

In a § 905(b) claim a longshoreman cannot establish negligence of a vessel through conjecture or speculation as to the cause of an accident. *See, e.g., Yates v. Navigation*

*Maritime Bulgare Ltd.*, 2000 U.S. Dist. LEXIS 11229, at *10-*12 (E.D. Pa. 2000) (negligence by vessel not established by a longshoreman's statement that hydraulic oil on which he slipped "had to come from" the ship's crane, where longshoreman could not articulate a sound basis for his position); *Wells v. Flota Bananera Equatoriana, S.A.*, 1985 U.S. Dist. LEXIS 18452, at *8 (S.D.N.Y. 1985) (injured longshoreman's speculation that vessel was to blame for electrical problems with cargo booster was "not sufficient to raise a factual issue sufficient to defeat summary judgment in light of the absence of any demonstrated physical facts"); *Vadas v. J. Lauritzen Holdings*, 2000 U.S. Dist. LEXIS 20054, at *10, 2001 AMC 498 (D. Conn. 2000) (The complaint of a plaintiff longshoreman who fell from a ship's crane ladder when one of the steel rungs broke off near the site of a defective weld dismissed on summary judgment because "[e]vidence of a ship's defect, absent evidence demonstrating the shipowner's culpability, cannot support a claim under section 905(b)."); *Wright v. Daviesyndicate, Inc.*, 1993 U.S. Dist. LEXIS 8739 (E.D. Pa. 1993) (holding that evidence of various operational problems or malfunction of equipment, without evidence of negligence of the vessel, is not sufficient to establish liability of the shipowner based on § 905(b)); *McMullen v. Guise Shipping Co.*, 1992 U.S. Dist. LEXIS 6471 (E.D. Pa. 1992), *aff'd* 983 F.2d 1051 (3d Cir. 1992) (summary judgment granted in favor of shipowner where plaintiff longshoreman who was injured due to a malfunctioning ship's crane failed to prove that the shipowner had actual knowledge of the alleged defect in the ship's gear prior to the crane swinging and striking the plaintiff.); *Manning v. Mars, Ltd.*, No. 85-1271, 1987 U.S. Dist. LEXIS 1777 (E.D. Pa. 1986) *aff'd* 833 F.2d 305 (3d Cir. 1987) (failure of proof of § 905(b) negligence against the shipowner notwithstanding evidence that the window from an excessively vibrating crane fell out striking and injuring the plaintiff longshoreman); *DeLange v. Dutra Construction, Co.*, 183 F.3d 916, 921 (9th Cir. 1998) (summary judgment

granted in favor of shipowner where longshoreman's fingers were severed due to a hidden

defect in a spud mechanism in the form of a "bent" pin which the plaintiff claimed was

difficult to remove because "it was bent, a defect he could not have identified in time to avoid

the accident because the pin was hidden in the spud." The court held that the mere assertion

that the pin was bent, without a showing of specific facts supporting negligence amounts to a

claim that the barge was unseaworthy, a strict liability claim not cognizable under section

905(b).").

In the case presently before the court, there is a complete lack of evidence as to

whether the condition complained of was even in existence prior to the plaintiff pulling the

cover onto himself and, therefore, summary judgment must be granted.

Although it is clear that the record shows that the access cover in question was open,

secured, and solid just prior to the alleged accident, even if plaintiff were to now contend that

the allegedly defective condition of the securing device should have been obvious to ship's

personnel, there could be no liability against the shipowner under such circumstances.[8] This

is because an obviously unsecured or broken securing device at the top of the fixed ladder

being used by an expert stevedore is precisely the type of condition that a shipowner is, as a

matter of law, entitled to rely on the stevedore to observe and deal with in accordance with

the mandatory OSHA Safety and Health Regulations for Longshoring, 29 C.F.R.§ 1918.24

(a), (b) and (c).[9]  In the event the ladder access between 2C and 2D was visibly unsafe, it was

stevedore DRS' duty to either require the longshoremen to use the access ladder located at the

---

[8] It should be noted that plaintiff has already admitted in answers to interrogatories that the alleged condition was "latent." (Ex. 17, Pl. Ans. to Interrog.).

