# DRS SUPERVISOR'S ACCIDENT INVESTIGATION

Date of the Report: 11-08-02

COMPANY/DIVISION REPORTING: DRS Wilmington
CITY - STATE: Wilmington Del.

NAME OF INJURED PERSON: (Rha) Tonwen
JOB CLASSIFICATION:

ADDRESS: 701 W. 19TH Street
CITY: Wilmington
STATE: Del.
ZIP CODE: 19802
TELEPHONE NO.: 302-984-0650

SOCIAL SECURITY NUMBER: [redacted]
PORT NO.:
12/6/73

AGE: 39
MARITAL STATUS: ☐ SINGLE ☒ MARRIED ☐ DIVORCED ☐ SEPARATED
NUMBER OF DEPENDENTS (SPECIFY): 3

DATE AND TIME OF ACCIDENT: 11/08/02 250 ☐ AM ☒ PM
DATE AND TIME COMPANY NOTIFIED: 250 ☒ AM ☐ PM
TO BY WHOM: Mr. Jackson / Cliff Lasch

SCENE OF ACCIDENT (BE SPECIFIC, i.e., HATCH NO., INTERSECTION, STREET/AREA, DOCK, LOCATION, ETC.):
Aboard M/V Lozen Strait
#2 Hatch "D" Deck

COMMODITY/CARGO: Frozen Meat
LOADING ☐ / UNLOADING ☒ / OTHER (EXPLAIN)

SHIP/BARGE: M/V Lozen Strait
LINE/CHARTER: C+S Mea?

SUPERVISOR: Cliff Lasch
SHIP FOREMAN: Terrin (Jackson)
HATCH FOREMAN: Bru (Jackson)

DESCRIBE ACCIDENT FULLY (GIVE DETAILS OF WHAT INJURED WAS DOING AT TIME OF ACCIDENT):

While Climbing Escape Hatch from "D" to "C" deck. Escape Hatch cover unlatched from it's securing. Mr Tonwen fell back onto "C" deck and said cover struck him in the left leg by the knee cap. Man also claims slight back ache.

DATE AND TIME WORK BEGAN: 11/08/02 7:00 ☒ AM ☐ PM
DATE AND TIME WORK FINISHED: 11/08/02 3:00 ☒ AM ☐ PM

NATURE OF INJURIES: Left Knee Cap and Lower Back

HOSPITAL/ATTENDING PHYSICIAN: Christiana Care - Wilmington Hospital
ADDRESS:

INJURED:
☐ RESUMED WORK WITHOUT TREATMENT ☐ RESUMED WORK AFTER TREATMENT ☒ WENT HOME ☐ ADMITTED TO HOSPITAL

WITNESS - NAME AND ADDRESS - PHONE NUMBER: Jerry Brady
WITNESS - NAME AND ADDRESS - PHONE NUMBER: Anthony Frazier

SUPERVISOR'S COMMENTS (WHY DID ACCIDENT OCCUR AND WHAT SHOULD BE DONE TO PREVENT RECURRENCE):

Seems as though securing pin worked out of the slot. Should be inspected before entering deck.

FOREMAN NOTIFIED: ☒ YES ☐ NO

EMPLOYEE'S SIGNATURE: [signature]
SUPERVISOR'S SIGNATURE: [signature]

LETTER - 11/13/02
[signature] Carmela Di Pietro

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

JOHN TURNER                :   CIVIL ACTION

                          :

    vs.                    :

                          :   **ORIGINAL**

SEATRADE                   :

GRONINGER B.V.             :   04-CV-0936

- - -

December 9, 2004

- - -

Oral deposition of JOHN TURNER, held in the offices of Palmer, Biezup & Henderson, 620 Chestnut Street, 956 Public Ledger Building, Philadelphia, Pennsylvania 19106, commencing at 2:10 p.m., on the above date, before Pamela J. Gober Bracic, a Federally-Approved Registered Professional Reporter and Commissioner for the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
15th Floor
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

EXHIBIT

2

**2**

```
 1   A P P E A R A N C E S :
 2
 3       FREEDMAN AND LORRY, P.C.
         BY: STANLEY B. GRUBER, ESQUIRE
         Suite 900
 4       400 Market Street
         Philadelphia, Pennsylvania 19106
 5       (215) 931-2510
         Counsel for the Plaintiffs
 6
 7       PALMER, BIEZUP & HENDERSON
         BY: RICHARD Q. WHELAN, ESQUIRE
 8       620 Chestnut Street
         956 Public Ledger Building
 9       Philadelphia, Pennsylvania 19106
         (215) 625-9900
10       Counsel for the Defendant
11                  - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1          DEPOSITION SUPPORT INDEX
 2
     Direction to Witness Not To Answer
 3   Page Line Page Line
     (None)
 4
 5
 6
 7
     Request For Production of Documents
 8   Page Line Page Line
     (None)
 9
10
11
     Stipulations
12   Page Line Page Line
        5   2-8
13
14
15
     Questions Marked
16   Page Line Page Line
     (None)
17
18
19
20
21
22
23
24
```

**3**

```
 1              - - -
 2            I N D E X
 3   WITNESS              PAGE NO.
 4   JOHN TURNER
 5      By Mr. Whelan         5
 6              - - -
 7          E X H I B I T S
 8   NO.     DESCRIPTION    PAGE NO.
 9   1    Records           42
10   2    Photos            98
11   3    Accident Report   99
12
              - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

**5**

```
 1              - - -
 2         (It is hereby stipulated and
 3      agreed by and between counsel that
 4      the reading, signing, sealing,
 5      filing and certification are
 6      waived; and that all objections,
 7      except as to the form of
 8      questions, be reserved until the
 9      time of trial.)
10              - - -
11          JOHN TURNER, after having
12      been duly sworn, was examined and
13      testified as follows:
14              - - -
15           EXAMINATION
16              - - -
17   BY MR. WHELAN:
18      Q.   Mr. Turner, my name is Rick
19   Whelan.  I represent the owners of the
20   ship called the LUZON STRAIT.  You've
21   filed a lawsuit against them for injuries
22   for your accident of November 8, 2002,
23   and we are here to ask you questions
24   about your accident, your injuries,
```

6

1 losses, et cetera.
2        If at any time you don't
3 understand any of my questions, just let
4 me know and I will rephrase the question.
5 But if you don't let me know that you
6 didn't understand, it will be assumed
7 that you understood the question. Okay?
8    A.   Yes.
9    Q.   And any of your responses
10 should be verbal rather than shaking your
11 head or saying mm-hum so the court
12 reporter can get down the proper answer.
13 Okay?
14    A.   Okay.
15    Q.   If you need a break at any
16 time we can break either for the men's
17 room or whatever. If you want to rest or
18 take a break, let me know and we will do
19 that. Okay?
20    A.   Okay.
21    Q.   Have you ever given your
22 deposition before?
23    A.   Yes.
24    Q.   How many times?

7

1    A.   Once.
2    Q.   Was it in a case that you
3 had filed before?
4    A.   Yes.
5    Q.   So you kind of know the
6 rules and the --
7    A.   No.
8    Q.   Well, the only rules are
9 basically what I'm telling you. And
10 just, again, I will stress if you don't
11 understand or it's unclear, just let me
12 know. Okay?
13    A.   Okay.
14    Q.   State your full name for the
15 record?
16    A.   John A. Turner.
17    Q.   And Mr. Turner, what is your
18 present home address?
19    A.   701 West 19th Street.
20    Q.   Wilmington?
21    A.   Yes, Wilmington, Delaware
22 19802.
23    Q.   What is your date of birth?
24    A.   12/16/63.

8

1    Q.   You are 41?
2    A.   I will be.
3    Q.   You will be 41?
4    A.   Hopefully.
5    Q.   What is your Social Security
6 number?
7    A.   ████████████
8    Q.   And your port number, if you
9 can give it to me?
10    A.   It's 7533.
11    Q.   And your height?
12    A.   Approximately six three.
13    Q.   And weight?
14    A.   About 230.
15    Q.   Is that about what your
16 weight was on the date of the accident,
17 230?
18    A.   No, no. I think I was maybe
19 ten pounds more.
20        MR. GRUBER: More or less?
21        THE WITNESS: More.
22        MR. GRUBER: I think that's
23 confusing. You want to know
24 whether he weighed more or less at

9

1    the time of the accident?
2 BY MR. WHELAN:
3    Q.   Right now you weigh 230?
4    A.   Yes.
5    Q.   Did you weigh 230 on the
6 date of the accident?
7    A.   I think I weighed a little
8 bit more.
9    Q.   A little bit more than that?
10    A.   Yes.
11    Q.   How many pounds more; about
12 ten, as you said?
13    A.   Yes.
14    Q.   So you were about 240 on the
15 date of the accident?
16    A.   Yes.
17    Q.   Give or take a few pounds?
18    A.   Approximately, yes.
19    Q.   How long have you been
20 living at the 701 West 19th Street
21 address?
22    A.   Since 1995.
23    Q.   Do you live there with
24 anyone?

3 (Pages 6 to 9)

18

```
1      Q.   So you are a member of
2  International Longshore Union.  What
3  local?
4      A.   1694.
5      Q.   And that's the local in
6  Wilmington?
7      A.   Yes.
8      Q.   How many years have you been
9  a member of that union?
10     A.   Twenty.  Almost 20.
11     Q.   So once you became -- got
12 your hours, have you worked from that
13 point in time, to date, have you worked
14 any other job for money or compensation,
15 other than working as a longshoreman?
16     A.   No.
17     Q.   When I ask that question, I
18 include -- some people call it
19 moonlighting, like people will work as a
20 longshoreman and they might do plastering
21 work or electric.
22     A.   For about a month I did work
23 for a janitorial service.  I don't
24 remember the date.  It was in the '80s.
```

19

```
1      Q.   And since your accident on
2  November 8, 2002, have you worked
3  anywhere for money, been employed or
4  worked anywhere for money?
5      A.   No.
6      Q.   You have been just
7  collecting the Harbor Workers'
8  Compensation Act compensation on a weekly
9  basis?
10     A.   Yes.
11     Q.   What is the name of the
12 janitorial service you worked for?
13     A.   I don't remember.
14     Q.   Where was it located?
15     A.   It was up on -- I don't
16 remember the proper name.  It was --
17 might have been Star Janitorial.  It was
18 up on -- it was a building like ICI.  We
19 were cleaning out offices at night.  I
20 did it for about a month.
21     Q.   Now, we got to the point
22 where you became a regular for the union.
23 You haven't had any education, vocational
24 training or anything since you've been
```

20

```
1  working as a union longshoreman?
2      A.   No.
3      Q.   Have you ever served in the
4  Armed Services of the United States?
5      A.   No.
6      Q.   Have you ever applied for or
7  received Social Security disability
8  benefits?
9      A.   Yes.
10     Q.   Which one; have you applied
11 or received or both?
12     A.   I applied for disability.
13 Social Security is what I get now.
14     Q.   You applied for Social
15 Security disability?
16     A.   Yes.
17     Q.   And you are receiving it
18 now?
19     A.   Yes.
20     Q.   How much do you receive by
21 way of those benefits either monthly or
22 weekly?
23     A.   Monthly.
24     Q.   And what is it a month?
```

21

