1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF DELAWARE

3              -   -   -

4  JOHN TURNER            :    CIVIL ACTION

                        :

5        V.            :

                        :    COPY

6  B.V. SHIPPING       :

    GRONNIGEN (LUZON STRAIT):  NO. 04-CV-0936

7

               -   -   -

8          MARCH 29, 2005

               -   -   -

9

10         ORAL DEPOSITION OF CLIFFORD

11  J. LASCH, TAKEN PURSUANT TO NOTICE, WAS

12  HELD AT THE OFFICES OF DELAWARE RIVER

13  STEVEDORE'S OFFICE, TIOGA AND ALLEGHENY

14  AVENUE, PHILADELPHIA, PENNSYLVANIA,

15  BEGINNING AT 10:05 A.M., ON THE ABOVE

16  DATE, BEFORE NANCY D. RONAYNE, A

17  PROFESSIONAL COURT REPORTER AND NOTARY

18  PUBLIC IN THE COMMONWEALTH OF

19  PENNSYLVANIA.

20

21              -   -   -

22      ESQUIRE DEPOSITION SERVICES

               15TH FLOOR

23    1880 JOHN F. KENNEDY BOULEVARD

    PHILADELPHIA, PENNSYLVANIA 19103

24        (215) 988-9191



EXHIBIT
4

1  APPEARANCES:

2

3          FREEDMAN AND LORRY, P.C.
           BY:  STANLEY B. GRUBER, ESQUIRE
4          400 MARKET STREET
           SUITE 900
5          PHILADELPHIA, PA 19106-2509
           (215) 931-2510
6          REPRESENTING THE PLAINTIFF

7

8          PALMER, BIEZUP & HENDERSON, LLP
           BY:  RICHARD Q. WHELAN, ESQUIRE
9          956 PUBLIC LEDGER BUILDING
           620 CHESTNUT STREET
10         PHILADELPHIA, PA 19106-3409
           (215) 625-9900
11         REPRESENTING THE DEFENDANT

12

13                   -    -    -

14

15

16

17

18

19

20

21

22

23

24

CLIFFORD J. LASCH

```
 1                    -   -   -

 2              (LASCH-1 AND -2 MARKED FOR

 3         IDENTIFICATION.)

 4                    -   -   -

 5              CLIFFORD J. LASCH, AFTER

 6         HAVING BEEN DULY SWORN, WAS

 7         EXAMINED AND TESTIFIED AS FOLLOWS:

 8                    -   -   -

 9              DIRECT EXAMINATION

10                    -   -   -

11  BY MR. WHELAN:

12         Q.    MR. LASCH, MY NAME IS

13  RICHARD WHELAN, I REPRESENT THE OWNERS OF

14  THE SHIP CALLED THE LUZON STRAIT.  THE

15  SHIP OWNER OR MY CLIENT HAS BEEN SUED BY

16  LONGSHOREMAN JOHN TURNER IN CONNECTION

17  WITH AN ALLEGED ACCIDENT OF NOVEMBER 8,

18  2002 THAT OCCURRED IN THE PORT OF

19  WILMINGTON.  AND HE'S TESTIFIED AND THE

20  RECORDS INDICATE THAT HE WAS EMPLOYED BY

21  DELAWARE RIVER STEVEDORES ON THE DATE OF

22  HIS ACCIDENT.

23              YOU'VE BEEN IDENTIFIED

24  BECAUSE YOUR NAME AS A POTENTIAL WITNESS
```

