## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN TURNER | : | CIVIL ACTION |
| | : | |
| AND | : | |
| | : | |
| NANETTE TURNER | : | |
| vs. | : | |
| | : | |
| B.V. SHIPPING COMPANY | : | |
| LUZON STRAIT (GRONINGEN) | : | NO. 04-0936-JJF |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

/S/ Stephen B. Potter
STEPHEN B. POTTER, ESQ. (ID# 298)
840 North Union Street
Wilmington, DE 19805
(302) 658-8940
(302) 654-8377 (fax)

Date: September 2, 2005

/S/ Stanley B. Gruber
STANLEY B. GRUBER, ESQ.
FREEDMAN & LORRY, P.C.
400 Market Street, Suite 900
Philadelphia, PA 19106
215-925-8400
215-925-7516 (fax)
Attorneys for Plaintiffs John and Nanette
Turner

**D.I    45**
**Filed    September 2, 2005**

## TABLE OF AUTHORITIES

Cases                                                                      Page

Anastasiou v. M/T World Trust, 338 F. Supp. 2nd 406 (E.D. NY 2004) . . . . . . . . . 29,30

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . .  15,16

Bilderbeck v. World Wide Shipping Agency, 776 F. 2nd 817 (9th Cir. 1985). . . . . .  28,29

Brown v. Wilmington Trust Co. 1992 WL 382299 (E.D. Pa 1992). . . . . . . . . . . . . 20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15

Davis v. Portline Transports Maritime Internacional, . . . . . . . . . . . . . . . . . . . .

                                                                           17,31,3
                                                                           2,
16 F.3d 532 (3d Cir. 1994)

                                                                           33,35,3
                                                                           6

Drames v. Sun River Investment, ____ F. Supp. ____, 1992 . . . . . . . . . . . . . . . . 15
WL357756 (E.D. Pa. 1992)

Hill v. NSB Niederelbe Schiffahrtsges MBH & Co. . . . . . . . . . . . . . . . . . . . . . .  19
2003 WL 23162396 (E.D. Pa. 2003)

Howlett v. Birkdale Shipping Co., 512 U.S. 92, 114 S. Ct. 2057 (1994) . . . . . . . . .

                                                                                             16,17,18

In Re Japanese Electronic Products Anti-Trust Litigation, . . . . . . . . . . . . . . . . . . . 15
723 F. 2d 238 (3rd Cir. 1983)

Kirsch v. Plovidba, 971 F. 2d 1026 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . .
        18,19,20,25

Mattivi v. South African Marine Corps., 615 F. 2nd 163  (2d. Cir. 1980) . . . . . . . . .29

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . 15

Metal Bldg. Components, Inc v. Gibson Roofers, Inc. . . . . . . . . . . . . . . . . . . . . . . 37
1998 WL 186721 (E.D. La 1998)

<u>Prinski v. Blue Star Line Marine, Ltd.</u> 341 F Supp 511 (E.D. Pa 2004) . . . . . . . . . 19,22,
23,24

<u>Scindia Steam Navigation Co., Ltd. v. DeLos Santos</u>, 451 US 156 (1981) . . . . .
16,17,18,
101 S. Ct. 1614 (1981)
20,28,31,33

<u>Serbin v. Bora Corp., Ltd.</u>, 96 F. 3rd 66 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . .
20,22,23,
24,25,3
1,
32,33,3
5,36

<u>Shaw v. Strackhouse</u> 920 F2d 1135 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 37

<u>1836 Callowhill Street v. Johnson Controls, Inc.</u> . . . . . . . . . . . . . . . . . . . . . . . . . 37
819 F. Supp 460  (E.D. Pa 1993)

---

### Statutes & Rules

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

Section 2 (21) of the Longshore and Harbor Workers' Compensation Act, . . . . . . 1
33 U.S.C. § 902(21)

Section 5 (b) of the Longshore and Harbor Workers' Compensation Act, . . . . . . . . 1,
2,16,
33 U.S.C. § 905 (b)    27,29

33 CFR  Part 96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

F.R.C.P 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,14

F.R.E. 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

---

<u>Other Authorities</u>

Section 3.6.1 of the International Labour Organization Publication . . . . . . . . . . . 14, 24

"Safety and Health in Dock Work"

International Convention for the Safety of Life at Sea . . . . . . . . . . . . . . . . . . . . . .  14

For the reasons that follow, plaintiffs John and Nanette Turner respectfully submit that this Honorable Court should enter an Order denying the Motion for Summary Judgment brought by defendant B.V. Shipping Company Luzon Strait (GRONINGEN) (Hereinafter "B.V. Shipping") in its entirety pursuant to F.R.C.P. 56.

## NATURE AND STAGE OF THE PROCEEDING

This is an action for damages brought by the plaintiffs John and Nannette Turner as a result of serious personal injuries sustained by the plaintiff John Turner on November 8, 2002 while Mr. Turner was in the course and scope of his employment as a longshoreman aboard the M/V Luzon Strait, a vessel owned and operated by defendant B.V. Shipping.   Plaintiffs seek damages pursuant to Section 5(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), which permits a longshoreman to recover damages from a "vessel"[1] in the event of an injury which is "caused by the negligence of a vessel".  Jurisdiction is based on 28 U.S.C. § 1332, there being Diversity of Citizenship between the parties.

Defendant B.V. Shipping has now moved for summary judgment contending that there are no genuine issues of material fact and that plaintiffs cannot sustain their burden of establishing defendant's negligence under Section 5(b) of the LHWCA.

---

[1] The term "vessel" is defined at Section 2 (21) of the LHWCA, 33 U.S.C. § 902 (21) as including the "owner" of a vessel. Defendant B.V. Shipping has acknowledged its ownership of the M/V Luzon Strait (see page 4 of defendant's brief in support of its Motion for Summary Judgment).

## SUMMARY OF ARGUMENT

1.    Under Section 5(b) of the LHWCA, 33 U.S.C. §905(b) a vessel owner owes a stevedore and its longshore employees three distinct duties-the "turnover duty/duty to warn", the "active operations" duty and the "duty to intervene" The duties pertinent to this case are the "turnover duty/duty to warn" and the "active operations" duty.

2.    Plaintiff's do not seek damages based on any theory of unseaworthiness.  Instead, they seek damages solely on the grounds of the negligence of defendant B.V. Shipping in breaching its turnover and/or active operations duties to the plaintiff John Turner.

3.    There is sufficient evidence in the Record before this Court from which a reasonable jury may conclude that defendant breached its "turnover duty/duty to warn" due to the existence of a hazardous condition at the forward access hatchway of hatch level 2C of the M/V Luzon Strait which existed upon the commencement of cargo operations, to wit, an inadequate and insufficient securing device to hold the forward access hatch lid in a locked and open position and the absence of a handhold, separate from the hatch lid itself, for use in assisting persons in stepping off the ladder coming up from the 2D hatch level to the deck at the 2C level.

4.    There is evidence in the Record before this Court from which a reasonable jury may conclude that defendant actively involved itself in the cargo operations involved in this case and thus triggered the defendant's "active operations" duty of exercising "due care" to avoid exposing longshoremen to harm from hazards present in the area of "active operations".

5.    There is evidence in the Record before this Court from which a reasonable jury may conclude that defendant breached its "active operations" duty by failing to remedy

the aforedescribed condition at the forward access hatchway of hatch level 2C of the M/V
Luzon Strait.

## STATEMENT OF FACTS

### 1. The M/V Luzon Strait

Defendant has acknowledged that it is the owner of the M/V Luzon Strait, a
refrigerated cargo vessel.[2]  The vessel was built in Taiwan by China Shipbuilding
Company ("CSBC") and was delivered to B.V. Shipping by CSBC on or about August
31, 2002. (Exh. B, Jansen Dep. pp 103-104; Exh. A, Mobach Dep. pp 26-27)[3].

The vessel was constructed with four refrigerated cargo hatches located forward
of the ship's house or "superstructure" (Exh. F, General Arrangement Plan).  The hatches
are numbered 1 through 4, starting at the forward end of the ship (Exh. F; Mobach 30-31)
Inside hatches 2, 3, and 4 there are four deck levels at which cargo can be stowed.  These
deck levels are designated from top to bottom as levels A through D (Id.)

