## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHN TURNER                  :   CIVIL ACTION
    AND
NANNETTE TURNER         :
    vs.                      :
                                :
B.V. SHIPPING COMPANY    :
LUZON STRAIT (GRONINGEN)    :   NO. 04-0936-JJF

### JOINT PRETRIAL ORDER

**1.    Statement of Nature of Action**

        This is an action for damages brought by the plaintiffs John and Nannette Turner

pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §

905(b), arising out of personal injuries which the plaintiff John Turner alleges he sustained on

November 8, 2002 while working as a longshoreman aboard the M/V LUZON STRAIT, a vessel

owned by defendant B.V. Shipping Company Luzon Strait (GRONINGEN) (hereinafter referred

to as "B.V. Shipping"). The pertinent pleadings in which the issues in this case are raised are the

2nd Amended Complaint and Answer thereto.

**2.    Statutory Basis of Federal Jurisdiction**

        The subject matter jurisdiction of this Court is based on 28 U.S.C. §1332 there being

diversity of citizenship between the parties. The plaintiffs John and Nannette Turner are citizens

and residents of the State of Delaware, while defendant B.V. Shipping is a business organization

organized and existing under and by virtue of the laws of a governmental body other than the

State of Delaware, with its principal place of business located in Groningen, The Netherlands.

3.    **Statement of Facts Which Are Admitted**

Defendant B/V Shipping is the owner of the M/V LUZON STRAIT a refrigerated cargo vessel. The ship was built in Keelung, Taiwan by China Shipbuilding Company ("CSBC") for a different owner who refused delivery. B.V. Shipping subsequently purchased the vessel and took delivery from CSBC in Taiwan on or about August 31, 2002.

The LUZON STRAIT, was constructed by CSBC with four refrigerated cargo hatches located forward of the ship's house or "superstructure". The hatches are number 1-4, starting at the forward end of the ship. Inside hatches 2, 3, and 4 there are four deck levels or cargo compartments in, which cargo can be stowed. These deck levels/compartments are designated from top to bottom as levels A through D.

In hatch number 2 of the vessel (as with hatches 3 and 4) there are "access hatches" and vertical fixed ladders located at the forward and aft ends of each deck level which individuals may use to travel from the main deck down to level D.

The access cover and securing device aboard the vessel on the date of the alleged accident were part of the ship's original design and construction. At the time of delivery of the vessel by CSBC, the securing or locking device used to hold the forward access hatch lid at level 2C in an open position was a hook and eye arrangement. The hook was attached to the steel coaming around the access opening and the eye was attached to the top of the access cover.

Captain Martijn Mobach served as Master of the vessel from the time of delivery of the ship on August 31, 2002 through December 14, 2002.

In order to fully load cargo into compartment 2C, it was necessary for the forward access hatch lid to be in a down and closed position. In addition, it was necessary for that hatch lid to be covered by a section of the metal grating which formed the deck in compartment 2C.

2

The M/V LUZON STRAIT berthed at the Port of Wilmington Delaware at 5:45 a.m. on November 6, 2002 with the vessel's starboard side alongside the pier. An independent stevedoring company known as Delaware River Stevedores, Inc. ("DRS") was engaged to discharge pallets of frozen beef which previously had been loaded aboard the vessel in various Australian ports in various cargo compartments, including compartments 2C and 2D.

On November 7 and 8, 2002 the plaintiff John Turner was employed by independent stevedoring company DRS as a holdman in a longshore gang that discharged cargo from the M/V LUZON STRAIT.

**4. Statement of Issues of Fact Which Parties Contend Remain to be Litigated**

**A. Plaintiffs' Issues of Fact**

1. Whether the access hatch at the forward end of level 2C was located in the middle of the hatch in an area where cargo could be stowed and whether the access hatch at the aft end of level 2C was located behind a bulkhead where the equipment used to refrigerate the hold was located.

2. Whether, when the hatch lid for the access hatch at the forward end of level 2C was in a raised and open position, the hook and eye was on the opposite side of the hatch lid from where individuals would descend or ascend in and out of the D level.

3. Whether there was no separate handhold available at the forward access hatch lid at level 2C which could be used in order to assist an individual climbing out of the D level onto the C level and whether it was well known to the ship's officers that individuals coming out of the D level onto the C level at the forward end of number 2 would grab the hatch lid itself in order to obtain the necessary balance and leverage to raise themselves out onto the deck at the 2C level.

3

4. Whether at the time of delivery of the vessel, the securing device at the aft end of the level 2C was a hook welded to a nearby stanchion and whether this hook latched onto the handle of the hatch lid.

5. Whether at the aft end a separate handhold was welded to the deck on the right side of the aft access hatch at level 2C as one would be coming gout of the 2D level.

6. Whether Captain Mobach traveled to the CSBC Shipyard two weeks before the delivery of the ship for the express purpose of familiarizing himself with the vessel and whether prior to the accident in this case Captain Mobach and the other officers aboard the ship were aware of the nature of the hook and eye device used to lock and secure the hatch lid at the forward end of the 2C level in an open position and also were aware that there was no handhold available for use coming out of the 2D level at the forward access hatch at 2C other than the hatch lid itself.

7. Whether prior to the accident in this case Captain Mobach was aware that longshoremen in the different parts of the world would be going in and out of the 2C and 2D hatch levels at the forward end and would be using the hatch lid at the forward 2C level as a handhold and whether he also knew that a person coming out of the 2D level at the forward access hatch would be unable to see the hook and eye locking device since it was positioned on the opposite side of the hatch lid.

8. Whether, when the forward access hatch lid at level 2C had to be raised and locked in order for longshoremen to go in and out of the cargo hold, it was the responsibility of the officers and crew of the vessel to open that hatch lid and securely lock it into place and whether in order to accomplish this, it was necessary for the crew member assigned to the job to utilize a steel bar

4

to lift the grating out of place, unlock the "dog" which secured the lid in place while closed, raise the hatch lid and secure the hook and eye in place.

9. Whether each time a crewmember secured the hook and eye into position he was required to report any problem therewith which required correction and whether if such a report was made, it was the responsibility of the ship's officers to correct the problem.

10. Whether prior to the accident in this case it would have been feasible for defendant to place holes on either side of the access hatch opening at the forward end of 2C in order to accommodate a portable handhold which could be placed into position at the time the forward access hatch lid at the level was opened.

11. Whether prior to the accident in this case it would have been feasible for defendant to remove the hook and eye securing device for the forward access hatch lid at 2C and to replace it with other forms of locking devices.

12. Whether at all time pertinent to this case there were manuals in effect that set forth the responsibilities of the ship's officers and crew for maintaining safety aboard ship and whether those manuals specified that the vessel's Master had overriding authority regarding safety aboard ship and that such responsibility included identifying and eliminating hazardous conditions which can cause injury aboard the ship.

13. Whether longshoremen employed by DRS began discharging cargo from the number 2 hatch on November 7, 2002 and first went into the 2D level at approximately 2:00 p.m. that day and whether prior to 2:00 p.m. on November 7, 2002 a member of the ship's crew had opened and secured the forward access hatch lid at the 2C level in order to provide access for the longshoremen to the 2D level.

5

14. Whether at the conclusion of cargo operations on November 7, 2002 a member of the ship's crew closed that hatch lid.

15. Whether sometime prior to 6:00 a.m. on November 8, 2002 a member of the ship's crew again opened the forward access hatch lid at 2C and secured that lid in an open position.

16. Whether on November 8, 2002 the plaintiff John Turner was employed as a holdman in a longshore gang that was discharging cargo from the 2D level and whether this was the first day that Mr. Turner had worked in the number 2 hatch of the vessel.