[9] By implementing 29 C.F.R. § 1918.24 (a), (b) and (c), Congress and the Secretary of Labor have concluded, as a matter of law, that an expert stevedore can cope with and alleviate hazards involving handholds at the top of fixed vertical ladders.

aft end of 2D and 2C or to rig an OSHA compliant portable ladder through the hatch opening as referred to in 29 C.F.R.§ 1918.24 (c) and (e)(1).[10]

The essential thrust of the case opinions interpreting section 905(b) is that the stevedore retains primary responsibility for the safety of its employees pursuant to its statutory duty, and the vessel's obligations to the longshoremen are limited. *Howlett*, 512 U.S. at 97, 101; *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 493 (3d Cir. 1987); 33 U.S.C. § 941; OSHA Safety and Health Regulations for Longshoring 29 C.F.R. § 1918.1 *et. seq.* h that context, the vessel's turnover duty, which attaches before the stevedore takes control of the cargo operation, only requires the vessel to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Scindia*, 451 U.S. at 167. The turnover duty to warn extends only to those hazards (1) that "are known to the vessel or should be known to it in the exercise of reasonable care," *and* (2) that "would not be obvious to or anticipated by [the stevedore] if reasonably competent in the performance of his work." *Howlett*, 512 U.S. at 98-99. A shipowner is not required to turn over a hazard free vessel. *Scindia*, 451 U.S. at 167. It necessarily follows that there are certain hazardous conditions that an expert and experienced stevedore can reasonably be expected to anticipate and work with. *See Kirsch v. Plovidba,* 971 F.2d 1026, 1029-30 (3d Cir. 1992) (agreeing with the observation in *Bjaranson v. Botelho Shipping Corp. Manila,* 873 F.2d 1204, 1208 (9th Cir. 1989), that "the fact that cargo operations will be conducted by an 'expert and experienced stevedore implies that

---

[10]See deposition testimony of Captain Mobach who indicated that stevedores often used portable ladders to get in and out of the compartment in question. (Ex. 6, Mobach Dep. pp.113-114).

certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them"; affirming a grant of summary judgment in favor of the vessel where the vessel was as a matter of law entitled to rely on the stevedore to work around a vessel oil spill/leak that caused the plaintiff longshoreman to fall from a stow of containers to the deck); *Bjaranson*, 873 F.2d at 1208 (holding that the blockage of the ship's fixed access ladders by the ship's own gantry crane causing the plaintiff longshoremen to fall to the deck and sustain serious injuries was the type of condition that a shipowner could reasonably rely on the stevedore to deal with).

The DRS Supervisor in the case at bar, Cliff Lasch, who acknowledged that he was required to ensure that the access cover was secured and the ladder was safe for use, was clearly in the best position just 40 minutes before the alleged accident to determine whether or not the access cover was properly secured and safe for use as a handhold. The DRS Stevedore Supervisor was also in the best position at that time to require the use of the access ladder at the aft end, arrange for an OSHA compliant portable ladder, or require the use of the cargo elevator, if necessary. *See Woodward v. Logistec Ltd.*, 164 F. Supp. 2d 941, 950 (N.D. Ohio 2001) (vessel entitled to summary judgment on the issue of turnover duty where "the stevedore knew as much about the stowage as the shipowner"). (In *Woodward,* the claim of a longshore plaintiff whose leg was amputated by a falling unit of ingots was dismissed by way of summary judgment notwithstanding vessel's knowledge of a discharge method that it had, on prior occasions, expressed concerns about.) *See also McCourt v. Mitsui O.S.K. Lines Am.*, 921 F. Supp. 1315, 1317, 1319 (D.N.J. 1996) (summary judgment in favor of vessel; finding no breach of turnover duty where the longshoreman was injured as a result of a condition, the consequences of which could have "easily [been] avoided by a stevedore employing simple and commonly utilized precautions"; observing that "Congress based the 1972 Amendments