```
1      A.   I think it's 1,576 or 1,578.
2      Q.   One thousand, five hundred
3  and seventy-eight dollars a month?
4      A.   Yes.
5      Q.   When did you start receiving
6  that?
7      A.   June of '03.
8           MR. GRUBER:  I thought it
9  was '04.
10          MR. WHELAN:  If you know,
11 Stan, just tell me.
12          THE WITNESS:  It's this
13 year, '04.
14 BY MR. WHELAN:
15     Q.   We are just doing background
16 questions, and if you are not sure or
17 whatever, ask Mr. Gruber.
18     A.   June '04.  This year.
19     Q.   Now, at the time of your
20 accident, were you a regular in what they
21 call the Jackson gang, a regular gang
22 member?
23     A.   No.
24     Q.   Were you a regular in any
```

6 (Pages 18 to 21)

14

1  part time.
2      Q.   A couple of months or
3  something?
4      A.   Yes.  It was like, I went to
5  work for a couple days and went to the
6  docks for a couple of days.
7      Q.   Would it be accurate to say
8  that after you came back from college you
9  did some part-time work with your father,
10  with the landscaping?
11      A.   Yes.
12      Q.   And at the same time when
13  you got work on the docks, you would take
14  that work, as well?
15      A.   Sometimes, yes.
16      Q.   Did there come a point in
17  time when you got a permanent job and all
18  you were doing was working on the
19  waterfront?
20      A.   No.  Everything was causal
21  at that time.
22      Q.   Did you work any other jobs
23  other than the landscaping job and the
24  causal longshore work during that time

15

1  period?
2      A.   Prior to when I came home?
3      Q.   After you came home.
4      A.   I worked for Chrysler for
5  about a year, maybe a year and a half.  I
6  can't remember the dates.
7      Q.   Was that a full-time
8  position?
9      A.   Part time.
10      Q.   What did you do for them?
11      A.   I used to make doors, put
12  the headers on the doors.  Like a
13  subassembly job.
14      Q.   Where was the Chrysler
15  facility located?
16      A.   Newark, Delaware.
17      Q.   When you say part time, how
18  many hours would you work a week,
19  approximately?
20      A.   I don't remember.  It might
21  have been three days a week.  I can't
22  remember exactly.
23      Q.   And how long did you do
24  that, a couple of years, you said?

16

1      A.   Yes.
2      Q.   And then at the same time
3  during that time period were you also
4  working on the docks?
5      A.   Yes.
6      Q.   Were you also working
7  landscaping?
8      A.   No.
9      Q.   So it was just the docks and
10  at Chrysler?
11      A.   Yes.
12      Q.   Then after that what was
13  your work situation, after those two
14  years?
15      A.   I stayed at the docks.
16      Q.   And have you been working at
17  the docks ever since?
18      A.   Yes.
19      Q.   When you first came back
20  from college and you went down to the
21  docks, as you described it, did you have
22  a connection down there, like a family
23  member or an aunt or an uncle or somebody
24  who got you into the union?

17

1      A.   I didn't have any family
2  members, no.
3      Q.   Did you have friends?
4      A.   Yes.
5      Q.   Who was the person that got
6  you in?
7      A.   Mr. Jackson.
8      Q.   And how did you know him?
9      A.   He knew my parents, and I
10  came home from school and he said --
11  asked me did I want to work, make some
12  money.  And I said yes.  And he got me a
13  job down there throwing bananas.
14      Q.   And this is Mr. Jackson,
15  Junior?
16      A.   Yes.
17      Q.   Was he the gang boss that
18  you would work for when you worked on the
19  waterfront, typically?
20      A.   Yes, sometimes.
21      Q.   So after the two years, then
22  you became regular on the waterfront?
23      A.   Yes.  I made my hours and
24  joined the union.

5  (Pages 14 to 17)

6

1  losses, et cetera.
2      If at any time you don't
3  understand any of my questions, just let
4  me know and I will rephrase the question.
5  But if you don't let me know that you
6  didn't understand, it will be assumed
7  that you understood the question. Okay?
8      A.  Yes.
9      Q.  And any of your responses
10  should be verbal rather than shaking your
11  head or saying mm-hum so the court
12  reporter can get down the proper answer.
13  Okay?
14      A.  Okay.
15      Q.  If you need a break at any
16  time we can break either for the men's
17  room or whatever. If you want to rest or
18  take a break, let me know and we will do
19  that. Okay?
20      A.  Okay.
21      Q.  Have you ever given your
22  deposition before?
23      A.  Yes.
24      Q.  How many times?

7

1      A.  Once.
2      Q.  Was it in a case that you
3  had filed before?
4      A.  Yes.
5      Q.  So you kind of know the
6  rules and the --
7      A.  No.
8      Q.  Well, the only rules are
9  basically what I'm telling you. And
10  just, again, I will stress if you don't
11  understand or it's unclear, just let me
12  know. Okay?
13      A.  Okay.
14      Q.  State your full name for the
15  record?
16      A.  John A. Turner.
17      Q.  And Mr. Turner, what is your
18  present home address?
19      A.  701 West 19th Street.
20      Q.  Wilmington?
21      A.  Yes, Wilmington, Delaware
22  19802.
23      Q.  What is your date of birth?
24      A.  12/16/63.

8

1      Q.  You are 41?
2      A.  I will be.
3      Q.  You will be 41?
4      A.  Hopefully.
5      Q.  What is your Social Security
6  number?
7      A.  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.
8      Q.  And your port number, if you
9  can give it to me?
10      A.  It's 7533.
11      Q.  And your height?
12      A.  Approximately six three.
13      Q.  And weight?
14      A.  About 230.
15      Q.  Is that about what your
16  weight was on the date of the accident,
17  230?
18      A.  No, no. I think I was maybe
19  ten pounds more.
20      MR. GRUBER: More or less?
21      THE WITNESS: More.
22      MR. GRUBER: I think that's
23  confusing. You want to know
24  whether he weighed more or less at

9

1  the time of the accident?
2  BY MR. WHELAN:
3      Q.  Right now you weigh 230?
4      A.  Yes.
5      Q.  Did you weigh 230 on the
6  date of the accident?
7      A.  I think I weighed a little
8  bit more.
9      Q.  A little bit more than that?
10      A.  Yes.
11      Q.  How many pounds more; about
12  ten, as you said?
13      A.  Yes.
14      Q.  So you were about 240 on the
15  date of the accident?
16      A.  Yes.
17      Q.  Give or take a few pounds?
18      A.  Approximately, yes.
19      Q.  How long have you been
20  living at the 701 West 19th Street
21  address?
22      A.  Since 1995.
23      Q.  Do you live there with
24  anyone?

3 (Pages 6 to 9)

10

1    A.    My wife and four children.
2    Q.    What is your wife's name?
3    A.    Nanette Turner, Nanette M.
4  Turner, N-A-N-E-T-T-E.
5    Q.    How many years have you been
6  married or when did you get married?  I
7  don't want to put you in a bad spot here.
8    A.    We have been together since
9  high school.
10   Q.    And your children's names?
11   A.    Tasha, John, Steven and
12 Daniel.
13   Q.    And could you give me their
14 ages?
15   A.    Tasha is 20, John is 17,
16 Steven is 16 and Daniel is 14.
17   Q.    And are all of those
18 children living with you presently?
19   A.    Yes, sir.
20   Q.    Are they all dependent upon
21 you or is Tasha independent at age 20?
22   A.    She depends on me, she's in
23 college.
24   Q.    What high school did you

11

1  graduate from?
2    A.    Delcastle Technical High
3  School.
4    Q.    What year did you graduate?
5    A.    1982.
6    Q.    And after you graduated from
7  Delcastle Vo-tech High School, did you
8  have any subsequent education or
9  training?
10   A.    Yes, I went one year to
11 Denmark Vo-tech.  It's in --
12   Q.    Where is it located?
13   A.    In South Carolina.
14   Q.    What did you study there?
15   A.    Really nothing.
16   Q.    Why did you go?  What was
17 the reason for going there, what were you
18 trying to get experience in?
19   A.    Actually, I got a
20 scholarship for basketball, really.
21   Q.    Is that a four-year college
22 or a junior college?
23   A.    I think junior college.
24   Q.    Did you have a major or

12

1  anything?
2    A.    No.
3    Q.    Did you successfully
4  complete that semester or not?
5    A.    I don't remember.  I think
6  when I came home I didn't go back.
7    Q.    So did you go through to
8  Christmas and then you didn't go back?
9    A.    Yes.  I came home around
10 December.
11   Q.    Why didn't you go back?
12   A.    I started a family.
13   Q.    So after you came back --
14 I'm sorry, I didn't mean to interrupt
15 you.
16   A.    That's okay.
17   Q.    First of all, while you were
18 at this college in South Carolina, were
19 you employed in any way or were you just
20 going to school and playing basketball?
21   A.    Just going to school and
22 playing basketball.
23   Q.    When you came back in
24 December, what was your first job after

13

1  you got back home?  I want to take you
2  through your employment history up to
3  when you became a longshoreman.
4    A.    When I came back I went down
5  to the docks.  At that time they were
6  selling banana boxes on the Del Monte
7  ship at the time.
8    Q.    So you went right to work as
9  a longshoreman when you got back?
10   A.    Not right back.
11   Q.    Your first job --
12   A.    My first job after I came
13 back from school, I was working for my
14 father part time.
15   Q.    What was that job?
16   A.    Landscaping.
17   Q.    Does he have a landscaping
18 business?
19   A.    Yes.  He was working for
20 Stires at the time.  J. Franklin Stires
21 on 202.
22   Q.    And how long did you do that
23 before you went to the docks?
24   A.    I don't remember.  It was

4 (Pages 10 to 13)

14

1  part time.
2      Q.  A couple of months or
3  something?
4      A.  Yes.  It was like, I went to
5  work for a couple days and went to the
6  docks for a couple of days.
7      Q.  Would it be accurate to say
8  that after you came back from college you
9  did some part-time work with your father,
10  with the landscaping?
11     A.  Yes.
12     Q.  And at the same time when
13  you got work on the docks, you would take
14  that work, as well?
15     A.  Sometimes, yes.
16     Q.  Did there come a point in
17  time when you got a permanent job and all
18  you were doing was working on the
19  waterfront?
20     A.  No.  Everything was causal
21  at that time.
22     Q.  Did you work any other jobs
23  other than the landscaping job and the
24  causal longshore work during that time

15

1  period?
2      A.  Prior to when I came home?
3      Q.  After you came home.
4      A.  I worked for Chrysler for
5  about a year, maybe a year and a half.  I
6  can't remember the dates.
7      Q.  Was that a full-time
8  position?
9      A.  Part time.
10     Q.  What did you do for them?
11     A.  I used to make doors, put
12  the headers on the doors.  Like a
13  subassembly job.
14     Q.  Where was the Chrysler
15  facility located?
16     A.  Newark, Delaware.
17     Q.  When you say part time, how
18  many hours would you work a week,
19  approximately?
20     A.  I don't remember.  It might
21  have been three days a week.  I can't
22  remember exactly.
23     Q.  And how long did you do
24  that, a couple of years, you said?

16

1      A.  Yes.
2      Q.  And then at the same time
3  during that time period were you also
4  working on the docks?
5      A.  Yes.
6      Q.  Were you also working
7  landscaping?
8      A.  No.
9      Q.  So it was just the docks and
10  at Chrysler?
11     A.  Yes.
12     Q.  Then after that what was
13  your work situation, after those two
14  years?
15     A.  I stayed at the docks.
16     Q.  And have you been working at
17  the docks ever since?
18     A.  Yes.
19     Q.  When you first came back
20  from college and you went down to the
21  docks, as you described it, did you have
22  a connection down there, like a family
23  member or an aunt or an uncle or somebody
24  who got you into the union?

17

1      A.  I didn't have any family
2  members, no.
3      Q.  Did you have friends?
4      A.  Yes.
5      Q.  Who was the person that got
6  you in?
7      A.  Mr. Jackson.
8      Q.  And how did you know him?
9      A.  He knew my parents, and I
10  came home from school and he said --
11  asked me did I want to work, make some
12  money.  And I said yes.  And he got me a
13  job down there throwing bananas.
14     Q.  And this is Mr. Jackson,
15  Junior?
16     A.  Yes.
17     Q.  Was he the gang boss that
18  you would work for when you worked on the
19  waterfront, typically?
20     A.  Yes, sometimes.
21     Q.  So after the two years, then
22  you became regular on the waterfront?
23     A.  Yes.  I made my hours and
24  joined the union.

5  (Pages 14 to 17)

18

```
 1        Q.    So you are a member of
 2   International Longshore Union.  What
 3   local?
 4        A.    1694.
 5        Q.    And that's the local in
 6   Wilmington?
 7        A.    Yes.
 8        Q.    How many years have you been
 9   a member of that union?
10        A.    Twenty.  Almost 20.
11        Q.    So once you became -- got
12   your hours, have you worked from that
13   point in time, to date, have you worked
14   any other job for money or compensation,
15   other than working as a longshoreman?
16        A.    No.
17        Q.    When I ask that question, I
18   include -- some people call it
19   moonlighting, like people will work as a
20   longshoreman and they might do plastering
21   work or electric.
22        A.    For about a month I did work
23   for a janitorial service.  I don't
24   remember the date.  It was in the '80s.
```

19

```
 1        Q.    And since your accident on
 2   November 8, 2002, have you worked
 3   anywhere for money, been employed or
 4   worked anywhere for money?
 5        A.    No.
 6        Q.    You have been just
 7   collecting the Harbor Workers'
 8   Compensation Act compensation on a weekly
 9   basis?
10        A.    Yes.
11        Q.    What is the name of the
12   janitorial service you worked for?
13        A.    I don't remember.
14        Q.    Where was it located?
15        A.    It was up on -- I don't
16   remember the proper name.  It was --
17   might have been Star Janitorial.  It was
18   up on -- it was a building like ICI.  We
19   were cleaning out offices at night.  I
20   did it for about a month.
21        Q.    Now, we got to the point
22   where you became a regular for the union.
23   You haven't had any education, vocational
24   training or anything since you've been
```

20

```
 1   working as a union longshoreman?
 2        A.    No.
 3        Q.    Have you ever served in the
 4   Armed Services of the United States?
 5        A.    No.
 6        Q.    Have you ever applied for or
 7   received Social Security disability
 8   benefits?
 9        A.    Yes.
10        Q.    Which one; have you applied
11   or received or both?
12        A.    I applied for disability.
13   Social Security is what I get now.
14        Q.    You applied for Social
15   Security disability?
16        A.    Yes.
17        Q.    And you are receiving it
18   now?
19        A.    Yes.
20        Q.    How much do you receive by
21   way of those benefits either monthly or
22   weekly?
23        A.    Monthly.
24        Q.    And what is it a month?
```

21