CLIFFORD J. LASCH

1    GIVE YOUR ANSWER.  OKAY?

2           A.     UH-HUH.

3           Q.     STATE YOUR FULL NAME FOR THE

4    RECORD PLEASE?

5           A.     CLIFFORD JOSEPH LASCH.

6           Q.     WHAT IS YOUR PRESENT HOME

7    ADDRESS?

8           A.     13 CYPRUS POINT COURT,

9    BLACKWOOD, NEW JERSEY.

10          Q.     WHAT'S THE ZIP CODE THERE?

11          A.     08012.

12          Q.     AND YOUR HOME TELEPHONE

13    NUMBER?

14          A.     (856) 227-2531.

15          Q.     DO YOU PLAN TO BE AT THAT

16    ADDRESS FOR THE FORESEEABLE FUTURE?

17          A.     YES.  YES.

18          Q.     AND WHAT'S YOUR DATE OF

19    BIRTH?

20          A.     8/14/46.

21          Q.     AND BY WHOM ARE YOU

22    PRESENTLY EMPLOYED?

23          A.     DELAWARE RIVER STEVEDORES.

24          Q.     HOW MANY YEARS, WHEN DID YOU

CLIFFORD J. LASCH

1    START WORKING FOR DRS -- WE'LL CALL

2    DELAWARE RIVER STEVEDORES DRS -- WHEN DID

3    YOU FIRST START WORKING FOR THEM?

4         A.    '97 OR '98, ABOUT

5    EIGHT YEARS.

6         Q.    ABOUT EIGHT YEARS.  AND WHAT

7    IS YOUR PRESENT TITLE OR JOB FOR DRS?

8         A.    TERMINAL SLASH SHIP

9    SUPERINTENDENT.

10        Q.    AND YOU'RE PRESENTLY

11   ASSIGNED TO THE TIOGA MARINE TERMINAL?

12        A.    THAT'S CORRECT.

13        Q.    THIS ACCIDENT WHICH I

14   DISCUSSED WITH YOU A LITTLE BIT EARLIER

15   OCCURRED ON NOVEMBER 8TH, 2002 AT THE

16   WILMINGTON MARINE TERMINAL, AT THAT TIME

17   ON THAT DATE WHAT WAS YOUR TITLE WITH

18   DRS?

19        A.    TERMINAL MANAGER WITH DRS IN

20   WILMINGTON.

21        Q.    COULD YOU TELL US HOW LONG

22   -- THE TIME PERIOD DURING WHICH YOU WERE

23   ASSIGNED TO THE WILMINGTON MARINE

24   TERMINAL, IF YOU WERE ASSIGNED?

CLIFFORD J. LASCH

1        A.      YES, I WAS ASSIGNED AT THE

2   DELAWARE MARINE TERMINAL FROM US FIRST

3   GOING IN THERE I GUESS -- WHEN DID THAT

4   OCCUR?

5        Q.      NOVEMBER OF 2002.

6        A.      I WOULD SAY 2001 TO 2003, I

7   WAS THERE FOR THREE YEARS.

8        Q.      AND COULD YOU TELL US WHAT

9   YOUR JOB DESCRIPTION OR DUTIES WERE AS

10  THE TERMINAL MANAGER OR STEVEDORE -- IS

11  IT TERMINAL MANAGER OR STEVEDORE

12  SUPERVISOR?

13       A.      ACTUALLY, IN WILMINGTON IT

14  ENCOMPASSED EVERYTHING.  YOU ACTUALLY

15  WERE SUPERINTENDENT ON ALL THE VESSELS

16  THERE YOU WERE IN ATTENDANCE ON A

17  MAJORITY IF NOT ALL VESSELS THAT WERE

18  DONE THERE, IF I WAS ONLY THERE FOR A

19  MOMENT OR IF I WAS THERE FOR THE ENTIRE

20  PRACTICE OR THE ENTIRE PROCEDURE.  I WAS

21  ALMOST ON EVERY VESSEL IN DELAWARE WHEN I

22  WAS THERE.

23       Q.      WHEN YOU SAY YOU WERE ON YOU

24  MEAN YOU WERE LITERALLY WENT ABOARD AT

1    SOME POINT IN TIME?

2          A.    I WAS ACTUALLY ABOARD EVERY

3    SHIP ACTUALLY WAS IN PROBABLY 70 PERCENT

4    OF THE TIME I WAS THE ACTIVE

5    SUPERINTENDENT ON THERE ALSO.

6          Q.    COULD YOU TELL US WHAT ARE

7    THE DUTIES OF THE STEVEDORING

8    SUPERINTENDENT FOR DRS AT THAT TERMINAL

9    BACK IN NOVEMBER 2002?

10         A.    WELL, THE PRIMARY THING WAS

11   TO HIRE THE LABOR FROM THE ILA UNDER

12   CONTRACT TO WORK THE VESSELS IN

13   CONJUNCTION WITH CONTRACTS OF THE

14   CUSTOMERS.  SO THE CUSTOMER WOULD TELL ME

15   THEY HAVE A SHIP THAT WANTS TO START AT A

16   CERTAIN TIME AND WE KNOW HOW MANY MEN AND

17   WHAT TIME THEY WANT TO START AND WHAT

18   GEAR AND EQUIPMENT WE NEEDED AND THAT WAS

19   MY JOB TO MAKE SURE THAT ALL THOSE WERE

20   PUT INTO -- INTO POSITION.  AND IF YOU

21   HAD AN EIGHT O'CLOCK START, START AT

22   EIGHT O'CLOCK WITH HOW MANY GANGS AND

23   WHATEVER THE COMMODITY WOULD BE WHETHER

24   IT WOULD BE JUICE, FRUIT, MEAT, BULK

CLIFFORD J. LASCH

1  CARGOES.  WE DID AN INORDINATE AMOUNT OF

2  BULK CARGO MORE SO THAN BREAK BULK.

3         Q.      AND WHO WOULD BE DIRECTLY,

4  IF YOU WERE THE STEVEDORING SUPERVISOR

5  WHO WOULD BE THE PERSON THAT WOULD REPORT

6  TO YOU DIRECTLY BELOW YOU, WOULD THERE BE

7  ANOTHER SORT OF COMPANY PERSON OR WOULD

8  THERE BE A UNION PERSON?

9         A.      WELL, THERE WERE TWO OF US

10 DOWN THERE, THERE WAS A FELLOW NAMED GARY

11 LEWIS, HE WAS ACTUALLY WE WERE IN PRETTY

12 MUCH THE SAME SITUATION, I WAS SOLID

13 COMPANY HE WAS COMPANY SLASH UNION.  HE

14 WAS STILL AN ILA LABOR AND HE, IN

15 WILMINGTON THEY USE ILA PEOPLE AS

16 SUPERINTENDENTS ALSO.  SOMETIMES IN A

17 FULL CAPACITY AND SOMETIMES WE CO-WORKED

18 THE VESSELS, I BELIEVE THAT PARTICULAR

19 VESSEL I WAS ON PRETTY MUCH, WE BOTH

20 STARTED THAT VESSEL I'M PRETTY SURE BUT

21 I'D HAVE TO CHECK MY RECORDS.  I THINK WE

22 HAD A BULK SHIP WORKING IT LIKE THE

23 SECOND OR THIRD DAY OF THAT VESSEL AND

24 MR. LEWIS WAS ON THE BULK AND I HAD THIS

CLIFFORD J. LASCH

1   BY MYSELF I THINK.  BUT IT WAS LIKE A

2   TWO-MAN OPERATION.

3           Q.     AND THEN WHO WOULD BE BELOW

4   YOU TWO OF THAT GROUP?

5           A.     RIGHT BELOW US WOULD BE WHAT

6   THE UNION WOULD REFER TO AS A SHIP BOSS,

7   AND THEY'RE ASSIGNED BY THE UNION ON A

8   DAILY BASIS.  AND THAT COULD BE ONE OF

9   NINE INDIVIDUALS.  THE HATCH FOREMAN

10  ACTUALLY BECOME THE SHIP BOSS DOWN IN

11  WILMINGTON.

12          Q.     WHAT DO YOU MEAN BY THAT,

13  YOU MEAN THEY WORK THEIR WAY UP?

14          A.     WELL, EACH GANG THERE'S A

15  BOSS, WE'LL SAY YOU HAVE A GANG AND YOU

16  HAVE A GANG AND I HAVE A GANG.  WELL, ON

17  ANY GIVEN DAY I COULD, MY GANG COULD BE

18  ON THE SHIP AND I ALSO COULD BE THE SHIP

19  BOSS.

20          Q.     AND IF THAT OCCURS WOULD

21  YOUR --

22          A.     BUT IT WOULD ONE OF NINE

23  DIFFERENT PEOPLE.

24          Q.     IF THAT OCCURS THOUGH WOULD

CLIFFORD J. LASCH

1   YOUR GANG, IF YOU WERE THE SHIP BOSS THAT

2   DAY, SOMEBODY IN YOUR GANG WOULD THEN

3   FILL IN AS THE GANG BOSS?

4           A.    THAT'S CORRECT.

5           Q.    A SENIOR PERSON?

6           A.    YES, YES.  I THINK IN FACT

7   THIS FELLOW WAS JOHN, I DON'T KNOW IF HE

8   WAS FILLING IN FOR, I'M TRYING TO THINK

9   WHO HE WORKED FOR.

10          Q.    LET ME HAND YOU --

11          A.    I'D HAVE TO LOOK AT THE

12  REPORT ON THAT.

13          Q.    LET ME HAND YOU WHAT'S BEEN

14  MARKED AS LASCH-1 WHICH IS THE DRS

15  SUPERVISOR ACCIDENT INVESTIGATION AND

16  MAYBE THAT WILL REFRESH YOUR

17  RECOLLECTION.  ALSO, MR. LASCH, I HAVE

18  WHAT ARE SOME TIME RECORDS AND WORK

19  RECORDS THAT WERE SUPPLIED BY DRS

20  PURSUANT TO SUBPOENA AND THEY MIGHT HELP

21  REFRESH YOUR RECOLLECTION.  THAT'S A

22  COMPOSITE EXHIBIT OF TWO DIFFERENT TYPES

23  OF RECORDS.

24          A.    YES, OKAY.  HERE'S WHAT I

CLIFFORD J. LASCH

1   MEAN, I'M LISTED HERE AS THE SHIP

2   SUPERVISOR.   TERRIN JACKSON IS

3   ACTUALLY --

4                    MR. WHELAN:  OFF THE RECORD.

5                    (A DISCUSSION OFF THE RECORD

6           OCCURRED.)

7                    THE WITNESS:  BUT TERRIN IS

8           ACTUALLY BEN JACKSON'S SON, HE'S

9           THE STRAW BOSS.  SO BASICALLY IF

10          JACKSON'S GANG WAS ON THAT SHIFT

11          THEN JACKSON WOULD HAVE HAD IT BUT

12          ACCORDING TO THIS IT WAS LIKE BEN

13          JACKSON WAS THE SHIP FOREMAN AND

14          TERRIN THEN BECOMES THE GANG

15          FOREMAN.  SO THAT MAKES IT CLEAR

16          TO ME.

17  BY MR. WHELAN:

18          Q.    OKAY.

19          A.    DOES THAT EXPLAIN TO YOU?

20          Q.    YES.  AND THAT WOULD, CAN

21  YOU TELL FROM THAT RECORD THAT JOHN

22  TURNER WAS A MEMBER OF THE JACKSON GANG

23  FOR THAT PARTICULAR DAY?

24          A.    THAT I COULDN'T TELL, NOT BY

CLIFFORD J. LASCH

1  REFERRING TO?

2      A.    YES.

3      Q.    AND CAN YOU GIVE US JUST A

4  BRIEF DESCRIPTION FROM YOUR RECOLLECTION

5  OF THE LUZON STRAIT, YOU SAID IT WAS A

6  BRAND NEW SHIP AND WHAT MADE IT DIFFERENT

7  FROM OTHER SHIPS?

8      A.    WELL, IT WAS A SIDE PORT

9  DISCHARGE LOAD OPERATION ON

10 SELF-CONTAINED TRAYS THAT WOULD ELEVATOR

11 INTO THE VARIOUS DECKS.  UNLIKE

12 CONVENTIONAL VESSELS WHERE YOU OPEN UP

13 THE TOP HATCH COVERS AND USE THE CRANES

14 OR UNION PURCHASE TO GAIN ACCESS TO THE

15 DECKS, DISCHARGE THE DECK THEN OPEN UP

16 THE NEXT DECK, GO DOWN, DOWN, DOWN.  YOU

17 NEVER HAD TO OPEN THIS UP, IT WAS JUST A

18 SIDE DOOR WOULD OPEN UP AND THE PLATE

19 WOULD BE SUSPENDED ON WIRES AND GO DOWN

20 INTO EACH COMPARTMENT BEING A DECK, B

21 DECK, C DECK, D DECK, WITHOUT EVER HAVING

22 TO ACTUALLY SEE -- THE ONE WAY YOU COULD

23 SEE IN THE HATCH WAS TO GO DOWN INTO THE

24 HATCH.  IT WAS IN FACT THEY'RE USING

CLIFFORD J. LASCH

1    THOSE VESSELS TODAY IN PHILADELPHIA.  AND

2    THEY WERE PARTICULARLY I THINK MADE FOR

3    THE BANANA TRADE AND WE HAD I GUESS THE

4    SHIP WAS COMING OVER AND THEY SENT MEAT

5    ON IT.

6         Q.     SO THE CARGO YOU

7    DISCHARGED --

8         A.     WAS FROZEN BEEF.

9         Q.     -- WAS FROZEN BEEF;

10   PALLETIZED?

11        A.     YES.

12        Q.     AND JUST GOING BACK, YOU HAD

13   INDICATED THAT YOU HAD STARTED WITH DRS

14   ABOUT 1997 OR SO, AND WHO WAS YOUR

15   EMPLOYER BEFORE THAT?

16        A.     INDEPENDENT PIER COMPANY.

17        Q.     AND HOW MANY YEARS DID YOU

18   WORK FOR INDEPENDENT?

19        A.     27; 1969 TO 1996.

20        Q.     HOW DID YOU GET INVOLVED IN

21   WORKING FOR STEVEDORING COMPANIES, DID

22   YOU HAVE TRAINING OF ANY SORT BEFORE THAT

23   IN TERMS OF --

24        A.     NO.

1      Q.      -- FORMAL TRAINING OR DID

2  YOU JUST LEARN ON THE JOB WORKING FOR

3  INDEPENDENT PIER?

4      A.      NO, I'M A NAVY VETERAN.   I

5  CAME DOWN HERE PRIMARILY I GUESS IN THE

6  LATE SUMMER OF '69 LOOKING FOR A JOB AND

7  STARTED ON THE TERMINALS AND ON-THE-JOB

8  TRAINING MOSTLY.  JUST ONE THING LED TO

9  ANOTHER AND IT WAS ONLY A PART-TIME JOB

10  AND I WOUND UP BEING HERE FOR 36 YEARS OR

11  SOMETHING.

12      Q.      NOW, LOOKING AT THIS PART OF

13  COMPOSITE EXHIBIT 6 WHICH ARE THE

14  HANDWRITTEN, CAN YOU TELL US WHEN THE

15  DELAWARE RIVER STEVEDORES STARTED

16  DISCHARGE, WHAT DATE AND THEN WHAT DATES

17  WAS THE DISCHARGE COMPLETED?

18      A.      IT APPEARS WE STARTED ON THE

19  SIXTH WHICH WAS A WEDNESDAY, AND WE

20  FINISHED ON THURSDAY THE -- NO, FRIDAY.