In hatch number 2 of the vessel (as with hatches 3 and 4) there are "access
hatches" at the forward and aft ends of each deck level which individuals may use to
travel from the main deck down to level D. (Exh. F; Mobach 38-40, 46)[4]

### 2. The Access Hatch Lids at Hatch Level 2C

As indicated, there were two access hatches available for individuals to use in
order to get from the C level of the number 2 hatch into and out of the D level.  The
access hatch at the forward end of level 2C was located in the middle of the hatch in the

---

[2] See page 4 of defendant's Brief in support of its Motion for Summary Judgment
[3] Henceforth initial references to portions of deposition transcripts will be referenced by the exhibit
number, name of the witness and the transcript page numbers, e.g. "Exh. B, Jansen pp 103-104."
Thereafter, references to such deposition transcripts will be by the name of the witness and page number of
the transcript.
[4] Captain Mobach marked up the vessel's General Arrangement Plan (Exh. F) to designate in red the hatch
levels and locations of the access hatches (Mobach 38-39)

area where cargo would be stowed. (Exh. F; Photo Exh. G1) The access hatch at the aft

end was positioned in a separate compartment of the number 2 cargo hold behind a

bulkhead where the equipment used to refrigerate the hold was located. (Exh. F; Photo

Exhs. G2-3) While the hatch openings for the access hatchways at the forward and aft

end of the 2C level were the same size, there were marked differences regarding the

manner in which those hatch lids could be secured in an open position and the manner in

which individuals going in and out of the D level would utilize those hatch lids for

support.

The securing or locking device used to hold the forward access hatch lid at 2C in

an open position was a small hook and eye, markedly similar to the type of hook and eye

that would be used with a screen door.[5]  The hook was welded to the bottom portion of

the hatch lid and the eye was secured to the frame surrounding the hatch lid. (Exh. H3)

When the hatch lid was placed in a raised and open position the hook and eye was not

visible to anyone descending or ascending in and out of the D level since it was on the

opposite side of the hatch lid. (Mobach 58; Exh. J, Lasch 61-63; Photo Exh. H 4)

Moreover, there was no separate handhold available at the forward access lid at

2C which could be used in order to assist an individual climbing out of the D level onto

the C level. (Mobach 54-55; Lasch 35-36, 67) Accordingly, individuals coming out of the

D level onto the C level at the forward end of number 2 typically had to grab the hatch lid

itself in order to obtain the necessary balance and leverage to raise themselves out onto

the deck at the 2C level. (Mobach 55-56, 88;Lasch 35-36)

---

[5] The hook and eye device which was in place at the time the ship was delivered and at the time of the accident on November 8, 2002 is circled and shown in the photographs marked as Exhs. H1-3. At that time, the hook and eye was painted gray, along with the rest of the hatch lid (Mobach 53).

Strikingly different conditions existed at the aft end of the 2C level on the Luzon Strait. To begin, the hatch lid at the aft end of 2C was secured by a large hook welded to a nearby stanchion. This hook latched onto the handle of the hatch lid[6]. (Mobach 81-83; Photo Exhs. G4-5) In addition, a separate handhold was welded to the deck on the right side of the aft access hatch at 2C as one would be coming out of the 2D level. (Mobach 67-8; Photo Exh. G3; Exh. K (13-14))[7] Moreover, there were separate handholds placed adjacent to other hatch lid openings throughout the ship at the time of delivery. (Exh. K (13); Mobach 142)

### 3. Defendant's Familiarity with the Condition of the Access Hatch Lids at 2C level at the Time of Delivery of the Vessel in August 2002

Captain Martijn Mobach served as master of the vessel from the time of delivery on August 31, 2002 through December 2002. (Mobach 11) However, Captain Mobach traveled to the CSBC Shipyard two weeks before the delivery of the ship for the express purpose of familiarizing himself with the vessel. (Mobach 22, 27) During that two-week period before delivery of the vessel, Captain Mobach familiarized himself with every aspect and area of the ship, including the access hatch lids at the forward and aft ends at the 2C level. (Mobach 28, 50-51) He became fully familiar with the devices used to lock or secure those hatch lids in an open position and also became aware that there was no separate handhold available to use coming out of the 2D level at the forward access hatch lid at 2C. (Mobach 51-55) Indeed, during the two week period prior to delivery of the ship he observed multiple individuals going in and out of the 2D level at the forward end

---

[6] Surprisingly, defendant contends that there are no drawings available which provide the dimensions of the original hooks and eyes utilized at the forward and aft access hatch lids at the 2C level. However, viewing the photographs of these objects with the naked eye, it seems readily apparent that the hook utilized at the aft access lid was substantially thicker and sturdier than the one used at the forward lid.

[7] Exhibit K consists of drawings of various components of the ship prepared in June, 2002. Numbers in parenthesis are to page numbers of the exhibit.

using the hatch lid itself to assist themselves in getting from the ladder coming out of the 2D level onto the deck level of 2C. (Mobach 55) During that period of time, it became apparent to him that under normal circumstances, a person coming out of the 2D level at the forward end would grab the hatch lid in order to steady himself. (Mobach 55-56)

Captain Mobach acknowledged that some type of handhold was needed to assist a person in getting in and out of the 2D level. (Mobach 88) He knew that longshoremen in different ports of the world would be going in and out of 2C and 2D at the forward end and would be using the hatch lid as a handhold. (Mobach 95) He also knew that a person coming out of the 2D level at the forward access hatch would be unable to see the hook and eye since it was positioned on the other side of the lid. (Mobach 58)

### 4. The Ship's Crew's Responsibility for Opening and Securing the Access Hatch Lid in Question

In order to load cargo into the 2C level of the vessel, it was necessary as shown in the photographs marked as Exhibits G1 and G2 for the forward access lid to be in a down and closed position. In addition, it was necessary for that hatch lid to be covered by a section of the grating which formed the deck at the 2C level. (Exh. G6-G7, Mobach 47-48) It was the responsibility of the officers and crew of the vessel to open the forward access hatch lid at 2C and securely lock that lid into place. (Mobach 99-100) In order to do so, the crewmembers first utilized a steel bar to lift the grating out of place, unlocked the "dog" which secured the lid in place while closed, then raised the hatch lid and secured the hook and eye in place. (Mobach 48-50, 99-100)

Each time a crewmember secured the hook and eye into position he was required to report any problem therewith which required correction. (Mobach 101-103) If such a

report was made, it was the responsibility of the ship's officers to correct the condition.
(Id.)

### 5. Defendant's Ability to Modify the Locking Device at the Forward Access Hatch Lid of 2C and to Provide a Separate Hand Hold to be Used in Connection Therewith

A permanent handhold could not have been welded into the deck adjacent to the forward access hatch lid at 2C since the presence of such a handhold on a permanent basis would have interfered with the stowage of cargo at that deck level. (Mobach 67-68) However, it was perfectly feasible for defendant to place holes on either side of the access hatch opening at the forward end of 2C in order to accommodate a portable handhold which could be placed in position at the time the forward access hatch lid was opened.  Indeed, some time between October 2003 and February 2004 the vessel's Chief Engineer, with the assistance of a crewmember, fabricated and installed such a portable handhold for use with the forward access hatch lid at 2C.  (Exh. L, Defendant's supplemental answers to Int. 16; Photo Exh. H5)

Moreover, it was feasible for defendant to remove the hook and eye securing device for the forward access lid at 2C and to replace it with any number of other forms of locking devices including the use of a chain or wire rope, or the so-called three bar system which was actually installed by defendant aboard the vessel in January 2004.

(Exh. Q—Pazos Report)[8]

### 6. The Safety Responsibilities of the Ship's Master and Chief Mate

At all times pertinent to this case there were manuals in effect that set forth the responsibilities of the ship's officers and crew for maintaining safety aboard ship.  Those manuals specified that the vessel's Master has overriding authority regarding safety

---

[8] The plans for such securing device are appended as Exh. I

aboard ship.  (Mobach 92-3; Exh. M, Manual) That responsibility includes identifying

and eliminating hazardous conditions which can cause injury aboard the ship.  (Id.)