17. Whether Mr. Turner's gang entered the 2D level by the forward access hatch at 11:00 a.m. in order to finish the work of discharging the cargo in that hold and whether by approximately 2:45 p.m. the gang had completed discharging such cargo.

18. Whether at approximately 2:45 p.m. on November 8, 2002 plaintiff John Turner was climbing the ladder leading from the D level to the C level of the number 2 hatch at the forward access hatchway;

19. Whether Mr. Turner grabbed the access hatch lid at the forward end of the 2C level as he got near the top of the ladder in order to support himself in stepping up onto the C deck;

20. Whether the aforedescribed hatch lid came loose at that time and fell back onto Mr. Turner pinning him with his legs hanging down into the D level;

21. Whether the aforedescribed hook and eye arrangement used to secure the forward access hatch lid at the 2C level deformed or straightened out to the point where it came out of the eye causing the hatch lid to fall back on to Mr. Turner at the time of the accident here in question;

22. Whether Mr. Turner sustained the claimed  injuries and damages in question as a result of the aforedescribed accident.

6

**B. Defendant's Contested Issues of Fact**

1. Whether plaintiffs' claim is based on an alleged design defect in the securing device for the access cover in question, a claim which is barred by the 1972 Amendments to the LHWCA.

2. Whether plaintiffs' claim is based on an alleged design defect in the access cover and fixed ladder arrangement, a claim which barred by the 1972 Amendments to the LHWCA.

3. Whether plaintiffs' claim is based on an alleged latent defect created at the time of the original design and construction of the vessel, a claim which is barred by the 1972 Amendments to the LHWCA.

4. Whether plaintiff was involved in an alleged accident on November 8, 2002.

5. Whether the securing device was actually secured just before the alleged accident.

6. Whether the before the alleged accident the subject securing device was unhooked by stevedoring personnel / longshoremen during the time that the work area was in the possession and control of the expert stevedore.

7. Whether plaintiff observed the securing device in question when he approached, passed by and used the access opening on three occasions just before the alleged accident without incident.

8. Whether the condition of the access cover , securing device, fixed ladder, and access opening were open and obvious to plaintiff John Turner, his fellow longshoremen, and Delaware River Stevedores, Inc Stevedore Supervisor, Cliff Lasch during the many times they used the access cover, access opening and ladder before the alleged accident on November 8, 2002.

9. Did stevedore Delaware River Stevedore's Inc. comply with the mandatory OSHA Safety and Health Regulations for Longshoring, 29 C.F.R § 1918.24 (a) , (b), and (c) when DRS

7

Supervisor Lasch entered and exited compartment 2D through the access in question using the access cover as a handhold to support his weight and pulled on the access cover with his weight to test the integrity of the handhold and determined it was safe for use by the Plaintiff and the other longshoremen.

10. Can there be any breach of duty by the defendant vessel owner given that during the two weeks leading up to the delivery of the M/V LUZON STRAIT, inspectors from the flag state, The Netherlands, inspected the entire vessel, including all accessways and access covers, and certified the vessel as properly constructed and equipped for sailing.

11. Can there be any breach of duty by the defendant vessel owner given that surveyors from the ship's Classification Society fully inspected the newly constructed LUZON STRAIT in the shipyard just prior to the voyage in question and certified that the vessel was in full compliance with all safety and construction requirements of the Classification Society, Bureau Veritas.

12. Can there be any breach of duty by the defendant vessel owner given the vessel was audited by Lloyd's Register just prior to delivery and was certified as compliant with the International Safety Management (ISM) Code, which resulted in the issuance of an ISM Safety Management Certificate.

13. Whether Plaintiff John Turner, a longshoremen with 20 years of experience and extensive prior experience as a holdman in climbing up and down ladders and through accesses with covers on them should have been able to safely enter and exit compartment 2D.

14. Was the access securing device and access arrangement in good order and condition right up to the time of the alleged accident given that all three times Plaintiff passed through the access, 11:00 AM, 12:00 Noon, and 2:00 PM, he grabbed onto the open cover to support his

weight as he climbed up and down and experienced no problem with the subject cover, securing device , and ladder.

15. Was the access securing device and access arrangement in good order and condition right up to the time of the alleged accident given that plaintiff's fellow longshoremen also used the access in question numerous times to get in and out of compartment 2D before the accident without experiencing a problem.

16. Was the access securing device and access arrangement in good order and condition right up to the time of the alleged accident given that just 40 minutes before Turner's alleged accident, DRS Stevedore Supervisor Lasch entered and exited the 2D compartment through the access in question without a problem with Lasch using the access as a handhold to support his weight and testing the integrity of the securing device by pulling on it with his weight on the cover resulting in Lasch (a) being fully satisfied that the access and cover, as secured in the open position, was safe for use by his longshoremen and (b) concluding that there were no defects or problems with the access, cover, or securing device.

17. Whether DRS Supervisor Lasch concluded after investigation that (a) the securing device was not broken or defective and (b) the plaintiff and he fellow longshoremen should have inspected the securing device before entering compartment 2D ensure that there was a safe and secure handhold at the top of the fixed vertical ladder that ran between 2C and 2D.

18. Whether the securing device was broken or deformed after the alleged accident given the fact that no one ever advised Stevedore Supervisor Lasch that anything was broken or deformed and had someone told Lasch that the securing device was broken or deformed, he would have included that in his Supervisor's Accident Investigation report.

9

19. Whether the plaintiff was negligent in never inspecting or looking at the securing device for the subject access cover before his alleged accident.

20. Whether DRS Stevedoring Superintendent Cliff Lasch and DRS were negligent for failing to actually look at the securing device in question before the alleged accident.

21. Whether there is a total lack of proof as to the condition of the securing device before the alleged accident because the plaintiff, Supervisor Lasch, and plaintiff's fellow longshoremen claim that they never saw the condition of the securing device before the alleged accident.

22. Whether there is a total lack of proof by Plaintiffs because the securing device was in apparent good condition at all times leading up to the alleged accident.

23. Whether there was a latent defect in the securing device that was impossible to detect before the alleged accident.

24. Whether the arrangement and structural condition of the access , access cover, and securing arrangement were  open and obvious to the plaintiff, his fellow longshoremen, and stevedore employer DRS.

25. Whether plaintiff John Turner and his employer, DRS, failed to act with reasonable care when they failed to use the access opening and fixed ladder located at the aft end of compartments 2C and 2D in the cooler space.

27. Whether plaintiff John Turner and his employer, DRS, failed to act with reasonable care when they failed to use either portable ladders or the pallet tray to enter and exit compartment 2D.

28. Whether there is a complete failure of proof since there is no evidence that defendant had any notice of any problems with or accidents involving the subject access and/or the subject access securing device before the alleged accident.

10

29. Given plaintiffs' admission that they do not know the period of time the alleged defective condition in the access in question existed, is there a complete failure of proof on the part of the plaintiffs.

30. Was the access cover in question open, secured, and solid up to the time of alleged accident as confirmed by plaintiff, Supervisor Lasch, and plaintiff's fellow longshoremen.

31. Was the condition(s) complained of by plaintiffs even in existence before plaintiff John Turner's alleged accident.

32. Was the access, access securing device, or fixed vertical ladder in question visibly unsafe at any time before the alleged accident so as to require the plaintiff and his stevedore employer to take action to obey the requirements set forth in the mandatory OSHA regulations, 29 C.F.R § 1918.24 (a) , (b), and (c).

33. Were the conditions complained of by plaintiff John Turner, the alleged absence of an adequate handhold at the top of the fixed ladder in question and an allegedly improperly sized access securing device, the types of conditions that an experienced stevedore can be reasonably expected to anticipate and work around with commonly utilized precautions.