PBH: 177310.1

32

[to the LHWCA] on its observation that the stevedores are in the best position to prevent injuries to longshore workers"); *McSwiggan v. Oulu Shipping, Ltd.*, 1992 U.S. Dist. LEXIS 4959, at *12 (E.D. Pa. 1992) (finding *inter alia* that a surging in the ship's own crane during discharge operations "is precisely the type of danger which an experienced and competent stevedore, exercising reasonable care, should be able to anticipate"); *Harrington & Co. v. United States Lines, Inc.*, 587 F. Supp. 239, 244-46 (M.D. Fla. 1984) (finding no violation of turnover duty in a case where the stevedore had previous experience with unsecured container doors which made a container impossible to discharge and caused the plaintiff decedent longshoreman to fall into the cargo hold while attempting to get to the container to correct the condition; explaining that "[u]nsecured container doors commonly occur within the normal realm of stevedoring and are anticipated and dealt with by the stevedore and longshoremen in the exercise of their profession"). As stated in *Scindia*, "'The shipowner defers to the qualification of the stevedoring contractor in the selection and use of equipment and relies on the competency of the stevedore company.'" *Scindia*, 451 U.S. at 171-72 (quoting *Italia Societa v. Oregon Stevedoring Co.*, 376 U.S. 315, 322-23 (1964)). Safety during discharge operations "is a matter of judgment committed to the stevedore in the first instance." *Howlett*, 512 U.S. at 101 (quoting *Scindia,* 451 U.S. at 174).

In sum, in the event plaintiffs allege that the alleged defective condition of the securing device should have somehow been obvious to the shipowner, there would be no liability as such a condition would have been equally open and obvious to the stevedore[11] and

---

[11] See *Anastasiou,* 338 F. Supp. 2d at 421, where the court in granting summary judgment in favor of the shipowner found that the absence of non-skid paint and handrails was not latent and would have been equally obvious to a stevedore.

the type of condition that the shipowner could have reasonably expected the stevedore to observe and alleviate in accordance with the mandatory OSHA regulations.

## C.    The Active Operations Duty Cannot Apply

Plaintiff has thus far made no allegation that the active operations duty is somehow implicated in this case. Defendants briefly discuss the active operations duty just in case plaintiffs raise this duty in their brief in response to the within motion. Under *Scindia*, the active operations duty is limited to situations where the vessel "actively involves itself in the cargo operations and negligently injures a longshoreman or fails to use due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167.

The active operations duty is wholly inapplicable to this case. Plaintiff claims that his alleged accident occurred at the completion of cargo operations in compartment 2D which had been ongoing since 11:00 AM that morning. The plaintiff and all of the longshore witnesses admit that the ship's personnel were not in or near the No. 2 cargo hold at the time of the alleged accident. (Ex. 2 , Pl. Dep. p. 117; Ex. 16, Brady Dep. pp. 33-34; Ex. 14, Ringgold Dep. p 25; Ex. 15, Grinnel Dep. p 27). There is no evidence that the ship's personnel became actively involved with the cargo operation or with the process of the Jackson gang exiting compartment 2D. The discharge operation in Camden was carried out entirely by the expert stevedore DRS and its own personnel. At no time during the discharge of cargo did the vessel's officers or crew participate in or direct any longshoring activities. In these circumstances, the active operations duty cannot be applied in this case.[12]

---

[12] "Mere observation of unloading or warning the stevedores about some risk is not sufficient to place the shipowner in active control of the unloading operation." *Woodward v.*

In *Howlett*, the Supreme Court reinforced the rule that a vessel owes three, limited duties to longshoremen in respect of the condition of the ship and its cargo, and confirmed that the determination of which duty applies to a particular accident is dependent upon (1) the time when the act occurred or the condition arose, and (2) the location where the act occurred or the condition arose. Specifically, the Supreme Court said:

> The starting point in this regard must be our decision in *Scindia Steam*, which outlined the three general duties shipowners owed to longshoremen. The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. . . . The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." . . . The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

> 512 U.S. at 98 (citations omitted).