```
 1        A.    I think it's 1,576 or 1,578.
 2        Q.    One thousand, five hundred
 3   and seventy-eight dollars a month?
 4        A.    Yes.
 5        Q.    When did you start receiving
 6   that?
 7        A.    June of '03.
 8             MR. GRUBER:  I thought it
 9   was '04.
10             MR. WHELAN:  If you know,
11   Stan, just tell me.
12             THE WITNESS:  It's this
13   year, '04.
14   BY MR. WHELAN:
15        Q.    We are just doing background
16   questions, and if you are not sure or
17   whatever, ask Mr. Gruber.
18        A.    June '04.  This year.
19        Q.    Now, at the time of your
20   accident, were you a regular in what they
21   call the Jackson gang, a regular gang
22   member?
23        A.    No.
24        Q.    Were you a regular in any
```

22

1  gang?
2      A.   Yes.
3      Q.   Which gang were you a
4  regular in?
5      A.   Rice.
6      Q.   Is that Albert Rice?
7      A.   Exactly.
8      Q.   On the date of the accident
9  were you working for the Rice gang or the
10 Jackson gang?
11     A.   Jackson gang.
12     Q.   So you would get picked up
13 by Jackson if Rice wasn't working that
14 day, you would get picked up as an extra?
15     A.   That's correct.
16     Q.   Is that what happened on the
17 date of the accident?
18     A.   Yes.
19     Q.   And what is your job in the
20 Rice gang; holdman, deckman?
21     A.   Deckman, crane driver.
22     Q.   What was your job in the
23 Jackson gang on the date of the accident?
24     A.   Holdman.

23

1      Q.   You had worked as a holdman
2  before the day of the accident on other
3  ships?
4      A.   Yes.
5      Q.   About how many times in your
6  career, before the date of the accident,
7  do you think or however you can quantify
8  it --
9      A.   All of them.
10     Q.   You've worked all jobs?
11     A.   Yes.
12     Q.   And you had hundreds of days
13 of experience as a holdman before the
14 date of your accident?
15.    A.   Yes.  I started as a
16 holdman.
17     Q.   How many years did you work
18 as a holdman in your 20-year period
19 before you became a deckman?
20     A.   Ten, maybe.  Just guessing.
21     Q.   Is the Jackson gang a house
22 gang for Dole or any other company?
23     A.   No.
24          MR. GRUBER:  Off the record.

24

1          - - -
2          (Whereupon, a discussion was
3  held off the record.)
4          - - -
5  BY MR. WHELAN:
6      Q.   On the date of your
7  accident, your employer, your stevedoring
8  company, was Delaware River Stevedores,
9  Incorporated?
10     A.   Yes.
11     Q.   Have you ever, Mr. Turner,
12 applied for or received unemployment
13 compensation benefits?
14     A.   Yes.
15     Q.   When is the last time you
16 did that?
17     A.   In the '80s, mid '80s.
18     Q.   Where would the office be
19 where you would have applied for that?
20     A.   Unemployment office?
21     Q.   Yes.  Where would you go in
22 Delaware?  I'm assuming you have to go
23 somewhere and fill out a form and submit
24 it.

25

1      A.   It's been so long.  It used
2  to be on Lancaster Avenue.  I don't know
3  where it's at now.
4      Q.   In Wilmington?
5      A.   Yes.  Now it's in the city
6  somewhere, but I don't know where it's
7  at.
8      Q.   Have you applied for or
9  received unemployment benefits since the
10 date of your accident, November 2, 2002?
11     A.   No.  November 8th.
12     Q.   No?
13     A.   No.
14     Q.   You haven't worked at all
15 since the date of your accident.  Is that
16 correct?
17     A.   That's correct.
18     Q.   Now, with regard to the
19 injuries that you sustained on November
20 8, 2002, can you tell us what parts of
21 your body you injured that day?
22     A.   My back, my leg and my knee.
23     Q.   Let's start with the back.
24 Where in the back is it; low back,

7 (Pages 22 to 25)

26

1    mid-back, upper back?
2    A.   Lower back.
3    Q.   And the leg, which leg?
4    A.   Left.
5    Q.   And which knee?
6    A.   Left.
7    Q.   Any other parts of your body
8    that were injured that day?
9    A.   No.  Well, no.
10   Q.   Now, as you sit here today,
11   have you taken any prescription
12   medication before you came here?
13   A.   Yes.
14   Q.   What drugs have you taken?
15   A.   Celebrex this morning, I
16   took a half of a Percocet.  I just took
17   another half about half an hour ago.
18   Q.   Are any of these drugs or
19   the effects from them making it so you
20   can't testify or can't understand my
21   questions?  Do you feel like you are
22   okay?
23   A.   Well, I'm dizzy, but, you
24   know.

27

1    Q.   If you feel that the effects
2    of the drugs or whatever are interfering
3    with your ability for you to understand
4    my questions and answer them, let me
5    know.  Okay?
6    A.   Okay.
7    Q.   Or let your attorney know
8    and he can let me know.  All right?
9    A.   All right.
10   Q.   Now, sitting here today are
11   you experiencing any pain?
12   A.   Yes.
13   Q.   Where do you presently feel
14   the pain?
15   A.   My inner thigh, leg.
16   Q.   That's left?
17   A.   Yes, left leg.  My lower
18   back, my foot is numb.
19   Q.   Is that your left foot?
20   A.   Left foot is numb.  I feel a
21   burning and tingling sensation in my
22   foot.  It's getting ready to rain or
23   something.
24   Q.   Left foot?

28

1    A.   Yes.
2    Q.   Anything else?  Not that
3    that isn't enough.
4    A.   My back is bothering me.
5    Q.   You have pain in your low
6    back?
7    A.   Yes.
8    Q.   If you could describe for me
9    where the pain is in your low back; is it
10   at the beltline, below the beltline,
11   above the beltline?
12   A.   My lower back.  I don't know
13   where the beltline is.
14   Q.   If you look at where my
15   beltline is, on your body --
16   A.   Approximately where your
17   beltline is.
18   Q.   About the beltline there?
19   A.   Yes.
20   Q.   Now, before November 8,
21   2002, had you ever experienced pain in
22   your low back?
23   A.   Yes.
24   Q.   When was that?

29

1    A.   In 1998, 1999, in that
2    period.
3    Q.   And what was the problem?
4    A.   I was in an automobile
5    accident.
6    Q.   Were you rear-ended?
7    A.   Yes, sir.
8    Q.   What was the date of that
9    accident?
10   A.   I'm not quite sure of the
11   date.  I think it was May of '98 or '97
12   or '98.  In that area, in the '90s.
13   Q.   In your Answers to
14   Interrogatories you indicate that you
15   filed an underinsured motorist claim as a
16   result of a 1999 motor vehicle accident.
17   A.   Okay.
18   Q.   And you filed an arbitration
19   in the Superior Court of Wilmington, and
20   the claim was settled for policy limits.
21   And you were represented by Vincent
22   Romano.  Is that the accident you are
23   talking about?
24   A.   Yes, sir.

8  (Pages 26 to 29)

30

1  Q.  So it would be '97, '98,
2  '99, somewhere in that area?
3  A.  Yes.
4  Q.  Any other automobile
5  accidents you've ever been involved in,
6  other than that one?
7  A.  No.
8  Q.  Now, before November 8,
9  2002, had you ever had pain in your left
10 leg or left knee?
11 A.  Say that again?
12 Q.  Before November 8, 2002, the
13 date of the accident, had you ever
14 experienced pain in your left leg or left
15 knee?
16 A.  No.
17 Q.  Before November 8, 2002, you
18 obviously, with regard to the motor
19 vehicle accident, had received treatment
20 for your low back problem.  Is that
21 correct?
22 A.  I received therapy.
23 Q.  Did you go to a hospital?
24 A.  Yes.

31

1  Q.  On the date of the accident?
2  A.  Yes.
3  Q.  Which hospital was that?
4  A.  I'm assuming Wilmington.  I
5  don't remember.  It was in the city, so
6  Wilmington General, I guess.
7  Q.  What street is that on?
8  A.  13th Street.  Washington
9  Street -- 13th and Washington.
10 Q.  Did you go to the emergency
11 room?
12 A.  Yes.
13 Q.  Did you --
14 A.  The ambulance came and got
15 me out the truck.
16 Q.  Were you driving in that
17 accident?
18 A.  Yes.
19 Q.  What were you driving?
20 A.  My truck.
21 Q.  Did you have a pickup truck?
22 A.  Yes, sir.
23 Q.  Could you describe the
24 damage to your pickup truck?

32

1  A.  It pushed my bumper
2  underneath my truck, back bumper.
3  Q.  What did you get hit by,
4  what kind of vehicle; a car, a truck?
5  A.  It was a car.
6  Q.  Was there anyone else in the
7  car with you?
8  A.  No.
9  Q.  And you were taken by
10 ambulance to the emergency room?
11 A.  Yes.
12 Q.  Do you remember the dollar
13 amount of damage that you had sustained
14 to your truck?
15 A.  Whatever the policy limits
16 were.
17    MR. GRUBER:  He said damage
18    to your truck.
19    THE WITNESS:  Oh, I don't
20    remember.
21 BY MR. WHELAN:
22 Q.  Was it totaled?
23 A.  No.
24 Q.  So was it fixed?

33

1  A.  Yes.
2  Q.  By your insurance company or
3  did you do it on your own?
4  A.  Yes, I think the insurance
5  company took care of it for me.
6  Q.  Do you know the name of the
7  insurance company you had at the time?
8  A.  Still have it.  Nationwide.
9  Q.  Did they pay for your
10 medicals, as well, under your
11 underinsured or uninsured motorist?
12 A.  I think they did, yes.
13 Q.  Did you receive treatment
14 from an orthopedic doctor for those back
15 injuries?
16 A.  No.
17 Q.  Who treated you for the back
18 injuries?
19 A.  My family doctor, which is
20 Dr. Song.  And he referred me to Dynamics
21 Physical Therapy.  I can't remember where
22 it's located at.
23 Q.  Is it in Wilmington?
24 A.  Yes.

9 (Pages 30 to 33)

**34**

1  Q.   Other than Dr. Song, did you
2  receive treatment anywhere else for those
3  injuries from the 1999 automobile
4  accident?
5      A.   No, sir.
6      Q.   Other than that accident,
7  before November 8, 2002, the accident you
8  are here to testify to today, had you
9  been in any other accidents where you
10  hurt your back?
11     A.   No, not that I remember.
12     Q.   Before this accident, had
13  you ever received any medical treatment
14  from any doctors, physical therapists, et
15  cetera, for problems with your left leg
16  or knee?
17     A.   Before the accident?
18     Q.   Right.
19     A.   No.
20     Q.   For example, in basketball
21  did you ever sprain your left knee or
22  have a problem with your left knee?
23     A.   No.
24     Q.   In connection with your 1999

**35**

1  automobile accident, did you have an MRI
2  scan of your back?
3      A.   No, sir.
4      Q.   Had you ever, before the
5  accident of November 8, 2002, when you
6  got hurt on the LUZON STRAIT, had you
7  ever had an MRI of your back?
8      A.   No, sir.
9      Q.   What about of prior to the
10  date of the accident, had you ever had an
11  MRI or x-ray of your left knee or left
12  leg?
13     A.   Prior to the accident of
14  November 8, 2002?
15     Q.   Yes.
16     A.   I think I might have had an
17  x-ray of my leg -- my knee.
18     Q.   And when would that have
19  been, and for what?
20     A.   That would have been either
21  from the car accident -- I'm not sure.
22  Yes, that would be from the accident with
23  the car.
24     Q.   Other than that, any other

**36**

1  x-rays or MRIs of the left leg or left
2  knee before your accident on the LUZON
3  STRAIT?
4      A.   No.
5      Q.   After the automobile
6  accident, did you miss any work as a
7  longshoreman?
8      A.   Yes.
9      Q.   How long were you out of
10  work?
11     A.   A few months, give or take.
12     Q.   A few months?
13     A.   Yes.
14     Q.   Now, have you ever received
15  treatment for drug, alcohol or substance
16  abuse in your lifetime?
17     A.   Never.
18     Q.   On the date of this
19  accident, had you taken any type of drug
20  or substance or alcohol before your
21  accident occurred?
22     A.   No.
23     Q.   Have you ever been treated
24  by a chiropractor in your lifetime?

**37**

1      A.   No.
2      Q.   Prior to November 8, 2002,
3  have you ever had an EMG or a nerve
4  conduction study?
5      A.   I don't remember.
6      Q.   Now, before November 8,
7  2002, had you ever received treatment for
8  any type of chronic condition, like
9  cancer or anemia or something of that
10  nature?
11     A.   No, sir.
12     Q.   Have you ever been
13  hospitalized between, say, when you
14  graduated from college up until the time
15  of the accident on November 8, 2002?
16     A.   I never graduated from
17  college.
18     Q.   From the time you left
19  college up until the accident of November
20  8, 2002.
21     A.   No.
22     Q.   Had you ever had any
23  surgeries at all before November 8, 2002?
24     A.   No, sir.

10  (Pages 34 to 37)

38

1    Q.    Other than the car accident
2    and this accident of November 8, 2002,
3    have you ever had any visits to the
4    emergency room?
5    A.    I think one time. I don't
6    remember the date. It was the flu, the
7    first time I ever caught the flu.
8    Q.    Where did you go, Wilmington
9    Hospital?
10    A.    Yes, sir.
11    Q.    When was that?
12    A.    I don't remember the date.
13    Q.    Was it recently?
14    A.    No. Back in the '80s. I
15    think the last time I was sick -- well.
16    Q.    Your family doctor is Dr.
17    Song. That's who you would go to if you
18    had the flu or a problem, assuming he was
19    open at the time?
20    A.    Yes.
21    Q.    How many years has Dr. Song
22    been your family doctor?
23    A.    I think since I was 14.
24    Q.    Did you ever file a lawsuit?

39

1    You filed an arbitration in connection
2    with your automobile accident. Is that
3    right?
4    A.    Yes.
5    Q.    Other than this lawsuit,
6    have you ever filed a lawsuit in your
7    lifetime for injuries or for any other
8    reason?
9    A.    No, sir.
10    Q.    Have you ever been sued?
11    A.    No.
12    Q.    I mean as a defendant.
13    A.    No.
14    Q.    Other than this accident on
15    November 8, 2002, have you ever collected
16    compensation benefits from your stevedore
17    employer under the Longshoreman's Act?
18    A.    Yes.
19    Q.    Tell me about that.
20    A.    I collected. It was back in
21    the '80s. I don't quite remember what
22    happened to me. I collected for maybe
23    two or three months. I think something
24    to do with my hand. I'm not quite sure

40

1    what happened.
2    Q.    Some kind of injury to your
3    hand?
4    A.    Yes.
5    Q.    Do you remember which hand,
6    right or left?
7    A.    I don't remember.
8    Q.    What company were you
9    working for?
10    A.    I think at the time it was
11    Wilmington Stevedores.
12    Q.    Did you get treatment from a
13    doctor for that injury?
14    A.    I think so. I don't
15    remember, to be honest. I probably got
16    treated, but I don't remember.
17    Q.    You can't recall who the
18    doctor was?
19    A.    I don't remember. I don't
20    know if I went to the emergency room or
21    whatever. It's been a long time.
22    Q.    Now, since your accident of
23    November 8, 2002, have you had any other
24    accidents where you've aggravated these

41

1    injuries, like falling down or some sort
2    of accident like that?
3    A.    No.
4    Q.    Now, before your accident of
5    November 8, 2002, had you regularly
6    worked on refrigerated ships that came
7    into Wilmington that had either fruit or
8    meat or fish?
9    A.    Yes.
10    Q.    So this was nothing new to
11    you, the LUZON STRAIT, to go aboard and
12    work on a reefer ship?
13    A.    The ship was new. I'd been
14    working on ships.
15    Q.    The ship was new, you had
16    never worked on what ship before?
17    A.    Right. I had never worked
18    on that ship before.
19    Q.    You said you had worked
20    regularly as a holdman before your
21    accident of November 8, 2002. Does that
22    mean that you regularly would climb up
23    and down ship's ladders and go through
24    access ways or manholes that had covers

11 (Pages 38 to 41)

42

1   on them to get to and from cargo holds?
2       A.   Yes.
3       Q.   So that's something you had
4   a lot of experience with?
5       A.   Yes.
6       Q.   Now, I'm trying to find out
7   the schedule of the ship.  The date of
8   your accident, was that your first day of