21      Q.      WHAT DAY WAS THAT?

22      A.      FRIDAY THE 8TH.

23      Q.      NOVEMBER 8, 2002?

24      A.      THAT'S CORRECT.

CLIFFORD J. LASCH

1      Q.     OKAY.  NOW, I'M GOING TO

2  SHOW YOU -- LET'S GO BACK FOR A SECOND.

3  IN TERMS OF YOUR JOB AS A STEVEDORE

4  SUPERVISOR DURING THOSE DAYS, HOW OFTEN

5  OR HOW MUCH TIME WOULD YOU ACTUALLY SPEND

6  ABOARD THE VESSEL?

7      A.     THIS VESSEL PROBABLY MORE

8  THAN ANY, I SPENT AN INORDINATE AMOUNT OF

9  TIME BECAUSE IT WAS JUST ALL NEW TO US.

10  UP AND DOWN THE DECKS, TRYING TO WORK

11  WITH THE MATES.  TO MY RECOLLECTION THERE

12  WAS A LOT OF MECHANICAL BREAKDOWNS AND

13  THINGS HERE.  AND THERE WAS A LOT OF

14  CHANGING OF GEAR, TAKING THE BREAKOUT

15  CAGE OFF, BREAKING OUT CARGO, PUTTING THE

16  BREAKOUT CAGE BACK ON, OPENING DECKS.  I

17  THINK I PRETTY MUCH COVERED IT ALL WITH

18  THIS REPORT WITH THE TIMEKEEPER.

19           WHAT DO YOU WANT ME TO TELL

20  YOU, 60 PERCENT, 70 PERCENT, 10 PERCENT,

21  IS THAT WHAT YOU'RE LOOKING FOR?

22      Q.     YES, HOW MUCH OF YOUR DAY

23  WOULD TYPICALLY BE SPENT ABOARD THE SHIP?

24      A.     I'M SUPPOSED TO BE THERE ALL

CLIFFORD J. LASCH

1   THE TIME, I'M EITHER --

2          Q.      FOR MOST OF THE DAY OR --

3          A.      IF I AM NOT ON THE VESSEL I

4   WAS IN MY CAR OR WALKING ON THE DOCK IN

5   CLOSE PROXIMITY TO THE VESSEL BETWEEN THE

6   HOURS OF SEVEN TO 12 AND ONE TO SIX.

7   VERY RARELY DID I OR DO I LEAVE THE

8   VESSEL WHEN IT'S MY RESPONSIBILITY.

9          Q.      NOW YOU HAD MENTIONED

10  EARLIER THAT THERE WERE SOME BREAKDOWNS,

11  I'M LOOKING AT THE PAGE WHICH IS PART OF

12  A HANDWRITTEN PAGE, PART OF NOVEMBER 6TH,

13  EXHIBIT AND I SEE ONE BREAKDOWN AT THE

14  BOTTOM, CAGE DOWN?

15         A.      GO TO THE SIXTH, HATCH

16  NUMBER ONE, IN OTHER WORDS THIS IS THE

17  WAY I WOULD HAVE DESCRIBED WHAT WE WERE

18  DOING.  DISCHARGE BREAKOUT IN A DECK FROM

19  8 TO 8:15, MACHINE WITH A SPREADER, AND

20  THEN THERE WAS OVER STOKED PALLETS THAT

21  WE DID, THEN WE RIGGED THE CAGE, THEN WE

22  DISCHARGED A DECK AND THEN A CAGE BROKE

23  DOWN FROM WAS IT 10:05 TO 11:10.

24         Q.      NOW, WHAT WOULD THAT MEAN

CLIFFORD J. LASCH

1    THE CAGE BROKE DOWN; DO YOU KNOW?

2           A.    IN THIS RESPECT SOMETHING

3    MECHANICAL WENT WRONG, WHEN THE PLATE WAS

4    FLOATING DOWN IT MAY HAVE KICKED THE

5    SENSOR IN THE RAIL, OR IT WAS WEIGHTED

6    TOO MUCH TO ONE SIDE, OR JUST THERE WAS

7    SOME FAILURE ON THE SHIP, THERE WAS ALL

8    KINDS OF PANELS AND BOARDS AND EVERYTHING

9    AND THE CREW WAS STILL LEARNING HOW TO DO

10   THINGS AS WELL AS WE WERE.  IT WAS JUST

11   BRAND NEW, IT WAS TOTALLY NEW.  IN FACT,

12   I REMEMBER GETTING INTO SOME DEBATE WITH

13   THE CAPTAIN AT CERTAIN TIMES WHEN THE

14   VESSEL WAS BROKE DOWN AND TOLD ME HE

15   COULD DO SOMETHING IN 10 MINUTES BUT I

16   SAID IT TOOK 30 MINUTES TO DO, I SAID

17   WELL, I HAVEN'T SEEN YOU ON DECK SO MAYBE

18   YOU CAN BUT YOUR CREW CAN'T.

19           Q.    OKAY.  NOW LET ME SHOW YOU,

20   SWITCH EXHIBITS WITH YOU HERE, LASCH-1

21   WHICH IS THE ACCIDENT REPORT.  AND FIRST

22   OF ALL, ASK YOU WHAT'S THE DATE OF THAT

23   REPORT IN THE UPPER RIGHT HAND CORNER OF

24   EXHIBIT-1?

CLIFFORD J. LASCH

1          A.        11/8/02.

2          Q.        NOW, THE HANDWRITING ON THIS

3     REPORT, IS THAT YOURS?

4          A.        THAT'S CORRECT.

5          Q.        AND THAT'S YOUR SIGNATURE ON

6     THE LOWER --

7          A.        THAT'S CORRECT.

8          Q.        -- RIGHT HAND CORNER?

9                    AND THEN IT LOOKS LIKE

10    THERE'S ANOTHER SIGNATURE, THERE'S TWO

11    SIGNATURES IN THE RIGHT HAND CORNER, WHO

12    WAS THE OTHER SIGNATURE?  UNLESS THAT'S

13    YOU TWICE?

14         A.        WHO'S THIS CARMELLA

15    DIPIERRO?  I DON'T KNOW WHERE THAT CAME

16    FROM.  THIS LOOKS TO BE, IT IS OUR POLICY

17    WHEN WE DO AN ACCIDENT REPORT THAT YOU

18    HAVE THE PERSON THAT YOU ARE SIGNING THE

19    REPORT IT, IF HE'S COGNIZANT TO SIGN, TO

20    STATE THAT WHAT YOU -- TO CONCUR WITH YOU

21    WHAT THE REPORT IS IN FACT WHAT HE'S

22    SAYING OR WHAT DID HAPPEN.  SO THAT LOOKS

23    LIKE TO BE JOHN TURNER I BELIEVE

24         Q.        IN THE LEFT HAND SIDE?

CLIFFORD J. LASCH

1          A.      THAT'S CORRECT.

2          Q.      NOW WHAT ABOUT I CAN SEE

3   YOUR SIGNATURE AND THEN IT LOOKS LIKE

4   THERE'S ANOTHER SIGNATURE NEXT TO IT ON

5   THE RIGHT HAND SIDE, OR IS THAT ALL YOUR

6   SIGNATURE?

7          A.      I HAVE A BIG SIGNATURE.

8          Q.      I MEAN SO THIS IS ALL ONE

9   SIGNATURE ON THE RIGHT?

10         A.      IT SAYS CLIFFORD J. LASCH.

11  WHAT ARE YOU LOOKING AT?

12         Q.      DOES THAT LOOK LIKE -- I

13  DON'T KNOW?

14              MR. GRUBER:   DOES IT LOOK

15         LIKE CLIFFORD?

16              MR. WHELAN:   IT DOES LOOK

17         LIKE CLIFFORD.

18              THE WITNESS:   DOES IT LOOK

19         LIKE A BIG J?   LOOKS LIKE A

20         L-A-S-C-H?   THAT'S ME.

21  BY MR. WHELAN:

22         Q.      THAT'S YOU, OKAY.   SO THAT

23  WHOLE THING IS YOU, I JUST WANTED TO MAKE

24  SURE?

CLIFFORD J. LASCH

1         A.       NORMALLY THE WAY I SIGN

2   THINGS IS BIG AND BOLD.

3         Q.       NOW, WHEN IF YOU CAN

4   REMEMBER -- WELL FIRST OF ALL, ON THIS

5   REPORT IN THE UPPER PORTION OF IT THERE'S

6   AN INDICATION OF "TO/BY WHOM" I GUESS

7   REPORTED IT AND IT SAYS:  MR. JACKSON AND

8   THEN UNDER THAT CLIFF LASCH, I GUESS IN

9   YOUR HANDWRITING.  SO WAS IT MR. JACKSON

10  THAT REPORTED THE ACCIDENT TO YOU

11  INITIALLY OR DID MR. TURNER REPORT THE

12  ACCIDENT TO BOTH OF YOU?

13        A.       FROM THAT I COULDN'T TELL BY

14  JUST LOOKING AT THIS WHETHER HE SAID

15  SOMETHING TO TERRIN ON THE WAY OFF THE

16  VESSEL IF IN FACT TERRIN WAS IN HIS

17  IMMEDIATE AREA BUT HE DID SEE ME AND HE

18  KNEW WHERE I WOULD BE.

19        Q.       SO YOU DO REMEMBER HIM,

20  REMEMBER MR. TURNER REPORTING IT TO YOU?

21        A.       OH DEFINITELY, DEFINITELY.

22        Q.       AND WAS HE -- WAS THIS

23  REPORT PREPARED RIGHT AFTER HE REPORTED

24  IT TO YOU AND IN HIS PRESENCE SO HE COULD

CLIFFORD J. LASCH

1   SIGN IT LIKE HE DID IN THE LOWER LEFT

2   HAND CORNER?

3        A.    YES.  HE FIRST SPOKE TO ME

4   AT SHIP SIDE AFTER COMING OFF THE GANG

5   WAY, I WAS -- I THINK I WAS ON THE PHONE

6   WITH THE AGENT TELLING HIM WE WERE DONE

7   OR SOMETHING BUT HE WALKED UP TO ME AND

8   MADE SOME SORT OF COMMENT AND THEN SAID

9   LOOK, I HATE TO SPOIL YOUR DAY BUT I WANT

10  TO REPORT AN ACCIDENT; AND I SAID OKAY,

11  WHO; HE SAID, ME.  AND I SAID WELL HOW DO

12  YOU FEEL; MY FIRST RESPONSIBILITY IS YOUR

13  HEALTH AND WELL-BEING.  HE SAID WELL I'M

14  ALL RIGHT.  I SAID WELL, I DON'T HAVE

15  ANYTHING WITH ME IN THE CAR WOULD YOU

16  LIKE TO COME OVER TO THE OFFICE THE

17  SHIP'S DONE.  AND WE WENT AND SAT AT A

18  TABLE IN OUR OFFICE IN DELAWARE AND

19  COMPOSED THIS WHILE HE WAS SITTING THERE.

20        Q.    AND SO UNDER THE DESCRIPTION

21  OF HOW THE ACCIDENT OCCURRED THAT WOULD

22  HAVE BEEN YOU WROTE DOWN WHAT HE TOLD

23  YOU, WHAT MR. TURNER TOLD YOU?

24        A.    YES.  BECAUSE THERE WOULD BE

CLIFFORD J. LASCH

1   NO WAY THAT I COULD MAKE THAT STATEMENT

2   WITHOUT HIS COLLABORATION WITH HIM.

3        Q.    AND AS A RESULT OF THIS

4   ACCIDENT DID YOU EVER GO ABOARD THE SHIP

5   TO INSPECT THE AREA OF THE ACCIDENT?

6        A.    NO, BUT I HAD JUST LEFT THAT

7   AREA, THERE WAS A -- THE REASON WE WERE

8   LATE ON THIS IS BECAUSE A MACHINE HAD

9   JUMPED OUT OF A TRACK DOWN IN THE HATCH,

10  AND ONE OF THE GRATINGS HAD COME UP AND A

11  TIRE BECAME LODGED IN IT AND WE WENT TO

12  LUNCH THEN WE CAME BACK AND THERE WAS --

13  WE ALL MET DOWN THERE TO SEE HOW TO GET

14  THIS TIRE BACK OUT OF THE GRATING AND

15  JOHN WAS DOWN THERE AND THERE HAD TO BE

16  AT LEAST FIVE OR SIX OTHER INDIVIDUALS.

17       Q.    WHEN YOU SAY DOWN THERE,

18  WHERE?

19       A.    IN D DECK.  I HAD CLIMBED

20  ALL THE WAY DOWN TO A DECK, B DECK, C

21  DECK TO SEE THIS MACHINE IN THE GROOVE.

22       Q.    AND THAT WOULD BE THE NUMBER

23  TWO HOLE IN D DECK?

24       A.    YES.  THAT'S WHERE THEY

CLIFFORD J. LASCH

1  FINISHED ACCORDING TO THE REPORT AND TO

2  THIS REPORT, WE FINISHED, THAT WAS THE

3  LAST GANG FINISHED IN NUMBER TWO D DECK,

4  IT LOOKED LIKE A LITTLE AFTER TWO

5  O'CLOCK.

6          Q.     AND THEN WHEN YOU WENT DOWN,

7  SO YOU WENT -- HOW DID YOU GO DOWN?

8          A.     THE SAME PATH THAT EVERYBODY

9  TOOK.  YOU LEFT THE MAIN DECK AND WENT

10  DOWN THROUGH A HATCH COVER INTO A DECK

11  AND THEN OUT INTO THE DECK THEY FOUND

12  ANOTHER HATCH OPEN DOWN INTO B DECK AND

13  THEN ANOTHER INTO C DECK AND SO FORTH.

14          Q.     SO YOU'RE ACTUALLY OUT INTO

15  THE HATCH ITSELF WHERE THE CARGO --

16          A.     YES, YOU'RE ACTUALLY OUT

17  WHERE THE CARGO HAD BEEN, YES.  IT

18  DOESN'T GO, I DON'T BELIEVE IT WENT ALONG

19  THE BULK HEADS AND STRAIGHT DOWN LIKE

20  MOST CONVENTIONAL SHIPS DID WHERE YOU

21  JUST KEEP CLIMBING DOWN THROUGH A HATCH

22  OPENING, YOU HAD TO COME DOWN AND THEN IT

23  WAS OFFSET, YOU HAD TO GO TO ANOTHER

24  PLACE AND THEY LIFTED THE LID AND YOU

CLIFFORD J. LASCH

```
1    CLIMBED DOWN ANOTHER LADDER AND THEN YOU

2    WALKED A LITTLE BIT MORE AND DOWN AND

3    FOUND ANOTHER LID.  I JUST CLIMBED OUT OF

4    THIS, PROBABLY I GOT TO SAY MAYBE 35,

5    40 MINUTES PRIOR TO ALL THIS.

6            Q.      BEFORE THE ACCIDENT?

7            A.      BEFORE THE ACCIDENT I WAS

8    DOWN THERE WITH THEM.

9            Q.      AND WHEN YOU WENT DOWN

10   THROUGH THE ACCESS COVER AND LADDER THAT

11   WENT FROM 2C DOWN TO 2D DID YOU

12   EXPERIENCE ANY TROUBLE?

13           A.      NO, I DID NOT.

14           Q.      WHEN YOU WENT DOWN WAS THAT

15   COVER FOR THAT ACCESS, FOR THAT LADDER

16   ACCESS OPEN AND SECURED IN THE OPEN

17   POSITION?

18           A.      YES, ALL A, B, AND C WERE

19   ALL OPEN.

20           Q.      AND SECURED?

21           A.      AND SECURED.  SIX OR SEVEN

22   OF US WENT DOWN AND I GUESS SEVEN OF US

23   GOT OUT COMPLETELY AND THE EIGHTH PERSON

24   DIDN'T, I DON'T KNOW WHAT HAPPENED.
```