Moreover, the Manuals impose specific responsibility upon the vessel's Chief Officer to

take necessary safety precautions to ensure that the access hatch lids are locked in a

secured and opened position.  (Mobach 98-99)  Captain Mobach considered the hook and

eye which secured the forward access hatch lid at 2C to be a safety device. (Mobach 101)

### 7. The Voyage of the M/V Luzon Strait Commencing on August 31, 2002

During the maiden voyage of the Luzon Strait, which commenced on August 31,

2002, the vessel called at a number of ports before arriving in the Port of Wilmington,

Delaware on or about November 6, 2002. (Mobach 107-20)  At several of those ports,

there were cargo operations involving longshoremen going in and out of the D level of

the number 2 hatch.  Thus, cargo was loaded into 2D at a Japanese port and then

discharged in New Zealand.  (Mobach 108-09) At both ports, the forward access hatch lid

in question was utilized. (Id.)  Thereafter, that same hatch lid was utilized in the Port of

Townsville, Australia where pallets of frozen beef were loaded into the 2D level.

(Mobach 112-13)  No further cargo operations took place at the 2D level until the

vessel's arrival at the Port of Wilmington, Delaware where the frozen beef loaded into

2D at Townsville, Australia was scheduled to be discharged. (Mobach 112-17)

### 8. The Accident of November 8, 2002

As indicated, the vessel berthed at the Port of Wilmington, Delaware on

November 6, 2002. (Exh. O, Ship's Port Log) A stevedoring company known as

Delaware River Stevedores ("DRS") was engaged to discharge the pallets of frozen beef

which had been stowed aboard the vessel in Australian ports, including the cargo located at hatch levels 2C and 2D.[9]

The longshoremen began discharging cargo from the number 2 hatch on November 7, 2002 and first went into the 2D level at approximately 2:00 p.m. that day. (Exh. P, Statement of Facts; Mobach 119-20) Prior to 2:00 p.m. on November 7, the ship's crew had opened and secured the forward access hatch lid at the 2C level to provide access to the 2D level. (Mobach 131-32) At the conclusion of cargo operations on November 7, 2002 the ship's crew closed that hatch lid. (Id.)

November 8, 2002 was the vessel's last day in the Port of Wilmington. (Exh. P) Sometime prior to 6:00 a.m. that day, a vessel's crewmember again opened the forward access lid at hatch number 2C and secured that lid in an open position. (Mobach 123) Neither the Master or any other officer aboard the ship directed the stevedore to have its longshoremen use the access hatchway at the aft end of the number 2 hatch to get to the 2D level. (Mobach 97)

On November 8, 2002 the plaintiff John Turner was employed by DRS as a hold man in a longshore gang that was discharging cargo from the 2D level. This was the first day that Mr. Turner had worked in the number 2 hatch. (Exh. C, Turner 47) Mr. Turner's gang entered the 2D level at 11:00 a.m. in order to finish the work of discharging the cargo in that hold. (Exh. P) By approximately 2:45 p.m. the gang had completed discharging such cargo. (Id.) It was then time to knock off work and climb the ladder leading from the D level to the 2C level at the forward end. (Turner 77-78).

---

[9] No cargo was stowed at hatch levels 2A and 2B upon the vessel's arrival in Wilmington. (Exh. N, Cargo Stowage Plan; Mobach 111-12)

Throughout the day on November 7 and November 8, 2002 the longshoremen utilized the ladder at the forward hatchway to go in and out of the D deck level of the number 2 hatch. (Mobach 131-33) Indeed, during cargo operations in Japan, New Zealand and Australia, longshoremen working in those countries had done the same thing, using the hatch lid at the 2C level as a handhold. (Mobach 108-09)

At the time of the accident Mr. Turner was 6'3'' tall and approximately 240 pounds. (Turner 8-9) At approximately 2:45 p.m. on November 8, 2002, Mr. Turner was climbing the ladder leading from the D level to the C level at the forward end of number 2. (Turner 78-83) When he got near the top of the ladder he grabbed the hatch lid to support himself in stepping up onto the C deck. (Id.) As he did so, the hatch lid came loose and fell back on him causing the injuries which are the subject of this action. (Id.)

A fellow longshoreman, Sean Brady, who was already at the C level, pulled the lid off Mr. Turner after seeing it fall and helped Turner up to the C level. (Exh. D, Brady 24, 28-30) Brady then attempted to re-secure the lid in an open position because there was one more longshoreman (William Grinnel) who needed to get out of the D level. (Turner 84; Brady 29-30) At that point Mr. Brady discovered the hook and eye arrangement and saw that the hook had straightened out or deformed to the point where it could no longer fit into the eye. (Brady 30-33; Exh. E, Grinnel 20-22) As a result, Mr. Brady was unable to re-secure the hatch lid in place. (Brady 30-33) He had to hold the lid for Mr. Grinnel, the remaining longshoreman coming up out of the hold. (Brady 32)

**9. The Affidavit/Expert Report of Hector V. Pazos**

Mr. Pazos is a naval architect, marine engineer and mechanical engineer whose Affidavit incorporates his report of April 27, 2005. (Exh. Q) Mr. Pazos' summary of

the underlying facts of this case, referred to as "Background" in his report[10], specifies the following points:

- Mr. Turner's accident took place in the forward area of Hold #2 at the C level. "At this location, Hold #2 has a 24" x 24" personnel access hatch, located some 40' after the forward bulkhead of Hold #2 and some 16' from the port side of the vessel, that is, the hatch is located in a totally clear, unobstructed area";

- At the aft end of the Hold, there is an athwartship bulkhead that separates the cooler space (where the refrigeration equipment is located), from the cargo space of Hold #2.[11] The steel deck of the cargo space of Hold #2 is covered with aluminum panels creating an elevated floor for the purpose of developing an under-the-floor space to circulate cool air under the refrigerated cargo;

- "At the locations of the personnel access hatch, the aluminum panels are cut allowing a 33" x 33" section of the aluminum panels to be removed to expose the hatch cover. The hatch opening measures 24" x 24" and the hatch cover measures 28 ½" x 28 ½" ";

- At the time of the accident the hatch lid had a "small hook or latch intended to maintain the hatch cover almost vertical when it was in open position." This "small hook was very close to the axis of the hinges (about 2"), therefore having a small lever arm, and, as a result, the force applied to the hook when a person is pulling on the hatch, could be several times larger than the force created by the person pulling on the hatch. For instance, if a person applies a

[10] Mr. Pazos had an opportunity to conduct an inspection and take photographs aboard the vessel on March 1, 2005.
[11] See photograph, Exhibit G2

40 pound force 20" from the hinges of the hatch, the force acting on the small hook could be larger than 400 pounds (40 x 20 /2 = 400);

- On November 8, 2002, Mr. Turner was working on the D level of the number 2 hold and at about 2:45 p.m. he attempted to climb to the C level using the vertical ladder providing access to the hatch opening described above;

- "Once he reached the top of the ladder, he needed to pull himself up and toward the open hatch cover to assist getting himself through the hatch opening and to maintain his balance, to counter to moment created by the gravity force acting on his body.  Because there was no handgrabs (handholds) or any other type of device to hold, to pull himself up and forward, he grabbed the sides of the open hatch cover and proceeded to attempt to pull himself up to the C deck.  The small hook or latch sustained a plastic deformation (yielding) losing its holding capability and allowing the hatch to rotate around the hinges";

- "The hatch cover gave way and swung back toward Mr. Turner, at the same time that Mr. Turner fell backwards hitting the edge of the hatch coaming";

- "After the accident, a fellow longshoremen attempted to secure the small hook, but the hook would not fit into the securing hardware (eye bolt).  In other words, the small hook had sustained a permanent deformation";

- After Mr. Turner's accident a "portable handrail type-pipe arch" was fabricated that could be inserted into pipe sockets.  With this portable handrail in place, the handrail functioned as a handgrab and also provided a blocking device to keep the hatch lid from moving.

After citing international standards regarding safety systems and procedures

aboard ship Mr. Pazos noted the following at page 7 of his report;

"1.     The hatch should have had suitable handholds for a person to grab, to control his balance while pulling himself up;
     2.     The hatch cover should have had appropriate hardware creating strong means to restrain the hatch cover from moving from its open position, since it is obvious that the hatch cover would be used by the person going through the hatch opening to pull himself up and forward, particularly if there are no handholds.
        3.     The ship officer responsible for operations related to the opening of the hatch related to the accident under consideration should have realized that the small hook was totally inadequate and should have taken action to eliminate that hazard by:
     (a) Securing the hatch in an open position by connecting the handgrab located on top of the hatch to a structural anchor point in the side of the hold using wire rope, turnbuckles and shackles; or
     (b) Should have notified users of the hatch of the hazard represented by the hatch deficiencies and instructed them not to apply any force to the hatch cover."