34. If the expert stevedore deemed it necessary, was is not the Stevedore Supervisor, Cliff Lasch, who was in the best position to require the use of the access and ladder at the aft end of compartments 2D and 2C, arrange for an OSHA compliant portable ladder, or require the use of the ship's cargo elevator / pallet tray, if necessary.

35. In this instance, was it not the expert stevedore,. DRS, who was in the best position while in possession of compartments 2C and 2C during cargo operations to prevent Mr. Turner's alleged accident.

11

36. In the event plaintiff John Turner claims that the alleged condition was open and obvious to the vessel owner, was it not also open and obvious to the plaintiff, his fellow longshoremen, and the expert stevedore DRS.

37. Is the alleged condition complained of by plaintiffs limited to alleged defects in the original design and construction of the LUZON STRAIT?

38. At the time of the alleged accident did the ship's personnel participate in or direct any longshoring activities.

39. Given that plaintiffs concede that the securing device and access cover were not broken or deformed before the alleged accident, is there not a total lack of proof by plaintiffs. .

40. Could the plaintiff John Turner and his fellow longshore have used the access at the aft end of compartment 2D in the cooler trunk to exit the cargo space during the time period in question.

41. Could the stevedore employer DRS and their employee John Turner have used the cargo elevator / pallet tray or an OSHA approved portable ladder to exit compartment 2D during the time period in question.

42. Did the defendant have actual knowledge of any alleged defects in the original ship design before the alleged accident.

**5.    Statement of Issues of Law Which Remain to be Litigated**

**A. Plaintiffs' Statement of Issues of Law Which Remain to be Litigated**

1. Was the Defendant Negligent by Virtue of Breaching its Turnover Duty to the Plaintiff John Turner?

Scindia Steam Navigation Co. v De Los Santos, 451 U.S. 156, 101 S. Ct. 1614 (1981)
Howlett v. Birkdale Shipping Co., 512 U.S. 92, 114 S. Ct. 2057 (1994)

Kirsch v. Plovidba, 971 F. 2d 1026 (3rd Cir. 1992)
Davis v. Portline Transportes Maritime Internacional, 16 F. 3d 532 (3rd Cir. 1994)
Serbin v Bora Corp., LTD., 96 F. 3d 66 (3rd Cir. 1996)
Prinski v. Blue Star Line Marine, Ltd., 341 F. Supp 2d 511 (E.D Pa 2004)

2. Was the Defendant  Negligent by Virtue of Breaching its Active Operations Duty to

the Plaintiff John Turner?

Scindia Steam Navigation Co. v De Los Santos, 451 U.S. 156, 101 S. Ct. 1614 (1981)
Howlett v. Birkdale Shipping Co., 512 U.S. 92, 114 S. Ct. 2057 (1994)
Davis v. Portline Transportes Maritime Internacional, 16 F. 3d 532 (3rd Cir. 1994)
Serbin v Bora Corp., LTD., 96 F. 3d 66 (3rd Cir. 1996)
Prinski v. Blue Star Line Marine, Ltd., 341 F. Supp 2d 511 (E.D Pa 2004)

3. If Defendant Was Negligent, Was Such Negligence A Legal Cause of Any Injury or

Damage Suffered by the Plaintiff John Turner.


4. Was the Plaintiff John Turner Comparatively Negligent?

5. Whether the Opinions of Ronald Signorino, defendant's liability expert, are

inadmissible because they constitute legal conclusions without support in the law and have no

legal relevance to a claim under Section 5(b) of the LHWCA.

6. Are the opinions of Ronald Signorino, defendant's liability expert, inadmissible since

they are solely limited to opinions regarding the conduct of plaintiff's stevedore employer and do

not address the duties and responsibilities of a ship owner or vessel's Master?

7. Are the opinions of defendant's liability expert, Ronald Signorino, inadmissible

because the opinions fail to meet the requirements of FRE 702 and 703 pertaining to expert

testimony and because such opinions are not supported with admissible facts and because Mr.

Signorino has not adequately explained how he derived his conclusions.

**B.  Defendant's Statement of Issues of Law Which Remain to be Litigated.**

1. Is plaintiffs' claim barred because, as a matter of law, the defendant vessel owner cannot be held liable under §905(b) of the LHWCA for alleged design defects in the newly constructed M/V LUZON STRAIT. *Bilderbeck v. World Wide Shipping Agency*, 776 F.2d 817, 818 (9th Cir. 1985); *Biggs v. Logicon, Inc.*, 663 F.2d 52 (8th Cir. 1981); *Wilhelm v. Associated Container Transportation*, 648 F.2d 1197, 1198 (9th Cir. 1981); *Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004); *McSwiggan v. Oulu Shipping Ltd.*, 1992 AMC 1825, 1829 (E.D. Pa. 1992); *Htut v. Toko Kaiun Kaisha, Ltd.*, 1992 A.M.C. 766 (N.D. Cal. 1991); *Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443, 1444 (N.D. Cal. 1989); *see also Davis v. United States*, 827 F. Supp. 1576, 1581-82 (S.D. Ga. 1993); *Mitchell v. Sea-Land Services, Inc.,* 1987 AMC 1698, 1987 U.S. Dist. LEXIS 15067 (D. Md. 1987).

2. Is plaintiffs' claim, which is based on an alleged design defect in the original design and construction of the access in question, barred because it is an impermissible allegation of unseaworthiness, a claim for which there is no recovery under §905(b) of the LHWCA. *Bilderbeck v. World Wide Shipping Agency*, 776 F.2d 817, 818 (9th Cir. 1985); *Biggs v. Logicon, Inc.*, 663 F.2d 52 (8th Cir. 1981); *Wilhelm v. Associated Container Transportation*, 648 F.2d 1197, 1198 (9th Cir. 1981): *Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004); *McSwiggan v. Oulu Shipping Ltd.*, 1992 AMC 1825, 1829 (E.D. Pa. 1992); *Htut v. Toko Kaiun Kaisha, Ltd.*, 1992 A.M.C. 766 (N.D. Cal. 1991); *Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443, 1444 (N.D. Cal. 1989); *see also Davis v. United States*, 827 F. Supp. 1576, 1581-82 (S.D. Ga. 1993); *Mitchell v. Sea-Land Services, Inc.,* 1987 AMC 1698, 1987 U.S. Dist. LEXIS 15067 (D. Md. 1987).

3. Should plaintiffs' turn-over duty claim be dismissed since (A) as a matter of law mere vessel owner knowledge of the existence of a design feature cannot support a prima facie case of

14

negligence under LHWCA §905 (b) and (B) plaintiffs have admitted that the brand new securing device and access were not broken or deformed in any way before the alleged accident. *Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004); *McSwiggan v. Oulu Shipping Ltd.*, 1992 AMC 1825, 1829 (E.D. Pa. 1992); *Htut v. Toko Kaiun Kaisha, Ltd.*, 1992 A.M.C. 766 (N.D. Cal. 1991); *Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443, 1444 (N.D. Cal. 1989); *see also Davis v. United States*, 827 F. Supp. 1576, 1581-82 (S.D. Ga. 1993).

4. Should plaintiffs' claim be dismissed as an impermissible claim under §905(b) of the LHWCA since the condition which forms the basis of plaintiffs' liability theory is limited to the access in question having been (a) designed with an inadequately sized securing device and (b) designed without separate handholds.

5. Should plaintiffs' claim be dismissed as an impermissible unseasworthiness claim under §905(b) of the LHWCA since plaintiffs have admitted that the defendant did not design or construct the vessel LUZON STRAIT.

6. Should plaintiffs' claim be dismissed as an impermissible claim under §905(b) of the LHWCA since defendant had no actual or constructive notice of any prior problems or accidents involving the newly designed and constructed access. *See: Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406, 421 (E.D.N.Y. 2004).