Given the Supreme Court's ruling that the turnover duty governs the condition of the vessel upon commencement of cargo operations, and that the active control duty governs the vessel's actions after cargo operations have commenced, it has been held that the respective duties must be applied according to the time when the vessel's negligent conduct occurs:

> The active involvement that *Scindia* envisions has to do with the discharging of cargo and not occurrences prior to the ship even docking. The *Scindia* duties operate in a temporal and sequential fashion. At the time of said [painting of the doorway], defendants had not even implicated their turnover duty yet, let alone had a chance to take active control.

---

*Logistec Ltd., supra,* 164 F. Supp. at 951. *See also Yates v. Navigation Maritime Bulgare Ltd.,* 2000 U.S. Dist. Lexis 11229 (E.D. Pa. 2000) (summary judgment in favor of the vessel based in part on a finding that the active operations duty was inapplicable to a case involving a plaintiff longshoreman who fell 30 feet from a ladder coated with hydraulic fluid which led to a ship's crane that was inspected by ship's personnel twice per day).

> *Sinagra v. Atlantic Ocean Shipping, Ltd.*, 182 F. Supp. 2d 294,
> 302 (E.D.N.Y. 2001); *see also Treadaway v. Societe Anonyme*
> *Louis-Dreyfus,* 894 F.2d 161, 166 (5th Cir. 1990).

It is also significant that the Supreme Court defined the shipowner's obligation which

arises after cargo operations commence as being triggered by "<u>active</u> involvement" and

"<u>active</u> control." As a consequence, the active control duty "recognizes that although a vessel

owner no longer retains the primary responsibility for safety in a work area turned over to an

independent contractor, no such cession results as relates to areas or equipment over which

the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103

F.3d 31, 34 (5th Cir. 1997) (finding no breach of shipowner's duty when "there is no

evidence that the vessel's crew was active in that area [of the deck]"). In other words, the

nature of the shipowner's control must relate to the methods and operative details of the work

of the stevedore or independent contractor. *Breaux v. United States,* 1996 WL 16318 (E.D.

La. Oct. 23, 1996) (citing 1 T. Schoenbaum, Admiralty & Maritime Law, § 7-10 at 478-79

(4th ed. 2001)). In order to establish that the shipowner has an active control duty in respect

of some part of the vessel, a "plaintiff is required to show more than mere casual use or

ownership of parts of the vessel." *Wright v. Gulf Coast Dockside, Inc.*, 1998 U.S. Dist.

LEXIS 9519, at *6, 1998 AMC 2460 (E.D. La. 1998). Likewise, the mere physical presence

of members of the vessel's crew does not, by itself, render a vessel liable under the active

control duty. *Quevedo v. Trans-Pacific Shipping Inc.*, 1997 U.S. Dist. LEXIS 4745 (N.D.

Cal. 1997), *aff'd* 143 F.3d 1255 (9th Cir. 1998). Indeed, even a chief engineer inspecting and

climbing a defective ship's crane ladder prior to the accident and repairing the ladder

immediately following the accident does not establish active control of ladder by the ship's

crew. *Vadas v. J. Lauritzen Holdings,* 2000 U.S. Dist. LEXIS 200054, at *16-17, 2001 AMC

498 (D. Conn. 2000).