9   work aboard the ship or had you worked
10  previous days?
11      A.   I had work a previous day.
12      Q.   Just one previous day?
13      A.   I'm not sure.  My gang was
14  on it for one day.  Number one hatch.
15      Q.   For one day at number one
16  hatch?
17      A.   I think so, yes.
18      Q.   And that would be the day
19  before the accident, November 7th?
20      A.   Yes, sir, I think that's
21  correct.
22          MR. WHELAN:  Let's mark this
23      as Turner Exhibit-1.
24              - - -

43

1          (Whereupon, Exhibit Turner-1
2       was marked for identification.)
3              - - -
4   BY MR. WHELAN:
5       Q.   We have marked as Turner
6   Exhibit-1 a group of Delaware Stevedores,
7   Incorporated records, and it consists of
8   ten pages.  I want you to focus on a page
9   in the back here.  There's a page of
10  handwritten records.  It looks like it's
11  the fourth one from the bottom.
12          MR. GRUBER:  What is the
13      date on it?
14  BY MR. WHELAN:
15      Q.   It says Wednesday, November
16  6th, and then LUZON STRAIT.  Now, it
17  appears to me that's the first day of
18  work aboard the ship, Mr. Turner.
19          Can you tell me from that
20  document whether your gang worked that
21  day, November 6th?
22      A.   We would have worked number
23  one hatch the first day.  What is the
24  date on that?

44

1       Q.   November 6th.  That would
2   have been two days before your accident.
3       A.   I don't know if my gang
4   worked it or not.  I'm not quite sure  if
5   I worked it that day or I might have been
6   ordered out on the crane somewhere else
7   and came back the next day.  I'm not
8   quite sure about November 6th.  If my
9   gang was on it, I probably would have
10  worked it.  Rice's gang.
11      Q.   You had testified that on
12  the date of your accident, you were
13  working for the Jackson gang.  Is that
14  correct?
15      A.   That's correct.
16      Q.   So would all of your work
17  aboard the ship been for the Jackson
18  gang?
19      A.   No.
20      Q.   So it's your best
21  recollection that you only worked on
22  November 7th and November 8th?
23      A.   To the best of my knowledge.
24  I'm not quite sure.  I would really have

45

1   to look through my book.  I don't
2   remember if I worked it on the 6th.  If
3   my gang was on it, I probably would have
4   been on the crane.
5       Q.   On the crane?
6       A.   Yes.
7       Q.   And what crane would that
8   have been?
9       A.   Number one elevator or
10  crane, whatever they want to describe it
11  as.
12      Q.   Can you describe that for
13  us?  Do you remember operating that
14  crane?
15      A.   Yes.
16      Q.   Which day did you operate
17  the crane, if you remember; was it the
18  day of your accident?
19      A.   Not the day of the accident,
20  it would have been the day before, which
21  would have been the 7th.  I remember
22  operating it on the 7th, because number
23  one hatch was difficult.  It was an easy
24  thing to operate, but they made sure I

12  (Pages 42 to 45)

46

1  was there because of -- whoever the
2  deckie was -- instead of using the button
3  they did it manually, they used the
4  levers, the joy sticks.
5       Q.   There's a page dated
6  November 7th, handwritten page, that
7  looks like about the fifth page from the
8  bottom.  At the top left side it has
9  number one hatch and then Rice, with two
10 lines under it.  Is that correct?
11      A.   Yes.
12      Q.   So you would have worked
13 November 7th for the Rice gang?
14      A.   Yes.
15      Q.   It looks like they started
16 at number one, shifted to number two,
17 back to number one and then shifted to
18 number two?
19      A.   Yes.  If that's what they
20 have down, yes.
21      Q.   So that day you would have
22 been only operating the crane?
23      A.   Yes.
24      Q.   You wouldn't have been in

47

1  the hold at all?
2       A.   Yes.
3       Q.   The first day you would been
4  in the hold was the November 8, 2002, the
5  day of the accident, when you were on the
6  Jackson gang?
7       A.   Yes.
8       Q.   Now, on that date, November
9  8, 2002, the top page says that cargo
10 operations started number three, 7:00
11 a.m., and went to 11:00 a.m. and then it
12 went from number two, 11:00 a.m. to 3:00
13 p.m.  Does that refer to the Jackson
14 gang?
15      A.   Yes, sir.
16      Q.   Is the Jackson gang the only
17 gang that was called back for that last
18 day?
19      A.   Yes, sir.
20      Q.   And did you report to work
21 prior to 7:00 in the morning for the
22 Jackson gang?
23      A.   That's when I was hired to
24 work that morning.

48

1       Q.   And did you, starting at
2  seven o'clock, work as a holdman?
3       A.   Yes.
4       Q.   Do you remember going down
5  into the number three hatch?
6       A.   I would have been on the
7  second shift.  So I would have went down
8  at 9:30, probably to 11:00, on the number
9  three.  That's probably what I did.  Came
10 up -- we probably finished that hatch,
11 evidently.  We never went back in there.
12 And we went down number two.
13      I don't remember if it was
14 broken open or -- I don't remember if it
15 was broken open.  I remember going down,
16 and we brought the machine in.  They had
17 the bring the machines in from hatch
18 three, take them out and bring them down
19 to hatch two and put them on the plate,
20 lift them on, bring them in, take them
21 off and then we would load the plate as
22 it would go outside instead of wasting
23 time.
24      Do you follow me?

49

1       Q.   Yes.
2       What was the cargo you were
3  discharging?
4       A.   Meat.
5       Q.   Frozen meat?
6       A.   Yes.
7       Q.   Was it in pallets?
8       A.   Yes.
9       Q.   And when you were in the
10 number three hatch, starting from 9:30 to
11 11:00, were you spelling; not all of the
12 men were working at the same time?
13      A.   Yes.
14      Q.   Who was in your spelling
15 shift of holdmen, if you can recall?
16      A.   Let's see.  I was Grinnel
17 Williams, Gregory Ringgold, Sean Brady,
18 Anthony Frazier was down there, and I
19 believe me and Ron shared the same
20 machine.  So I relieved Ron Anderson.
21      Q.   So you were a forklift
22 driver at that time?
23      A.   Yes.
24      Q.   And that would have been

13 (Pages 46 to 49)

50

1    when you worked in number three and
2    number two?
3        A.   Yes, sir.
4        Q.   Why don't you just tell me
5    what your spelling shifts were.  We
6    already have the first one, 9:00 to
7    11:00.  And then were you off for a
8    period of time?
9        A.   From 12:00 to 1:00 we broke
10   for lunch.
11       Q.   So you were off from 11 --
12       A.   No, I was still working.  I
13   was off from 12:00 to 1:00.  I came back
14   at one o'clock, because Mr. Jackson said,
15   I want everybody back.  And he rounded us
16   up and he said, split the time.  Don't
17   let them do the same shit.
18           So in other words, we were
19   going to do two and a half hours a piece,
20   instead of us me doing two and them doing
21   three.
22       Q.   You were on from 9:30 until
23   11:00?
24       A.   9:30 until 12:00.

51

1        Q.   In number three?
2        A.   Three hatch, yes.
3        Q.   And then you were from 11:00
4    to 12:00 in number two?
5        A.   Right.
6        Q.   And then you came back at
7    1:00?
8        A.   I didn't go back in the
9    hatch at 1:00.  I came back.
10       Q.   When did you go back in the
11   hatch?
12       A.   Two o'clock.
13       Q.   2:00 to 3:00?
14       A.   Yes, until we finished.
15       Q.   So the first time you went
16   in to number two would have been at 11:00
17   a.m.?
18       A.   Yes.
19       Q.   And when you went in to
20   number three, did you use any of the
21   ladders and access manhole covers to go
22   in and out of number three?
23       A.   Yes.
24       Q.   Did you have any trouble

52

1    going up and down the ladders or using
2    the access covers?
3        A.   In number three?
4        Q.   Yes.
5        A.   No.
6        Q.   Do you remember, in number
7    three, where the ladders and assesses
8    were located that you were using to get
9    in and out of the hatch?
10       A.   No, I don't remember.
11       Q.   Can you describe them for
12   me, what the access covers were like and
13   so forth in number three?
14       A.   No.
15       Q.   Let's go to number two.  In
16   your Answers to Interrogatories you had
17   indicated that you had climbed in and out
18   of the D deck, which is the bottom most
19   deck, three times prior to the accident.
20   That that means down and up once, down
21   and up twice, down and up three times?
22       A.   No.  I would have went down
23   in the morning, up, that's two, and,
24   right, down in the afternoon and then

53

1    back up, which is four.
2        Q.   Let's count down the ladder
3    and up the ladders as --
4        A.   Number two hatch, right?
5        Q.   Just number two.  Let me go
6    through this carefully.  At 11:00 a.m.
7    you went down the access ladders and
8    through the manholes to the D deck into
9    number two at 11:00 a.m.?
10       A.   Correct.  Around that time,
11   yes.
12       Q.   Approximately?
13       A.   Approximately, yes.
14       Q.   And then at 12:00 or
15   approximately at that time, you came back
16   up the same ladders and through the same
17   accesses?
18       A.   Yes.
19       Q.   And then you had your lunch
20   break.  And then at two o'clock you came
21   down, all the way down the same way?
22       A.   Same way.
23       Q.   And then back up the same
24   way?

14 (Pages 50 to 53)

54

1    A.    Yes, sir.
2    Q.    So that's a total of two
3  round trips?
4    A.    Okay.
5    Q.    Is that right?
6    A.    Yes.
7    Q.    In your Answers to
8  Interrogatory it says D deck three times.
9  This is Answer to Interrogatory No. 15.
10  It doesn't say the hatch number. So that
11  is including going down and back in
12  number three that day?
13    A.    Yes.
14    Q.    So it would be three round
15  trips, including the morning work and
16  number three.
17        So to recap, you worked in
18  number three from 9:30 to 11:00. You
19  went down at 9:30 in number three, and
20  back up at 11:00. That's one round trip.
21  Right?
22    A.    Yes.
23    Q.    And then at 11:00 you go
24  down, and then back and at 12:00 from

55

1  number two?
2    A.    That's correct.
3    Q.    That's two. And the last
4  time or the third round trip, back down
5  and back up at 2:00?
6    A.    That's correct.
7    Q.    So I'm clear, the two round
8  trips that you did on the ladders and
9  through the manholes in number two were
10  the same route; you didn't change routes?
11  It was the same ladders and access covers
12  you went through?
13    A.    Yes.
14    Q.    Now, what time did your
15  accident happen?
16    A.    Approximately around quarter
17  to 3:00, 2:40, 2:45.
18    Q.    And had your gang finished
19  the hatch at that time, and you were
20  leaving?
21    A.    The gang that I was working
22  in finished the hatch, the Jackson gang.
23  We were finished.
24    Q.    And going back a little bit,

56

1  we already went through the name of the
2  vessel. Do you remember if the ship was
3  birthed with the port side or the
4  starboard side to the pier you were
5  working at?
6        The starboard side, the
7  pointy side, is the right and the port
8  side to be to your left?
9    A.    The nose was facing Jersey.
10  So that would have been starboard side.
11    Q.    So you were kind of facing
12  out towards the Delaware River, or the
13  ship was?
14    A.    Yes.
15    Q.    And when you went into
16  number two D at 11:00 a.m., you went down
17  with these men that you just described
18  for us. Is that correct?
19    A.    Yes.
20    Q.    Did you all go down at the
21  same time?
22    A.    No.
23    Q.    So you would just go down
24  and relieve your person. That's the only

57

1  thing you were concerned about?
2    A.    Yes, sir.
3    Q.    At that time was the
4  forklift already on the number two D
5  deck?
6    A.    Yes.
7    Q.    How many forklifts were in
8  there?
9    A.    Three.
10    Q.    And you were going to --
11    A.    That I remember.
12    Q.    And you were going to
13  operate one of them?
14    A.    Yes.
15    Q.    And who were the two other
16  forklift operators of these fellows? We
17  have Williams, Ringgold and Frazier.
18    A.    Ringgold and Grinnel.
19  Frazier would have been the brakeman for
20  us. Do you follow me?
21    Q.    All right. So you had
22  Grinnel Williams, and Ringgold and
23  yourself operating forklifts. Was there
24  a fourth guy in the hatch at the time?

58

1    A.   No.
2    Q.   It was just the three of
3  you?
4    A.   Yes.
5    Q.   You didn't need anyone to
6  hook you up, because you were just on
7  this tray as you described it, and the
8  elevator as you described it?
9    A.   Yes.
10    Q.   And when you went down, as
11  you were going down, did you experience
12  any problems with -- first of all, were
13  all of the access covers to the ladder
14  open as you went down?
15    A.   Yes.
16    Q.   And as you were going down
17  that first time, were they all secured in
18  the open position?
19    A.   Yes.
20    Q.   Did you check as you went
21  down each level to be sure that they were
22  secured?
23    A.   No.
24    Q.   Did you, as you were going

59

1  down for the first time at 11:00 o'clock,
2  did you hold onto the access covers as
3  support going down the ladders?
4    A.   Yes.  Or whatever was there
5  to grab onto.  I'm not quite sure.  I
6  don't remember what I grabbed onto.
7    Q.   So it would be either the
8  access cover or whatever was there,
9  handle or whatever, to grab onto?
10    A.   I didn't notice any handles.
11  There were just covers.
12    Q.   Now, you had indicated in
13  your Answers to Interrogatories -- maybe
14  we can get into that plan right now --
15  that the access that you had used was at
16  the aft end of number two D.  Is that
17  correct?
18    A.   To the best of my knowledge.
19    Q.   Let's see if we can orient
20  you here.  This is a general arrangement
21  plan of the LUZON STRAIT.  This section
22  here is the bottom-most deck down, and
23  this is the number two hatch here.
24  (Indicating.)  And this is the aft end,

60

1  this way, as you can see up here.  It's
2  all oriented the same way.  So this would
3  be the aft end and this would be the
4  forward end.  (Indicating.)
5    MR. GRUBER:   And this would
6  be the starboard side.  Do you
7  follow me?
8    THE WITNESS:   Yes.
9  BY MR. WHELAN:
10    Q.   And this would be the dock.
11  (Indicating.)  Is the access that you
12  used the one at the aft end of the number
13  two hatch or the forward end?
14    MR. GRUBER:   We have been at
15  this a long time.  I think you
16  have to establish whether he
17  remembers there being two accesses
18  down there.  You are assuming that
19  there were two.
20  BY MR. WHELAN:
21    Q.   Are you aware of whether
22  there were two accesses down there or
23  not?
24    A.   No, only one.

61

1    Q.   The access that you used,
2  where was it located?  In your Answers to
3  Interrogatories you indicate it's at the
4  aft end.
5    A.   It's hard to remember.  It
6  was actually midship.  When we came on C
7  deck, you walked across the deck and
8  there was another access to go down to D
9  deck.
10    Q.   Okay.
11    A.   It wasn't a straight run all
12  the way down to D deck is what I'm
13  saying.  If you go on that ship you can't
14  go straight down to D deck from there.
15    Q.   Okay.
16    A.   In other words, when you are
17  coming down from the top, you can go
18  straight down, but in order to get to the
19  D deck, that has to go – you had to walk
20  about another five or six feet to get to
21  another hatch to go down to the next
22  level.  Do you follow me?
23    Q.   Not really.  Let me try
24  this.  The accesses that you used to go

16 (Pages 58 to 61)

62

1  in and out of number two, were they