CLIFFORD J. LASCH

1         Q.      WHEN YOU WENT BACK UP YOU

2    HAD THE SAME THING, IT WAS SECURED IN THE

3    OPEN POSITION?

4         A.      I EXITED THE SAME WAY I

5    ENTERED, I WENT UP IN D TO C; C TO B; B

6    TO A, A TO THE MAIN DECK.

7         Q.      AND THAT ACCESS COVER

8    LEADING, THEY HAD TO GO THROUGH TO GET

9    FROM D TO C, IT WAS OPEN WHEN YOU WENT UP

10   AND SECURED IN THE OPEN POSITION?

11        A.      YES.  THEY WERE ALL OPEN, A,

12   B, AND C WERE ALL UP.  A, B, C WERE ALL

13   UP, YES.

14        Q.      AND THEY WERE ALL SECURED?

15        A.      TO MY KNOWLEDGE, YES.  I

16   BELIEVE THEY OPENED UP WITH AT THE BASE

17   FROM THE CLEVIS PIN IN THEM, DOWN AT THE

18   BOTTOM.  BECAUSE THEY FREE STAND, THEY

19   COME RIGHT UP OUT OF THE MIDDLE OF THE

20   DECK.  AND THEN THERE'S A HINGE OR

21   SOMETHING AND THERE WAS A CLEVIS PIN OR

22   SOMETHING OR SOME PIN.

23        Q.      AS A STEVEDORING SUPERVISOR

24   AND SOMEONE THAT'S GONE THROUGH THESE

CLIFFORD J. LASCH

1    TYPES OF HATCHES MANY TIMES, DID THEY

2    SEEM UNUSUAL TO YOU IN ANY WAY?

3              A.    WELL OTHER THAN THE FACT

4    THAT THEY WEREN'T STRAIGHT DOWN AND

5    USUALLY YOU SEE AN ACCESS AREA WHERE

6    YOU'RE, THEY'RE FAIRLY IN THE SAME

7    PROXIMITY WHERE YOU COULD LOOK ONE DECK

8    DOWN TO THE NEXT, THEY WERE JUST A LITTLE

9    OFFSET.  YES, BECAUSE SOME OF THEM, MOST

10   OF THEM ARE UP AGAINST THE BULKHEAD WITH

11   THE PIN UP AT THE TOP WHERE YOU CAN

12   ACTUALLY SEE WHERE THEY'RE LATCHED.  THIS

13   TO MY RECOLLECTION IS THEY JUST CAME UP

14   FLAT FROM THE DECK AND THEY PIN SOMEWHERE

15   LOW AND SOMETIMES I THINK THEY PUT

16   STANCHIONS AROUND THEM, THERE'S HOLES,

17   THEY PUT A COUPLE STANCHIONS OR POLES IN,

18   PORTABLE POLES IN.

19             Q.    DO YOU REMEMBER THAT ON THIS

20   PARTICULAR DAY?

21             A.    WHETHER THEY HAD THE POLE

22   UP?

23             Q.    YES.

24             A.    I THINK IT WAS JUST A LID

1  BUT I'M NOT SURE.  IT WAS JUST THE LID

2  WAS PULLED UP AND ANCHORED, I MEAN, YOU

3  HAVE TO ACTUALLY PHYSICALLY GRAB THAT TO

4  PUT YOUR FEET ON THE LADDER TO GO DOWN, I

5  THINK THERE'S A HAND HOLD.

6       Q.    WHEN YOU SAY GRAB THAT YOU

7  MEAN THE LID?

8       A.    THE LID, THE OPEN LID.  IF

9  IT'S OPEN IT'S UP LIKE THIS.  YOU HAVE TO

10 ACTUALLY HOLD ONTO THIS TO GET YOUR FEET

11 SET TO GO DOWN INTO THE --

12      Q.    TO THE LID?

13      A.    -- TO THE COMPARTMENT YOU

14 WANT TO BE IN.

15      Q.    SO WHEN YOU DID THAT ON THIS

16 PARTICULAR LID LEADING FROM C TO D, GOING

17 UP AND DOWN, YOU HAD NO PROBLEM DOING

18 THAT?

19      A.    NO.  SEVEN OR EIGHT OF US

20 WENT DOWN AND SEVEN OR EIGHT OF US COME

21 UP.  SEVEN GOT OUT AND THE EIGHTH ONE

22 DIDN'T.

23      Q.    AND WHEN YOU AS A

24 STEVEDORING SUPERVISOR DOING THIS MANY

CLIFFORD J. LASCH

1   TIMES BEFORE ON OTHER SHIPS AND

2   EVERYTHING, IS IT IMPORTANT TO BE SURE

3   THAT THE LIDS ARE OPEN AND SECURED BEFORE

4   YOUR MEN USE THEM?

5          A.     YES.   IT'S -- IT'S THE

6   RESPONSIBILITY OF THE SHIP BOSS AND THE

7   HATCH BOSS AND THE SHIP SUPERINTENDENT TO

8   MAKE SURE THAT EVERYTHING IS DONE SAFELY.

9          Q.     AND IS THERE ANY REGULATION

10  THAT YOU'RE AWARE OF THAT REQUIRES OR

11  SAFETY POLICY OR ANYTHING THAT REQUIRES

12  TWO WAYS TO ACCESS A HATCH?

13         A.     TWO WAYS?

14         Q.     RIGHT.   IN OTHER WORDS, IS

15  IT -- WELL, STRIKE THAT QUESTION.

16                IN YOUR EXPERIENCE IS THERE

17  TYPICALLY TWO ACCESSES TO SHIP'S CARGO

18  HOLES?

19         A.     SOME COULD BE, LIKE ON A

20  REFRIGERATED VESSEL YOU COULD GO DOWN

21  THROUGH THE BACK SIDE OF THE

22  REFRIGERATION COMPARTMENT AND COME

23  THROUGH A DOOR.   AND ALSO ENTER FROM THE

24  OTHER END, YES, MAYBE PORT AND STARBOARD

CLIFFORD J. LASCH

1  -- FORWARD AND AFT.