In the "Conclusions and Opinions" section of his report Mr. Pazos noted the

following:

1. The primary cause of the accident was the presence of two major "deficiencies related to the inspection and maintenance of the hatch and it's hardware", namely:
     (a) "The lack of handholds close to the hatch opening to allow a person going through the hatch opening to pull himself up and forward to climb to the deck and to assist himself in maintaining his balance when his feet leave the vertical ladder.
          Grabbing the edges of the flat plate of the hatch cover is not a reasonable substitute for grabbing a handhold where the grip can be more powerful.
     (b) The lack of positive means of holding the hatch cover in the open position when subject to the action of forces to be expected.  The small hook existing at the time of the accident was totally inadequate to resist the force that can be expected to act on the hook when a person pulls himself through the hatch opening.  It should have been obvious to the officer and crew opening the hatch that the existence of a small hook close to the hinges of the hatch was improper and adequate action should have been taken to eliminate this hazardous condition.
          The condition was latent, that is, not visible or apparent to the user of the hatch, in that the hatch cover appeared to be secured in an open position.  Once the hatch is in an open position, the user has no reason to investigate the system that exists to maintain the hatch securely opened.

A person climbing up the ladder to reach deck C cannot see the small hook and cannot determine if it is safely engaged;

      2.     Defendant's representatives knew or should have known that a dangerous condition existed, "since it was the responsibility of the ship's crew to make sure that the hatch cover was firmly secured in an open position to enable the longshoremen to have a safe access in and out of the cargo hold";

      3.     CFR Title 33 implements Chapter IX of SOLAS,[12] which requires the "owner of the vessel to adopt and maintain a Safety Management System". Then defendant "failed to comply with the International Safety Management (ISM) Code, which requires that the personnel involved with company safety management system (ship's officers and port engineers) have an adequate understanding of the relevant rules, regulations, codes and guidelines. They should have known that the International Labour Organization requires adequate handholds and adequate securing arrangements of the hatch cover."[13]

      4.     "The representatives of the owner were negligent because they failed to correct a hazardous condition that should have been obvious to the officer and crew, or to temporarily secure the hatch cover in a secure and open position during the stevedoring activities. The officer and crew of the vessel could have done this very quickly with wire rope and a turnbuckle."

## ARGUMENT

**A.    Principles Governing the Rendering of Summary Judgment**

The principles governing the granting or denial of a Motion for Summary Judgment are well established. The entry of Summary Judgment is appropriate only when "there is no genuine issue of material fact" and "the moving party is entitled to judgment as a matter of law". F.R.C.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986);

In determining whether the evidence from such sources as depositions, answers to interrogatories and Affidavits demonstrate the existence of a "genuine issue as to any

---

[12] International Convention for the Safety of Life at Sea, which requires an owner of a vessel to adopt and maintain a Safety Management System.

[13] Mr. Pazos cites Section 3.6 of the International Labour Organization Publication entitled "Safety and Health in Dock Work" which provides in pertinent part:

    "3.6 Access to Ship's Hold

        3.6.1 *               *               *

                (6) A separate man-hatch giving access to a ladder should-

      *                   *               *

                (c) be provided with adequate handhold fitted clear of the coaming; and (d) have its hatch cover, if any, provided with adequate securing arrangement, particularly where the handhold required by (c) is fitted to the inside of the cover."

material fact" which would preclude the granting of Summary Judgment, such evidence

and all the inferences reasonably to be drawn therefrom, must be considered in a light

most favorable to the party opposing the Motion. Matsushita Electric Industrial Co. v.

Zenith Radio Corp., 475 U.S. 574, 588 (1986)  As the Third Circuit noted in In Re

Japanese Electronic Products Anti-Trust Litigation, 723 F. 2d 238, 258 (3rd Cir. 1983);

> "If, however, there is **any** evidence on the record from **any**
> source from which a reasonable inference in the respondent's favor
> may be drawn, the moving party simply cannot obtain a Summary
> Judgment, no matter how many Affidavits are filed."
> (emphasis supplied)

As the Court noted in Drames v. Sun River Investment, _____ F. Supp. _____, 1992

WL357756 (E.D. Pa. 1992);

> "An issue is 'genuine' if there is sufficient evidence with which
> a reasonable jury could find for the non-moving party.  See Anderson
> v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A fact is 'material'
> if it might affect the outcome of the suit under the relevant substantive
> law."

The party moving for Summary Judgment bears the initial burden of identifying

those portions of the record which it believes demonstrate the absence of a genuine issue

of material fact. Celotex v. Catrett, supra at pp. 322-23.  If the moving party satisfies its

initial burden, it then falls upon the non-moving party to make a factual showing

"sufficient to establish an element essential to that parties case, and on which that party

will bear the burden of proof at trial". (Id at p. 23)

At the Summary Judgment stage ". . . The Judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial . . .  There is no issue for trial unless there is sufficient

evidence favoring the non-moving party for a jury to return a verdict for that party."

Anderson v. Liberty Lobby, Inc., supra at p. 249. This inquiry mirrors the standard

applicable on Motion for Directed Verdict – namely an inquiry as to whether reasonable

minds could differ as to the import of the evidence. (Id at p. 251)

Thus, the nature of the inquiry is such that the trial court must consider ". . .

Whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law." (Id. at pp.

251-251)  However, the Supreme Court in Anderson took pains to note that its holding

did not "suggest that the Trial Court should act other than with caution in granting

Summary Judgment" and that " . . . The evidence of the nonmovant is to be believed, and

all justifiable inferences are too be drawn in his favor." (Id. at p. 255)

## B. The Standard of Care Imposed on "Vessels" Under the Longshore and Harbor Workers' Compensation Act

The Plaintiffs' action against defendant B.V. Shipping is governed by Section

5(b) of the LHWCA, 33 U.S.C. §905(b) which generally permits a recovery in the event

of injury to a longshoreman or harbor worker which is "caused by the negligence of a

vessel".  To date, the only decisions of the United States Supreme Court which have

attempted to delineate the standard of care imposed on a "vessel" under Section 5(b) are

Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S. Ct. 1614 (1981)

and Howlett v. Birkdale Shipping Co., 512 U.S. 92, 114 S. Ct. 2057 (1994).

In Scindia, the Court acknowledged the vessel's duty of "exercising due care

under the circumstances". (451 U.S. at p. 166)  However, after expressing this general

duty, the Court went on to discuss the application of that duty to the various

"circumstances" that arise both prior to and after the commencement of the "stevedore's

cargo operations" aboard ship. (Id. at p. 167)  In this respect, the Court outlined three

general duties which vessels owe to longshoremen under the Act. These duties were summarized by the Court in Howlett v. Birkdale Shipping Co. as follows (129 L.Ed. 2d at p. 87):

> "The starting point in this regard must be our decision in **Scindia Steam**, which outlined the three general duties ship owners owe to longshoremen. The first, which courts have come to call the 'turnover duty' relates to the condition of the ship upon the commencement of stevedoring operations. . . . The second duty, applicable when stevedoring operations have begun, provides that a ship owner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel'. . . The third duty, called the ' duty to intervene' concerns the vessel's obligation with regard to cargo operations under the principal control of the independent stevedore. . ."

In Davis v. Portline Transportes Maritime Internacional, 16 F. 3d 532, 537 (3rd Cir. 1994) the Third Circuit more succinctly summarized a vessel's duties as follows:

> "In **Scindia** the Court recognized at least three distinct duties that a ship owner owes a stevedore (and its longshore employees) under Section 5 of the Act, namely, the 'turnover duty'/'duty to warn', the 'active operations duty', and the 'duty to intervene'. . ."

As will be seen, the evidentiary materials submitted to this Court by plaintiffs in opposition to the Motion for Summary Judgment, together with all justifiable inferences which may be drawn therefrom, demonstrate the existence of evidence sufficient to establish every element essential to support plaintiff's theory of liability – namely, a breach by the defendant's vessel of its turnover duty and/or active operations duty.