7. Should plaintiffs' claim be dismissed since the allegation of the mere existence of a defect or malfunction in ships' equipment **after** the alleged accident without proof of negligence on the part of the defendant vessel owner cannot establish liability under §905(b) of the LHWCA. *See: Yates v. Navigation Maritime Bulgare Ltd.*, 2000 U.S. Dist. LEXIS 11229, at *10-*12 (E.D. Pa. 2000); *Wells v. Flota Bananera Equatoriana, S.A.*, 1985 U.S. Dist. LEXIS 18452, at *8 (S.D.N.Y. 1985); *Vadas v. J. Lauritzen Holdings*, 2000 U.S. Dist. LEXIS 20054, at

15

*10, 2001 AMC 498 (D. Conn. 2000); *Wright v. Daviesyndicate, Inc.*, 1993 U.S. Dist. LEXIS

8739 (E.D. Pa. 1993); *McMullen v. Guise Shipping Co.*, 1992 U.S. Dist. LEXIS 6471 (E.D. Pa.

1992), *aff'd* 983 F.2d 1051 (3d Cir. 1992); *Manning v. Mars, Ltd.*, No. 85-1271, 1987 U.S. Dist.

LEXIS 1777 (E.D. Pa. 1986) *aff'd* 833 F.2d 305 (3d Cir. 1987); *DeLange v. Dutra Construction,*

*Co.*, 183 F.3d 916, 921 (9th Cir. 1998).

   8. Should plaintiffs' claims be dismissed under §905(b) of the LHWCA since the

defendant could not have created the newly constructed design features which are the sole basis

of plaintiffs' claim.

   9. Can there be any alleged breach of the turnover duty where the design features which

form the sole basis of plaintiffs' claim were inspected and approved by the Dutch State Flag

Inspectors and the Classification society, (Bureau Veritas) prior to delivery to the defendant at

the CSBC shipyard in Taiwan. See generally: *Anastasiou v. M/T WORLD TRUST*, 338 F. Supp.

2d 406, 419 (E.D.N.Y. 2004); *Carbotrade, S.P.A. v. Bureau Veritas*, No. 92-1459, 1999 U.S.

Dist. LEXIS 13980, at *7-*8 (S.D.N.Y. Sept. 14, 1999).

   10. Was the condition of the access and securing device in question the type of condition

that the vessel owner could reasonably rely on the expert stevedore DRS and plaintiff John

Turner to deal with in the exercise of their profession. *See: Scindia Steam Navigation Co. v. De*

*Los Santos*, 451 U.S. 156, 167 (1981)*; Kirsch v. Plovidba,* 971 F.2d 1026, 1029-30 (3d Cir.

1992) ; *Bjaranson v. Botelho Shipping Corp. Manila*, 873 F.2d 1204, 1208 (9th Cir. 1989).

   11. Was it reasonable for the vessel owner to rely on the expert stevedore, DRS, to obey

the mandatory the applicable OSHA Safety and Health Regulations for Longshoring, 29 C.F.R §

1918.24 (a), (b), and (c), by inspecting the securing device and access cover in question as part

of its duties to (1) ensure that there was at least one safe and accessible fixed ladder with an

16

effective means to gain a handhold at the top of the ladder and (2) prohibit the use of any fixed ladders that were visibly unsafe.

12. Did the defendant vessel owner breach the turnover duty as set forth in the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 167 (1981) and *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994).

13. Did the defendant vessel owner breach the active operations duty as set forth by the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 167 (1981) *and Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994). *See also: Bjaranson v. Botelho Shipping Corp. Manila*, 873 F.2d 1204, 1208 (9th Cir. 1989); *Sinagra v. Atlantic Ocean Shipping, Ltd.*, 182 F. Supp. 2d 294, 302 (E.D.N.Y. 2001); *Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 166 (5th Cir. 1990);*Christensen v. Georgia-Pacific Corp.*, 279 F.3d 807 (9th Cir. 2002);*Yates v. Navigation Maritime Bulgare Ltd.,* 2000 U.S. Dist. Lexis 11229 (E.D. Pa. 2000); *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997); *Breaux v. United States,* 1996 WL 16318 (E.D. La. Oct. 23, 1996) (citing 1 T. Schoenbaum, Admiralty & Maritime Law, § 7-10 at 478-79 (4th ed. 2001)); *Wright v. Gulf Coast Dockside, Inc.*, 1998 U.S. Dist. LEXIS 9519, at *6, 1998 AMC 2460 (E.D. La. 1998); *Quevedo v. Trans-Pacific Shipping Inc.*, 1997 U.S. Dist. LEXIS 4745 (N.D. Cal. 1997), *aff'd* 143 F.3d 1255 (9th Cir. 1998); *Vadas v. J. Lauritzen Holdings,* 2000 U.S. Dist. LEXIS 200054, at *16-17, 2001 AMC 498 (D. Conn. 2000).

14. Was plaintiff John Turner negligent ?

15. If so, was the plaintiff's negligence the sole cause of the alleged accident ?

16. If plaintiff's negligence was not the sole cause of the alleged accident was it a substantial factor in causing of the accident ?

17. If plaintiff's negligence was a substantial factor in causing of the alleged accident, by what percentage did plaintiff's negligence contribute to the cause of the alleged accident?

18. Was the expert stevedore, Delaware River Stevedores, Inc., negligent and was such negligence the cause of the alleged accident ?

19. Was expert stevedore Delaware River Stevedores, Inc. negligent in failing to obey the mandatory OSHA Safety and Health Regulations for Longshoring set forth in 29 C.F.R § 1918.24 (a) , (b), and (c) and, if so , was said negligence the cause of the alleged accident.

14. Are the opinions of Hector Pazos, plaintiff's liability expert inadmissible because they constitute legal conclusions without support in the law and have no legal relevance to a claim under §905(b) of the LHWCA.

15. Are the opinions of Hector Pazos, plaintiff's liability expert inadmissible because Mr. Pazos is not a licensed Master mariner and is not qualified to render an opinion on the duties and responsibilities of a shipowner or a ship's Master serving aboard a refrigerated cargo vessel such as the LUZON STRAIT.. *See Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 322-24 (3d Cir. 2003); *Tokio Marine & Fire Ins. Co. v. Grove Manufacturing Co.*, 958 F.2d 1169, 1174-75 (1st Cir. 1992).

16. Are the opinions of plaintiffs' liability expert, Hector Pazos, inadmissible because Mr. Pazos relies on statutory schemes that cannot be invoked against a shipowner in a LHWCA §905(b) case. . *See Taylor v. Moore-McCormack Lines, Inc.*, 621 F. 2d 88 (4th Cir. 1980); *Smallwood v. American Trading and Transportation Co.*, No. 92-869, 1993 U.S. Dist. LEXIS 17704, at *20 (N.D. Cal. 1993) ("Coast Guard regulations are inapplicable to this action [under § 905(b)].")

18

17. Are the opinions of plaintiffs' liability expert, Hector Pazos, inadmissible because his opinion fails to meet the requirements of FRE 702 and 703 pertaining to expert testimony and because he has not adequately supported the opinion with facts and because he has not adequately explained how he derived his conclusions?

18. Are the opinions of plaintiffs' liability expert, Hector Pazos, inadmissible because he makes reference to subsequent remedial measures by the defendant which are inadmissible pursuant to FRE 407 and 403. *Kelly v. Crown Equipment Co.*, 970 F.2d 1273, 1276 (3d Cir. 1992); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 (3d Cir. 2002).

19. Are plaintiff's proposed exhibits, witness testimony, and expert witness testimony which refer to or show the subsequent remedial measures effected by defendants after the alleged accident inadmissible based on FRE 407 and 403 ?   *Kelly v. Crown Equipment Co.*, 970 F.2d 1273, 1276 (3d Cir. 1992); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 (3d Cir. 2002).