Two examples of active operations cases which are distinguishable from the case at bar are the cases of *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532 (3d Cir. 1994) (active control duty applied because a ship's crew member had hosed down a part of the deck in freezing weather to wash off cement dust during cargo operations which caused the plaintiff longshoreman to slip and fall on the icy surface on deck created by the crew member; it was also noted that the ship's crew retained control of the icy deck area throughout cargo operations), and *Serbin v. Bora Corp.*, 96 F.3d 66 (3d Cir. 1996) (active operations duty applying where a snatch block attached to a ship's hatch cover had always remained under the control of the ship's crew and the vessel argued that the stevedore should not have attempted to move an appurtenance that was customarily within the exclusive control of the vessel.)

An example of a case which is analogous to the case at bar where the application of the active operations duty was rejected is the case of *Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204 (9th Cir. 1989). In *Bjaranson*, the plaintiff longshoreman fell to the deck of a vessel and sustained serious injuries because the ship's fixed access ladders were blocked by the ship's own gantry crane, which forced the plaintiff to use a ladder that did not have handholds and which was located in a darkened area. The plaintiff in *Bjaranson* argued that the vessel was liable for a breach of the active control / operations duty because the area of the accident, the No. 2 cargo hold, was not one of the holds being discharged on the date in question and, therefore, the vessel retained control of the area. In dismissing plaintiff's complaint, the *Bjaranson* court rejected the application of the active control / operations duty due to a lack of evidence of "active" control of the area by the defendant shipowner.

Similarly, in *Wright v. Gulf Coast Dockside*, 1998 U.S. Dist. LEXIS 9519, at *6, 1998 AMC 2460 (E.D. La. 1998), a longshoreman fell after entering a dark hold after the vessel's

crew had cleaned the hold and closed the hatch; even though the longshoreman had received

permission to go into the hold, his complaint was dismissed because no crewmembers spoke

to him prior to his descent or accompanied him into the area, such that the vessel had not

exercised the active control that is required to trigger the duty.

In the instant case, the record establishes that there was no "active" involvement by

the ship's crew as required under *Scindia*, 451 U.S. at 167, and *Howlett*, 512 U.S. at 98. All

witnesses confirm no members of the ship's crew were in or near the area of the alleged

accident when Turner claims he was injured. Indeed, the testimony of Turner's own DRS

Supervisor, Cliff Lasch, confirms the control of the area by the stevedore, as he admitted  that

it was the responsibility of the DRS supervisory personnel to ensure that the access cover was

open, properly secured, and safe for use by the longshoremen. (Ex. 4, Lasch Dep. pp. 35-37).

## D.  The Duty to Intervene Cannot Apply

Similar to the active operations duty, defendant is unaware of any allegation by

plaintiffs that the narrow duty to intervene would somehow apply to this action.  In the event

plaintiffs' make such a contention, defendant submit the following in support of summary

judgment in defendant's favor on any claim based on the intervention duty.  Under *Scindia,*

the duty to intervene in the cargo operations entrusted to the expert stevedore is limited to

situations where the vessel acquires *actual knowledge* of (1) the existence of a dangerous

condition of the vessel or its equipment that poses an unreasonable risk of harm to

longshoremen working and (2) *actual knowledge* that the expert stevedore is exercising

obviously improvident judgment in failing to avoid or eliminate the condition. *Scindia*, 451

U.S. at 175-76.  Only if the shipowner gains *actual* knowledge of a dangerous condition in or

about the ship,[13] and also knows that the longshoremen are exercising poor judgment by continuing to work in an obviously improvident manner despite the dangerous condition, will there be a duty to intervene and remedy the situation. *Id.* at 167-68, 175-76. The requirement of proof of actual knowledge by the vessel is understandable since the vessel has no duty in the first instance to supervise the discharge operations entrusted to the expert stevedore. *See generally Scindia*, 451 U.S. at 172; *Howlett*, 512 U.S. at 101-02; *Harrington*, 587 F. Supp. at 245 (vessel was in the least effective position to intervene given that it had no duty to supervise and where the alleged condition was not discovered until stevedore attempted discharge and unsecured container doors made discharge difficult; "To place a duty on the vessel to intervene and latch the unsecured doors would require that he invade the offloading operations and perform a task that is a normal function of the offloading stevedore and its longshoremen," *id.* at 246); *Woodward,* 164 F. Supp. at 953 (no duty to intervene even where the shipowner had general "knowledge that the way in which the stevedore was doing its job was unsafe . . .").