2  inside of a room or, for lack of a better
3  word, a deck house-type thing?
4        In other words, they were
5  not inside the hatch itself, where the
6  cargo would be?
7     A.   I don't understand what you
8  mean.
9        MR. GRUBER: Do you know
10       what an access trunk is?
11 BY MR. WHELAN:
12    Q.   An access trunk. In other
13 words, the hatch itself, not where the
14 cargo is stowed, the access cover, it's
15 at a trunk at the forward end or the aft
16 end of the ship.
17    A.   I don't remember that.
18    Q.   You don't remember one way
19 or the other?
20    A.   All I remember is when we
21 came down from the top, we went all the
22 way down until we got to C deck.
23    Q.   Okay.
24    A.   Once we were on C deck, we

63

1  walked from -- it couldn't have been no
2  more than five feet, if that, and then we
3  went down to D deck. It was one way in
4  and one way out. Once you walked across
5  the deck you could go all the way up to
6  outside. It wasn't a straight run.
7     Q.   All right, let's start
8  again. If you are going from A deck, the
9  top deck, down, was that a straight run?
10    A.   Yes.
11    Q.   Was that --
12    A.   The hatches were open.
13    Q.   All of the access covers
14 were open?
15    A.   Yes, sir.
16    Q.   My question is, whether it's
17 in a trunk or whatever it might be,
18 there's never -- typically there's not a
19 continuous ladder all the way up? In
20 other words, you would go up, and it
21 might be over a little bit and up and
22 over a little bit?
23    A.   No. From A, from the top of
24 the deck, all the way to C deck, there

64

1  was a straight run.
2        Now, the way that ship -- to
3  the best of my knowledge, the way I
4  remember it is that the hatches were --
5  when they folded back, they folded back
6  like this. (Indicating.) When I went up
7  the later you could not access A or B. C
8  hatch was on a bulkhead where the
9  elevator was. You walked across the deck
10 and there was another access to go down
11 to D deck.
12    Q.   You are literally walking on
13 the gratings?
14    A.   It was an aluminum floor.
15    Q.   And you are actually in the
16 hatch?
17    A.   We were on top of C deck,
18 inside C deck.
19    Q.   You are inside. And maybe I
20 can get it this way. If you were coming
21 up from the D deck to the C deck on this,
22 presumably there's a ladder?
23    A.   Yes.
24    Q.   And when you were on the D

65

1  deck, where you were working, was the
2  ladder attached to a bulkhead or was it
3  instead of a trunk room or was it just
4  right in the middle of the --
5     A.   I think it was attached to
6  the bulkhead, if I remember correctly.
7        You are talking about the
8  hatch, right?
9        MR. GRUBER: No. He's
10       talking about the ladder to get
11       from the deck of the -- the skin
12       of the D deck up to the C deck.
13       The ladder.
14       THE WITNESS: The ladder
15       itself was on the bulkhead. It
16       was incorporated into the --
17       adjacent.
18 BY MR. WHELAN:
19    Q.   So if you're climbing up
20 from the D deck on this ladder, the
21 ladder is attached to a wall?
22    A.   A wall, right.
23    Q.   It's not like a
24 free-standing in the middle of the hatch

17 (Pages 62 to 65)

66

1  type thing?
2      A.  No. It's like a bookshelf.
3      Q.  If you are coming up from
4  the D deck and climbing up this ladder
5  that's attached to the wall, which wall
6  would it have been?
7          If you are thinking this is
8  forward, this is aft, and this is D deck
9  where you were working, as you were going
10  up this ladder which way were you facing?
11          MR. GRUBER:  Here is the
12      starboard side.  We are looking
13      down like a bird into the hatch.
14      So here is starboard.  That means
15      that would be the forward end,
16      this would be the aft.  That's off
17      shore. (Indicating.)
18          He wants the know the ladder
19      that was incorporated into the
20      bulkhead, which bulkhead was it?
21          THE WITNESS:  It would have
22      been on -- it would have been on
23      that bulkhead. (Indicating.)
24      It's hard for me to say without

67

1      looking at the ship again.
2  BY MR. WHELAN:
3      Q.  Okay.
4          MR. GRUBER:  Was there more
5      than one ladder to get out of D
6      deck?
7          THE WITNESS:  No, there was
8      only one ladder.
9          MR. GRUBER:  That should
10      help us.
11  BY MR. WHELAN:
12      Q.  Whatever ladder that you
13  used on D deck, that you went down at 11
14  o'clock, and then you came back up at
15  12:00, that's the same path you took on
16  the date of the accident?
17      A.  Yes.
18      Q.  Did you have to go through a
19  doorway to get into a trunk or a closet
20  to go up this ladder or was this
21  ladder --
22      A.  Not that I remember.  I
23  don't remember if I had to go inside of a
24  closet or a hallway.  I don't remember

68

1  that.
2      Q.  One way or the other you
3  don't remember?
4      A.  There was one way in and one
5  way out, that particular deck.
6      Q.  Do you remember whether
7  there were any handles as you came up the
8  ladder coming out at any time, including
9  the time of your accident?
10      A.  No.
11      Q.  When you came to the top and
12  you were sticking your head out into C
13  deck, was the access cover oriented
14  directly in front of you, to your right,
15  to your left or behind you?
16      A.  Directly in front of me.
17      Q.  And as you climbed up there,
18  was there a handle on the underside of
19  the access cover?
20      A.  Not that I remember.  I'm
21  not sure.
22      Q.  And then when you looked to
23  your left or to your right, was there a
24  handle on the left or on the right?

69

1      A.  I didn't see any.
2      Q.  When you came to the top,
3  each time you came out of the hatch,
4  which would have been twice, in number
5  two --
6          MR. GRUBER:  No.
7  BY MR. WHELAN:
8      Q.  When you departed D deck,
9  you did that once at 12:00 noon and then
10  once at 2:45, at the time of your
11  accident.  Let's start with noon.
12          When you came up the first
13  time at noon, was the hatch access cover
14  open for the manhole?
15      A.  Yes.
16      Q.  And did you pull on
17  something to get up to C deck when you
18  left at 12:00 noon?
19      A.  Yes.  You had to grab onto
20  the hatch.
21      Q.  You grabbed onto the
22  cover --
23      A.  Yes, you had to.
24      Q.  -- that you were facing when

18 (Pages 66 to 69)

70

1  you came up the ladder?
2      A.   Yes. That's how we helped
3  ourselves out.
4      Q.   When you got up to that
5  point, when you could grab onto the
6  cover, if you turned your head to the
7  right what did you see, if you can
8  remember?  In other words, was there a
9  bulkhead to your right?
10     A.   No.
11     Q.   Was there a bulkhead to your
12 left?
13     A.   If there was, it wasn't
14 much. I'm not sure. It might have been
15 where the hatch -- where the cone was,
16 where it lifted up and folded back.
17     Q.   Wait. You are facing where
18 it folded back.
19     A.   If I'm facing you, this is
20 the wall. It folded back. This side
21 would have been where the hatch cover
22 opened up at. (Indicating.) The other
23 side is where the aluminum floor was.
24 Okay?

71

1      Q.   Okay.
2      A.   Now, when I climbed out of
3  D, I had to walk on the aluminum floor on
4  C deck to get outside the hatch. So as I
5  was climbing up, you had to grab onto the
6  hatch to get out of the deck.
7      Q.   D deck?
8      A.   Yes.
9      Q.   To pull yourself up onto C
10 deck?
11     A.   Yes.
12     Q.   You said that "the cover."
13 You mean the hatch cover was open right
14 next to you?
15     A.   Yes. The hatch cover that
16 covers the cargo, that rolls back and
17 it's like straight up and down, parallel.
18     Q.   Okay.
19     A.   So there's your ladder. As
20 you are coming up the ladder -- I don't
21 know the distance, how fast I was from
22 the bulkhead or whatever. The lid is
23 this way. I'm coming up that way, the
24 same way the lid is.

72

1      Q.   To your left was the cover?
2      A.   Yes.
3      Q.   The hatch cover?
4      A.   Exactly. The floor that
5  raises up, that rolls back.
6      Q.   About how close was that to
7  you?
8      A.   I don't know. I don't
9  remember if it was arm's length or what.
10     Q.   Did anyone take any
11 photographs of the area of the accident?
12         MR. GRUBER: I wish.
13         THE WITNESS: No, not that I
14     know of.
15         - - -
16         (Whereupon, a recess was
17     taken.)
18         - - -
19 BY MR. WHELAN:
20     Q.   We were talking about where
21 this hatch access cover was that was
22 involved in your accident was located,
23 the ladder and so forth. And you had
24 indicated that you thought that as you

73

1  came up, stuck your ahead through C deck,
2  to your left side would have been the
3  open cover where the floor came up from C
4  deck on your left side.
5      A.   Okay, let me see if I can
6  paint this picture better for you. There
7  is no way you could have seen D deck from
8  C deck if you were on C deck. Because
9  the hatch was blocked to D deck, because
10 of the cover. It blocked that view.
11         This was a ladder that we
12 all used, one ladder to get up and to get
13 down. And we all used the same ladder.
14 When we came up there was -- the only
15 thing to grab onto was the hatch cover,
16 which was the escape hatch cover, the
17 manhole cover.
18     Q.   Okay.
19     A.   When you walked on C deck,
20 you walked about maybe five feet or
21 however long the size of the deck was.
22     Q.   The cover that you came
23 through that was involved in your
24 accident, if you closed it up and then

19 (Pages 70 to 73)

**74**

1 you closed that other part of the floor
2 you were talking about, when the ship
3 came into Wilmington could there have
4 been cargo on top of that cover that you
5 came up through?
6     A.   It's possible.
7     Q.   Or was it separate from the
8 hatch?
9     A.   It's possible it could have
10 been cargo on top of it or up against it.
11 It's possible.  There was cargo on -- if
12 there was any cargo on C deck I don't
13 know.
14     Q.   You didn't work on C deck?
15     A.   No.
16     Q.   Now, when you went down
17 through this accessway at 11 o'clock on
18 the date of your accident, in the
19 morning, for the first time, did you see
20 whether the securing device was secured
21 to that cover before you went down?
22     A.   No.
23     Q.   You didn't know one way or
24 the other?

**75**

1     A.   No.
2     Q.   Did you test it to see if it
3 was solid before you went down at 11
4 o'clock?
5     A.   No.
6     Q.   Did you hold onto it when
7 you went down at 11 o'clock?
8     A.   Yes.
9     Q.   Did it support your weight?
10     A.   Yes.
11     Q.   Now, when you came back up
12 at 12:00, did you hold onto the cover to
13 come out or did you put your hands to the
14 side or on something else when you came
15 out at 12:00 noon?
16     A.   I came out at 12:00?  Or
17 what time did you say, 12:00?
18     MR. GRUBER:  When you came
19 out the first time.
20     THE WITNESS:  Yes.
21 BY MR. WHELAN:
22     Q.   What did you hold onto?
23     A.   The cover.
24     Q.   The cover itself?

**76**

1     A.   Yes, to pull myself out.
2     Q.   When you typically do that,
3 do you just like willy-nilly grab the
4 cover or do you hold onto the ladder and
5 test it before you use it?
6     A.   I'm not sure.  Usually when
7 you pull back on it, it will grab.  You
8 grab a hold of it.  I wouldn't have
9 grabbed it if I thought it would come
10 back.
11     Q.   Back towards you?
12     A.   Yes.
13     Q.   So what I'm asking is, do
14 you have a method or whatever, from your
15 years as a holdman?  You said you didn't
16 know whether it was secure or not because
17 you didn't look at it?
18     A.   Right.
19     Q.   Did you have a method or
20 something that you used as a holdman to
21 do a little test before you used it to
22 pull all your weight up?
23     A.   No.  There is no method, no.
24     Q.   How are you sure that

**77**

1 someone hasn't undone it, before you rely
2 on it?
3     A.   Well, you don't know.
4     Q.   Okay.  Now, any of the times
5 that you came up through this same access
6 that was involved in your accident, did
7 you see any type of handles not attached
8 to the access cover?
9     A.   Not that I remember.
10     Q.   Do you remember what the
11 color of the access cover was, the
12 underside of it, as you faced it and it
13 was open?
14     A.   Green, like a lime green,
15 light green or something.
16     Q.   And you said the floor on
17 the ship was aluminum?
18     A.   Yes.
19     Q.   And when you went back down
20 at two o'clock, did you check to see if
21 it was secure at that time, the access
22 cover going down to two D?
23     A.   I didn't check to see if it
24 was secure, I just went down the ladder.

20 (Pages 74 to 77)

78

1  Q.  And again, did you use that
2  to support your weight going down or did
3  you --
4  A.  Yes.
5  Q.  And then when you came out
6  at 2:45 and you came up the ladder, were
7  you the first one out of the hold or did
8  someone go out before you?
9  A.  I would have been either the
10  second man -- I was the second man.
11  Q.  You were the second man out?
12  A.  Yes.
13  Q.  Who was the first guy out?
14  A.  I think Ringgold went up
15  before me.  I think it was Ringgold, me
16  and then Blue -- Grinnel was after me.
17  Q.  First Ringgold went out,
18  then you, and then Blue, Grinnel?
19  A.  Yes.
20  Q.  When Ringgold went out, did
21  you wait on D deck and watch him?
22  A.  Yes.  He was gone.  We
23  loaded the machines up and it was just
24  Grinnel and I down there.  He went up

79

1  before us.
2  Q.  Did you actually see him go
3  through the access cover, up the ladder
4  and through the access cover?
5  A.  I watched him leave.  I
6  didn't stand there and watch him go up
7  the ladder.
8  Q.  Did he yell anything back to
9  you, like watch out or anything?
10  A.  No.
11  Q.  Did you talk to him after
12  your accident?
13  A.  No.
14  Q.  Did he ever indicate that he
15  had any trouble using the access cover or
16  the ladder going from two D to two C?
17  A.  No.
18  Q.  No, he never said anything?
19  A.  No, he never said nothing to
20  me about something being wrong.
21  Q.  And then Ringgold went out.
22  And how soon after he left did you leave,
23  was it like a couple of seconds or
24  minutes?

80

1  A.  However long it took me to
2  load the machine onto the plate.  I don't
3  know how long that was.
4  Q.  In other words, all three of
5  you were on machines.  First Ringgold put
6  his machine on the plate and then he
7  left?
8  A.  Right.
9  Q.  And then you put your
10  machine on the plate and then you left?
11  A.  Actually, the first thing we
12  did was gathered up the plates.  Blue and
13  I gathered the plates up.
14  Q.  These are the steel plates?
15  A.  That cover the holes.  As
16  you put a hole in the floor or bend the
17  aluminum.  Or sometimes they will
18  separate them so you have to put a plate
19  on the line.  So Blue and I put three or
20  four plates down.  We gathered them up
21  and put them on the pan, which -- and
22  then I put one machine on there and Blue
23  put the other machine on there.  And I
24  put the last one in the center and I

81

1  braced it.  And then the bars would come
2  down and the elevator would go up.
3  Q.  You said like within a
4  minute after Ringgold, you went up?
5  A.  Yes.  We were finishing.
6  Yes.
7  Q.  And then Ringgold, again,
8  didn't say anything to you about any
9  problems with the cover?
10  A.  No, sir.
11  Q.  And then you went up, and
12  was Blue behind you?  Grinnel, Blue, was
13  he behind you?
14  A.  Yes.
15  Q.  And was he actually on the
16  ladder as you were on the top of the
17  ladder when the accident occurred?
18  A.  No.
19  Q.  Where was he when your
20  accident occurred?
21  A.  I don't know.  I wasn't
22  looking.  He was behind me.
23  Q.  Somewhere behind you?
24  A.  Yes.

82