2          Q.          FORWARD AND AFT.

3                      DO YOU KNOW WHETHER THAT

4  EXISTED ON THIS PARTICULAR SHIP?

5          A.          NO, I THINK WE HAD TO GO

6  DOWN AT -- IT WAS CLOSE TO WHERE THE

7  ELEVATOR ENTRIES WERE TO EACH HATCH, ONE

8  WOULD HAVE BEEN AFT, TWO WOULD HAVE BEEN

9  FORWARD, THREE WOULD HAVE BEEN AFT, FOUR

10 WOULD HAVE BEEN FORWARD I BELIEVE.  I

11 WASN'T AWARE OF ANY OTHER ENTRY OTHER

12 THAN OR EXIT OR IF THERE WAS TWO SETS OF

13 ENTRANCES OR EXITS TO THAT VESSEL.

14         Q.          SO YOU DON'T KNOW?

15         A.          NO.

16         Q.          YOU JUST KNOW THE ONE THAT

17 YOU DESCRIBED ALREADY?

18         A.          THE ONE WE USED, YES.

19         Q.          NOW LOOKING AT YOUR, IT SAYS

20 AT THE BOTTOM OF EXHIBIT LASCH-1,

21 SUPERVISOR'S COMMENTS AND THEN IN

22 PARENTHESES, WHY DID ACCIDENT OCCUR AND

23 WHAT SHOULD BE DONE TO PREVENT THE

24 RECURRENCE.  YOU STATE:  SEEMS AS THOUGH

CLIFFORD J. LASCH

1   SECURING PIN WORKED OUT OF THE SLOT.

2   SHOULD BE INSPECTED BEFORE ENTERING DECK.

3           A.      ACTUALLY YOU COULD SEE IT

4   BEFORE YOU WENT DOWN, BUT YOU COULDN'T

5   SEE IT COMING OUT PROBABLY. AGAIN, I

6   THINK IT WAS A SITUATION WHERE YOU JUST

7   LIFTED THE LID UP AND IT WAS A PIN OR TWO

8   PINS WERE HOLDING THE LID IN THE UPWARD

9   POSITION AT THE BASE.  IT WAS NOTHING AT

10  THE TOP.  I'VE ACTUALLY SEEN, I'VE SEEN

11  THEM WHEN THEY'VE OPENED UP AND THEY'VE

12  HAD AN ARM COME DOWN ON THE SIDE THAT

13  WOULD BE LIKE SHACKLED INTO THE SIDE TO

14  HOLD THAT LID UP, YOU CAN VISIBLY SEE

15  THAT THERE'S -- BUT THIS I BELIEVE IT WAS

16  DOWN IN BACK THERE.

17          Q.      OKAY.

18          A.      AND MY OWN PRACTICE WHEN I'M

19  GOING DOWN OR WHEN I WAS GOING DOWN THIS

20  WAS TO STAND IN FRONT OF IT PULLING IT

21  (INDICATING) YOU KNOW, MAKE SURE IT WAS

22  LOCKED BEFORE I WENT DOWN IN.

23          Q.      AND WOULD YOU DO THE SAME ON

24  THE WAY UP?

CLIFFORD J. LASCH

1    WHEN IT HAPPENED, HE CAME AND TOLD ME.

2    WE DID THIS PROBABLY 15 MINUTES LATER IN

3    MY OFFICE AND WENT THROUGH IT.

4         Q.      DID YOU SPEAK TO SEAN BRADY

5    AND ANTHONY FRAZER?

6         A.      THEY WERE GONE ALREADY.

7         Q.      DID ANYONE EVER TELL YOU

8    THAT THE SECURING PIN OR THE SECURING

9    DEVICE WAS BROKEN?

10        A.      NO.

11        Q.      IF THEY HAD TOLD YOU THAT

12   YOU WOULD HAVE PUT IT IN YOUR REPORT?

13        A.      IF THEY TOLD ME IT WAS BROKE

14   --

15        Q.      IT WAS BROKEN, THAT IT

16   BROKEN OFF OR WAS DISTORTED OR HAD

17   SOME --

18        A.      YOU MEAN IF TURNER WOULD

19   HAVE TOLD ME THAT?

20        Q.      OR WHOEVER, YES.  I MEAN

21   TURNER IS THE ONLY ONE YOUR TALKED TO

22   FROM WHAT I UNDERSTAND?

23        A.      YES, THAT'S THE ONLY ONE I

24   DID TALK TO.

CLIFFORD J. LASCH

1        Q.      SO IF HE HAD TOLD YOU THAT

2    IT WAS BROKEN YOU WOULD HAVE PUT THAT IN

3    YOUR REPORT?

4        A.      I BELIEVE I WOULD HAVE.  I

5    MEAN, THAT'S WHY WE SIGN IT.  JOHN IS

6    THIS ALL RIGHT AND YES, OKAY, THAT'S WHAT

7    HAPPENED.  IF HE TOLD ME AND IT WASN'T

8    THERE I'M SURE HE WOULD HAVE BROUGHT IT

9    TO MY ATTENTION BEFORE HE SIGNED IT.

10       Q.      NOW, WHAT TIME ACCORDING TO

11   YOUR REPORT DID MR. TURNER TELL YOU THAT

12   THE ACCIDENT HAD OCCURRED?

13       A.      WELL, AT RIGHT PRIOR TO 2:50

14   SO THAT'S WHEN HE REPORTED IT TO ME WAS

15   2:50 IS WHAT I PUT DOWN.  IT COULD HAVE

16   BEEN 2:30, THE ACTUAL OCCURRENCE, BUT IT

17   WASN'T -- IT HAD TO BE SOMEWHERE BETWEEN

18   TWO AND THREE O'CLOCK BECAUSE THAT'S WHEN

19   WE FINISHED THE SHIP.

20       Q.      CAN YOU TELL FROM MAYBE IF

21   YOU CAN LOOK AT YOUR COMPOSITE EXHIBIT 2

22   FOR THAT DAY, AND WHEN DID YOU COME BACK

23   FROM LUNCH AND START WORKING IN 2D AND

24   THEN WHEN DID YOU FINISH UP 2D ACCORDING

CLIFFORD J. LASCH

1   WENT BACK UP.

2          Q.     AND DID YOU, ARE YOU AWARE

3   OF ANYONE OTHER THAN YOURSELF FROM DRS

4   GOING ABOARD TO INVESTIGATE THE ACCIDENT?

5          A.     NO, BECAUSE I BELIEVE THEY

6   WERE SAILING RIGHT AWAY.

7          Q.     ARE YOU AWARE OF ANY

8   PHOTOGRAPHS OF THE ACCIDENT SCENE TAKEN

9   BY DRS OR ANY LONGSHOREMEN OR ANYONE

10  ELSE?

11         A.     NO, I'M NOT.  NO, I DIDN'T

12  TAKE ANY AND I DON'T THINK THE SHIP WAS

13  THERE LONG ENOUGH.  YOU COULD GET THOSE

14  RECORDS AND SEE WHEN SHE ACTUALLY SAILED.

15  I THINK SHE ACTUALLY SAILED WHEN WE WERE

16  DOING THE REPORT SO, I DIDN'T TAKE ANY.

17  IN FACT, WE USED TO HAVE A PORTION HERE

18  WHERE WERE ANY PICTURES TAKEN, MAYBE

19  THAT'S ON THE NEWER REPORTS.  NO, I

20  DIDN'T TAKE ANY, I DON'T KNOW OF ANYBODY

21  ELSE.

22         Q.     IN THIS PARTICULAR SHIP WHEN

23  YOU WERE WALKING AROUND AND SO FORTH, DID

24  IT APPEAR TO BE WELL-MAINTAINED TO YOU?

CLIFFORD J. LASCH

1      A.    YES, IT WAS BRAND NEW.  IT

2  WAS BRAND NEW, MAIDEN VOYAGE.

3      Q.    SO IT LOOKED, EVERYTHING

4  LOOKED NEW TO YOU?

5      A.    VERY NEW.  TOO NEW.

6      Q.    OTHER THAN THAT TIME YOU

7  DESCRIBED OR YOU WENT DOWN SOMETIME AFTER

8  LUNCH ON THE DATE OF THE ACCIDENT DOWN TO

9  2D AND THEN BACK UP THROUGH THE VARIOUS

10  LADDERS AND ACCESS, HAD YOU EVER GONE

11  DOWN IN TO D DECK BEFORE THAT?

12      A.    NO, I THINK THAT WAS MY

13  FIRST.  I HAD BEEN DOWN IN THE OTHER

14  DECKS WHILE WE WERE WORKING THE SHIPS TO

15  GO DOWN AND SEE HOW THINGS WORKED, HOW

16  THEY PLUGGED THINGS IN AND IT'S UNIQUE

17  BECAUSE YOU CAN'T SEE, THE ELEVATORS

18  CAN'T BE OPERATED TOPSIDE UNLESS SOMEBODY

19  PUSHES A BUTTON BELOW BECAUSE THE SIGHT

20  OF VISION IS VERY BAD THERE.

21      Q.    WHEN YOU WENT DOWN AND THEN

22  BACK UP SHORTLY AFTER LUNCH ON

23  NOVEMBER 8TH, FROM DOWN INTO D2 AND BACK

24  UP THROUGH THAT ACCESS WAY AT THE 2C

CLIFFORD J. LASCH

```
1   LEVEL, DID YOU NOTICE WHETHER THE

2   SECURING DEVICE OR ANYTHING RELATED TO

3   THAT ACCESS WAS BROKEN?

4        A.    NO, I DID NOT.

5        Q.    DID IT APPEAR TO BE IN GOOD

6   CONDITION TO YOU SO FAR AS YOU COULD

7   TELL?

8        A.    WELL AS I SAID, MY PROCEDURE

9   WOULD BE TO STAND THERE AND PULL ON IT

10  (INDICATING) AND IF IT'S OKAY I WENT

11  DOWN.  I DIDN'T ACTUALLY LOOK TO SEE IF

12  THERE WAS SOMETHING AMUCK WITH IT THAT IF

13  WHEN I SHOOK IT IT DID SOMETHING IRRATIC

14  I WOULD HAVE BUT I SHOOK IT AND WENT DOWN

15  ON EACH LEVEL AND OUT AT EACH LEVEL.

16       Q.    AND YOU WERE SATISFIED

17  THAT --

18       A.    I WAS, YES.

19       Q.    OKAY.  DID YOU DRIVE MR.

20  TURNER TO GET MEDICAL TREATMENT OR DID HE

21  GO ON HIS OWN?

22       A.    THAT'S ANOTHER FUNNY STORY.

23  NORMALLY I WOULDN'T EVEN HAVE DONE THIS

24  REPORT, WE USUALLY HAD SOMEONE ELSE DO
```

CLIFFORD J. LASCH

1    REPORT.

2            Q.      YOU'RE REFERRING TO LASCH-4?

3            A.      LASCH-4 WILL ALSO TELL YOU

4    THAT THERE'S CARGO ON THERE FOR CORPUS

5    CHRISTI AND PORT EVERGLADES.

6            Q.      LET'S JUST CONCENTRATE ON

7    LASCH-5?

8            A.      LASCH-5 WILL ALSO INDICATE

9    TO THE TRAINED EYE WHERE THE CARGO IS BUT

10   I JUST WANTED TO MAKE SURE THAT I WAS

11   READING IT RIGHT WHEN IT WENT BACK TO

12   LASCH-4.

13                  MR. GRUBER:  CAN I JUST SEE

14          LASCH-5 PLEASE FOR A MINUTE.

15                  THE WITNESS:  THIS WOULD

16          INDICATE PORT EVERGLADES AND THEN

17          THERE WOULD BE CORPUS CHRISTI

18          WOULD BE IN ONE AND THREE.

19   BY MR. GRUBER:

20           Q.      SO IF WE JUST CONCENTRATE ON

21   LASCH NUMBER 2 AND PARTICULARLY THE C AND

22   D LEVELS, DO I UNDERSTAND THAT PALLETS OF

23   FROZEN MEAT WERE LOADED INTO THE C AND D

24   LEVELS OF THE NUMBER TWO HATCH IN

CLIFFORD J. LASCH

1    AUSTRALIA?

2            A.    YES.

3            Q.    YES?

4            A.    YES, THAT'S CORRECT.

5            Q.    AND SO FAR AS YOU CAN TELL

6    WAS THERE ANY OTHER ACTIVITY IN THE C AND

7    D LEVELS OF THE NUMBER TWO HATCH BETWEEN

8    AUSTRALIA AND THE PORT OF WILMINGTON?    IN

9    OTHER WORDS, WHEN THE SHIP STOPPED AT

10   PORT EVERGLADES, WHEN IT CALLED AT CORPUS

11   CHRISTI WAS THERE ANY ACTIVITY IN THE C

12   OR D LEVEL OF THE NUMBER TWO HATCH?

13           A.    NO, THIS WOULD NOT INDICATE

14   THAT AT ALL.

15           Q.    OKAY.  NOW --

16           A.    IN FACT, THIS VESSEL LOADED

17   IN THREE OR FOUR DIFFERENT PORTS IN

18   AUSTRALIA IN NUMBER TWO HATCH, THEY WERE

19   IN TOWNSVILLE, PORT ALMA, I FORGET WHAT

20   THE CODING WAS FOR THAT.

21           Q.    PARDON ME?

22           A.    THERE'S DIFFERENT CODING

23   HERE, ACTUALLY ONE PORT TOWNSVILLE FOR 2C

24   -- OR 2D, THAT'S ALL TOWNSVILLE.  2C WAS

CLIFFORD J. LASCH

1    A COMPOSITE LOADING, THEY HAD LOADED

2    CARGO THERE FROM PORT ALMA.  LOOKS LIKE

3    TWO DIFFERENT PORTS AT LEAST, BUT OFF OF

4    THE DISCHARGE IN WILMINGTON.

5            Q.    BUT WITH RESPECT TO 2D?

6            A.    2D WAS ALL LOADED AT ONE

7    PORT, DISCHARGED AT ONE PORT.

8            Q.    IT WAS ALL LOADED AT, I'M

9    SORRY, PORT ALMA DID YOU SAY?

10           A.    IT LOOKS LIKE TOWNSVILLE.

11           Q.    TOWNSVILLE?

12           A.    YES.

13           Q.    NOW, TO REVERSING THE

14   PROCESS, YOU'VE TOLD US ABOUT DISCHARGING

15   THE CARGO; LOADING CARGO, LOADING IT INTO

16   THE D HATCH OF NUMBER TWO, WHAT WOULD THE

17   PROCESS BE, DO YOU KNOW?

18           A.    WITH THIS PARTICULAR VESSEL

19   YOU WOULD HAVE AN EMPTY SHIP, YOU WOULD

20   SEND IN MACHINES DOWN THE ELEVATOR SHAFT,

21   YOU WOULD POSITION THE MACHINES OFF OF

22   THE ELEVATOR, SEND THE ELEVATOR BACK OUT

23   TO THE DOCK, PICK UP THE CARGO, BRING IT

24   UP THE ELEVATOR, BACK OVER THE VESSEL,

1    DOWN INTO THE D DECK, FORKLIFTS WOULD

2    TAKE IT OFF AND RUN IT INTO A STOW POINT

3    IN HATCH NUMBER TWO. YOU WOULD BE

4    STOWING FORWARD TO AFT, THE ELEVATOR

5    WOULD BE IN THE FORWARD END STOWING THE

6    CARGO IN THE AFT AND ACROSS TO KEEP

7    WORKING IT OUT UNTIL IT CAME BACK TO THE

8    ELEVATOR.

9         Q.    AND OBVIOUSLY LONGSHOREMEN

10   WOULD HAVE HAD TO GONE INTO THE D HATCH

11   -- INTO THE, EXCUSE ME, THE D LEVEL AT

12   THE NUMBER TWO HATCH IN ORDER TO OPERATE

13   THOSE FORKLIFTS AND STOW THE CARGO?

14        A.    THEY WOULD HAVE HAD TO GO

15   DOWN THROUGH A DECK, B DECK, C DECK, TO

16   GET INTO THAT LEVEL, YES.

17        Q.    THE SAME WAY YOU DID?

18        A.    YES.

19        Q.    THEN PRESUMABLY THEY WOULD

20   HAVE HAD TO GO OUT OF THE HATCH AND WHEN

21   THEY COMPLETED STOWING THE CARGO IN THE D

22   LEVEL THEY WOULD HAVE GONE OUT THE SAME

23   WAY YOU DID?

24        A.    YES.

CLIFFORD J. LASCH

1              MR. WHELAN:  OBJECT TO THE

2         FORM OF THE QUESTION.  YOU CAN

3         ANSWER.

4              THE WITNESS:  PARDON ME?

5              MR. WHELAN:  I'M OBJECTING

6         TO THE FORM OF THE QUESTION BUT

7         YOU CAN ANSWER, I'M JUST PUTTING

8         IT ON THE RECORD.

9              THE WITNESS:  THEY WOULD

10         HAVE HAD TO GET OUT THE SAME WAY.

11         IN OTHER WORDS, ONCE THEY WERE

12         FINISHED D DECK THEY WOULD HAVE TO

13         COME OUT, YOU KNOW -- THAT'S

14         INTERESTING.

15    BY MR. GRUBER:

16         Q.    THAT THEY COULD HAVE COME

17    OUT THE ELEVATOR?

18         A.    THEY COULD HAVE COME UP THE

19    ELEVATOR, YES.

20         Q.    THEN OBVIOUSLY YOU HAVE NO

21    WAY --

22         A.    I WOULDN'T GO DOWN THE

23    ELEVATOR BUT THEY COULD HAVE CAME UP THE

24    ELEVATOR.  IN FACT, WE -- WE HAVE TO GO

CLIFFORD J. LASCH

1    IN THE LEVEL FROM AT LEAST ONE LEVEL DOWN

2    BECAUSE IT WAS ALL, YES, THEY WOULD HAVE

3    TO -- THEY COULD HAVE COME UP THE

4    ELEVATOR, THAT MAY HAVE EVEN BEEN

5    COVERED.

6             Q.    THAT WAS MY NEXT QUESTION?

7             A.    THAT COULD HAVE BEEN

8    COVERED. IN OTHER WORDS, WHERE YOU WOULD

9    HAVE HAD TO COME UP FROM D TO C MAY HAVE

10   BEEN COVERED AND THEY WOULD HAVE HAD TO

11   COME UP THE ELEVATOR TO GET TO C

12   PROBABLY. THAT WOULD BE MY RECOLLECTION.

13            Q.    IN ORDER TO STOW CARGO AT

14   THE C LEVEL IN THE NUMBER TWO HATCH, THAT

15   HATCH LID THAT WE'VE BEEN TALKING ABOUT

16   WHERE YOU WOULD COME UP OUT OF THE D

17   LEVEL INTO THE C LEVEL, WOULD HAVE TO BE

18   CLOSED?

19            A.    OH, YES.

20            Q.    AND THERE WOULD BE A PLATE

21   PUT OVER THAT, WOULDN'T THERE?

22            A.    THERE WOULD BE. I DON'T

23   KNOW IF IT'S A PLATE OR IF IT'S JUST PART

24   OF THE DECK.

CLIFFORD J. LASCH

1    MY KNOWLEDGE WITH DRS AS A

2    SUPERINTENDENT, DOESN'T HOLD AN OFFICE

3    POSITION BUT HE'S STILL AN ILA EITHER

4    FOREMAN OR ASSISTANT FOREMAN IN THE PETTY

5    GANG.

6              MR. GRUBER:  PETTY GANG.

7              THE WITNESS:  HIS FATHER IS

8         BEN PETTY.  AS I SAID, I LEFT

9         THERE ALMOST A YEAR AND A HALF AGO

10        AND I HAVEN'T HAD MUCH

11        CONVERSATION WITH GARY OR ANYONE

12        ELSE DOWN THERE.  AND THIS IS THE

13        FIRST TIME I'VE BEEN QUESTIONED

14        ABOUT THIS PARTICULAR CASE BY YOU

15        TWO GENTLEMEN OR WHEN YOU

16        (INDICATING) MAYBE FIVE WEEKS AGO

17        WHEN YOU CALLED.

18   BY MR. WHELAN:

19        Q.    I JUST HAVE ONE OTHER

20   QUESTION.  DID YOU AT ANY TIME EVER

21   REPORT THIS ACCIDENT TO THE SHIP, TO THE

22   CAPTAIN OR THE CREW OR ANYONE ABOARD THE

23   SHIP?

24        A.    NO.  FROM MY RECOLLECTION IT

CLIFFORD J. LASCH

1    WAS GONE, BY THE TIME I TOOK CARE OF JOHN

2    TURNER BACK AT THE OFFICE, DID THE

3    REPORT, GOT HIM TO THE HOSPITAL.  AS I

4    SAY, IF THERE WAS SOMEONE ELSE THERE, WE

5    USED TO HAVE A GUY BY THE NAME OF STEVE

6    JONES WHO USED TO DO THESE FOR US AND RUN

7    THEM TO THE HOSPITAL AND ALL IF WE WERE

8    BUSY BUT I DIDN'T NEED HIM THAT DAY, I

9    WASN'T BUSY SO I TOOK HIM.  BUT I BELIEVE

10   BY THE TIME WE EVEN LEFT FOR THE HOSPITAL

11   THE SHIP HAD SAILED.

12              MR. WHELAN:  OKAY.  THAT'S

13        ALL I HAVE.  THANKS.

14              MR. GRUBER:  THANKS.

15              (WITNESS EXCUSED.)