**C.     The Evidence in the Record Before This Court And The Reasonable Inferences That May Be Drawn Therefrom Are Sufficient For A Finder Of Fact To Reasonably Conclude That Defendant Breached Its Turnover Duty To Plaintiff**

**1.     Elements Of The Turnover Duty**

The turnover duty "relates to the condition of the ship upon the commencement of stevedoring operations". Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98 (1994). The oft-quoted description of the turnover duty is that:

> "A vessel must 'exercise ordinary care under the circumstances' to turn over the  ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of 'ordinary care to carry on cargo operations with reasonable safety to persons and property.'"

See Scindia Steam Navigation Co. v. De Los Santos, supra at p. 167

Accordingly, in order to establish a breach of the turnover duty, plaintiffs have the burden of demonstrating the existence of a "condition" that:

1. Existed upon the commencement of cargo operations;

2. Would preclude an "expert and experienced stevedore" from carrying on its cargo operations with reasonable safety to persons and property, even in the exercise of reasonable care.

Put another way, the vessel's basic duty is to provide a workplace where skilled longshore workers can operate safely.  Kirsch v. Plovidba, 971 F. 2d 1026, 1029 (3rd Cir. 1992)

The turnover duty also encompasses a duty to warn which was described in Howlett, supra at p. 98 as follows:

> "A corollary to the turnover duty requires the vessel to warn the stevedore 'of any hazards on the ship or with respect to its equipment' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.'"

The hazard or dangerous condition in this case-the presence of the small hook and eye securing device for the hatch lid in question, coupled with the absence of a separate handhold, involves the structure of the ship. Recently, in <u>Prinski v. Blue Star Line Marine, Ltd.</u> 341 F. Supp 2d 511, 517 (E.D. Pa 2004) the Court elaborated on the contours of the turnover duty when the alleged hazardous condition involves the ship's structure:

> "The Supreme Court has held that '[f]or the purposes of delineating the scope of a ship owner's turnover duty…the cargo stow is separate and distinct from other aspects of the ship.'…It explains that vessel's obligation under the turnover duty is 'commensurate with its access and control,' and that, therefore, the obligation to inspect the cargo stow is more limited than the obligation to inspect the ship itself. **Id.** at 104-05, 114 S. Ct. 2057. Therefore, while the vessel owner's duty as to the cargo area is limited to latent defects, **the vessel owner has a general "duty of reasonable care and a duty to warn as to the ship and its equipment.'** Hill v. NSB Niederelbe Schiffahrtsges MBH & Co….2003 WL 23162396…(E.D. Pa…2003). Unlike cases where the alleged defect was found in the cargo stow or cargo area, this case involves the general structure of the ship….Therefore, the general duty of reasonable care under the turnover duty applies, rather than the more limited duty related to the cargo area" (Emphasis Supplied)

The scope of the turnover duty is also affected by considerations of whether the alleged hazardous condition is an "obvious" one. In both <u>Kirsch v. Plovidba</u> 971 F2d 1026 (3rd Cir 1992) the Court elaborated upon a vessel's turnover duty with respect to obvious hazards. It is true that in <u>Kirsch</u>, the Third Circuit stated that a vessel owner "can ordinarily reasonably rely on the stevedore and its employees to notice obvious hazards and take steps consistent with their expertise to avoid those hazards when practical to do so". Id at p. 1030. However, the Third Circuit in <u>Kirsch</u> went on to recognize that:

> "…in some cases, however, a ship owner cannot reasonably rely upon **longshore workers** to avoid obvious hazards…
> [I]f a hazard is obvious yet practically unavoidable, the ship

> owner can hardly reasonably expect the stevedore or the **longshore** worker to avoid the hazard. Frequently, this question is one of degree for the standard is not whether it was absolutely impossible to avoid the hazard, but whether under all the circumstances safer alternatives were impractical. . . ('longshoreman need not show that he had no possible alternative . . . but only that the circumstances made safer alternatives unduly impractical or time consuming'). **In many cases, this fact-intensive question will be inappropriate to decide on summary judgment and must be left for the jury. . ."** (emphasis supplied)[14]

The Court in <u>Kirsch</u> went on to conclude that "a ship owner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore **could not** or **would not** avoid the hazard and conduct cargo operations reasonably safely." (**Id** at p. 1031) (emphasis added)

In <u>Brown v. Wilmington Trust Co.</u>, 1992 WL 382299 (E.D. Pa 1992), the Court concluded, based upon <u>Kirsch</u> and <u>Scindia</u>, that in order to avoid a Motion for Summary Judgment under the turnover duty, a plaintiff must present "some evidence" which raises a genuine issue of material fact as to whether:

> "(1) Defendants could have eliminated the obvious hazard by the exercise of reasonable care; and (2) either: (a) defendant should have expected that the expert stevedore **could not avoid** the obvious hazard or (b) defendant should have expected that the expert stevedore **would not avoid** the obvious hazard."

Against this background, the issues which must be considered by this Court in determining whether there are genuine issues of material fact in this case which preclude Summary Judgment on the "turnover duty" question are:

1) Is there evidence in the record before this Court from which a reasonable jury may conclude that a hazard existed upon the commencement of cargo operations;

---

[14] See <u>Kirsch</u>, supra at p. 1030. See also <u>Serbin v. Bora Corp., Ltd.</u>, 96 F. 3d 66, 73 (3rd Cir. 1996) where the Third Circuit noted that in most cases the question of obviousness is a question of fact for the jury and is not appropriate for resolution by a trial court on motion for summary judgment.

2) Is there evidence in the record before this Court from which a reasonable jury may conclude that the defendant vessel could have eliminated such hazard by the exercise of reasonable care;

3) Is the question of the alleged obviousness of the hazardous condition a question of fact for the jury;

4) Even if the hazard is considered obvious, is there evidence in the record before this Court from which a reasonable jury may conclude that the vessel should have expected that the stevedore could not or would not be able to avoid such hazard; and

**2. Defendant's Breach of the Turnover Duty**

The hazardous "condition" which plaintiffs contend existed at the commencement of cargo operations was the presence of the small hook and eye locking device for the forward access hatch lid at hatch level 2C, coupled with the absence of a separate handhold to utilize in getting in and out of the 2D level—thus requiring use of the hatch lid to which the locking device was attached as a handhold.

Defendant suggests, however, that in order for plaintiffs to succeed on their turnover duty/duty to warn cause of action, they must establish that at the commencement of cargo operations the locking hook for the hatch lid in question was in the same deformed condition as that discovered by Mr. Turner's fellow longshoremen immediately following the accident.

Plaintiffs do not contend, as they cannot, that the hook was in the same deformed state at the commencement of cargo operations as it was at the time of the accident. Had that been the case, the hatch lid could not have remained in a secured position throughout the day on November 7 and November 8, 2002, prior to 2:45 p.m., while longshoremen were going in and out of the 2D level.

It is plaintiffs' position that the small hook and eye device, coupled with the absence of a separate handhold, constituted a hazardous condition-that is, a condition

which presented a potential for injury when, as here, it was well known to the vessel's officers and crew that longshoremen would be constantly exposed to this condition by the need to grab the hatch lid itself to secure themselves in going in and out of the 2D level. In short, the only handhold available for use was the hatch lid to which the inadequate securing device was attached, thereby creating the potential for deformation over a period of time as force was applied to the hook each time a person pulled on the hatch lid.

Accordingly, the condition which plaintiffs contend created a "hazard" clearly existed upon the commencement of cargo operations in this case.

The next question is whether there is sufficient evidence in the Record before this Court from which a jury may reasonably conclude that the condition in question did in fact constitute a hazard or dangerous condition.