20. Did plaintiff fail to fulfill his duty under the law to mitigate his damages by failing to seek alternate, less strenuous employment ?

21. Should Nanette Turner's claim be dismissed as a matter of law because it is limited to non-pecuniary alleged losses?

**6.      Pre-Marked Exhibits, Designations or Interrogatories and Answers Thereto, and Request for Admissions and Responses.**

**A.      Plaintiff's Exhibits, Designations, Etc.**

1.      General Arrangement Plan of M/V "Luzon Strait"

2.      Photographs of the M/V "Luzon Strait"

    a. Photograph looking forward at hatch level 2C

    b. Photograph looking aft at hatch level 2C

    c. Photograph of the hatch lid at the aft end of 2C

    d. Photograph of the hatch lid at the aft end of 2C

    e. Photograph of the hatch lid at the aft end of 2C

    f. Photograph of a section of the grating which covered the forward access hatch lid at 2C

    g. Photograph of a section of the grating which covered the forward access hatch lid at 2C

    h. Photograph of forward access hatch lid at hatch level 2C showing hook and eye device

    i. Photograph of forward access hatch lid at hatch level 2C showing hook and eye device.

    j. Photograph of forward access hatch lid at hatch level 2C showing hook and eye device.

    k. Photograph looking up toward raised hatch lid at forward end of 2C taken from ladder coming out of 2D

    l. Photograph of portable handhold fabricated in 2003 for use at the forward access hatch lid at 2C

3.    Drawings of various components of the ship prepared in June 2002 identified as Exhibit P-K at the depositions taken in Amsterdam.

4.    Quality Assurance Manual for the M/V Luzon Strait

5.    Cargo Stowage Plan for the cargo aboard the vessel upon its arrival in the Port of Wilmington, Delaware on November 6, 2002.

6.    Vessel's Port Log covering the call of the vessel at the Port of Wilmington, Delaware for the period of November 6 through November 8, 2002.

7.    Statement of Facts prepared by vessel's agent covering the call of the M/V "Luzon Strait" at the Port of Wilmington, Delaware for the period November 6 through November 8, 2002.

8.    Plans for Three Bar Locking Device identified as Exhibit P-I at the depositions taken in Amsterdam.

9.    Plaintiffs' Interrogatories 10 and 16 and Defendant's Supplemental Answers thereto.

10.    Records of Wilmington Hospital regarding treatment afforded Plaintiff John Turner on November 8, 2002.

11.      Records of Bruce Katz, M.D. of First State Orthopaedics regarding treatment afforded Mr. Turner from November 20, 2002 to date.

12.      Records of Tae Sup Song, M.D. for treatment afforded Mr. Turner in November and December 2002.

13.      Records of St Francis Hospital, Wilmington, Delaware for treatment afforded Mr. Turner from November 14, 2002 to date.

14      Records of Christiana Care Center for treatment afforded Mr. Turner in July 2003.

15      Records of Glasgow Medical Center, LLC for treatment afforded Mr. Turner on July 21, 2004.

16.      Records of First State Surgery Center for treatment afforded Mr. Turner in 2003 and 2004.

17.      Records of Omega MRI regarding diagnostic studies performed on Mr. Turner on December 2, 2002, January 30, 2003 and September 22, 2003.

18.      Records of Papastavros Associates for diagnostic studies performed on November 13, 2002 and July 21, 2004;

19.      Records of Brandywine Pain Management for treatment afforded Mr. Turner in 2003 and 2004;

20.      Records of Pro Physical Therapy for treatment afforded Mr. Turner in 2002 and 2003;

21.      Records of Anthony L. Cucuzzella, M.D. for EMG performed on Mr. Turner on May 15, 2003;

22.      Records of Delaware Back Pain and Sports Rehabilitation Center for treatment afforded Mr. Turner in 2002, 2003, 2004 and 2005;

23.      Records of Irene Fisher Psy. D. for treatment afforded Mr. Turner from March 16, 2004 to Date;

24.      Medical Bills from the Following Health Care Providers

     a. Wilmington Hospital;
     b. Bruce Katz, M.D.;
     c. Tae Sup Song, M.D.;
     d. St. Francis Hospital;

  e. Christiana Care Center;
  f. Glasgow Medical Center;
  g. First State Surgery Center;
  h. Omega MRI;
  i. Papastavros Associate;
  j. Brandywine Pain Management;
  k. Pro Physical Therapy;
  l. Anthony L. Cucuzzella;
  m. Delaware Back Pain and Sports Rehabilitation Center;
  n. Dr. Irene Fisher

25. Earning Records for John Turner for the years 1998 through 2002;

26. PMTA/ILA Collective Bargaining Agreement containing wage and fringe benefit rates for Mr. Turner's employment.

27. Vocational-Economic Loss Report for John Turner Prepared by Robert P. Wolfe, Ed D MBA;

28. Report of Ronald Greene, M.D.

29. Mr. Turner's Federal Income Tax Returns for 1998-2004 (see D-54)

**B.** **Defendant's Objections to Plaintiffs' Exhibits, Etc.**

P-2 Defendant objects to the introduction of all photographic exhibits that show any of the subsequent remedial measures effected by defendant after the alleged accident on the grounds of Subsequent Remedial Measure-FRE 407, Prejudice-FRE 403, Critical Self Analysis Privilege, Relevance FRE 401. In particular, the following photographic exhibits fall into this category: 2a, d, e, f, h, I, j, and l.

P-4 Defendant objects to the quality assurance manual on the grounds of Relevance FRE 401 and 402 and Prejudice FRE 403.

P-8 Defendant objects this plan for subsequent remedial modifications on the grounds of Subsequent Remedial Measure-FRE 407, Prejudice-FRE 403, Critical Self Analysis Privilege, and Relevance FRE 401, 402.

P-9 Defendant objects to the interrogatories designated by plaintiffs as they refer and relate to subsequent remedial measures by defendant and on the further grounds of Subsequent Remedial Measure-FRE 407, Prejudice-FRE 403, Critical Self Analysis Privilege, and Relevance FRE 401, 402.

P-24    Defendant objects to the medical bills in exhibit 24 (a) – (n) based on authenticity FRE 901, and lack of foundation. Counsel are continuing to consult to possibly work out an agreement on this exhibit.

P-26    Defendant objects to the collective bargaining agreement due to lack of foundation, Hearsay FRE 802, Authenticity FRE 901 and Relevancy 401, 402 .

P-27    Defendant objects to the report of plaintiff's economic expert on the ground of Hearsay FRE 802, Authenticity FRE 901, and lack of foundation.

P-28    Defendant objects on the ground of Hearsay 802, Authenticity FRE 901, and Relevancy FRE 401 and 402.