In this case, the vessel can have no duty to intervene because it had no actual knowledge of any alleged defect or problem with the access cover, securing device, or ladder that developed within the confines of the cargo operations entrusted to DRS. The vessel's lack of actual knowledge in this regard is alone sufficient to eliminate any duty to intervene. "Moreover, the record lacks any evidence that [the vessel] knew how the stevedore were conducting the cargo operation. Without this evidence there can be no support for a finding

---

[13] The court in *Whitfield v. Craigwin Co.*, 727 F. Supp. 183, 185 (E.D. Pa. 1989), concluded that the duty to intervene attaches only with respect to conditions associated with *the ship's own gear.* The court synthesized the "duty to intervene" inquiry as follows: "(1) whether there was a malfunction in the ship's equipment, tools or work space; (2) whether the vessel owner knew of this malfunction; and (3) whether the stevedore's conduct was so 'obviously improvident' as to mandate intervention."

that [the vessel] knew the stevedore company had failed to remedy the asserted dangerous condition, a prerequisite to triggering the duty to intervene." *Bjaranson,* 873 F.2d at 1209. The evidence of record establishes that the ship's crew were never in the area of the alleged accident at or near the time Turner claims he was injured and that Turner's alleged accident was never even reported to the ship's personnel. In such circumstances, the intervention duty cannot apply.

**CONCLUSION**

Plaintiffs cannot demonstrate any breach by defendant BV Shipping of any of the limited duties owed by a shipowner under *Scindia* and *Howlett.* Plaintiff's claims against the defendant must therefore be dismissed and summary judgment in favor of defendant granted.

Respectfully submitted,

PALMER BIEZUP & HENDERSON LLP

Date: July 29, 2005

By:  /s/ Michael B. McCauley
      Michael B. McCauley (ID 2416)
      1223 Foulk Road
      Wilmington, DE 19803
      (302) 594-0895
      (302) 478-7625 (fax)
      Attorneys for Defendant,
      B.V. Shipping Company Luzon Strait
      (Groningen)

Of Counsel:
Richard Q. Whelan, Esq.
Palmer Biezup & Henderson LLP
956 Public Ledger Building
620 Chestnut Street
Philadelphia, PA 19106-3409
(215) 625-9900
(215) 925-0185 (fax)

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

JOHN TURNER, et al.            :
                                  :

       v.                  :        CIVIL ACTION NO.  04-936-JJF
                                    :

B.V. SHIPPING COMPANY     :
LUZON STRAIT (GRONINGEN)  :

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2005, I electronically filed Defendant's Motion for

Summary Judgment, Brief in Support, and Appendix (Exhibits 1-17) with the Clerk of Court

using CM/ECF which will send notification of such filing to the following:

> Stephen B. Potter, Esq.
> Potter Carmine Leonard & Aaronson, P.A.
> 840 North Union Street
> P.O. Box 514
> Wilmington, DE 19899
> spotter@pcllaw.com

I further certify that on July 29, 2005, the above documents were hand delivered to:

> Stanley B. Gruber, Esq.
> Freedman & Lorry, PC
> 400 Market Street
> Suite 900
> Philadelphia, PA 19106

PALMER BIEZUP & HENDERSON LLP

Date: July 29, 2005                  By:   /s/ Michael B. McCauley
                                     Michael B. McCauley (ID 2416)
                                     1223 Foulk Road
                                     Wilmington, DE 19803
                                     (302) 594-0895
                                     (302) 478-7625 (fax)
                                     mccauley@pbh.com