```
1        Q.   But you are sure he wasn't
2   on the ladder behind you?
3        A.   No, he wasn't behind me on
4   the ladder.
5        Q.   In terms of the top rung of
6   the ladder, which is at the very top,
7   where did you have -- how far up the
8   ladder did you get in relation to the top
9   of the ladder?
10       A.   I really can't say.  I
11  really don't remember.  I had more than
12  my torso -- I had half myself out of it.
13       Q.   You had half of yourself out
14  of it?
15       A.   Yes.
16       Q.   If you drew a diagram, you
17  would get like your beltline, and below
18  would have been still in D deck, and the
19  rest would have been above and in C deck?
20       A.   No.  My beltline would have
21  been above D deck.
22       Q.   Would have been above D
23  deck?
24       A.   It was in between the
```

83

```
1   opening.
2        Q.   And then where did you have
3   your hands at the time of your accident;
4   what were you holding onto with your
5   right and your left hand?
6        A.   The escape hatch.
7        Q.   With both hands?
8        A.   Yes, sir.
9        Q.   And you had said you had
10  gotten to the point where at least half
11  of your torso or below your beltline was
12  in the D deck level and --
13       A.   Not below.
14       Q.   Tell me again.
15       A.   It would have to be above.
16  Because when I fell, I fell back and my
17  legs were outside -- they weren't in the
18  ladder -- they weren't in the cylinders
19  of the ladder.  So when I fell back, I
20  fell back just like that, bam.  And my
21  legs kicked out.
22            I assume I put my hands on
23  first thing.  The lid was on me, on my
24  right hand.  I was holding myself --
```

84