16              (DEPOSITION CONCLUDED AT

17        APPROXIMATELY 11:20 A.M.)

18

19

20

21

22

23

24

1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

  JOHN TURNER                )
                             ) CIVIL ACTION
  vs.                        )
                             ) NO. 04-936 (JJF)
  B.V. SHIPPING COMPANY      )
  LUZON STRAIT (GRONINGEN)   )
```

<br>

ORAL DEPOSITION

CAPTAIN MARK ROBERT JANSEN

June 16, 2005

<br>

        ORAL DEPOSITION OF CAPTAIN MARK ROBERT JANSEN,

produced as a witness at the instance of the

Plaintiff and duly sworn, was taken in the

above-styled and numbered cause on the 16th day of

June, 2005, from 11:32 a.m. to 2:51 p.m., before

Michelle Hartman-Solari, Certified Shorthand Reporter

and Registered Professional Reporter, reported by

computerized stenotype machine at the offices of

Motel Schiphol A4, Rijksweg A4 No. 3, 2132 MA

Hoofddorp, The Netherlands, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

EXHIBIT
5

```
 1              APPEARANCES
 2
 3   FOR PLAINTIFF:
 4      Stanley B. Gruber
        Freedman and Lorry, P.C.
 5      400 Market Street
        Suite 900
 6      Philadelphia, Pennsylvania 19106-2509
        Telephone: 215-931-2510 - Fax: 215-925-7516
 7      E-mail: sbgruber@freedmanlorry.com
 8
 9   FOR DEFENDANT:
10      Richard Q. Whelan
        Palmer Biezup & Henderson LLP
11      956 Public Ledger Building
        600 Chestnut Street
12      Philadelphia, Pennsylvania 19106
        Telephone: 215-625-7806 - Fax : 215-625-0185
13      E-mail: rwhelan@pbh.com
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              INDEX
 2                          PAGE
 3   CAPTAIN MARK ROBERT JANSEN
 4   Examination by Mr. Gruber ....................   5
     Examination by Mr. Whelan ...................  100
 5   Signature Page .............................  109
     Court Reporter's Certificate ................  110
 6
 7              EXHIBITS
 8   EXHIBIT     DESCRIPTION              PAGE
 9   P-FF       19 Photographs of the forward    11
               hatch lid
10
     P-CC       Photographs of the aft hatch     27
11             lid
12   P-GG       Report of Safety Committee       27
               meeting of November 30, 2003
13
     P-EE       Luzon Strait Maintenance         85
14             Records for October 2002 -
               November 2002
15
     P-8        Large General Arrangement Plan   52
16
     P-24       Drawing 0409-51 New Loading      11
17             Device
18   P-39       Book entitled "Safety and        13
               Health in Dock Work"
19
     P-43       Luzon Strait Maintenance         96
20             Records for September 2002
21   P-44       Inspection Report dated          60
               November 8, 2002
22
     P-45       Inspection Report dated June     85
23             18, 2003
24
25
```

```
 1           EXHIBITS (cont.)
 2   EXHIBIT        DESCRIPTION         PAGE
 3   46         Inspection Report dated January   82
               15, 2003
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              MR. WHELAN:  We are going to have the
 2    same stipulation about swearing the witness as we
 3    have had for all of the depositions.
 4              Correct, Mr. Gruber?
 5              MR. GRUBER:  Correct, same
 6    stipulations.
 7              MR. WHELAN:  And also on all of the
 8    depositions, the same stipulation about the federal
 9    rules that Mr. Gruber recited at the first
10    deposition, correct?
11              MR. GRUBER:  Correct.
12              CAPTAIN MARK ROBERT JANSEN,
13    having been first duly sworn, testified as follows:
14              EXAMINATION
15    Q.   (BY MR. GRUBER):  Your full name, sir?
16    A.   Mark Robert Jansen.
17    Q.   Mr. Jansen, you sat were -- you sat through
18    the deposition of Mr. Borst earlier and the
19    depositions of the captain and the chief engineer
20    yesterday, correct?
21    A.   Correct.
22    Q.   And you heard the information or
23    instructions I gave each of those witnesses at the
24    beginning to each of their testimony?
25    A.   Correct.
```

2 (Pages 2 to 5)

6

1    Q.    I won't bother to repeat it. You
2  understand it?
3    A.    That's fine with me.
4    Q.    Okay. What is your position at the present
5  time with Seatrade Groningen B.V.?
6    A.    I'm manager of the operations department.
7    Q.    Was that your position in August of 2002?
8    A.    No.
9    Q.    What was your position at that time?
10   A.    I was technical superintendent.
11   Q.    And when did you first become technical
12 superintendent at Seatrade?
13   A.    That was -- let me review -- in 2000,
14 somewhere mid-2000. Sorry, I cannot recall exactly.
15   Q.    When did you first become employed by
16 Seatrade?
17   A.    In 2000.
18   Q.    Was that your first job with them,
19 technical superintendent?
20   A.    No. I have been for -- a couple of months
21 I worked for the crewing department and the QA
22 department.
23   Q.    Quality assurance?
24   A.    Yes, correct.
25   Q.    Okay. When were you born?

7

1    A.    31st of March, 1966.
2    Q.    And what's your highest level of education?
3    A.    I graduated from Hogere Zeevaartschool
4  college in Amsterdam.
5    Q.    And what year was that?
6    A.    1986.
7    Q.    And did you get some type of degree?
8    A.    Yeah. I got my master's license in --
9  after the -- during the practical range on board in
10 1995, so --
11   Q.    Okay. And so you haven't -- aside from the
12 maritime --
13   A.    Uh-huh.
14   Q.    -- university, you haven't gotten any
15 separate degrees?
16   A.    No, no.
17   Q.    And over the years between 1986 and the
18 year 2000 --
19   A.    Yeah.
20   Q.    -- did you have experience sailing as a
21 licensed officer aboard ship?
22   A.    Yes, correct.
23   Q.    And that included sailing as a master?
24   A.    Correct.
25   Q.    What type of ships did you serve on as

8

1  master, the types of ships?
2    A.    Reefer ships.
3    Q.    Did you serve aboard any ships -- as
4  master, did you serve aboard any ships managed by
5  Seatrade?
6    A.    Yes, correct.
7    Q.    Were they all managed by Seatrade?
8    A.    Yes, correct. As master?
9    Q.    Yes, as master.
10         Those ships on which you served as
11 master had access hatches that were used by the
12 ship's crew and by longshoremen going in and out of
13 the cargo holds?
14   A.    Yes.
15   Q.    That's common on reefer ships, obviously?
16   A.    That's common, correct.
17   Q.    Did those ships have access ways located in
18 the forward and after end of each hatch?
19   A.    Yeah.
20   Q.    Did those ships or did any of those
21 ships -- I mean -- let me rephrase the question.
22         Did any of those ships have a
23 configuration for the access hatches at the forward
24 end of the hatches similar to the ones we have seen
25 for the LUZON STRAIT?

9

1    A.    Yeah. It's -- we have different types of
2  access hatches, but it's a common type. I have seen
3  so many hatches in my seagoing career, and I cannot
4  recall exactly which ships, but yeah.
5         MR. WHELAN: Stan, I mean, are you
6  asking the location?
7         MR. GRUBER: Well, that's what I'm
8  going to do. I'm going to clarify. I'm going to
9  clarify. I think that's fair.
10   Q.    (BY MR. GRUBER): I really am talking about
11 the location. That is a hatch lid that basically
12 opens up out in the open in the hatch, as opposed to
13 being next to a stanchion or a bulkhead.
14   A.    Yeah.
15         MR. WHELAN: Yeah?
16         THE WITNESS: Well, I believe so. I
17 mean, once again, I cannot recall exactly a
18 comparable, but yes, that's not uncommon.
19   Q.    (BY MR. GRUBER): The situation with the
20 hatch lid in this case that we have been talking
21 about, that is the securing device being the
22 hook-and-eye that we have seen and the basic handhold
23 being the hatch lid itself --
24   A.    Uh-huh.
25   Q.    -- did you serve on ships as master where

3 (Pages 6 to 9)

10

1  there were identical situations?
2      A.   I believe so, yes.
3      Q.   Did you serve on ships as master for
4  Seatrade, whether there were -- whether -- I'm
5  sorry -- where there were different types of securing
6  devices used for these types of hatch lids, other
7  than a hook-and-eye arrangement?
8      A.   There are various types of locking devices
9  for hatch lids. We call them securing devices. And
10  yes, I have experienced various types.
11      Q.   Besides the hook-and-eye device, what other
12  devices are you familiar with?
13      A.   You have the -- the pin device, which is
14  actually an eye situated on the hatch lid, an eye
15  situated on the coaming of the hatch. So when it's
16  in an open position, you put a pin in it. The same
17  like Chief Engineer Balvert pointed out yesterday.
18      Q.   Okay.
19      A.   Then there is this kind of lifting hook
20  which is falling down when the lid is coming in, so
21  it's like a sliding hook. This type -- and this type
22  just by the head is what I can recall.
23      Q.   And the --
24          MR. WHELAN:  And "this type," you mean
25  hook-and-eye?

11

1          THE WITNESS:  The hook-and-eye device,
2  yeah.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12

1  the question's clear. The question's about the
2  handhold, not the locking device. Do you understand
3  that?
4          THE WITNESS:  Yeah.
5          MR. WHELAN:  Okay.
6          THE WITNESS:  Yeah, I have seen that.
7      Q.   (BY MR. GRUBER):  Okay. For your job as
8  technical superintendent, did you receive any
9  additional specialized training of any kind, other
10  than the experience that you already had and the
11  education that you already had?
12      A.   Of course, your initial period as a
13  superintendent is in close surveillance of the
14  technical director, who was by that time my direct
15  boss. And he will actually train you on the job as
16  we used to say, so he's guiding you through this
17  initial period of time where the vessel's -- where
18  you're responsible for. And he is training you as
19  far as required to make sure that you are ready to
20  perform your job and responsibilities as required.
21      Q.   That training, did it involve becoming
22  familiar with any written documents or authorities of
23  any kind?
24      A.   Part of the quality manual, yeah.
25      Q.   The quality assurance manuals --

13

1      A.   Yeah.
2      Q.   -- that we have been referring to?
3      A.   Yeah.
4      Q.   How about the ISM code?
5      A.   The quality assurance manual is based for a
6  good part on the ISM code.
7      Q.   Any other international standards or
8  authorities that you were required to become familiar
9  with?
10      A.   No, not in particular.
11      Q.   Okay. For example, the ILO standard
12  entitled, "Safety and Health in Dock Work," do you
13  have any familiarity with it?
14          MR. WHELAN:  P-39.
15          THE WITNESS:  I know what the ILO
16  means, but we are not familiar with these kinds of
17  books, and I think it's mostly related to dock
18  workers and stevedores, and not really to seagoing
19  personnel or crew.
20      Q.   (BY MR. GRUBER):  As technical
21  superintendent, were you assigned to a specific
22  number of ships?
23      A.   Correct.
24      Q.   How many ships? Well, let me -- I'm sorry.
25  Let me withdraw that.

4 (Pages 10 to 13)

14