In this respect, the analyses of the Third Circuit in Serbin v. Bora Corp. Ltd., 96 F. 3d. 66 (3rd Cir.1996) and the District Court in Prinski v. Blue Star Line, supra, are most useful.  In Serbin, the Third Circuit reviewed the trial court's grant of summary judgment in a case where a longshoreman was injured by a stuck block in a cargo hold. In analyzing "whether a reasonable fact-finder could draw the inference that the condition posed an unreasonable risk of harm," the Court noted that the non-movant plaintiff was "entitled to the inferences flowing from the many (i.e. general) ways a stuck block could injure someone". 96 F. 3d at p. 72. The Court then delineated the several ways that a stuck block could injure someone and concluded that "recognizing that the stuck block presented a general hazard would not require clairvoyance on the part of the crew that a longshoremen would hurt himself in this particular way.  A fact-finder could reasonably

conclude that the crew should have recognized the **general danger** the stuck block posed." Id. at p. 73. (Emphasis supplied)

In <u>Prinski</u>, the question before the trial court on motion for summary judgment was whether the height of certain archways, which were part of the general structure of the ship, could be considered a dangerous condition or hazard "such that the vessel owner would have a duty to address it before turning the vessel over to the stevedore." 341 F. Supp. 2nd at p. 518. The court in <u>Prinski</u> concluded that evidence of the inconsistent heights among the archways and within the structure of the archway was sufficient for a fact-finder to reasonably conclude that such condition was a dangerous one based on the following reasoning: (Id.)

"...Plaintiffs do not argue that the height of the archways violated any known U.S. Coast Guard or federal regulations. Plaintiffs do, however, point to testimony by a longshoreman saying that he had struck his head on these low archways...and testimony by the ship's captain admitting to bumping his hard hat on the archway at times...Although the ship's captain did not say that the archways were dangerous, an attorney asked, 'But, it certainly would have been safer if you didn't have to stoop...isn't that correct?' and the captain responded, 'Ideally, yes.'...Furthermore, the plaintiffs present evidence that archways vary in height...and that the archway itself had ribs that extended lower than the front of the archway. Granting all reasonable inferences in favor of the non-moving party, I agree that a fact-finder could reasonably conclude that the inconsistent heights among the archways and within the structure of the archway created a dangerous condition. A fact-finder could reasonably conclude that Blue Star Line should have inspected the ship for hazards such as this one in its exercise of reasonable care, and that because it failed to discover or address this hazard, it turned over the ship in a dangerous condition."

Here, unlike <u>Prinski,</u> there is a report from an expert naval architect, marine engineer and mechanical engineer (Exh. Q) which specifically cites pertinent Standards which, in the expert's opinion, were violated by the failure to provide a separate handhold

and the inadequate or insufficient securing arrangement (the small hook and eye) provided for the hatch lid in question[15].

Moreover, the fact that the aft end access hatch lid at the 2C level—the same hatch level where the accident occurred—was equipped with a separate handhold and substantially stronger locking hook, is further evidence from which a reasonable jury may draw an inference that such devices were necessary in order to provide a safe method for a person to extract himself from the 2D level and that the failure to provide such devices created a dangerous condition or hazard.

Captain Mobach readily recognized that the hook and eye device utilized to secure the forward access hatch lid was a "safety device", and that a handhold was needed to assist people in getting in and out of 2D. (Mobach 88, 101) As in Serbin, "clairvoyance" would not have been required on the part of the ship's crew and officers to recognize that if the hook and eye device failed, a longshoreman could be seriously injured by the falling access hatch lid. Clearly, Mr. Turner is "entitled to the inferences flowing from the many ways" a suddenly unsecured hatch lid could injure someone while that person was holding such hatch lid. Accordingly, here, as in Serbin and Prinski, there is sufficient evidence in the record from which a jury could reasonably conclude that a hazard was present which should have been recognized by the defendant prior to the turnover of the vessel to the stevedore.

The next issue for consideration under the turnover duty is whether the hazardous condition was an "obvious" one. As indicated, "...obviousness is generally a question

---

[15] See 33 CFR Part 96 and Section 3.6.1 of the International Labour Organization Publication "Safety and Health in Dock Work" cited in Mr. Pazos' report. (Exh. Q)

for the jury, not often appropriate for resolution by the Court on Summary Judgment. Serbin, supra at p. 73.

Here, the size, shape, and location of the hook and eye securing device for the hatch lid in question was anything but obvious to the stevedore and longshoremen. The only time that the hatch lid would have been visible to the longshoremen would have been while it was in a raised and locked position since, as the evidence establishes, ship's crew members would open and secure the hatch lid prior to the commencement of cargo operations. As demonstrated by both pertinent deposition testimony (Mobach 58; Lasch 61-61) and the photographic evidence (Exh. H-4) the small hook and eye securing device was hidden behind the underside of the open hatch lid as longshoremen went in and out of the 2D level. All the longshoremen could know was that the hatch lid, which was the only object for them to grab while going in and out of 2D, was holding their weight. The hook and eye device was not visible to them. Nor were they in a position to see whether or not the hook was in the process of deformation over a period of time. Accordingly, there is more than sufficient evidence in the record before this Court from which a reasonable jury could conclude that the hazardous condition in this case was not "obvious" to the stevedore or the plaintiff and his fellow longshoremen.

Even if it be determined that the condition in question was "obvious", there is evidence in the Record before this Court from which a reasonable jury could conclude that the defendant ship owner nonetheless remains liable for breach of its turnover duty. As recognized by the Third Circuit in Kirsch, supra at p. 1030:

"...We therefore conclude that a ship owner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely."

Here, there is ample evidence from which a reasonable jury may conclude that the longshoremen working aboard the vessel on November 8, 2002 could not avoid the hazard here in question. Thus, the longshoremen were compelled to use the forward access hatchway when the ship's crew opened and secured that hatch lid at the 2C level to provide access into hatch 2D. The crew did not direct the longshoremen to the access located at the aft end of the 2D level where a separate handhold **was** provided, together with a significantly stronger locking hook. The photographic evidence demonstrates that the aft access hatch at the 2D level was behind a bulkhead at the aft end of the hatch, which would not have been visible or known to the longshoremen working aboard the ship on its maiden voyage[16]. (Exh. G-2)

There is overwhelming evidence that defendant's officers and crew knew that the longshoremen would be required to utilize the hatch lid to pull themselves out of level 2D, thereby continuously applying force to the small hook and eye device located near the hinge portion of the hatch lid. Moreover, as was the custom and practice aboard the Luzon Strait, it was a member of the ship's crew who had opened and locked the hatch lid into position on November 7, 2002 and unhooked the hatch lid at the close of cargo operations on that day. Similarly, a member of the ship's crew opened and secured the hatch lid at 6:00 a.m. on November 8th—the day of the accident. Once the hook was in the eye and the hatch lid was in an open position, a reasonable jury could conclude that it would have been difficult, if not impossible, for the longshoremen and their supervisors to be able to determine whether there was any deformation of the hook—particularly

---

[16] Just as the absence of a separate handhold and the size, shape and location of the securing device at the forward access hatch lid at 2C was well known to the ship's officers and crew, the presence of the well secured hatch lid at the aft end of the hatch, with its separate handhold, would have been obvious to the ship and crew-but not to the stevedore and longshoremen.

when the hook and eye was on the reverse side of the hatch lid as longshoremen went in and out of the 2D level.

Accordingly, plaintiff has presented more than sufficient evidence to demonstrate that the hazardous condition in question was not obvious and that, in any event, defendant should have expected that the stevedore **could not** avoid the hazard, and that, indeed, it **would not** avoid the hazard.

Finally, there is sufficient evidence in the Record before this Court from which a reasonable jury may find that the defendant vessel owner had the ability to eliminate the hazard by fabricating and installing a separate portable handhold, as it did following the accident, and either providing a stronger locking device, as was already present at the aft end access hatch lid, or using alternative locking mechanisms, such as the three bar locking device installed following the accident or simply securing a strong wire or cable through the handle on the top of the hatch lid and securing the other end of such wire to a nearby fixture on the closest bulkhead.

Accordingly it is respectfully submitted that the plaintiffs have presented sufficient evidence to satisfy every element necessary to establish a breach of defendant's turnover duty to the plaintiff John Turner.

### 3. Plaintiffs Do Not Seek Damages Under the Doctrine of Unseaworthiness

In its brief in support of its Motion for Summary Judgment defendant contends that plaintiffs' action is based on a claim of a defect in the structural design of the ship must, accordingly, be dismissed as a claim of unseaworthiness which is precluded by Section 5(b) of the LHWCA, 33 U.S.C §905(b).[17]  Plaintiffs agree that Section 5(b) does not permit recovery against a vessel on a theory of "unseaworthiness", and are **not**

---

[17] See pages 18-24 of defendant's brief.

making such a claim here.  As demonstrated by plaintiffs' foregoing argument on the

turnover duty, this is a case where plaintiffs are charging negligence as a result of

defendant's actual or constructive knowledge of the existence of a hazardous condition

and the failure of defendant to remedy or warn Mr. Turner of the existence of this hazard

when it had the ability to do so.