## C. Defendant's Exhibits, Designations, Etc.

D-1    DRS Supervisor's Accident Investigation Report;

D-2    Large General Arrangement Plan (Drawing No. K2000401 dated August 20, 2002; "1 H-2");

D-3    Small Ship's Plan with Particulars (2 pages);

D-4    Delaware River Stevedores, Inc. Daily Work Reports November 608, 2002  (4 pages);

D-5    Sections of Ship's Plans sections showing forward and aft accesses between 2C to 2D and the hatch opening (3 pages);

D-6    Terminal Shipping Company, Inc. "Statement of Facts" M/V LUZON STRAIT Wilmington, DE (2 pages);

D-7    Dutch Shipping Inspectorate Inspection Report dated August 14, 20, 2002 - Keelung, Taiwan (6 pages); (FRE  803(6), 803(8) )

D-8    Lloyds Register ISM Code Certification Shipboard Audit Report dated August 29, 2002 with attached Ship Audit Plan dated 8/29/02 and Audit Log dated 8/29/02 (4 pages); (FRE  803(6), 803(8) )

D-9    Ship's Plan - "Traffic Arr't & Practice in C/H & Tank" dated June 14, 2002 (Drawing #K 2731404, "F-19") (41 pages);

D-10   E-mail dated October 10, 2002 received by Cliff Lasch (2 pages);

D-11   Official Integrated Log, September 1, 2002 - September 30, 2002;

D-12    Official Integrated Log, October 1, 2002 - October 31, 2002;

D-13    Official Integrated Log, November 1, 2002 - November 30, 2002;

D-14    Stowage Plan dated October 8, 2002 ;

D-15    Small Ship's Plan showing deck levels and USDA sensors (# 99442001-17);

D-16    Cargo Manifest (arrival) - M/V LUZON STRAIT

D-17    C&S Shipping Agency Pro forma Manifest M/V LUZON STRAIT;

D-18    "Delaware River Stevedores Palletized Ship Reports" November 6-8, 2002;

D-19    DRS Time Sheet, November 8, 2002;

D-20    Declaration of Company (1 page);

D-21    Safety Management Certificates (2 pages); (FRE 803(6), 803(8) )

D-22    Maintenance Repair Records, September 30, 2002 through November 30, 2002;

D-23    Inspection Report - M/V LUZON STRAIT, November, 2002;

D-24    Inspection Report - M/V LUZON STRAIT, January, 2003;

D-25    Inspection Report - M/V LUZON STRAIT, June, 2003;

D-26    Letter dated October 5, 2000 from Gibson Minto & Aiton Pty. Ltd.; (FRE 803(6), 803(8) )

D-27    Maritime Safety Authority of New Zealand Report of Inspection dated September 30, 2002; (FRE 803(6), 803(8) )

D-28    Defendant's Interrogatories 1, 3, 6,7, 8,9, 10,11, 12,13, 15, 16,17, and 19 and plaintiff's Answers thereto.

D-29    Overall photograph of M/V LUZON STRAIT;

D-30    Photograph of door to cooler trunk aft end of Compartment 2C;

D-31    Photograph of Compartment 2C with access door to cooler trunk aft end 2C;

D-32    Photograph of open forward access 2C with top of vertical fixed ladder leading from 2D;

D-33   Photograph of open forward access 2C with top of vertical fixed ladder leading from 2D;

D-34   Photograph of open forward access Compartment 2C;

D-35   Photograph of open forward access Compartment 2C with hook and eye securing device;

D-36   Photograph of closed forward access Compartment 2C with hook and eye securing device;

D-37   Photograph of deck plug for forward access Compartment 2C;

D-38   Photograph of vertical fixed ladder at forward end of 2C leading to Compartment 2B;

D-39   Photograph of access door aft end of Compartment 2C leading to aft access in cooler trunk;

D-40   Photograph of aft open access Compartment 2C cooler trunk with top of fixed vertical ladder leading to 2D;

D-41   Photograph of aft open access Compartment 2C - cooler trunk with person on fixed vertical ladder leading to 2D;

D-42   Photograph of aft open access Compartment 2C cooler trunk with top of fixed vertical ladder leading to 2D;

D-43   Photograph of top of fixed vertical ladder leading from 2D to 2C at aft end in cooler tank space;

D-44   Photograph of top of fixed vertical ladder leading from 2D to 2C at aft end in cooler tank space;

D-45   Photograph of aft open access Compartment 2C - cooler room showing ladder leading from 2C up to 2B as well as ladder leading from 2C down to 2D;

D-46   Photograph of aft open access Compartment 2C - cooler room showing ladder leading from 2C up to 2B as well as ladder leading from 2C down to 2D;

D-47   Two photographs of fixed vertical ladder at aft end of 2D leading up to 2C - cooler trunk;

D-48   Photograph showing fixed vertical ladder at forward end of 2D leading up to open access at 2C level;

D-49   Photograph showing fixed vertical ladder at forward end of 2D leading up to open access at 2C level;

D-50   Records Occupational Health dated 11/8/02 - 11/12/02;

D-51   Records Tae Sup Song, M.D. - 4/7/78 - 8/2/2000;

D-52   Pro Physical Therapy records;

D-53   PMTA-ILA Benefit Fund Hours & Earnings records;

D-54   Federal Income Tax Returns 1998-2004;

D-55   State Income Tax Returns 2000 - 2004;

D-56   Plaintiff's Social Security Earnings records;

D-57   Report and C.V. of Gladys Fenichel, M.D.;

D-58   Report and C.V. of James M. Pascuiti, M.A.;

D-59   Report and C.V. of Richard I. Katz, M.D.;

D-60   Report and D.V. of Ronald Signorino.

D-61   Plaintiff John Turner's Deposition as an admission.

D-62   Photograph of Forward Access

D-63   Photograph of Forward Access

D-64   Photograph of Forward Access

D-65   Photograph of Forward Access

D-66   Photograph of Forward Access

D-67   Photograph of Forward Access

D-68   Photograph of Forward Access

D-69 Photograph of Forward Access

D-70 Photograph of Forward Access

**D. Plaintiff's Objections to Defendant's Exhibits**

D-7 Plaintiff objects to the Dutch Shipping Inspectorate Inspection Report on the grounds of Hearsay, FRE 802 and Authenticity FRE 901;

D-8 Plaintiff objects to the Lloyd Register ISM Codes Certification on the grounds of Hearsay, FRE 802 and Authenticity FRE 901;

D-21 Plaintiff objects to the Safety Management Certificates on the grounds of Hearsay, FRE 802 and Authenticity FRE 901;

D-26 Plaintiff objects to the letter dated October 5, 2000 on the grounds of Hearsay, FRE 802, Authenticity FRE 901 and Relevance FRE 401, 402;

D-27 Plaintiff objects to the Maritime Safety Authority of New Zealand Report of Inspection on the grounds of Hearsay, FRE 802 and Authenticity FRE 901;

D-60 Plaintiff objects to the report of Ronald Signorino for the same reasons posited in objection to Mr. Signorino's opinions specified in items 5, 6, and 7 of Plaintiff's Statement of Issues of Law

**7.     Name and Addresses of Witnesses**

**A. Plaintiff's Witnesses**

1.     John Turner
       701 W. 19th Street
       Wilmington, DE 19802

2.     Nanette Turner
       701 W. 19th Street
       Wilmington, DE 19802

3.     Sean Brady
       1104 Melrose Place
       Newark, DE 19702

4.     William Henry Grinnell
       519 E. 35th Street
       Wilmington, DE 19802

5.     Cliff Lasch

13 Cyprus Point Court
Blackwood, NJ 08012

6.     Portions of Deposition Transcript of Captain Martijn Mobach;

7.     Portions of Deposition Testimony of Mark Robert Jansen;

8.     Hector V. Pazos, P.E., Naval Architect,Marine Engineer and Mechanical
       Engineer
       566 Villa Grande Avenue. S.
       St. Petersburg, FL 33707

9.     Bruce Katz, M.D., Orthopaedic Surgeon
       First State Orthopaedics
       4745 Ogletown-Stanton Road
       Suite 225
       Newark, DE 19713

10.    Irene Fisher, Psy. D., Clinical Psychologist
       2006 Foulk Road, Suite B
       Wilmington, DE 19810

11.    Robert P. Wolfe EDD, MBA, Vocational Expert/Economist
       1939 Route 70 East, Suite 120
       Cherry Hill, NJ 08003