```
1   positioning myself with my left hand.  I
2   had a hold of myself.  When I did, I
3   pushed the lid up, thinking it was a
4   counterweight.  It didn't do that.  It
5   was coming back at that time.
6            That's when Sean, he grabbed
7   the lid and he had my jacket or my suit.
8   He seen I was sliding down to D deck.  I
9   was trying to get -- actually, my legs
10  were probably -- if you say this would be
11  C deck, this would be D deck.
12  (Indicating.)  As I fell back, my knees
13  would have been on top of D deck ceiling.
14  Do you know what I mean?
15       Q.   Up against the ceiling?
16       A.   Up against the ceiling, yes.
17  So I'm figuring --
18       Q.   In the accident report it
19  says you hit your kneecaps?
20       A.   That's probably right.
21       Q.   So then a better
22  description, other than the beltline, is
23  your rear end or your buttocks were
24  already at C deck level --
```

85

```
1        A.   Yes.
2        Q.   -- when the cover came down?
3        A.   When it turned loose.
4        Q.   So I get an understanding of
5   how the accident occurred, as you were
6   coming up, the cover -- it sounds like
7   the cover was holding for a while?
8        A.   Yes.
9        Q.   And then it gave way?
10       A.   Yes.
11       Q.   Now, why was Sean in that
12  area?  Did he happen to be in the area at
13  that time?
14       A.   He was the elevator man, the
15  button man.
16       Q.   And he was positioned on C
17  deck?
18       A.   Yes, sir.
19       Q.   The elevator man is right
20  next to --
21       A.   Nobody.  He's sitting there
22  on the wall.  There's a wall there with a
23  button that indicates to the crane driver
24  that it's okay to lift.  He's the deckie.
```

22  (Pages 82 to 85)

86

1    MR. GRUBER: Or hatch
2 tender.
3 BY MR. WHELAN:
4    Q. Could you see on this plan
5 where he would be positioned? If you
6 can't, that's fine. These are the hatch
7 covers.
8       MR. GRUBER: This is the
9 forward end here. (Indicating.)
10       THE WITNESS: I couldn't
11 really say.
12 BY MR. WHELAN:
13    Q. That's fine. But he was
14 definitely on C deck?
15    A. Yes. Because I said, clear,
16 it's okay to take it out.
17    Q. And then when you were kind
18 of trapped or when this cover came down,
19 about how far was the location of where
20 your accident occurred from where Sean
21 would have been standing with the button?
22 Best estimate.
23    A. I don't know. Five feet,
24 maybe, six feet. I don't know.

87

1    Q. The other end of the hatch
2 or closer?
3    A. No, no, he was by the
4 ladder.
5    Q. He was close to that area?
6    A. Yes. He was -- I don't know
7 if he was yelling or what he was doing.
8 Maybe taking his clothes off. I don't
9 know what he was doing at the time.
10    Q. And so eventually it gave
11 way, and you fell down, and you got your
12 knees trapped on the ceiling of D deck?
13    A. Right.
14    Q. And you were on your back?
15    A. Yes, sir.
16    Q. You fell backwards?
17    A. Yes.
18    Q. Did you fall all the way
19 back?
20    A. I went back and hit the
21 deck.
22    Q. You hit the C deck?
23    A. Right.
24    Q. And that would have been --

88

1    A. In between C and D.
2    Q. When you fell back, what
3 were you lying on, was it aluminum
4 gratings, was it a steel deck or
5 something else, if you remember?
6    A. I don't remember. It was
7 all steel and aluminum.
8    Q. I'm trying to see if that
9 will help us straighten out if it was in
10 a trunk area or actually out in the cargo
11 hold area.
12       Do you remember, as you were
13 there, did it appear that you were out in
14 the middle of the cargo hold or did it
15 appear that you were in a trunk area?
16    A. No. I was in the middle of
17 the cargo hold.
18    Q. Then you tried to push it
19 off you, and that's when it came down on
20 you once and you fell back onto the deck?
21    A. Right.
22    Q. And then you tried to push
23 it up, because you said it might be
24 spring-loaded?

89

1    A. Yes. You try to get it off
2 of you.
3    Q. And that's when Sean came
4 and helped you?
5    A. Right.
6    Q. Did he grab the cover and
7 you at the same time?
8    A. Yes. He seen me kicking. I
9 was struggling, I guess. And he saw
10 that, and he grabbed the cover and he had
11 my suit. I had a freezer suit on. He
12 pulled me up. I was sitting on my
13 backside, sitting on C deck. My feet
14 were dangling between C and D through the
15 manhole.
16    Q. You were off the ladder at
17 that point?
18    A. Yes.
19    Q. Did he pull you out and away
20 from this access cover at that point?
21    A. He helped me up. He asked
22 me was I all right and helped me up.
23    Q. Did you get up on your feet
24 at that time?

23 (Pages 86 to 89)

**90**

1  A.  Yes.
2  Q.  And at that time when you
3  got up on your feet, was the access cover
4  closed?
5  A.  No.
6  Q.  It was open?
7  A.  Sean had pushed it open.  He
8  was fiddling with it.  I don't know what
9  he was doing exactly.
10  Q.  Did you take a look at the
11  securing device; can you tell us what it
12  was or what it looked like?
13  A.  It looked like -- reminded
14  me of a hook on a screen door.
15  Q.  Like a round eye-and-hook
16  thing?
17  A.  Yes, yes.
18  Q.  So it looked something like
19  a hook, like this, and it goes through an
20  eye like that?  (Indicating.)
21  A.  Close.  It had a hook like
22  that, but I don't remember what kind of
23  an eye it went through.
24  Q.  But the typical hook and eye

**91**

1  that you think would be on a wooden
2  screen door?
3  A.  Exactly.
4  Q.  You are not sure of the eye
5  part of it, but you know it had a hook?
6  A.  Yes.
7  Q.  Was it secured or unsecured
8  when you saw it?
9  A.  What do you mean "when I saw
10  it?"
11  Q.  You described the hook
12  securing device.
13  When he was fooling with it?
14  Q.  Yes.  Did he resecure it?
15  A.  He tried.  He tried and it
16  wouldn't go back.
17  Q.  Why was that?
18  A.  It wouldn't stay attached.
19  Do you follow me?  Almost like this was
20  the hook, it would come off and it looked
21  like it was bent out of shape or broke.
22  Q.  Did you notice that it was
23  bent or broken?
24  A.  No.  Sean was fooling with

**92**

1  it.
2  Q.  He would be the one that
3  would know that?
4  A.  Yes.
5  Q.  But you, with your own two
6  eyes, can't tell us whether it was bent
7  or broken.  Is that correct?
8  A.  That's correct.
9  Q.  You didn't see it with your
10  own eyes, is what I'm saying?
11  A.  Right.
12  Q.  You weren't really looking
13  for that at the time?
14  A.  No, I wasn't.
15  Q.  What did you do next?  You
16  are standing up there, you saw Sean
17  fiddling with this thing, and you saw the
18  securing device.  Then what did you do?
19  A.  Sean helped me up, he asked
20  me was I all right.  He said -- my
21  nickname is J.T.  He said J.T., do you
22  want me to call the basket for you?  I
23  said no, Sean, I'm fine.  Just follow me
24  up.

**93**

1  I had a lot of pain in my
2  leg and my back.  And I was afraid of
3  falling back.  I didn't want to fall back
4  down if I lost strength.
5  Q.  So then did you climb up
6  through the ladders the same way you came
7  down?
8  A.  Yes.  When I walked up on C
9  deck, I climbed up out the hatch, C, and
10  then B, and then A.
11  Q.  The same way you came down?
12  A.  Yes.
13  Q.  In the area of this access
14  cover and the ladder that you were
15  climbing out at the time of your accident
16  was there enough light to see everything
17  that you were doing?
18  A.  Yes, I guess.
19  Q.  Darkness or lack of light
20  didn't have anything to do with your
21  accident.  Is that correct?
22  A.  No, no.
23  Q.  No, it's not correct?
24  A.  No.  It was enough light.

24  (Pages 90 to 93)

94

1    Q.    And was there any oil or
2    grease or slippery substance in the area
3    that had anything to do with your
4    accident?
5        A.    I didn't see any.
6    Q.    So your accident was caused
7    by this securing device either coming
8    undone or wasn't secured?
9        A.    That's correct.
10    Q.    You don't know which?
11        A.    I don't know which, no.
12    Q.    When you came up to the top
13    of that ladder, where the access cover
14    was that came down on you, could you
15    describe for me the angle at which the
16    cover was?
17        A.    No, not really.
18    Q.    Was it kind of like straight
19    up?
20        A.    I don't remember if it was
21    straight up, leaning back or what.
22    Q.    You don't recall?
23        A.    No, I'm not sure.
24    Q.    I may have asked you this,

95

1    and I apologize. But on the underside of
2    that cover, was there any sort of handle
3    that would open or close the cover or was
4    it a blank cover?
5        A.    I don't remember.
6    Q.    You don't recall?
7        A.    No. I think it was just a
8    cover.
9    Q.    You don't recall actually
10    grabbing onto a handle?
11        A.    No.
12    Q.    You would have grabbed onto
13    the edges of the cover?
14        A.    Yes, yes.
15    Q.    When you came up the ladder
16    just before the accident, and you came
17    out, your head and body were coming out
18    of D deck onto C deck, and you grabbed
19    onto the cover when it was in the open
20    position, did you grab onto the sides
21    with your right and left hand or the top
22    of the cover?
23        A.    I don't remember.
24    Q.    You don't recall one way or

96

1    the other?
2        A.    No.
3    Q.    Now, after the accident, did
4    you ever speak to anyone else that had
5    any trouble with the access cover?
6        A.    No.
7    Q.    Did anyone ever say to you,
8    hey, John, I've I had the same problem,
9    or anything like that?
10        A.    No.
11    Q.    As the cover came down on
12    you the first time at the time of your
13    accident, did you hear anything like
14    something braking?
15        A.    No. I didn't notice, no.
16    Q.    Now, as you went up on the
17    way out, after the accident, when you
18    went out through the B and A decks, did
19    you pull on those covers the same way you
20    did this one, to get out?
21        A.    Whatever there was available
22    for me to get out of the hatch with.
23    There is no special way I climb out.
24    Q.    Do you ever just, rather

97

1    than hold onto the cover, put your arms
2    to the side of the deck and go out that
3    way?
4        A.    No.
5    Q.    It would always be on the
6    cover --
7        A.    No. If a rail was there or
8    whatever was there, any access for you to
9    get out. It's hard to lift your body out
10    like that. (Indicating.)
11    Q.    Meaning pushing yourself up
12    with your palms?
13        A.    Yes. How would you get out?
14    You could roll onto the deck, I guess.
15    Q.    So you haven't seen any
16    photographs of this access cover or
17    anything like that?
18        A.    No, I haven't.
19    Q.    The only photograph that I'm
20    aware of, which your attorney provided to
21    me, just shows the ship in general. Have
22    you ever seen that before?
23        A.    The ship?
24    Q.    This photograph.

25 (Pages 94 to 97)

98

1      A.   Yes.
2      Q.   Other than that photograph,
3   which we will mark as Turner-2, you
4   haven't seen any other photographs of the
5   accident scene or the access cover or
6   anything like that?
7      A.   Nope.
8             - - -
9         (Whereupon, Exhibit Turner-2
10      was marked for identification.)
11            - - -
12  BY MR. WHELAN:
13      Q.   Do you know who took this
14   photograph, which is marked as Turner-2?
15      A.   Yes.
16      Q.   Who?
17      A.   Joe Selvaggi.
18      Q.   And he didn't take any other
19   photographs of the ship, as far as you
20   know?
21      A.   Not that I know of.
22         MR. WHELAN:  Let's mark this
23      as the next exhibit.
24             - - -

99

1         (Whereupon, Exhibit
2      Turner-3 was marked for
3      identification.)
4             - - -
5   BY MR. WHELAN:
6      Q.   We have marked as Turner
7   Exhibit-3 a document called DRS
8   Supervisor's Accident Investigation.
9   Have you seen this document before?
10      A.   Yes.
11      Q.   Is that your signature on
12   the lower left-hand corner?
13      A.   Yes.
14      Q.   This appears to be signed by
15   Clifford Lasch and somebody Jackson, I
16   think.  Looks like two people signed it.
17   Do you recognize any of those signatures
18   on the right side?
19      A.   No.
20      Q.   It says under Comments,
21   right above the two signatures, "Seems as
22   though securing pin worked out of the
23   slot.  Should be inspected before
24   entering deck."  Do you see that?

100

1      A.   Yes.
2      Q.   Did anyone from DRS ever
3   tell you that you should look at the
4   securing devices before you enter the
5   accessway or use the accessway?
6      A.   No.
7      Q.   Is that something you've
8   ever done as a holdman or a longshoreman,
9   make sure that the securing device is
10   secure before you go down into a deck?
11      A.   Not really, no.
12      Q.   And then the Description is,
13   "While climbing escape hatch from D to C
14   deck, escape hatch cover unlatched from
15   it's securing.  Mr. Turner fell back to C
16   deck and said cover struck him in the
17   left leg at the kneecap.  Man also claims
18   slight backache."
19            Is that an accurate
20   description?  Is that what you told them,
21   in other words?
22      A.   Maybe at the time.  He was
23   asking me -- we were in his office, and
24   my leg and back was bothering me.  And we

101

1   are like you and I are talking.
2      Q.   Does that generally sound
3   accurate to you?
4      A.   Close.
5      Q.   What is not close?  Is there
6   anything that is not close?
7      A.   Well, I don't think the
8   lid -- I think I hit my knee or my leg
9   underneath the deck.  I think he was just
10   writing it down when I said it.
11      Q.   Anything else that is not
12   accurate?
13      A.   That's about accurate, yes.
14      Q.   And then this indicates that
15   you were taken to Christiana Care,
16   Wilmington Hospital, or you went there?
17      A.   I was taken to Wilmington.
18      Q.   Wilmington, okay.  How did
19   you get from the terminal to the hospital
20   when you first went to the hospital after
21   the accident?
22      A.   I drove.
23      Q.   You got off at 2:45 or three
24   o'clock or so.  Did you go right away or

102

1  did you go home first; how did you
2  proceed?
3      A.  I went to Clifford's office
4  and from Clifford's office we went to
5  Wilmington Hospital, to occupational
6  health, took the drug and alcohol test.
7  From there, Cliff left.  He said, John,
8  you will be okay, I will see you later.
9  And I seen a doctor.  I don't remember
10  her name.
11     Q.  Okay.
12     A.  They x-rayed my knee, and I
13  asked them what about my back, because it
14  was really bothering me more and more.
15  And she said, take this ibuprofen or
16  whatever they gave me at the time.  I
17  don't remember.  And come back Tuesday or
18  something like that, in a couple of days
19  or something like that.
20     Q.  And did you do that?
21     A.  Prior to then, I went to my
22  doctor on the 12th.  I had very, very
23  uncomfortable pain radiating and shooting
24  down my leg and in my back.

103

1      Q.  Again, this is your left
2  leg?
3      A.  Yes.
4      Q.  And you went to Dr. Song?
5      A.  Yes, my family doctor.  My
6  wife took me to the doctor.
7      Q.  And then you went back to
8  this other place after Dr. Song?
9      A.  No.  I went to Dr. Song, and
10  he recommended I see -- First Day
11  Orthopedics, a Dr. Bodenstab.
12     Q.  Had you ever been treated by
13  Dr. Bodenstab before?
14     A.  No.
15     Q.  Is the doctor that you saw
16  at the clinic, Dr. Maria DeJoseph?
17     A.  I guess.
18     Q.  And you continued to treat
19  with both Dr. Bodenstab and Dr. Song for
20  a period of time?
21     A.  I went to my doctor, who
22  sent me to Dr. Bodenstab.  Dr. Bodenstab
23  took x-rays and MRIs.  From Dr. Bodenstab
24  I went to -- he recommended I see Dr.

104

1  Katz, because my problem was stemming
2  from my back.  And he said I had disc
3  problems, and he had me talk to a spine
4  specialist.
5      Q.  And Dr. Katz was the spine
6  specialist?
7      A.  Yes, sir.
8      Q.  And on July 3, 2002, you had
9  surgery?
10     A.  Yes, sir.
11     Q.  Have you had any surgery
12  since that time?
13     A.  No, sir.
14     Q.  And what was the surgery
15  that Dr. Katz performed, as far as you
16  know?
17     A.  He did a decompression, I
18  think, at L5.  He did a discectomy, took
19  out the bone.  I had a cracked disc, bone
20  fragments he took out.
21     Q.  Did that give you any relief
22  of your symptoms, your radiating pain?
23     A.  It corrected some of the
24  pain on the outside of the leg.

105

1      Q.  And then you saw a Dr.
2  Yahadi?
3      A.  He's a pain management --
4  Yahadi is a pain management specialist.
5      Q.  When is the last time you
6  saw him?
7      A.  I don't remember.
8      Q.  I have May 2003.
9      A.  Yes.
10     Q.  Have you seen him since
11  then?
12     A.  No, I haven't.
13     Q.  And then I have the last
14  examination by Dr. Katz as January 2004.
15  Have you seen him --
16     A.  Was it January?
17     Q.  2004.  That's almost a year
18  ago.  Have you seen him since then?  When
19  is the last time you saw him?
20     A.  I think it was August.
21     Q.  2004?
22     A.  Yes.
23     Q.  What about Dr. Bodenstab,
24  are you now limited to Dr. Katz or did

27 (Pages 102 to 105)

**106**

1 you also see him?
2     A.   I'm in pain management.  I
3 see Ginger Chiang, that's who I see now.
4     Q.   When is the last time you
5 saw her?
6     A.   The last injection I got --
7     Q.   The last date I have is
8 March 9, 2004.
9     A.   I've seen her since then.
10 She prescribed my medicine for me.
11         MR. GRUBER:  I think it was
12     August 3rd.
13 BY MR. WHELAN:
14     Q.   Okay.  And then at PRO
15 Physical Therapy, I have the last visit
16 as September 23rd.  Have you done any
17 physical therapy since then?
18     A.   No.  Dr. Katz took me out of
19 that.  He said it wasn't going to work
20 any more.
21     Q.   I also have some records
22 from a Dr. Fisher or a -- he might be a
23 Ph.D.?
24     A.   She's a psychologist.

**107**

1     Q.   And the last treatment I
2 have is April 1, 2004.  Have you seen Dr.
3 Fisher or psychologist Fisher since then?
4     A.   No.
5     Q.   Has your psychological
6 difficulty, or whatever reason you saw
7 psychologist Fisher for, resolved itself
8 or is it better so you don't need to see
9 a psychologist?