```
1              As of August 2002 --
2       A.    Uh-huh.
3       Q.    -- how many ships were you assigned to?
4       A.    Six.
5              MR. WHELAN: Do you want him to say
6  the names?
7              THE WITNESS: Sorry, you said
8  August 2002, huh?
9       Q.    (BY MR. GRUBER): Yes.
10      A.    Five.
11      Q.    Five ships?
12      A.    Yes.
13      Q.    Did the LUZON STRAIT make it six?
14      A.    Not in August.
15      Q.    Okay. When did you become assigned to the
16 LUZON STRAIT?
17      A.    I believe that was in September.
18      Q.    And that made it six?
19      A.    Yeah.
20      Q.    They were all reefer ships, correct?
21      A.    Correct.
22      Q.    And there were other technical
23 superintendents employed by Seatrade at that time who
24 were assigned to different ships?
25      A.    Correct.
```

15

```
1       Q.    I didn't ask you before, but when did you
2  become manager of operations?
3       A.    2003.
4       Q.    And what's the difference in the job as
5  manager of operations as compared to technical
6  superintendent?
7       A.    Technical superintendent is assigned to a
8  group of vessels to take care of the maintenance
9  planning, to monitor the maintenance, to coordinate
10 with regard to supply of spare parts, and to schedule
11 dry dockings for the vessel.
12             Manager of operations department -- in
13 2003 we started off a new department, being the
14 operations department, headed by myself, and it was
15 implemented in order to improve our service towards
16 our customers, being the ships' owners, and then
17 especially with respect to cargo claim prevention,
18 and to have a better monitoring body within our
19 company with regard to cargo care and all related
20 matters: To go ashore, to present hires, and to
21 reduce cargos.   [prevent off-hires]
22      Q.    Cargo claims, that's what you said?
23      A.    Yeah.
24      Q.    When you became manager of operations, did
25 you retain any responsibilities related to the LUZON
```

16

```
1  STRAIT?
2       A.    Can you come again?
3       Q.    Yeah. When you became manager of
4  operations --
5       A.    Yeah.
6       Q.    -- in 2003, did you retain any -- or keep
7  any responsibility, direct responsibility for the
8  LUZON STRAIT?
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1
2
3
4
5
6       A.    We learned in the due course of 2003 that
7  this incident happened.
8       Q.    You mean that --
9       A.    Or that these allegations were reported.
10      Q.    Are you talking about Mr. Turner's --
11      A.    Yeah.
12      Q.    -- claim?
13      A.    Yeah.
14      Q.    Okay. How did you learn that?
15      A.    We learned it via our legal department in
16 our Antwerp office.
17      Q.    Do you remember when in 2003 that would
18 have been?
19      A.    I think that was around June or July.
20      Q.    Okay. All right, you were -- I interrupted
21 you. I'm sorry.
22      A.    And, well, we were of the opinion that the
23 ship was fully certified in compliance with all the
24 rules and regulations as required on a brand new
25 ship. We did not have any complaints or claims
```

5 (Pages 14 to 17)

18

1 whatsoever of a similar nature, and we informed the
2 vessel or we requested the vessel about this. And I
3 do not recall exactly when this happened.
4    Q.   Do you know if --
5    A.   If there were any -- any particulars or
6 anything -- any particular about this hatch lids and
7 they said, no, everything's okay, fine. So just --
8    Q.   Well, when you received the information
9 about this claim --
10   A.   Yeah.
11   Q.   -- in 2003, in July or thereabouts --
12        MR. WHELAN: He said June or July.
13   Q.   (BY MR. GRUBER): Okay -- June or July, were
14 you still functioning as technical superintendent for
15 the ship, or had you already become manager of
16 operation?
17   A.   No, I wasn't -- of course, it was a
18 handover period between myself and my successor. And
19 I -- I would have to check the exact date of
20 handover. I don't have them here. I don't know them
21 by heart.
22   Q.   When you got the information, did you
23 personally speak to anybody aboard the ship about
24 this matter?
25   A.   Yeah, I did speak with them.

19

1    Q.   Who did you speak with?
2    A.   The captain.
3    Q.   Captain Mobach or somebody else or the
4 captain who was aboard the ship at that time?
5    A.   Yeah, the captain who was aboard the ship
6 at that time. I don't know who it was, sorry.
7    Q.   Did you ask for any written report
8 regarding the matter?
9    A.   No. Once again, we -- we were of the
10 opinion and we believed it was a very normal
11 situation with the hooks and the eyes, and we had no
12 special reason to -- to go deeper into that at that
13 stage.
14   Q.   Do you know whether anyone at Seatrade --
15 and I'm not including lawyers or anything of that
16 nature -- but anybody in the Seatrade organization
17 did anything in the way of an investigation into this
18 matter to determine what happened or didn't happen,
19 whether there were anybody -- whether there was
20 anybody in the crew or the officers who were serving
21 at that time had any information that might be
22 helpful?
23   A.   Yes, we --
24        MR. WHELAN: Do you -- hold on a
25 second. Are you including in that as a result of my

20

1 request?
2        MR. GRUBER: Well --
3        MR. WHELAN: Because if so, I'm going
4 to object to him testifying about investigation that
5 I requested. I mean, I obviously as part of my
6 defense asked them to do certain things to assist me
7 in defending them, and I think you're getting into an
8 area that's privileged.
9        MR. GRUBER: Well, let's --
10   Q.   (BY MR. GRUBER): All right. If you can
11 distinguish between what Mr. Whelan just said, other
12 than something that you were asked to do by
13 Mr. Whelan, or anybody in Mr. Whelan's office, did
14 anybody at Seatrade make any attempt to find out
15 whether anybody aboard the ship who was serving as a
16 crew member or an officer at the time had any
17 information that would be helpful in connection with
18 determining what had happened?
19   A.   Besides the requests of Mr. Whelan, no, we
20 didn't.
21   Q.   Pardon me?
22   A.   Besides the requests from Mr. Whelan, I
23 believe not.
24   Q.   Did you personally ever speak with Able
25 Seaman Medenilla about any information that he had

21

1 about this matter?
2    A.   No.
3    Q.   Did you ever receive any report or
4 information regarding what had happened -- strike
5 that -- regarding the condition of the hook-and-eye
6 in question after November 8, 2002?
7    A.   No.
8    Q.   Do you understand my question? I don't
9 think I made it very clear.
10   A.   Yes, just go back and --
11   Q.   I'm not sure I understood it either. I
12 don't know how you can understand it.
13        MR. WHELAN: I think what Mr. Gruber's
14 asking is: Did you find out whether the hook was
15 damaged or repaired or modified --
16        MR. GRUBER: Right.
17        MR. WHELAN: -- after the accident of
18 November 2002?
19   Q.   (BY MR. GRUBER): Did you receive any
20 information regarding that subject?
21        MR. WHELAN: One way or the other,
22 yeah.
23        (Witness shakes head)
24   Q.   (BY MR. GRUBER): Pardon me?
25   A.   No.

6 (Pages 18 to 21)

22

1    Q.   You didn't get any information?
2    A.   I mean, let's have this very clear:  This
3  incident occurred in November 2002.  Nobody notified.
4  The vessel sailed to various ports after that
5  incident.  Nothing happened.  Everything was normal.
6  We were absolutely not aware of anything wrong with
7  this hatch lid.  That is -- I mean, that is crystal
8  clear.
9    Q.   Well, but when you found out about it, did
10 you make any effort to find out whether there had
11 been any damage or there was anything that had
12 occurred to that hook-and-eye?
13   A.   Not before we were contacted by Mr. Whelan.
14 Because we were not aware of it.
15        MR. WHELAN:  I mean, you can answer
16 the question what you found out about the hook as a
17 result of my asking you.
18        THE WITNESS:  Yeah.
19        MR. WHELAN:  What, if anything, did
20 you find out?  Did you find out -- did you look into
21 whether or not the hook was replaced or seen to be
22 damaged or undamaged after the accident?  That's
23 probably a better way.
24        THE WITNESS:  Yes, we did a physical
25 observation as a result of this incident.

23

1    Q.   (BY MR. GRUBER):  I'm sorry, I didn't hear
2  anything you said.
3    A.   Yes, we did.  As a result of this incident,
4  the allegations which were made, we had a look at it.
5    Q.   All right.  And what did you do in that
6  connection?
7    A.   We -- we informed the ship and -- yeah.
8    Q.   No.  But I mean, how did you go about
9  finding out whether there was any -- any damage to
10 the hook-and-eye or it had been replaced?  What did
11 you do in order to get that information?
12   A.   What did you do to get this information is
13 your question?  We -- we requested the vessel, if
14 there was anything in particular wrong with this --
15 with this hook-and-eye and there was not.
16   Q.   Who told you that?
17   A.   I believe we received the information from
18 the captain at that time.
19   Q.   And who was the captain at that time?
20   A.   I don't remember.  I have to check.
21   Q.   And was that verbal or written?
22   A.   I believe that was verbal.
23   Q.   So you don't have any written report to
24 that effect?
25   A.   Not that I can recall at this time.

24

1    Q.   Well, that captain that you spoke to was
2  not Captain Mobach, correct?
3    A.   I have to check who was serving on board at
4  that time.
5    Q.   Well, whoever the captain was, do you know
6  how that captain got his information?
7    A.   Uh-huh.  Sorry?
8    Q.   How did the captain get his information
9  about whether there had been anything wrong with that
10 hook back in November 2002?
11   A.   How did that captain get this information
12 from -- he received that information from us.
13   Q.   Pardon me?
14   A.   He received that information from us.
15   Q.   No, no, I understand that.
16   A.   Okay.
17   Q.   But the captain is told that if somebody
18 says they had an accident back in November of 2002 --
19   A.   Uh-huh.
20   Q.   -- involving this hook-and-eye --
21   A.   Uh-huh.
22   Q.   -- do you know what method or process the
23 captain used in order to find out whether there had
24 been any damage to that hook-and-eye back in November
25 of 2002?

25

1    A.   He reviewed the logbooks.
2    Q.   Right.
3    A.   He checked probably if there was an
4  incident report issued on the -- listed on the
5  statement of facts, which we saw at an earlier stage.
6    Q.   The port log?
7    A.   The port log, and the statement of facts
8  which is issued by the agent.
9    Q.   Right.
10   A.   There is nothing written or indicated on
11 that.
12   Q.   Okay.
13   A.   We spoke to the captain and chief engineer
14 who were on board at that time.  Nobody knows
15 anything about it.  It was not reported to anybody.
16 And nothing was observed from our side which
17 indicated that something was wrong or that somebody
18 got injured to such an extent that he, you know --
19
20
21
22
23
24
25

7 (Pages 22 to 25)

98

1    Q.    Were you aware of the fact that that had
2  been done or was going to be done?
3    A.    That those pictures were taken you mean?
4    Q.    Yes.
5    A.    If that's the question, I guess so, yeah.
6  Yeah, I was aware of that. I'm not sure.
7    Q.    Do you know who requested that it be done?
8    A.    That must have been via Mr. Whelan's
9  office.
10    Q.    Do you know the reason -- do you see the
11  color of the hatch lid and the color that the --
12    A.    Yeah.
13    Q.    -- the dog and the handle and the
14  hook-and-eye are painted --
15    A.    Uh-huh.
16    Q.    -- that's not the normal color of that
17  equipment. Am I correct about that?
18    A.    Well, it is in a -- it is a contrasting
19  color, as we used to say, and I think for the picture
20  it is definitely much clearer when you have white or
21  red contrasting colors.
22    Q.    But that's my question.
23    A.    Yeah.
24    Q.    Was the hatch lid and its equipment painted
25  specially for the purpose of taking the photograph?

99

1    A.    I think it is for this photograph painted,
2  as it is obviously spotless, and it gives a very
3  clear distinguish in the separate components of this
4  hatch lid. Although our hatch lids and the equipment
5  connected to that are most of the time in a
6  contrasting color painted, it's not always red and
7  white. It can be yellow, like you see in the other
8  pictures, huh?
9    Q.    Right. But the -- the hook-and-eye when
10  you were onboard the ship or typically the -- not
11  typically, but if you remember, the hook-and-eye, was
12  it the same color as the hatch lid?
13        MR. WHELAN:  In November of 2002 is
14  the question?
15    Q.    (BY MR. GRUBER):  Yes.
16    A.    I do not know that exactly.
17    Q.    Okay. And what color was the hatch lid in
18  2002?
19    A.    I do not know it. I'm sorry.
20    Q.    I know. That's all right. I think we have
21  had some testimony on that.
22        MR. GRUBER:  Okay. Let me do a fast
23  look at my notes, and that's probably everything.
24        (Recess taken)
25        MR. GRUBER:  Thank you very much.

100

1        THE WITNESS:  You're welcome.
2        MR. WHELAN:  Well, I have a few just
3  quick follow-up questions.
4        MR. GRUBER:  Sure.
5            EXAMINATION
6    Q.    (BY MR. WHELAN):  Just so we are clear, you
7  have just gone over some of the entries -- or two
8  exhibits, P-43, which are the VIS system printouts
9  for the LUZON STRAIT for the time period of August 1
10  through October 1 or August -- either that or
11  August 31st, 2002, and the other group that was
12  marked as Exhibit EE, which covers the time period
13  October 1, 2002, through November 30, 2002.
14        And are there entries for -- in the
15  first exhibit I just described, November -- I'm
16  sorry, September -- for -- strike that.
17        Are there entries in Exhibit P-43 for
18  the time -- for the month of August -- I'm sorry,
19  September 2002 in this P-43?
20    A.    Any entries during that period of time
21  you --
22    Q.    Yes, before the -- during the month of
23  September.
24    A.    Yeah, there are.
25    Q.    Okay. Does that indicate to you that

101

1  someone was keeping these VIS records --
2    A.    We are --
3    Q.    -- and entries in September of 2002 for the
4  LUZON STRAIT?
5    A.    Yes. You are obliged to keep maintenance
6  records as per ISM and that was complied with.
7    Q.    And then similarly for EE, are there
8  entries both for the months of October 2002 and
9  November 2002 contained in that Exhibit EE of the
10  VIS?
11    A.    I confirm that in Exhibit EE there are
12  entries for the months of October, November, yeah,
13  for --
14    Q.    2002?
15    A.    Exactly. For the period of time 1st
16  October through the period of November 30th, 2002.
17    Q.    Okay. So back to --
18        MR. WHELAN:  I'm sorry, Stan, what was
19  the first --
20        MR. GRUBER:  44.
21    Q.    (BY MR. WHELAN):  -- Exhibit 44, which is
22  the inspection report November 2002, you made a
23  comment about the VIS system.
24    A.    Uh-huh.
25    Q.    That comment did not mean that the VIS

26 (Pages 98 to 101)

102

1    entries were not being kept track of or entered; is
2    that correct?
3        A.    That's correct.
4        Q.    Okay.  That it needed some additional what
5    to -- in your opinion to get it going?
6        A.    The VIS was installed on board as a
7    stand-alone computer where all of the basic
8    components of the vessel were included in it,
9    including the safety equipment as required as per the
10   ISM code, and these standard equipment were
11   maintained accordingly in the system.
12       Q.    And then what did you -- what needed to be
13   done to expand on that system in your --
14       A.    When we received the full drawings and
15   instruction manuals, all details of the equipment
16   will have to be entered into the system.
17       Q.    And that's what you were referring to?
18       A.    That's what I was referring to.
19       Q.    All right.  Then when you were talking
20   about the VIS documents in EE, which would also apply
21   to P-43, you mentioned that the printout of
22   information about jobs, that that means maintenance
23   and repair jobs?
24       A.    Yeah.
25       Q.    And then an additional -- sometimes there's

103

1    checks that are entered into the VIS system?
2        A.    Correct.
3        Q.    And I think Mr. Gruber asked you about in
4    Exhibit 44 this photograph of the masthouse.
5            MR. GRUBER:  Deck house?
6        Q.    (BY MR. WHELAN):  I'm sorry, the deck house.
7    Here it is, No. 16.  He said that -- pointed to some
8    items and said it looked to him like there was some
9    rope there or something, and you said you really
10   couldn't tell.
11       A.    That's correct.
12       Q.    Now, sometimes do ships' crews put ropes
13   around handles to be able to lift up the covers
14   easily?
15       A.    Correct.
16       Q.    If it is there, could that be a reason why
17   it's there?
18       A.    Could be, yeah.
19       Q.    And I think you have explained this in some
20   detail, but I wanted to make sure it's clear for the
21   record.  The LUZON STRAIT, before it was purchased
22   and delivered to the owners for whom Seatrade acts --
23       A.    Uh-huh.
24       Q.    -- this vessel was ordered at that shipyard
25   by a totally unrelated owner; is that correct?

104

1        A.    Correct.
2        Q.    And they are the ones that were involved
3    with the shipyard during the construction of the
4    vessel; is that correct?
5        A.    That's correct.
6        Q.    And it wasn't until after the construction
7    was completed that the owners -- present owners of
8    the LUZON STRAIT became involved?
9        A.    That's correct.
10       Q.    And it was a situation where now the
11   shipyard was stuck with the ship because the original
12   owner wasn't going to carry through on the contract
13   and they needed to sell the ship?
14       A.    Correct.
15       Q.    Okay.  Was Seatrade at all involved in the
16   design or construction of the LUZON STRAIT --
17       A.    Negative.
18       Q.    -- at the shipyard?
19       A.    No, we were not involved.
20       Q.    Now, Mr. Gruber had asked you about after
21   learning about the accident, alleged accident of
22   Mr. Turner, some inquiries were made to determine
23   what the vessel knew or what people would know about
24   the reporting of the accident and the securing device
25   and the access lid.

105

1            First of all, was the accident ever
2    reported by the stevedore and company or Mr. Turner
3    so far as you know to the vessel's command or to
4    Seatrade?
5        A.    No.  Nobody reported anything neither to
6    the captain or the duty officer or whatsoever.
7        Q.    Okay.  And --
8        A.    And --
9        Q.    Okay.  Go ahead.
10       A.    They also were asked if they noticed
11   somebody crawling from the ship or giving an injured
12   impression or something like that.  Nothing was the
13   case.
14       Q.    Okay.  And --
15       A.    Besides that -- if I may continue on this
16   point?
17       Q.    Yeah.
18       A.    -- the vessel remained alongside for
19   another, I guess, six hours or so after discharging
20   to perform this USDA certification, which can be
21   confirmed by the attending USDA officials.  So there
22   was plenty of time to let anybody know if there was
23   an accident whatsoever.
24       Q.    And did you -- or are you aware of people
25   asking Captain Mobach, who testified yesterday --

27 (Pages 102 to 105)

106

1    A.    Uh-huh.
2    Q.    -- whether he went and -- whether he --
3  whether he knew about -- strike that.
4          Was Mr. -- was Captain Mobach asked to
5  confirm whether or not there were any repairs done to
6  this particular securing device and access cover
7  during his command?
8    A.    He was asked, yes.
9    Q.    All right.  And what was -- what were the
10  results of that when he was asked that?
11    A.    He responded negative.  It was a no.
12    Q.    And was he --
13    A.    Or during his presence.
14    Q.    And was he asked whether he ever -- whether
15  the securing device was damaged at all after it left
16  Wilmington?
17    A.    Yes.  We -- we asked these questions to
18  him.
19    Q.    And what was his response?
20    A.    As a result of the allegations we received
21  in 2003, which is once again quite some time later.
22  And well, nobody knew anything.  So no records,
23  nobody saw a bent hook or a broken hook or a damaged
24  hook, nothing at all of that.
25    Q.    Okay.  And was he -- he asked whether

107

1  this hook was ever replaced or repaired?
2    A.    Yes.
3    Q.    And what did he advise people at the
4  office?
5    A.    Not during his presence of work.
6          MR. WHELAN:  Okay.  That's all that I
7  have.  Thanks.
8          MR. GRUBER:  Okay.  Thank you very
9  much.
10          (Proceedings concluded at 2:51 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

108

1          CHANGES AND SIGNATURE
2  PAGE LINE CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

109

1
2
3
4
5          I declare under penalty of perjury that the
6  foregoing is true and correct.
7
8          _____
9          CAPTAIN MARK ROBERT JANSEN
10
11
12          SUBSCRIBED AND SWORN TO BEFORE ME, the
13  undersigned authority, by the witness, CAPTAIN MARK
14  ROBERT JANSEN, on this the _____ day of
15  _____, 2005.
16
17          _____
18          NOTARY PUBLIC IN AND FOR
19          THE STATE OF _____
20
21  My Commission Expires: _____
22
23
24
25

28 (Pages 106 to 109)

CAPTAIN MARK ROBERT JANSEN - JUNE 16, 2005

108

CHANGES AND SIGNATURE

PAGE LINE. CHANGE                    REASON

1
2
3
4  PAGE 5/15 Line 20-21 should read:
5  To go short, to prevent off-hires, And to reduce
6  cargo claims. (reason: wrongly noted down).
7
8  PAGE 10/37 Line 7-8 should read:
9  Job van Zon. (reason: wrongly spelled).
10
11  PAGE 11/40 Line 23 should read:
12  "classification society" instead of (investigation)
13  (reason: wrongly noted).
14
15  PAGE 13/46 Line 24 should read:
16  "August 2002" instead of (August 2000).
17  (reason: wrongly noted).
18
19
20
21
22
23
24
25

109

1