The cases cited by defendant on this point do not support the proposition that a

longshoremen is precluded from recovering under a theory of negligence relating to a

dangerous condition present within the structure of the vessel.

Indeed, in the seminal case of <u>Scinida Steam Navigation Co., Ltd. v. De Los</u>

<u>Santos</u>, 451 U.S. 156, 167, 101 S. Ct. 1614 (1981), the Supreme Court explained that the

turnover duty "extends at least to exercising ordinary care under the circumstances to

have **the ship** and its equipment in such condition that an expert and experienced

stevedore will be able by the exercise of reasonable care to carry on its cargo operations

with reasonable safety to persons and property, and to warning the stevedore of any

hazards on **the ship** or with respect to its equipment that are known to the vessel or

should be known to it in the exercise of reasonable care…" (emphasis supplied)  Clearly,

the Supreme Court understood that a dangerous condition within the structure of "the

ship" itself could constitute a basis for a finding of breach of the turnover duty.  Nothing

in the cases cited by defendant suggests otherwise.

In <u>Bilderbeck v. World Wide Shipping Agency,</u> 776 F. 2nd 817, 819 (9th Cir.

1985) the Court expressly noted that the case before it did not involve "a negligently

created defect that made the vessel hazardous to longshoremen and that the ship owner

knew or reasonably should have known of the hazard, and nonetheless failed to warn the

stevedore company so that it could take steps to protect its workmen." Thus, in
Bilderbeck, the plaintiff attempted to recover solely on a contention of defective design
without presenting any evidence that the ship owner knew of the alleged defects or in the
exercise of reasonable care should have known of them. In this case, however, there is
no question that the defendant ship owner was well aware of the existence of the alleged
defective condition.

In Anastasiou v. M/T World Trust, 338 F. Supp. 2nd 406 (E.D. NY 2004), the case
principally relied upon by defendant, suit was not brought by a plaintiff "longshoremen"
as alleged by defendant. Instead, the suit was brought by a marine radio technician who
alleged that he was a seaman and thus was entitled to pursue a theory of liability based on
the doctrine of unseaworthiness. The Court held that the plaintiff was not a seaman and
then considered his case under Section 5(b) of the LHWCA based on its conclusion that
the plaintiff was in fact a "harbor worker". The District Court in Anastasiou did not hold
that a plaintiff harbor worker was barred as a matter of law from proceeding on a theory
of negligence with regard to a defect or defects in the structure of a vessel. Instead, the
Court dismissed the claim for negligence under the LHWCA on the following grounds
(338 F. Supp. 2nd at p. 419):

> "Here, Plaintiff has not come forward with any evidence that Defendants had
> actual or constructive notice from any third party of the dangerous condition of the ramp.
> Specifically, plaintiff has failed to proffer any evidence which would indicate that
> Defendants were aware that the ramp was unsafe to walk on when it was wet, or evidence
> of other accidents or problems because of the ramp's condition, or that Defendants should
> have known that the ramp would cause injury. Plaintiff's failure in that regard therefore
> requires the Court to dismiss Plaintiff's negligence claim. See, e.g. Mattivi v. South
> African Marine Corps., 615 F. 2nd 163, 168-69 (2d. Cir. 1980) (In the context of
> negligence claims under LHWCA, a plaintiff must show that defendant 'had notice of the
> dangerous condition (and should have reasonably anticipated that plaintiff might be
> injured by it)')"

Indeed, in its "Conclusion", the Court in <u>Anastasiou</u> specifically noted that defendant's motion for summary judgment was being granted because plaintiff had failed "to create a genuine issue of material fact on his negligence claim". Accordingly, this was a case where summary judgment was not issued as a matter of law, but rather due to a failure of proof.

In the case at bar, plaintiffs have in fact come forward with evidence indicating defendant's actual or constructive knowledge of the hazardous condition of the access hatch lid in question, including the following:

- Captain Mobach's acknowledgement that the securing device for the hatch lid was a safety device and that people could be injured if the securing device failed (Mobach 101);

- The installation of a separate handhold at the aft end access hatch of 2C and other areas of the vessel, thereby demonstrating the need for such a device at the forward access hatch lid;

- The installation of a visibly stronger and sturdier hook as a securing device for the access hatch lid at the aft end of hatch 2C, thereby demonstrating the need for such a device at the forward access hatch lid;

- The Standards referenced in the expert report of Hector V. Pazos.

It must be remembered that this is not a case where the defendant was powerless to modify or correct the structural condition in question. The defendant had the ability to fabricate and install a portable handhold as it did in 2003, and further had the ability to install a more secure locking device as it did in 2004.

Defendant also contends that the fact that it received class certification from Bureau Veritas and certification by the Netherlands conclusively establishes that the vessel was built in accordance with international regulations. Plaintiffs in no way concede that any certificates issued to the vessel by Bureau Veritas or the Netherlands establishes that the absence of a handhold and the type of securing device utilized for the hatch lid in question was "in accordance with international regulations". There has been no admissible evidence presented by defendant that these conditions were even considered by the Netherlands or Bureau Veritas.

In sum, plaintiffs do not seek recovery from defendant on the ground that it negligently **designed** the ship. It did not design the ship. However it did have the ability to recognize a hazardous condition present in the structure of the ship, as well as the ability to correct that condition. Accordingly, recovery is sought from defendant under the well established turnover and actual operations duties.

**D.    The Record Before this Court and the Reasonable Inferences That May be Drawn Therefrom Are Sufficient for a Finder of Fact to Reasonably Conclude that Defendant Breached its Active Operations Duty to Plaintiff.**

1.    **Elements of the Active Operations Duty**

The contours of the "active operations" duty have not been delineated as yet by the Supreme Court. However, in <u>Davis v. Portline Transportes Maritime Internacional</u>, 16 F. 3d 532 (3d Cir. 1994) and <u>Serbin v. Bora Corp., Ltd.</u>, 96 F.3d 66, 72 (3d Cir. 1996), the Third Circuit considered the elements of such duty at great length.

The Court in <u>Davis</u> first pointed out the distinction between the turnover and "active operations" duty at p. 537, as follows:

> "As to the active operations duty, **Scindia** explained that 'the vessel may be liable if it actively involves itself in the cargo operations

and negligently injures a longshoreman, or if it fails to exercise due care
to avoid exposing longshoremen to harm from hazards they may encounter
in areas, or from equipment under the active control of the vessel during
the stevedore operation. . .' This formulation lies in stark contrast to the
rule applicable when the vessel does not actively involve itself in the cargo
operations, in which event the vessel may rely and depend on the
experience and expertise of the stevedore.  Thus, for example, under the
other two duties, the vessel need not supervise or inspect the stevedoring
operation to discover and correct dangerous conditions which develop
within the cargo areas as a result of those operations.

In the case at bar, there is evidence in the record before this Court from which a
reasonably jury may conclude that defendant "actively involved itself in the cargo
operations" when its crew opened and secured the forward access hatch lid, thereby
inviting the longshoremen to use that accessway into hatch 2D, and failed to make the aft
access hatch way available to the longshoremen for that purpose

In determining whether a jury may find the active operations duty to be
triggered, the Court in <u>Davis</u> noted at p. 541:

"A jury may find that the vessel exercised control or took charge over
an area either because it never turned exclusive control of the area
over to the stevedore but retained substantial control, **or because
the vessel substantially interfered, by invitation or otherwise, with the
stevedore's exercise of exclusive control, such as by actively
intervening in the area."** (emphasis supplied)

Once the "active operations" duty has been triggered, the issue to be decided is
whether the vessel exercised "due care" to avoid exposing longshoremen to harm from
hazards present in the area under the active or shared control of the vessel during the
stevedoring operation.  Thus, the Third Circuit in <u>Davis</u> and <u>Serbin</u> held that a plaintiff
must establish the following points in order to establish a prima facia case of breach of
the active control duty:

(1) "That the vessel appreciated, should have appreciated, or with the exercise of
reasonable care would have appreciated the condition;

    (2) That the vessel knew or should have known, that the condition posed an unreasonable risk of harm to a longshore worker;

    (3) That a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger; and

    (4) That the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition."[18]

Under the active operations duty, the "obviousness" of the hazard is not a bar to liability. Thus, the question of whether a hazard is "obvious" is viewed differently under the active operations duty where the focus is on the knowledge of the injured longshoreman, as opposed to the knowledge of his/her stevedore employer which is pertinent under the turnover duty. As noted in <u>Davis</u>, supra, at p. 543:

> ". . . We consider a hazard to be obvious for purposes of the **Scindia** active operations duty, if a reasonable longshore worker under all the circumstances would actually have noticed the hazardous condition exists **and** would actually have appreciated the true significance (probability and gravity) of the threatened harm. . ."
> (emphasis in original)

Even in those circumstances where a trier of fact concludes that the condition would have been obvious to the injured longshoreman, the active operations duty does not preclude a finding of liability for the plaintiff. Rather, it calls for the application of typical principles of comparative negligence. See <u>Davis</u>, supra at p. 544 and <u>Serbin</u>, supra at pp. 74-76.