**B. Defendant's Witnesses**

1.     Captain Martijn S. Mobach (Ship's Captain)-   Willem Klooslaan, Post Code
       2050, Antwerp, Belgium

2.     Mark Robert Jansen (Technical Superintendent)-  Markiezenhof 18, 9301 DD
Roden, The Netherlands.

3.     Cornelius J. Balvert (Chief Engineer) Looyerslaan 47, 2223 GJ Katwijk AAN De
Rijn , Netherlands  .

4.     Peter Borst, (Senior Quality Coordinator)-  Bremstraat 26, 9302 AP Roden, The
Netherlands

5.     Joel T. Medenilla (AB Seaman) -   Manilla, Philippines (c/o Seatrade Groningen)

6.     Arcado C. Abuzo, Jr (Chief Officer). -  Manilla, Philippines (c/o Seatrade
       Groningen)

7.      Arturo G. Dones, Jr (Bosun).-   Manila, Philippines (c/o Seatrade Groningen)

8.      Helbert M. Aguelo (AB Seaman)-   Manila, Philippines (c/o Seatrade Groningen)

9.      Edgardo S. Aro (AB Seaman) -    Manila, Philippines (c/o Seatrade Groningen)

10.     Richard S. Buagas (Ord. Seaman) -   Manila, Philippines (c/o Seatrade Groningen)

11.     Reynaldo Jison (Second Off.)-   Manila, Philippines (c/o Seatrade Groningen)

12.     Eliseo I. Santillan (AB Seaman)-   Manila, Philippines (c/o Seatrade Groningen)

13.     Boniffscio C. Delocado (Fitter)-   Manila Philippines (c/o Seatrade Groningen)

14.     Clifford Lasch- ( Delaware River Stevedores, Inc. Supervisor), 13 Cyprus Point Rd., Blackwood, N.J.

15.     Gregory Ringgold- (longshoreman), 25 Halcyon Drive, New Castle, Delaware.

16.     Sean Brady- (longshoreman), 1104 Melrose Place, Newark, Delaware.

17.     William Grinnell, Jr.- (longshoreman) 519 East Thirty-Fifth Street, Wilmington, Delaware.

18.     Custodian of Records, Delaware River Stevedores, Inc., 411 North 5th Street, Suite 101, Philadelphia, Pa 19123 / Port Administration Building, 1Hausel Road, Suite 115, Wilmington, Delaware 19801.

19.     Custodian of Records, Terminal Shipping Company, 38 South 3rd Street, Philadelphia, Pa. 19106.

20.     Custodian of Medical Records Occupational Health - Christiana Care, Dr. Maria Joseph

21.     Custodian of Medical Records, Dr. Tae Sup Song.

22.     Custodian of Records, Pro Physical Therapy .

## Defendant's Expert Witnesses

1.      Ronald Signorino (stevedoring expert) , 8 Homestead Road,  Basking Ridge, New Jersey 07920 .

2.      Richard I. Katz, M.D. (medical expert), 5401 Old York Road, Suite 405 Klein Building, Philadelphia, Pa 19141.

3.      Ronald B. Greene, M.D. (medical expert), 1525 Locust Street, 2nd Floor, Philadelphia, Pa. 19102.

4.      Gladys Fenichel, M.D. (medical / psychiatrist expert) 210 Kent Road Ardmore, Pa. 19003.

5.      James A. Pascuitti, M.A. (vocational expert), 155 Morris Avenue, Springfield, New Jersey 07081.

6.      Jerome Staller, Ph.D. or Brian P. Sullivan, Ph.D. or Pia Girolamo, Ph.D. (Expert economist) , The Center for Economic Studies, Philadelphia, Pa..

**8.      Brief Statement of Plaintiff's Proof**

Under Section 5(b) of the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. §905(b), a vessel owner owes a stevedore and its longshore employees three distinct duties- the "turnover duty/duty to warn", the "active operations" duty and the "duty to intervene". The duties pertinent to this case are the "turnover duty/duty to warn" and the "active operations" duty.

Defendant breached its "turnover duty/duty to warn" to the plaintiff as a result of the existence of a hazardous condition at the forward access hatchway of hatch level 2C of the M/V "Luzon Strait" which existed upon the commencement of cargo operations, to wit, an inadequate and insufficient securing device to hold the forward access hatch lid in a locked and open position and the absence of a handhold, separate from the hatch lid itself, for use in assisting persons in stepping off the ladder coming up from the 2D hatch level to the deck at the 2C level.

The defendant sufficiently maintained control over the equipment involved in this case so as to trigger its "active operations" duty of exercising "due care" to avoid exposing longshoremen to harm from hazards present in the area of "active operations".

The defendant breached its "active operations" duty by failing to remedy the aforedescribed conditions at the forward access hatchway of hatch level 2C of the M/V "Luzon Strait".

As a result of defendant's breach of its "turnover duty/duty to warn" and/or "active operations" duty the plaintiff John Turner sustained a two level disc herniation at L3-4 and L4-5 which resulted in the performance of an L4-L5 microdiskectomy and left L5 nerve root decompression being performed by Bruce Katz, M.D on July 3, 2003. In addition to the back injuries, Mr. Turner sustained contusions and soft tissue injuries to his left knee aggravating a pre-existing condition. He is also suffering from depression related to the physical injuries he suffered on November 8, 2002.

Mr. Turner has not returned to work since November 8, 2002 and is totally and permanently disabled from any form of work.

Mr. Turner has incurred medical bills to date approximating **$64,000.00.** His past and future impairment of earning capacity, allowing for taxes and reducing to present value, is **1,413,878**, with an additional sum for loss of household services, reduced to present value, of **$51,575.00.**

In addition, Mr. Turner has suffered and will continue to suffer significant pain and suffering and loss of ability to enjoy life.

## 9.    Brief Statement of Defendant's Proof

To the extent this section of the pre-trail order pertains to liability issues[1], defendant intends to prove that it can have no liability under § 905 (b) of the LHWCA because defendant did not in any way breach the turnover duty or the active operations duties as set forth in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 167 (1981) ; *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994); *Kirsch v. Plovidba,* 971 F.2d 1026, 1029-30 (3d Cir. 1992) ; and *Bjaranson v. Botelho Shipping Corp. Manila*, 873 F.2d 1204, 1208 (9th Cir. 1989). Moreover, defendant will prove that plaintiffs' claim must be dismissed as an impermissible unseaworthiness claim under §905(b) of the LHWCA since the alleged conditions which form the sole basis of plaintiffs' liability theory are alleged design defects in the access in question: (a) an allegedly inadequately sized securing device and (b) the absence of a separate handhold arrangement. Plaintiffs have admitted that the defendant did not design or construct the vessel. It will also be shown that defendant had no actual or constructive notice of any prior problems or accidents involving the newly designed and constructed access arrangement. *See: Anastasiou v. M/T WORLD TRUST*, 338 F. Supp. 2d 406, 421 (E.D.N.Y. 2004). The M/V LUZON STRAIT was brand new ship on her maiden voyage, having just been delivered to the defendant on August 31, 2002. In such circumstances, the defendant, as a purchaser of a new vessel, was entitled to rely on the shipyard and the Shipyard's naval architect to design and construct a vessel in accordance with applicable international regulations and the requirements of the Classification society, in this instance Bureau Veritas. The mere knowledge of a design feature by a vessel owner without notice of prior accidents or problems is insufficient as a matter of law to establish negligence under §905(b) of the LHWCA . *See: Anastasiou v. M/T WORLD TRUST*,

---

[1]   In this regard defendant incorporates by reference its factual and legal issues sections and its contested facts section of the within Pre-Trial Order as well as the legal defenses briefed in its Motion for Summary Judgment, including Defendant's Reply Brief .

338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004); *McSwiggan v. Oulu Shipping Ltd.*, 1992 AMC 1825, 1829 (E.D. Pa. 1992); *Htut v. Toko Kaiun Kaisha, Ltd.*, 1992 A.M.C. 766 (N.D. Cal. 1991); *Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443, 1444 (N.D. Cal. 1989); *Davis v. United States*, 827 F. Supp. 1576, 1581-82 (S.D. Ga. 1993).