10     A.   It's not better.  I just
11 deal with it.
12     Q.   I mean, it's not better, but
13 you feel you can deal with it on your own
14 at this point?
15     A.   Well, she told me to come
16 back at any time I want to talk to her.
17     Q.   So at least you haven't felt
18 the need to go back yet?
19     A.   No, I felt the need.  I just
20 pray, really.  I don't do anything but
21 pray.  That's what I do.
22     Q.   But you haven't seen her
23 since April 1, 2004?
24     A.   No.

**108**

1     Q.   Now, other than those
2 doctors that I've mentioned, are there
3 any other doctors you've treated with?
4     A.   No, not that I remember.
5 Dr. Song, Dr. Bodenstab, Dr. Katz, Dr.
6 Yahadi, Dr. Chiang, Dr. Fisher and my
7 family doctor, Dr. Fucci.
8         MR. GRUBER:  Song died.
9 BY MR. WHELAN:
10     Q.   Can you spell that?
11     A.   I think it's F-U-C-C-I.
12     Q.   Is he or she in the same
13 practice?
14     A.   No.  He was referred from
15 Dr. Song's office.  He's not in the
16 same -- I think they are Brandywine
17 something.
18     Q.   And that's just a family
19 doctor?
20     A.   Yes.
21         MR. GRUBER:  Do you know who
22     examined you?
23         THE WITNESS:  Dr. Draper
24     from Liberty Mutual.

**109**

1 BY MR. WHELAN:
2     Q.   Dr. Draper?
3     A.   Yes.
4     Q.   Anyone else?
5     A.   Robert Draper.
6     Q.   Anyone else?
7     A.   No, not right now.
8         MR. WHELAN:  I think we have
9     one scheduled this Monday.
10         MR. GRUBER:  Ronald Greene.
11 BY MR. WHELAN:
12     Q.   Now, have you ever given any
13 kind of written or recorded statement
14 about this accident to anyone, other than
15 what you are doing today and what you
16 testified to on Turner Exhibit-3, where
17 you told somebody at the stevedoring
18 company what happened?
19     A.   Besides my lawyer?
20     Q.   Besides your lawyer.
21     A.   No.
22     Q.   Unless you've given a signed
23 statement to your lawyer.
24     A.   No.

28 (Pages 106 to 109)

**110**

1  Q.  Getting back to your medical
2  condition, do you presently drive a car,
3  your truck or whatever?
4  A.  Occasionally.
5  Q.  Do you use that to get
6  around?
7  A.  My wife usually drives.
8  Sometimes I might get my medicine or go
9  to my doctor's appointment if my father
10  can't take me.
11  Q.  Do you have the same pickup
12  truck that you described earlier or do
13  you have a different car?
14  A.  I have a truck.
15  Q.  A truck?
16  A.  Yeah.
17  Q.  Is it an automatic or a
18  stick?
19  A.  Automatic.  I don't even
20  drive it too much any more.
21  Q.  And what kind of truck is
22  it?
23  A.  Ford Ranger.
24  Q.  Getting back to your

**111**

1  injuries and so forth, is there anything
2  you were doing recreationally before the
3  accident that you can't do now?
4  A.  Oh, everything.  I mean, I
5  used to fish, I used to play ball with
6  the kids.  My pain limits me from doing
7  just -- things I used to like to do,
8  anyway.  Most of the time I'm exhausted
9  from the pain or tired.
10  If I walk -- I was trying to
11  walk a little bit and it hurt my back so
12  much that I couldn't go but so far.  I'm
13  more afraid of people now.
14  There was an incident about
15  a few months ago where a guy approached
16  me, and I was afraid he was going to do
17  something to me.  I'm skeptical of
18  people.
19  Q.  Are you afraid you can't
20  defend yourself?
21  A.  Yes.  If my house caught on
22  fire I couldn't get outside.  Hopefully,
23  one of my sons would be there.  I haven't
24  had sex in two years or longer.  I

**112**

1  haven't done normal chores that I used to
2  do.
3  I'm a very clean person with
4  the housekeeping.  I used to do a lot of
5  vacuuming, washing the dishes.  I was
6  always doing something around the house,
7  fixing this, repairing that, replacing
8  this.  I'm limited.  The pain that I'm
9  in, it limits me.  It exhausts me, it
10  really does.  Especially if I get to
11  doing things.
12  Q.  So you used to do household
13  chores that you can't do now?
14  A.  I did the outside chores,
15  the landscaping, I did everything, the
16  painting.  I did whatever needed to be
17  fixed or whatever needed to be done.  A
18  house needs work 24/7.
19  Q.  Do you have a large piece of
20  property; is it a single home family?
21  A.  Yes.
22  Q.  So there's grass to be cut?
23  A.  Landscaping.  I don't have
24  any grass.  It has to be weeded, mulched.

**113**

1  Right now she was talking about bulbs, so
2  I have to plant them for the spring.
3  Q.  And who does that now, your
4  children?
5  A.  No.  I hire a guy that comes
6  around, yard guy.
7  Q.  Anything else that you used
8  to do before that you can't do now, other
9  than what you described?
10  A.  I don't drive long distances
11  any more.  I can't.  It gets hard to --
12  it's difficult sitting in this chair for
13  a long time.
14  Q.  Have you been on any
15  vacations since your accident?
16  A.  No.  My wife and children
17  do.  They have been away several times.
18  I haven't tried, really.  I wanted to see
19  my daughter, but she'll be home.  I
20  didn't take the trip.
21  Q.  Where is she in school?
22  A.  Atlanta.
23  Q.  Atlanta, Georgia?
24  A.  Yes.

29 (Pages 110 to 113)

114

1   Q.   What sort of fishing did you
2   used to do?
3       A.   All kinds.
4   Q.   Freshwater, salt water?
5       A.   Fly fishing, salt water.
6   Just going out, having a peaceful time.
7       Q.   When is the last time you
8   got a freshwater license?
9       A.   Oh, never got no license.
10  You don't need a license to fish. That's
11  given by God, that's free, like water,
12  should be free.
13      Q.   How often would you say you
14  used to fish before?
15      A.   Every time I could get a
16  chance.
17      Q.   What would you fish for,
18  what kind of fish?
19      A.   Just to go out there and
20  fish. I would go out there -- I usually
21  would go by myself. There's a place up
22  there in Pennsylvania -- I can't think of
23  the state park. There's a little -- you
24  go there to fish, or down to Brandywine.

115

1   Now they have the mounties down at
2   Brandywine.
3       Q.   The mounties?
4       A.   The park rangers. It used
5   to be you didn't need a license. So I
6   might go off a bank or go down with a few
7   guys in Maryland, they have a little
8   fishing home. The back of the bay. I
9   wouldn't fish nothing down there.
10      Q.   At least not after the oil
11  spill.
12      A.   No. They are glowing in the
13  dark.
14      Q.   You said you couldn't play
15  ball with your kids and stuff. You mean
16  like basketball?
17      A.   I have three sons playing
18  for the same school. My youngest boy,
19  who is 14, just made the JV and I would
20  like to show him a few things, but I
21  can't do it. I love baseball. Baseball
22  is the love, but I love basketball, too.
23      Q.   Before your accident, you
24  weren't involved in any leagues of your

116

1   own, were you?
2       A.   No. Just with the guys when
3   I could.
4       Q.   Now, in your lifetime have
5   you ever been convicted of a crime?
6       A.   No.
7       Q.   We are almost done. Let me
8   check my notes.
9       A.   I've told Dr. Chiang, I also
10  have experienced pain going in my arms,
11  and my fingers have been numb, and my
12  hand gets numb sometimes when I sit, like
13  now.
14      Q.   This is your left knee?
15      A.   Yes. And I get severe
16  headaches. I've never had these
17  headaches before. I will mention it to
18  my family doctor, too.
19      Q.   Now, is there any plan to
20  get further surgery?
21      A.   I'm still thinking about it.
22      Q.   Is that something Dr. Katz
23  is recommending?
24      A.   Yes.

117

1       Q.   What sort of surgery is he
2   recommending?
3       A.   Fusion.
4       Q.   Spinal fusion?
5       A.   Yes.
6       Q.   At the time of your
7   accident, were there any crew members in
8   the vicinity, the ship's crew, in the
9   vicinity of your accident?
10      A.   I didn't see any.
11      Q.   Were there any in the cargo
12  hold that you were working in at the
13  time, from 2:00 to 2:45?
14      A.   No.
15      Q.   Did you ever report your
16  accident to the ship's crew?
17      A.   No.
18      Q.   Did you have any discussion,
19  yourself, with anyone from the ship's
20  crew?
21      A.   No.
22      Q.   Are you aware of anyone else
23  that had discussions or made complaints
24  of any type to the ship's crew?

30  (Pages 114 to 117)

**118**

1  A.  No.
2  Q.  Mr. Turner, do you know who
3  opened that lid for the first time, on
4  the date of your accident?
5  A.  No.
6  Q.  Or who secured it?
7  A.  No.
8  Q.  But it wasn't you?
9  A.  No, it wasn't me.  It was
10 open.
11 Q.  Do you know whether or not
12 the hook that you described that you saw
13 after the accident was in place and
14 secure when you first started coming out
15 of the hold at the time of your accident?
16 Could you tell from the feel of it?
17 A.  No.
18 Q.  So you are not sure whether
19 there was any resistance or not, from the
20 hook being secured?
21 A.  I didn't notice it.
22 Q.  Did it seem to you, when you
23 came up through the opening onto the C
24 deck, that it just came right down as

**119**

1  soon as you got to a certain point or did
2  it seem like it was holding your weight
3  and then it gave way?
4  A.  It seemed like it was
5  holding my weight and then gave way.
6  MR. WHELAN:  Those are all
7  the questions I have.  Thank you
8  very much.
9  - - -
10 (Whereupon, the deposition
11 concluded at 4:24 p.m.)
12 - - -

**120**

- - -
CERTIFICATE

I hereby certify that the
witness was duly sworn by me and the
deposition is a true record of the
testimony given by the witness.

_ _ _ _ _ _ _ _ _ _ _ _
Pamela J. Gober Bracic
RPR
Commissioner
Dated: December 23, 2004

(The foregoing certification
of this transcript does not apply to any
reproduction of the same by any means,
unless under the direct control and/or
supervision of the certifying reporter.)
- - -

**121**

LAWYER'S NOTES
PAGE  LINE

**A**

ability 27:3
aboard 41:11 42:9
  43:18 44:17
abuse 36:16
access 41:24 51:21
  52:2,12 53:7
  55:11 58:13 59:2
  59:8,15 60:11
  61:1,8 62:10,12
  62:14 63:13 64:7
  64:10 68:13,19
  69:13 72:21 77:5
  77:8,11,21 79:3
  79:4,15 89:20
  90:3 93:13 94:13
  96:5 97:8,16
  98:5
accesses 53:17
  60:17,22 61:24
accessway 74:17
  100:5,5
accident 3:11 5:22
  5:24 8:16 9:1,6
  9:15 19:1 21:20
  22:8,17,23 23:2
  23:6,14 24:7
  25:10,15 29:5,9
  29:16,22 30:13
  30:19 31:1,17
  34:4,6,7,12,17
  35:1,5,10,13,21
  35:22 36:2,6,19
  36:21 37:15,19
  38:1,2 39:2,14
  40:22 41:2,4,21
  42:8,19 44:2,12
  45:18,19 47:5
  52:19 55:15
  67:16 68:9 69:11
  72:11,22 73:24
  74:18 77:6 79:12
  81:17,20 83:3
  84:18 85:5 86:20
  93:15,21 94:4,6
  95:16 96:3,13,17
  98:5 99:8 101:21
  109:14 111:3
  113:15 115:23
  117:7,9,16 118:4
  118:13,15
accidents 30:5
  34:9 40:24
accurate 14:7
  100:19 101:3,12
  101:13
Act 19:8 39:17
ACTION 1:2
address 7:18 9:21
adjacent 65:17

afraid 93:2 111:13
  111:16,19
aft 59:16,24 60:3
  60:12 61:4 62:15
  66:8,16
afternoon 52:24
age 10:21
ages 10:14
aggravated 40:24
ago 26:17 105:18
  111:15
agreed 5:3
ahead 73:1
Albert 22:6
alcohol 36:15,20
  102:6
aluminum 64:14
  70:23 71:3 77:17
  80:17 88:3,7
ambulance 31:14
  32:10
amount 32:13
Anderson 49:20
and/or 120:20
anemia 37:9
angle 94:15
answer 4:2 6:12
  27:4 54:9
Answers 29:13
  52:16 54:7 59:13
  61:2
Anthony 49:18
anyway 111:8
apologize 95:1
appear 88:13,15
  99:14
applied 20:6,10,12
  20:14 24:12,19
  25:8
apply 120:18
appointment 110:9
approached
  111:15
approximately
  8:12 9:18 15:19
  28:16 53:12,13
  53:15 55:16
April 107:2,23
arbitration 29:18
  39:1
area 29:12 30:2
  72:11 85:12,12
  87:5 88:10,11,15
  93:13 94:2
Armed 20:4
arms 97:1 116:10
arm's 72:9
arrangement
  59:20

asked 17:11 89:21
  92:19 94:24
  102:13
asking 76:13
  100:23
assesses 52:7
assume 83:22
assumed 6:6
assuming 24:22
  31:4 38:18 60:18
Atlanta 113:22,23
attached 65:2,5,21
  66:5 77:7 91:18
attorney 27:7
  97:20
August 105:20
  106:12
aunt 16:23
automatic 110:17
  110:19
automobile 29:4
  30:4 34:3 35:1
  36:5 39:2
available 96:21
Avenue 25:2
aware 60:21 97:20
  117:22
a.m 47:11,11,12
  51:17 53:6,9
  56:16

**B**

B 2:3 3:7 64:7
  93:10 96:18
back 12:6,8,11,13
  12:23 13:1,4,9
  13:10,13 14:8
  16:19 25:22,23
  25:24,24 26:1,2
  27:18 28:4,6,9
  28:12,22 30:20
  32:2 33:14,17
  34:10 35:2,7
  38:14 39:20 43:9
  44:7 46:17 47:17
  48:11 50:13,15
  51:6,8,9,10 53:1
  53:15,23 54:11
  54:20,24 55:4,5
  55:24 64:5,5
  67:14 70:16,18
  70:20 71:16 72:5
  75:11 76:7,10,11
  77:19 79:8 83:16
  83:19,20 84:5,12
  87:14,19,20 88:2
  88:20 91:16 93:2
  93:3,3 94:21
  100:15,24
  102:13,17,24

103:7 104:2
  107:16,18 110:1
  110:24 111:11
  115:8
backache 100:18
background 21:15
backside 89:13
backwards 87:16
bad 10:7
ball 111:5 115:15
bam 83:20
banana 13:6
bananas 17:13
bank 115:6
bars 81:1
baseball 115:21,21
basically 7:9
basis 19:9
basket 92:22
basketball 11:20
  12:20,22 34:20
  115:16,22
bay 115:8
believe 49:19
beltline 28:10,10
  28:11,13,15,17
  28:18 82:17,20
  83:11 84:22
bend 80:16
benefits 20:8,21
  24:13 25:9 39:16
  bent 91:21,23 92:6
best 44:20,23
  59:18 64:3 86:22
better 62:2 73:6
  84:21 107:8,10
  107:12
Biezup 1:10 2:7
bird 66:13
birth 7:23
birthed 56:3
bit 9:8,9 55:24
  63:21,22 111:11
blank 95:4
blocked 73:9,10
Blue 78:16,18
  80:12,19,22
  81:12,12
Bodenstab 103:11
  103:13,19,22,22
  103:23 105:23
  108:5
body 25:21 26:7
  28:15 95:17 97:9
  104:19,19
bone 104:19
book 45:1
bookshelf 66:2
boss 17:17
bothering 28:4
  100:24 102:14

bottom 43:11 46:8
  52:18
bottom-most
  59:22
Boulevard 1:23
boxes 13:6
boy 115:18
braced 81:1
Bracic 1:14 120:11
Brady 49:17
brakeman 57:19
braking 96:14
Brandywine
  108:16 114:24
  115:2
break 6:15,16,18
  53:20
bring 48:17,18,20
broke 50:9 91:21
broken 48:14,15
  91:23 92:7
brought 48:16
building 1:11 2:8
  19:18
bulbs 113:1
bulkhead 64:8
  65:2,6,15 66:20
  66:20,23 70:9,11
  71:22
bumper 32:1,2
burning 27:21
business 13:18
buttocks 84:23
button 46:2 85:15
  85:23 86:21
B.V 1:5

**C**

C 2:1 61:6 62:22
  62:24 63:24 64:7
  64:17,18,21
  65:12 68:12
  69:17 71:4,9
  73:1,3,8,8,19
  74:12,14 79:16
  82:19 84:11,24
  85:16 86:14
  87:22 88:1 89:13
  89:14 93:8,9
  95:18 100:13,15
  118:23 120:2,2
call 18:18 21:21
  92:22
called 5:20 47:17
  99:7
cancer 37:9
car 32:4,5,7 35:21
  35:23 38:1 110:2
  110:13
care 33:5 101:15

career 23:6
carefully 53:6
cargo 42:1 47:9
  49:2 62:6,14
  71:16 74:4,10,11
  74:12 88:10,14
  88:17 117:11
Carolina 11:13
  12:18
case 7:2
caught 38:7 111:21
causal 14:20,24
caused 94:6
ceiling 84:13,15,16
  87:12
Celebrex 26:15
center 80:24
certain 119:1
certification 5:5
  120:17
certify 120:4
certifying 120:21
cetera 6:1 34:15
chair 113:12
chance 114:16
change 55:10
check 58:20 77:20
  77:23 116:8
Chestnut 1:10 2:8
Chiang 106:3
  108:6 116:9
children 10:1,18
  113:4,16
children's 10:10
chiropractor
  36:24
chores 112:1,13,14
Christiana 101:15
Christmas 12:8
chronic 37:8
Chrysler 15:4,14
  16:10
city 25:5 31:5
CIVIL 1:2
claim 29:15,20
claims 100:17
clean 112:3
cleaning 19:19
clear 55:7 86:15
Cliff 102:7
Clifford 99:15
Clifford's 102:3,4
climb 41:22 93:5
  96:23
climbed 52:17
  68:17 71:2 93:9
climbing 65:19
  66:4 71:5 93:15
  100:13
clinic 103:16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHN TURNER            :    CIVIL ACTION

      vs.                :

B.V. SHIPPING COMPANY    :
LUZON STRAIT (GRONINGEN)    :  NO. 04-CV-0936

### AMENDED COMPLAINT
### Jury Trial Demanded

1. Plaintiff John Turner is a citizen and resident of the State of Delaware.

2. Defendant B.V. Shipping Company Luzon Strait (Groningen) is a business organization organized and existing under and by virtue of the laws of a governmental body other than the Commonwealth of Pennsylvania, with its principal place of business located in Groningen, Netherlands.

3. The jurisdiction of this Court is invoked under 28 U.S.C. Section 1332, there being diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, being in excess of Seventy-Five Thousand Dollars ($75,000.00).

4. On or about November 8, 2002 and at all times material hereto, defendant owned, managed, operated, possessed and controlled the M/V Luzon Strait in foreign commerce.

5. On or about November 8, 2002 the M/V Luzon Strait was in navigable waters of the United States and moored at the Port of Wilmington, Wilmington, Delaware.

6. On or about November 8, 2002 and at all times mentioned herein, plaintiff was an employee of Delaware River Stevedores in the capacity of a longshoreman and was aboard the M/V Luzon Strait as a business visitor in connection with the performance of cargo operations being conducted thereon.

7. On or about November 8, 2002 plaintiff, while in the course of performing his duties as

EXHIBIT 3

aforesaid, was caused to sustain serious injuries due to the carelessness and negligence of defendant

B.V. Shipping Company Luzon Strait (Groningen) by its agents, servants, workmen and employees.

8. By reason of the carelessness and negligence of the defendant as aforesaid, the plaintiff

was caused to sustain severe injuries to his left knee and back; he sustained contusions to the left

knee with chondromalacia; he sustained disc herniations at L2-3 and L4-5; he sustained other

orthopedic, neurological and internal injuries; he sustained severe shock and injury to his nerves and

nervous system; he has in the past required and may in the future continue to require medicines,

medical care and attention; he has in the past been and may in the future be compelled to expend

monies and incur obligations for such care and attention; he has in the past suffered and may in the

future continue to suffer agonizing aches, pains and mental anguish; he has in the past been and

may in the future continue to be disabled from performing his usual duties, occupations and

avocations.

WHEREFORE, plaintiff claims damages of the defendant a sum in excess of Seventy-Five

Thousand Dollars ($75,000.00), together with pre-judgment interest and costs, and brings this action to

recover same.

POTTER, CARMINE & LEONARD, PA

BY: _____
        STEPHEN B. POTTER, ESQ. (ID# 298)
        840 North Union Street
        Wilmington, DE 19805
        (302) 658-8940
        Attorneys for Plaintiff

FREEDMAN AND LORRY, P.C.

BY: _____
        STANLEY B. GRUBER, ESQ. (ID #22954)
        400 Market Street, Suite 900
        Philadelphia, PA 19106
        (215) 925-8400
        Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of Plaintiff's Amended Complaint to be served by hand delivery, upon counsel for defendants at the addresses listed:

Richard Q. Whelan, Esquire
Palmer, Biezup & Henderson, LLP
956 Public Ledger Building
Independence Mall West
620 Chestnut Street
Philadelphia, PA 19106-3409
Attorneys for Defendant

STANLEY B. GRUBER

Dated:    11/08/04