```
 1
 2
 3
 4
 5      I declare under penalty of perjury that the
 6  foregoing is true and correct.
 7
 8      _____
 9          CAPTAIN MARK ROBERT JANSEN
10
11
12      SUBSCRIBED AND SWORN TO BEFORE ME, the
13  undersigned authority, by the witness, CAPTAIN MARK
14  ROBERT JANSEN, on this the 20 day of
15  ____July_____, 2005.
16
17
18                  _____
19                  NOTARY PUBLIC IN AND FOR
20                  THE STATE OF _____
21  My Commission Expires: _____
22
23
24
25
```

CAPTAIN MARK ROBERT JANSEN - JUNE 16, 2005

108

1

```
 1              CHANGES AND SIGNATURE
 2   PAGE LINE.  CHANGE                    REASON
 3   ─────────────────────────────────────────────
 4   PAGe 5/15 Line 20-21  should read:
 5   To Go short, to Prevent off-hires, And to reduce
 6   CARGO claims.  ( reason; wrongly noted down).
 7   ─────────────────────────────────────────────
 8   PAGe 10/37 line 7-8  should read:
 9   JoB vAn Zon.  ( reason; wrongly spelled).
10   ─────────────────────────────────────────────
11   PAGe 11/40 line 23  should read:
12   "classification society" instead of (investigation)
13   (reason: wrongly noted).
14   ─────────────────────────────────────────────
15   PAGe 13/46 line 24  should read:
16   "August 2002" instead of (August 2000).
17   ( reason: wrongly noted).
18   ─────────────────────────────────────────────
19   ─────────────────────────────────────────────
20   ─────────────────────────────────────────────
21   ─────────────────────────────────────────────
22   ─────────────────────────────────────────────
23   ─────────────────────────────────────────────
24   ─────────────────────────────────────────────
25   ─────────────────────────────────────────────
```

CAPTAIN MARK ROBERT JANSEN - JUNE 16, 2005

109

1

1

2

3

4

5        I declare under penalty of perjury that the

6   foregoing is true and correct.

7

8        _____

9        CAPTAIN MARK ROBERT JANSEN

10

11

12       SUBSCRIBED AND SWORN TO BEFORE ME, the

13   undersigned authority, by the witness, CAPTAIN MARK

14   ROBERT JANSEN, on this the _20_ day of

15   ____July____, 2005.

16

17       _____

18       NOTARY PUBLIC IN AND FOR

19       THE STATE OF _____

20

21   My Commission Expires: _____

22

23

24

25