Finally, the Court in <u>Serbin</u> emphasized that:

> ". . . The vessel cannot rely on the stevedore's expertise to protect its workers from the vessel's active operations."[19]

### 2.    Defendant's Breach Of The Active Operations Duty

---

[18] 96 F.3d at p. 71.
[19] Id at p. 76.

### a) The Triggering of the Active Operations Duty Through Defendant's Designation of the Accessway to be Used by the Stevedore and its Longshoremen Personnel

There were two means of access available to hatch 2D on November 8, 2002-the forward and aft access hatchways. The aft hatchway was hidden by a bulkhead and its presence would not ordinarily be known to the longshoremen. The ship's officers and crew did not instruct or advise the longshoremen regarding the presence of the aft accessway and to use that accessway in getting in and out of 2D. Instead, the ship's crew opened and secured the forward access hatch lid at 2C at approximately 6:00 a.m. on November 8, 2002, thereby compelling the longshoremen to use the forward access entry to 2D, as opposed to the aft accessway, which had a separate handhold and a stronger securing device. In this manner, defendant actively controlled a significant aspect of the cargo operations.

Accordingly, there is evidence from which a reasonable jury may conclude that the vessel actively involved itself in the cargo operations and/or substantially interfered with the stevedore's exercise of exclusive control thereof.

### (b) The Vessel Failed to Exercise Due Care to Avoid Exposing the Plaintiff John Turner to Harm From Hazards Present in the Area In Question

### (i) The Vessel Had Actual Knowledge of the Condition in Question

As previously noted, there is clear and convincing evidence in the record before this Court that the defendant vessel was well aware that there was no separate handhold present at the forward access hatch lid of 2C and the size, shape and location of the securing device utilized for that hatch lid.

### (ii) The Vessel Should Have Recognized That the Condition Posed an Unreasonable Risk of Harm to Mr. Turner, a Longshore Worker

The second element necessary to establish a prima facia case of breach of the active control duty is a showing of evidence from which a jury may find "that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker." Davis v. Portline, supra, supra at p. 541. Specifically, in this case, the question is whether the vessel knew, or should have known that the absence of a separate handhold and the size, shape and location of the securing device on the hatch lid, posed an unreasonable risk of harm to longshore workers.

In this respect, it must be borne in mind that the burden imposed on plaintiff with regard to this prong of the Davis formula is not to present specific evidence beyond the dangerous condition itself to show that such condition is generally hazardous. Serbin, supra at pp. 72-73. The Serbin Court elaborated on this principle as follows at p. 72:

> "For instance, a plaintiff could not rely on the mere fact that he fell on a staircase to prevail in a negligence case against the owner. But, if the plaintiff can show that the staircase was in disrepair, the jury is entitled to draw from that evidence the reasonable inference that the staircase presented a generally hazardous condition. . ."

In this case, there is testimony from Captain Mobach indicating that the vessel recognized that the hook and eye securing device for the hatch lid in question was a safety device and that people could be injured if that safety device failed (Mobach 101). In addition, the evidence regarding the presence of a separate handhold and stronger securing device at the aft hatch lid on the same deck level demonstrates notice to the defendant of the necessity of such devices in order to provide a safe means of access in and out of the 2D level. **If such devices were in use at the aft end, they surely should have been installed by defendant at the forward end of the same hatch level.**

In addition, the expert affidavit/report of Hector V. Pazos constitutes evidence from which a reasonable jury may conclude that the vessel should have recognized the unreasonable risk of harm to longshore workers caused by the conditions at the forward accessway of the hatch 2C.

### (iii)    The Foreseeable Failure of a Longshoreman to Protect Himself From the Harm Presented By the Hazardous Condition

The third prong of the Davis-Serbin "active control" negligence formula requires "evidence that could support a fact finding that a 'longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger.'"[20]

Here, there is ample evidence that the vessel knew that longshoremen would be using the forward accessway and would be grabbing the hatch lid to steady themselves in climbing from the ladder to the 2C deck level. The ship was well aware that there was no separate handhold available for use by the longshoremen. The vessel was also aware that the size, shape and location of the hook and eye securing device was hidden from the view of the longshoremen as they went in and out of the 2D level.

This evidence should be sufficient to raise a jury issue as to whether a longshore worker foreseeably might fail to discover the condition in question and/or protect himself from the danger presented therefrom.

### (iv)    The Defendant Vessel Failed to Take Remedial Steps to Prevent or Eliminate the Dangerous Condition

The final issue which must be evaluated under the "active operations" theory of liability is whether there is evidence that the defendant "failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition."

---

[20] See Davis, supra at p. 541 and Serbin, supra at p. 73.

Defendant clearly had the ability to take remedial steps to prevent or eliminate the condition. Thus, the defendant had the ability to fabricate and install a portable handhold, as it actually did following the accident.[21]   Moreover, defendant clearly had the ability to provide an alternate and stronger form of securing device including the three bar device actually installed following the accident; a stronger hook, as actually in place at the aft accessway at hatch 2D; or the use of the wire rope and turnbuckle as suggested by Mr. Pazos.[22]

The evidence is clear, however, that defendant took no action of any sort to remedy the condition in question.

Accordingly, plaintiff has presented sufficient evidence to demonstrate that a jury may reasonably conclude that the defendant vessel failed to take appropriate remedial action to remedy the hazard presented by the absence of a separate handhold and the insufficient securing device at the forward access hatch lid at hatch 2C.

## CONCLUSION

For all the foregoing reasons it is respectfully submitted that the record before this Court on defendant's Motion for Summary Judgment demonstrates that there are genuine issues of material fact and that a jury may reasonably conclude that the defendant vessel

---

[21] Plaintiffs are aware of FRE 407 which generally precludes the admission of evidence of subsequent remedial measures. However, that rule expressly provides that it "does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measure, if controverted…" Here, for purposes of the Motion for Summary Judgment, plaintiffs offer this evidence as evidence of defendant's control over the area in question and the feasibility of such precautionary measures-particularly when, as here, defendant seems to be suggesting that it was powerless to undo the original design of the condition in question.

[22] An expert's affidavit "is eligible for Summary Judgment consideration if the affiant would be qualified to give the expert opinion at trial." See 1836 Callowhill Street v. Johnson Controls, Inc. 819 F. Supp 460, 462 (E.D. Pa 1993); Shaw v. Strackhouse 920 F.2d 1135, 1139 (3d Cir. 1990); Metal Bldg. Components, Inc v. Gibson Roofers, Inc. 1998 WL 186721 (E.D. La 1998)

breached its "turnover" and/or "active operations" duties to the plaintiff longshoreman.

Accordingly, the Motion should be denied.

Respectfully Submitted,

/S/ Stephen B. Potter

STEPHEN B. POTTER, ESQ. (ID# 298)
840 North Union Street
Wilmington, DE 19805
(302) 658-8940
(302) 654-8377 (fax)

Dated: September 2, 2005

/S/ Stanley B. Gruber

STANLEY B. GRUBER, ESQ.
FREEDMAN & LORRY, P.C.
400 Market Street, Suite 900
Philadelphia, PA 19106
215-925-8400
215-925-7516 (fax)
Attorneys for Plaintiffs John and Nanette Turner