There is also no evidence of negligence on the part of the defendant vessel owner as plaintiff has admitted that the securing device and access arrangement were not broken or deformed at any time before the alleged accident. In fact, the Stevedore Supervisor for expert stevedore DRS, Cliff Lasch, inspected and used the access and fixed vertical ladder in question just 40 minutes before the alleged accident to enter and exit compartment 2D. Supervisor Lasch used the open access cover as a handhold and found it to be secure and safe for use by the DRS longshoremen. It was reasonable for the vessel owner to rely on the expert stevedore DRS to obey the mandatory the OSHA Safety and Health Regulations for Longshoring, 29 C.F.R § 1918.24 (a), (b), and (c) which required stevedore DRS to inspect the securing device and access cover in question as part of its duties to (1) ensure that there was at least one safe and accessible fixed ladder with an effective means to gain a handhold at the top of the ladder and (2) prohibit the use of any fixed ladders that were visibly unsafe.

There were no members of the ship's crew at or near the access in question during the time period that the plaintiff and his fellow workers entered, exited and discharged cargo from compartment 2D on November 8, 2005. The ship's personnel were not involved with the cargo operations performed by expert independent stevedore, DRS. In these circumstances, the active operations duty cannot, as a matter of law, apply to this case. Moreover, The conduct alleged by plaintiffs, i.e., the alleged failure to remedy alleged defects in the newly designed and

33

constructed access cover, did not occur during cargo operations and, therefore, the active operations duty is irrelevant to plaintiffs' claim.

Any alleged accident, said accident and the allegations of plaintiffs being denied by defendant, was caused by the negligence of plaintiff John Turner and the expert stevedore employer, DRS in failing to obey the mandatory OSHA Safety and Health Regulations for Longshoring, 29 C.F.R § 1918.24 (a), (b), and (c), failing to take precautions with respect to and avoid open and obvious conditions, failing to use the available alternate means of ingress and egress to and from 2D which included the aft end access in the cooler trunk, an OSHA compliant portable ladder, and the cargo pallet tray / elevator, failing to provide a safe workplace for the longshoremen, failing to properly inspect the access cover and securing device before the alleged accident, and failing to use due care under the circumstances.

Defendant denies that it caused any of the damages, injuries or losses alleged by plaintiffs. Defendant disputes each and every item of damages and plaintiff is put to his proof as to all damages. Defendant denies that plaintiff is permanently disabled from working as a longshoreman. Defendant's medical experts will testify that plaintiff is capable of returning to work as a longshoreman and at a minimum should be working in alternate, less strenuous employment. Defendant's vocational rehabilitation expert will testify that the plaintiff is and has been for quite some time capable of earning $30,000 to $35,000 per year in less strenuous employment.

Plaintiff has claimed that he suffers from depression. Defendant's expert psychiatrist, Dr. Gladys Fenichel examined plaintiff and concluded that he does not suffer from depression, does not require any sort of psychological treatment, and has no restrictions with respect to returning to work.

34

With regard to plaintiff's claim for alleged past and future lost wages, under the applicable Maritime Law any award for future lost wages must be reduced to present worth. Moreover, any wage loss, past or future must be net of all taxes including state tax, local tax, Federal Income tax, and FICA taxes. See: *Jones & Laughlin Steel Corp. v. Pfeiffer*, 462 U.S. 523, 103 S. Ct. 2541 (1983). The U.S. Department of Labor Worklife expectancy statistics / tables indicate that plaintiff has a worklife expectancy until age 60.9 . According to defendant's economic expert, the maximum possible wage loss is $569,248 with a worklife expectancy to age 60.9.

At this time, defendant does not agree to the amount or reasonableness of the medical expenses claimed by plaintiffs and plaintiff is put to his proof.

**10.    Amendments of the Pleadings Desired by any Party**

None

**12.    Certification**

It is hereby certified that two way communication has occurred between counsel for the parties in this case in a good faith effort to explore the resolution of this case by settlement.

**13.    Other Matters**

**A. Plaintiff -** None

**B. Defendant**

Subsequent to the alleged accident of November 8, 2002, and subsequent to defendant receiving notice of plaintiffs' claim, defendant effected remedial modifications to the arrangement of the access in question. During the period September 11-20, 2004, the access securing device was modified at a shipyard in Rotterdam in accordance with the design  which was prepared by independent naval architects. During the period of October 2003 and February

2004, a portable handhold was added to the access. Defendant objects to the plaintiffs making any reference to these subsequent remedial measures at trial on the grounds that said evidence is inadmissible under Fed. R. Evid. 407 and 403. Defendant will be filing a Motion *In Limine* requesting the Court to issue a ruling that all exhibits referring to or relating to the subsequent remedial measures are inadmissible and that no witnesses testimony can relate or refer to said subsequent remedial measures.

Rule 407 of the Federal Rules of Evidence provides:

When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Under the express terms of the rule, a plaintiff may not rely on subsequent remedial measures to show "negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction negligence." The underlying rationale is twofold. First, an alteration made after an accident should not be construed as an admission of liability, since a conscientious defendant would want to make positive changes even if the accident occurred through no fault of its own. Second, the law should encourage defendants to undertake voluntary steps to promote safety, and a defendant who does so should not run the risk of having its actions later used against it. *Kelly v. Crown Equipment Co.*, 970 F.2d 1273, 1276 (3d Cir. 1992); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 (3d Cir. 2002). Hence, any reliance by plaintiffs on the subsequent alteration of the access securing device and the installation of a portable handle to prove that the defendant should have been aware of alleged design defects prior to the date of the accident is impermissible.

Plaintiffs also asserted in their response to the Defendant's Motion for Summary Judgment that evidence of the subsequent alterations made to the hatchway should be admissible "as evidence of the defendant's control over the area in question and the feasibility of such precautionary measures – particularly where, as here, defendant seems to be suggesting that it was powerless to undo the original design of the condition in question." (Pls.' Br. p. 37 fn. 21.) Yet the defendant has never contested the feasibility of installing a portable handhold or a different securing device on the hatch, and with regard to the issue of control, there is no dispute that the defendant, as the owner of the LUZON STRAIT, maintained general control over its vessel for purposes of general maintenance and repairs.

Plaintiffs have in their list of witnesses indicated that they may use the testimony of Captain Martin Mobach and Technical Superintendent Mark Jansen. Defendant objects to the use of those portions of the deposition testimony that refer or relate to the subsequent remedial measures discussed above. Said objection includes all deposition exhibits that refer, show or relate in any way to the subsequent remedial measures in question.

**14.    This Order shall control the subsequent course of the action unless modified by the Court to prevent manifest injustice.**

Plaintiffs John and Nannette Turner

Defendant B.V. Shipping Company
Luzon Strait (Groningen)

/S/ Stephen B. Potter
STEPHEN B. POTTER, ESQUIRE(ID#298)

Potter, Carmine, Leonard, & Aaronsen
840 N. Union Street
Wilmington, DE 19805
(302)658-8940
(302)654-8377

/S/ Michael B. McCauley
MICHAEL B. MCCAULEY, ESQ
(ID 2416)
Palmer, Biezup & Henderson, LLP
1223 Foulk Road
Wilmington, DE 19803
(302) 594-0895

/S/ Stanley B. Gruber
STANLEY B. GRUBER, ESQ
FREEDMAN & LORRY, P.C.
400 Market Street, Suite 900
Philadelphia, PA 19106

RICHARD Q. WHELAN, ESQ.
Palmer, Biezup & Henderson, LLP
956 Public Ledger Building
620 Chestnut Street
Philadelphia, PA 19106